# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16- 11452 (__)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507 AND FED. R. BANKR. P. 2002, 4001
AND 9014 (I) AUTHORIZING DEBTORS
AND DEBTORS IN POSSESSION
TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING USE
OF CASH COLLATERAL, (III) GRANTING
LIENS AND SUPER-PRIORITY CLAIMS, (IV)
GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY, (VI)
SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Draw Another Circle, LLC ("DAC") and its chapter 11 affiliates, the debtors and

debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"),

hereby move the Court (the "Motion") for entry of an interim order on an expedited basis (the

"Interim Order")[2] substantially in the form attached hereto as **Exhibit A**, and following a final

hearing to be set by the Court, entry of a final order (the "Final Order" and, with the Interim

Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and

---

[1]      The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware (the "Local Rules"), authorizing the Debtors, among other things, to

obtain senior secured postpetition financing (the "DIP Facility") and use cash collateral on an

interim and final basis pursuant to the terms and conditions of that certain Senior Secured

Superpriority Debtor-In-Possession Loan and Security Agreement, by and among Debtors

Hastings Entertainment, Inc., Moviestop LLC, SP Images, Inc., Draw Another Circle, LLC and

Hastings Internet, Inc., as Borrowers, Bank of America, N.A., as administrative and collateral

agent (the "DIP Agent"), and the lenders party thereto (the "DIP Lenders"), substantially in the

form attached hereto as **Exhibit B** (the "DIP Credit Agreement").

      In support of the Motion, the Debtors rely on the *Declaration of Duane A. Huesers*

*in Support of First Day Pleadings* (the "First Day Declaration") and the *Declaration of Mike*

*Nowlan in Support of Debtors' (i) Financing Motion; (ii) Bidding Procedures and Sale Motion;*

*and (iii) Emergency Store Closing Sales Motion* (the "Nowlan Declaration", and together with the

First Day Declaration, the "Declarations"), filed concurrently herewith. In further support of the

Motion, the Debtors respectfully represent as follows:

### OVERVIEW

1.    By this Motion, the Debtors seek entry of the Interim Order:

    a.    authorizing the Debtors to obtain, on a joint and several basis, post-petition financing in the form of a revolving credit and letter of credit facility in accordance with the terms and conditions set forth in the DIP Credit Agreement, and in accordance with the Interim Order, secured by perfected senior priority security interests in and liens on the DIP Collateral pursuant to §§ 364(c)(2) and 364(c)(3), and 364(d) of the Bankruptcy Code (subject to the Carve-Out and the Permitted Liens); authorizing the Debtors to remit all collections, asset proceeds and payments to the DIP Agent and the DIP Lenders for application, or deemed application, first to all Prepetition ABL Loans (defined below) until such obligations are fully repaid, and then to the repayment of all

DIP Obligations (defined below); and deeming all letters of credit outstanding under the Prepetition Loan Agreement (defined below) as issued pursuant to and outstanding under the DIP Credit Agreement;

b.  authorizing the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Lenders, in respect of all DIP Obligations (subject to the Carve-Out);

c.  subject to paragraphs 24 through 26 of the Interim Order, approving certain stipulations by the Debtors as set forth in the Interim Order in connection with the Prepetition Loan Agreement and the Prepetition Term Loan Documents;

d.  authorizing the Debtors to provide adequate protection to the DIP Agent and the DIP Lenders and Prepetition Term Agent and Prepetition Term Lenders;

e.  effective only upon entry of the Final Order, waiving the Debtors' right to assert claims to surcharge against DIP Collateral pursuant to § 506(c) of the Bankruptcy Code;

f.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

g.  setting a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order; and

h.  granting related relief.

## <u>JURISDICTION</u>

2.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court,

132917634 v4

absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.       The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

### BACKGROUND

5.       On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

6.       The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in these Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

7.       Founded in 1968, Hastings Entertainment, Inc. ("Hastings"), a Texas corporation, is a leading multimedia entertainment and lifestyle retailer. Hastings operates entertainment superstores that buy, sell, trade and rent various home entertainment products, including books, music, software, periodicals, movies on DVD and Blu-ray, video games, video game consoles, hobby, sports and recreation, lifestyle and consumer electronics. Hastings also offers consumables and trends products such as apparel, t-shirts, action figures, posters, greeting cards and seasonal merchandise. With the assistance of over 3,500 employees, Hastings operates 123 superstores, averaging approximately 24,000 square feet, principally in medium-sized markets located in 19 states, primarily in the Northwestern, Midwestern, and Southeastern United States.

8.       Hastings also operates a multimedia entertainment e-commerce web site,

132917634 v4

goHastings.com, which offers a broad selection of books, software, video games, movies on DVD and Blu-ray, music, trends, comics, sports, recreation, and electronics. Hastings fills orders for new and used products placed at the website and also through Amazon and eBay Marketplaces using its proprietary goShip program, which allows Hastings to ship directly from its stores or distribution center. Hastings has one wholly-owned subsidiary, Hastings Internet, Inc. In 2015, Hastings generated revenue totaling approximately $401.1 million.

9.    MovieStop, LLC ("MovieStop"), a Delaware limited liability company, is a value retailer of new and used movies based in Atlanta, GA. MovieStop currently operates 39 destination locations in 10 states, primarily along the coast of the Eastern United States. MovieStop is conducting store closing sales at all of its locations.

10.    SP Images, Inc. ("SPI"), a Massachusetts corporation, is a full-service licensed distributor of sports and entertainment products and apparel headquartered in Franklin Massachusetts. SPI specializes in providing retail partners with an unmatched assortment of licensed merchandise that allows them to maximize turns, sales and gross margins. SPI stocks over 20,000 individual items licensed by Major League Baseball, the National Football League, the National Hockey League, the National Basketball Association, Marvel Comics, DC Comics and many more.

11.    Hastings, MovieStop and SPI are each wholly-owned subsidiaries of DAC.

12.    As is further discussed in the First Day Declaration filed contemporaneously herewith, the Debtors commenced these chapter 11 cases to (i) effectuate the sale of Hastings pursuant to a Court-approved bidding and auction process; (ii) complete the liquidation of the MovieStop business for the benefit of creditors; (iii) preserve SPI's business

132917634 v4

through a going concern sale process; and (iv) liquidate all of the Debtors' remaining assets and discontinue all business lines that cannot be sold for value.

13.     Toward that end, the Debtors have entered into the DIP Facility, pursuant to which, subject to Court approval, the Debtors will receive a senior secured debtor-in-possession revolver that should provide them with sufficient runway to navigate through the chapter 11 process.  The relief sought in this Motion is intended to preserve value and facilitate the Debtors' operations through this process.

14.     More detailed factual background regarding the Debtors and the commencement of these Cases is set forth in the First Day Declaration.

## I.     Prepetition Capital Structure and Secured Indebtedness

15.     As described below, the Debtors are borrowers under two credit facilities, namely, (1) a first lien revolving credit facility and (2) a second lien term loan facility, each as described below.

### A.     The Bank of America Revolving Credit Facility (First Lien)

16.     Each of the Debtors is indebted under that certain Amended and Restated Loan and Security Agreement, dated as of July 22, 2010 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement") by and among Hastings, Moviestop, and SPI (collectively "Borrowers"), as borrowers, DAC and Hastings Internet, Inc. (collectively, "Guarantors"), as guarantors, the DIP Agent and the DIP Lenders (the "Prepetition ABL Parties"). The Prepetition Loan Agreement provides for an asset-based revolving credit facility of up to a maximum of $115 million in the aggregate (the "Prepetition ABL Loans"). The Debtors' ability to borrow under the facility is further subject to a borrowing base calculation contained in the Prepetition Loan Agreement.

17.     As of the Petition Date, the Debtors' owed approximately $70 million

132917634 v4

under the Prepetition Loan Agreement, exclusive of accrued and unpaid interest, costs, expenses and other fees owed to the Prepetition ABL Lenders (collectively, the "Prepetition Loan Obligations"). The Prepetition Loan Obligations are secured by first priority liens on substantially all of the Debtors' personal property (the "Prepetition Collateral").

>    **B.**    **The Pathlight Term Loan (Second Lien).**

18.    Each of the Debtors is also indebted under that certain Term Loan and Security Agreement dated as of July 15, 2014 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement") by and among the Borrowers, as borrowers, the Guarantors, as guarantors, and Pathlight Capital LLC as agent (the "Prepetition Term Agent", and together with the Prepetition ABL Agent, the "Prepetition Agents") and lender (the "Prepetition Term Lenders", and together with the Prepetition Term Agent, the "Prepetition Term Parties"), pursuant to which the Prepetition Term Lenders extended to the Borrowers a term loan in the original principal amount of $15 million (the "Prepetition Term Loan"). The Prepetition Term Loan accrues interest at a rate of LIBOR plus 10.5%, which was increased by 3% prior to the Petition Date upon the Debtors' default under the Prepetition Term Loan Agreement.  The Prepetition Term Loan Agreement also provides for an early termination fee. The Prepetition Term Loan Agreement matures on July 15, 2017, unless terminated prior thereto pursuant to the terms of the agreement.

19.    As of the Petition Date, the Debtors' owed $10,000,000 under the Prepetition Term Loan Agreement, exclusive of accrued and unpaid interest, costs, expenses and other fees owed to the Prepetition Term Lenders (collectively, the "Prepetition Term Loan Obligations", and together with the Prepetition ABL Obligations, the "Prepetition Secured Debt"). The Prepetition Term Loan Obligations are secured by second priority liens on the Prepetition Collateral.

132917634 v4

C.     **Intercreditor Agreements.**

20.     The relative rights of the Prepetition ABL Parties and the Prepetition Term Parties (collectively, the "Prepetition Secured Lenders") with respect to the Prepetition Collateral are governed by the terms of that certain Intercreditor Agreement, dated as of July 15, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, (the "Prepetition Intercreditor Agreement"), by and between the DIP Agent and the Prepetition Term Agent. The Prepetition Intercreditor Agreement provides, among other things, that the liens held by the Prepetition Term Agent are junior and subordinate to the liens held by the DIP Agent with respect to the Prepetition Collateral.

D.     **Other Secured Debt.**

21.     As set forth in the First Day Declaration, other than the foregoing, the Debtors do not believe that they have any other secured debt as of the Petition Date, other than potentially secured claims of certain equipment lessors and/or taxing authorities in the ordinary course of business, all of whom will receive notice.

II.     **Events Leading Up to the Dip Facility and Negotiation of the Dip Facility**

22.     As set forth in more detail in the First Day Declaration, after facing significant declines in its core business throughout 2015, in early 2016 Hastings began to shift its merchandising and sales strategies, while also embarking on an aggressive reduction of expenses.   The Debtors undertook these efforts with the assistance of FTI Consulting, Inc. ("FTI").

23.     Through these efforts, the Debtors successfully obtained $4.2 million in signed rent concessions from landlords and reduced employee headcount in Hastings' warehouse and corporate headquarters by 15%.   However, notwithstanding the initial positive results generated by Hastings' operational restructuring, Hastings' top line revenue continued to

8

deteriorate in the first quarter of 2016, as Hastings suffered significant year-over-year sales decreases while the Moviestop business continued to perform below expectations. These precipitous -- and unanticipated -- drops in revenue created a short term liquidity crisis in late April 2016. These constraints limited the Debtors' ability to (i) pay rent to many of their landlords for the months of May and June 2016; (ii) pay vendors in accordance with applicable terms; (iii) purchase new inventory and normalize the inventory mix of their retail locations, all of which is especially essential with trends and new releases to maintain customer loyalty and drive customer traffic into their stores. This inventory shortfall negatively impacted sales even further, creating a vicious cycle that scuttled the Debtors' recapitalization efforts and threatened to destroy value for all of the Debtors' stakeholders.

24.    In light of these results, in early May 2016 the Debtors took a number of steps to conserve liquidity and maximize value for the benefit of creditors. First, the decision was made to immediately commence a chain-wide liquidation of the MovieStop business. Second, management began to aggressively explore strategic alternatives for the Hastings business. In consultation with FTI and in conjunction with the efforts of RCS Real Estate Advisors, Hastings' real estate disposition consultant and business broker, Hastings management began a targeted outreach to potential investors and strategic acquirers. Unfortunately, to date no indications of interest or letters of intent have been received and, as detailed in the First Day Declaration, the Debtors have determined that it would not be possible to restructure the Debtors out of court and that the commencement of chapter 11 cases offered the best path for the Debtors to restructure their balance sheets and maximize the value of their businesses and assets for their estates and creditors.

25.    Simultaneously in May 2016, the Debtors and FTI were authorized to negotiate the terms of DIP financing for the Debtors and related adequate protection arrangements in respect of the Debtors' credit facilities.  In exploring their options, the Debtors recognized that the obligations owed to their prepetition secured creditors are secured by substantially all of the Debtors' assets, such that either (a) the liens of the prepetition secured creditors would have to be primed to obtain postpetition financing, (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the prepetition secured creditors, or (c) a lender would have had to been willing to provide sufficient financing to satisfy the Debtors' prepetition secured indebtedness.

26.    The DIP Lenders indicated a willingness to negotiate terms of a postpetition financing facility on the terms described herein.  As set forth in the Nowlan Declaration, FTI, working closely with the Debtors' management and other advisors, reached out to a number of other potential lenders to solicit interest in providing DIP financing to the Debtors on a *pari passu* basis with the Debtors' existing secured lenders, on a junior secured basis, or on an unsecured, administrative expense basis, or, alternatively, by refinancing the existing secured debt.  No parties provided a term sheet or expressed an interest in providing such financing under the circumstances and in the timeframe required by the Debtors given their liquidity issues.

27.    The Debtors and their advisors and the Agent engaged in extensive, arm's length negotiations with respect to the terms and conditions of the DIP Credit Facility, which again was the only proposal the Debtors received for postpetition financing. The material terms and conditions of the DIP Facility are summarized below. The Debtors, the Agent, and the DIP Lenders have agreed upon an initial budget, which is attached hereto as **Exhibit C**, projecting cash flow for the first four weeks of these cases  (as it may be updated in accordance with the

10

132917634 v4

DIP Credit Agreement and DIP Orders, the "Budget"). The DIP Loan Agreement permits the Debtors to draw on the DIP Facility to make any disbursement specifically provided for in the Budget (subject to certain permitted variances).

### III.    Need for the Dip Facility and Continued Use of Cash Collateral

28.    The Debtors have an urgent and immediate need to obtain postpetition financing. Under the Debtors' prepetition credit facility, the Debtors do not have sufficient funds on hand or generated from their business to fund operations. Without the postpetition financing and the use of cash collateral that will be provided under the DIP Credit Agreement and the proposed DIP Orders, the Debtors would not be able to maintain operations pending the outcome of an orderly sale process that will maximize value for all constituents.

29.    Without the proposed credit facility and access to cash collateral, the Debtors will not have any liquidity, among other things, to operate their business, fund their ordinary course expenditures, including paying their over 3,500 employees, or to pay the expenses necessary to administer these chapter 11 cases. Absent adequate funding, the Debtors would be required to close their stores prematurely, otherwise cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates.

30.    Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and the use of cash collateral on the terms set forth in the proposed DIP Orders.

### CONCISE STATEMENT OF RELIEF REQUESTED

31.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the Loan Agreement and Interim Order:[3]

---

[3]    This summary is intended solely for informational purposes and is qualified in its entirety by the DIP Credit Agreement and the Interim Order. In the event there is any conflict between this Motion and the DIP Orders, the

132917634 v4

| (a) | Borrowers: | Hastings Entertainment, Inc.<br>Moviestop LLC<br>SP Images, Inc.<br> Draw Another Circle, LLC<br>Hastings Internet, Inc.<br><br>DIP Credit Agreement, preamble |
|-----|------------|---|
| (b) | Agent: | Bank of America, N.A., as administrative and collateral agent<br><br>DIP Credit Agreement, preamble |
| (c) | DIP Lenders: | Bank of America, N.A.<br><br>DIP Credit Agreement, preamble |
| (d) | Purpose: | Upon entry of the Interim Order, the proceeds of the DIP Credit Facility shall be used to finance: (i) the payment of transaction expenses, (ii) the payment of fees, expenses and costs incurred in connection with the  Debtors' chapter 11 cases subject to the Budget, (iii) the payment of any adequate protection payments approved in the Interim Order or Final Order, and (iv) working capital, capital expenditures, and other general corporate purposes of the Debtors subject to the Budget and any permitted variance.<br><br>Upon entry of the Final Order, in addition to the above, the proceeds of the DIP Credit Facility shall be used for the repayment of all indebtedness (other than letters of credit) under the Prepetition Credit Agreement.<br><br>Interim Order, ¶ 4 |
| (e) | Type of Amount of DIP Facility: | The DIP Credit Facility shall consist of a $90 million senior secured superpriority revolving credit facility (the commitments thereunder, the "<u>Revolving Commitments</u>" and the loans thereunder, the "<u>Revolving Loans</u>"). The Revolving Commitments will include a $5 million sublimit for the issuance of standby and documentary letters of credit (each a "<u>Letter of Credit</u>").  All letters of credit issued and outstanding under the Prepetition Credit Agreement shall be deemed issued under the DIP Credit Facility.<br><br> DIP Credit Agreement,  ¶¶ 2-4, 2-18 |

DIP Orders will control in all respects. Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP Credit Agreement and the Interim Order, as applicable.

132917634 v4

| | | |
|---|---|---|
| (f) | Maturity Date: | All obligations under the DIP Credit Facility (the "<u>DIP Obligations</u>"), accrued or otherwise, shall be due and payable in full on the earliest of (i) December 12, 2016, (ii) the date of consummation of a sale and/or other disposition (including any dispositions pursuant to court-authorized going-out-of-business sale) of all or substantially all of the working capital assets of the Debtors under Section 363 of the Bankruptcy Code, or (iii) the effective date of any plan (the earliest of the foregoing events being referred to as the "<u>Maturity Date</u>").<br><br>Interim Order, ¶ 31 |
| (g) | Priming DIP Lien | The DIP Agent is granted first-priority liens in the DIP Collateral subordinate only to (i) the Carve-Out, and (ii) Permitted Liens. In addition, the DIP Agent is granted a superpriority administrative expense claim which is subordinate to (i) the Carve-Out, and (ii) Permitted Liens.<br><br>"DIP Collateral" includes the following:<br><br>The DIP Collateral consists of substantially all of the assets of the Debtors and their estates, but excluding (i) real property leases (but including the proceeds of such real property interests) and (ii) causes of actions under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") or the proceeds thereof, other than those arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Action(s) (collectively, the "<u>Specified Avoidance Recoveries</u>").<br><br>Interim Order, ¶ 8 |
| (h) | Interest Rate: | The interest rates per annum applicable to the Revolving Loans under the DIP Credit Facility will be (i) (a) LIBOR Offer Rate (as defined in the DIP Credit Agreement) plus (b) 3.0% (provided that, LIBOR may never be less than zero) or, at the option of the Debtors, (ii) (a) the Base Rate (as defined in the DIP Credit Agreement) plus (b) 2%.<br><br>Interest rates increase 2.0% during the continuance of any Event of Default. |

132917634 v4

| | | DIP Credit Agreement, § 2-11 |
|---|---|---|
| (i) | Other Fees: | DIP Facility Fee: 1% of the Aggregate Commitments<br>Unused Line Fee: 0.375% per annum<br>Commercial Letter of Credit Fee: 2.5% per annum<br>Standby Letter of Credit Fee: 3.0% per annum<br><br>In addition, the Prepetition Term Loan Lenders will earn a consent fee in an amount equal to $100,000 on the effective date of the DIP Credit Agreement, which fee shall be paid in kind and added to the outstanding principal balance of the term loans under the Prepetition Term Loan Agreement.<br><br>DIP Credit Agreement, §§ 2-12, 2-14, 2-19, Fee Letter |
| (j) | Conditions Precedent to Initial Loan: | The obligation to make the interim financing available is subject to certain conditions precedent, including that the Debtors have Excess Availability of no less than $4 million after giving effect to the Availability Block.<br><br>DIP Credit Agreement, Article 3 |
| (k) | Superpriority Claim: | All DIP Obligations shall be an allowed superpriority administrative expense claim with priority under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates.<br><br>Interim Order, ¶ 13 |
| (l) | Budget and Financial Covenants: | Debtors shall comply with the Budget, subject to the following (the "**Permitted Variances**"):<br><br>(i) the Debtors' revenues shall be at least 90% of the projected amounts set forth in the Budget;<br><br>(ii) the Debtors' cumulative Total Disbursements shall be not more than 110% of the projected amounts set forth in the Budget; and<br><br>(iii) the Debtors' inventory levels, as tested on an average 2 weeks trailing basis, to be not less than 85% of the amount thereof projected in the Budget; provided that, the first such test shall be |

14

| | | |
|---|---|---|
| | | conducted following the conclusion of the first 4 weeks after the Petition Date. |
| | | The foregoing (other than with respect to clause (iii) above) will be tested (a) with respect to clause (i) above, on a cumulative basis for the first four (4) weeks after the Petition Date and thereafter on a trailing four (4) week basis, and (b) with respect to clause (ii) above, on a cumulative basis after the end of the second (2nd) week following the Petition Date, and thereafter on a trailing four (4) week basis. |
| | | DIP Credit Agreement, 5-10 |
| (m) | Limitations on Use of Proceeds: | The DIP Collateral and the proceeds of the DIP Financing cannot be used to pay fees or expenses incurred by any Professional in connection with any of the following: |
| | | (A)    invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Agent's Liens in the DIP Collateral, (iii) the Prepetition Secured Debt, (iv) the Prepetition Agents' and the Prepetition Secured Lenders' Liens in the Prepetition Collateral, and/or (v) the Adequate Protection Liens; or |
| | | (B)    preventing, hindering, or delaying, whether directly or indirectly, the DIP Agent's, the DIP Lenders', the Prepetition Agents', or the Prepetition Secured Lenders' assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Liens, or the respective Prepetition Indemnity Accounts; |
| | | However, such exclusion does not encompass any investigative work conducted by the Case Professionals retained by any Committee, but only up to $50,000.00 of the Carve Out may be used for such investigative work |
| | | Interim Order, ¶ 29 |

| (n) | Carve-Out: | "*Carve Out*" shall mean the following:<br><br>(a)     (i) statutory fees and interest payable to the Office of the U.S. Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (ii) 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;<br><br>(b)     all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or a Committee, if any (collectively, the "*Case Professionals*"), through the date of service by the DIP Agent of a Carve Out Trigger Notice (as defined below), up to and as limited by the aggregate Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable budget variances),[4] less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; and<br><br>(c)     all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice in an aggregate amount not to exceed $250,000 (the "*Carve Out Cap*"), less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.<br><br>For the avoidance of doubt, fees, disbursements, costs and expenses incurred by Case Professionals cannot be paid to Case Professionals unless and until allowed by the Court.<br><br>Interim Order, ¶ 27 |
| --- | --- | --- |

---

[4]     Accordingly, to the extent that a particular Case Professional is over budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice.

132917634 v4

| (o) | Roll-up/ Deemed Issuance of Existing Debt: | Between the time period of entry of the Interim Order and entry of the Final Order, the indebtedness under the Prepetition Credit Agreement (other than Letters of Credit under the Existing Credit Agreement, which shall be deemed issued under the DIP Credit Facility as of the date of entry of the Interim Order) shall be repaid in part pursuant to a "creeping roll up" whereby post-petition collections are applied to repay prepetition obligations with corresponding advances to be made with Revolving Loans under the DIP Credit Facility.<br><br>Upon entry of the Final Order, the proceeds of the Revolving Loans shall be used for the repayment of all indebtedness (other than Letters of Credit) under the Prepetition Credit Agreement.<br><br>Interim Order, ¶ 5-6 |
|---|---|---|
| (p) | Perfection Other Than Under State Law: | The liens granted pursuant to the Interim Order are automatically perfected upon entry of the Interim Order.<br><br>Interim Order, ¶ 18 |
| (q) | Adequate Protection: | The Prepetition Secured Lenders shall receive the following adequate protection:<br><br>(a)    replacement liens and security interests on the DIP Collateral (subject only to the Carve Out and the DIP Liens), only to the extent of any diminution in the value of the Collateral;<br><br>(b)    an adequate protection super-priority administrative claim under Section 507(b) of the Bankruptcy Code (subject to the Carve Out and the  DIP Superpriority Claim), only to the extent of any diminution in the value of the Prepetition Collateral;<br><br>(c)    payment of all accrued and unpaid interest at the default rate under the Prepetition ABL Agreement or Prepetition Term Loan Agreement, respectively;<br><br>(d)    reimbursement on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties, solely to |

132917634 v4

|     |     | the extent permitted under the Prepetition ABL Agreement or Prepetition Term Loan Agreement, respectively;[5]

(e)    funded escrow accounts in the sum of $250,000 to secure any contingent indemnification obligations[6] under the Prepetition ABL Agreement or Prepetition Term Loan Agreement, respectively;[7] and

(f)    access to the Debtors' records and regular reporting, including in connection with the Sale (defined below).

In accordance with the Prepetition ABL Agreement and the DIP Credit Agreement, the Prepetition Term Loan Agent may notify the DIP Agent as to the amount of the Term Loan Reserve, if any, and the DIP Agent shall implement and maintain such Term Loan Reserve.

Interim Order, ¶ 16 |
|-----|-----|-----|
| (r) | Waivers: | Subject to entry of the Final Order, the Prepetition Secured Lenders shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, and a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code.

The Budget provides for the payment of postpetition rent for June 2016 ("Stub Rent"); however, payment of Stub Rent is conditioned on a Final Order being entered that provides for these waivers.

Interim Order, ¶¶ 44, 45, 54, Budget |
| (s) | Debtors' Stipulations and Releases / Challenge: | Subject to paragraphs 24-26 of the Interim Order, the Debtors stipulate, among other things, to the validity, enforceability, perfection, non-avoidability, priority and amount of the liens and claims of the Prepetition Secured Lenders, and release any claims against the Prepetition Secured Lenders. |

---

[5]    If the claims of the Prepetition Term Loan Lenders are determined by the Court to have been undersecured as of the Petition Date, then reimbursements made to the Prepetition Term Loan Agent shall be reallocated and applied to reduce the outstanding principal balance owed to the Prepetition Term Loan Lenders.

[6]    Any such indemnification claim(s) are subject to (i) the terms of the Prepetition Credit Agreement and the Prepetition Term Loan Agreement, as applicable, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) under paragraphs 24-26 of the Interim Order, and (iii) the jurisdiction of the Court.

[7]    The Prepetition Term Indemnity Account is only funded upon payment in full of all DIP Obligations and Prepetition ABL Obligations.

132917634 v4

| | | The Debtors' stipulations are potentially subject to challenge (x) by any Committee within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of the Interim Order.<br><br>If a challenge is timely and properly filed and successfully pursued, the Court may grant appropriate relief.<br><br>Interim Order,  ¶¶ F, 24-26 |
|---|---|---|
| (t) | Milestones: | The DIP Credit Agreement requires the Debtors to, among other things:<br><br>(i)      obtain entry of the Interim Order on or before June 14, 2016;<br><br>(ii)     obtain entry of the Final Order on or before July 14, 2016;<br><br>(iii)    obtain entry of an order approving bidding procedures ("Bidding Procedures") on or before July 8, 2016;<br><br>(iv)    receive binding bids for the consummation of a 363 Sale on or before July 11, 2016;<br><br>(v)     conduct an auction with respect the Sale Motion (as defined in the Interim Order) on or before July 13, 2016;<br><br>(vii)   conduct a hearing and obtain entry of an order approving the sale ("Sale") of the Debtors' assets under the Sale Motion on or before July 14, 2016; and<br><br>(vii)   consummate the Sale by July 15, 2016, in the event that a liquidation bid is selected as the highest and best bid, and July 22, 2016, in the event that a going-concern bid is selected as the highest and best bid.<br><br>DIP Credit Agreement, ¶¶ 5-12, 10-23 |
| (u) | Events of Default: | Usual and customary in transactions of this type, including, without limitation, conversion of a Debtors' chapter 11 case to a case under Chapter 7, appointment of a trustee, examiner with expanded powers or similar insolvency official or administrator, modification or reversal of any interim or final orders with respect to the DIP Credit Facility or the Prepetition Credit Agreement without the consent of the DIP Agent; the entry of an order granting relief from stay to any other creditor as to a |

| | | |
|---|---|---|
| | | material portion of the Prepetition Collateral and/or DIP Collateral, the failure of the Debtors to obtain a final order from the Bankruptcy Court satisfactory in form and substance to DIP Agent, authorizing the DIP Credit Facility within 35 days after the Petition Date, and other events.<br><br>DIP Credit Agreement, Art. 10 |
| (v) | Cash Dominion | The Debtors will implement cash management systems substantially consistent with pre-petition practices and reasonably satisfactory to the DIP Agent, including, but not limited to, the establishment of customary lockbox arrangements and blocked account agreements.  The Debtors will cause or direct all cash receipts and collections from all sources, including all proceeds from the sale of inventory and other DIP Collateral, collection of accounts, and credit card charges, to be transferred daily to an account subject to a blocked account agreement or to an account of Bank of America maintained with Bank of America (the "Collection Account").  All amounts deposited or transferred into a blocked account will be swept daily to the Collection Account for application to the loans under the Prepetition Credit Agreement until paid in full and then to reduce exposure (without any reduction in commitments) under the DIP Credit Facility.<br><br>DIP Credit Agreement, Art. 7 |
| (w) | Remedies / Relief from Automatic Stay: | Following delivery of a Remedies Notice, parties shall have five (5) days to seek an emergency hearing with the Court for to contest whether an Event of Default has occurred and/or the DIP Lenders can exercise their remedies. Unless the Court determines during the Remedies Notice Period that no Event of Default has occurred or that the DIP Lenders cannot exercise their Remedies, the Agent shall be granted relief from the automatic stay to enforce its rights and remedies.<br><br>Interim Order, ¶ 38-42 |
| (x) | No Priming / Proceeds of Subsequent Financings | The following orders are prohibited, absent the consent of the Prepetition Lenders:<br><br>(i)     an order authorizing the use of cash collateral of Debtors in which Agent or DIP Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Agent or DIP Lenders have a lien or security interest, except as expressly permitted in the Interim order or in the DIP Credit Agreement; and |

132917634 v4

|     |                                      | (ii)    an order authorizing under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Agent or DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to DIP Agent and DIP Lenders in the Interim Order;<br><br>If at any time prior to the irrevocable repayment in full in cash of all Prepetition Secured Debt and DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over first, to the Prepetition ABL Agent to be applied in reduction of the Prepetition ABL Obligations, second, to the DIP Agent to be applied in reduction of the DIP Obligations, and then to the Prepetition Term Loan Agent to be applied to the Prepetition Term Loan Debt.<br><br>Interim Order, ¶¶ 46-48 |
| (y) | Cash Collateral Termination Event | In the event that Prepetition ABL Obligations and DIP Obligations are paid in full, the Debtors will consult with the Prepetition Term Loan Agent and other parties in interest as to the terms and conditions of continued consensual use of Cash Collateral.  If an agreement is not reached, the Prepetition Term Loan Agent can terminate the Debtors' rights to use Cash Collateral under the Interim Order, in which case the Debtors will be entitled to seek an emergency hearing to determine the terms and conditions upon which the Debtors' can use Cash Collateral.<br><br>Interim Order, ¶¶ 33-34 |

## REQUIRED DISCLOSURES

32.    The required disclosures under Local Rule 4001-2(a)(i) are limited to seeking approval of  (i) the payment of prepetition secured debt from the proceeds of postpetition secured debt and the "roll up," or deemed issuance, of prepetition secured debt into postpetition secured debt (disclosure required under Bankr. L.R. 4001-2(a)(i)(E)), (ii) the waivers of the

132917634 v4

"equities of the case" exception under section 552(b) of the Bankruptcy Code (disclosure required under Bankr. L.R. 4001-2(a)(i)(H)),  and (iii) liens on certain of the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (disclosure required under Bankr. L.R. 4001-2(a)(i)(D).

33.    While the DIP Motion also seeks to waive any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code and grant liens in certain avoidance actions, such relief is only being requested pursuant to the Final Order. Similarly, the waiver of the "equities of the case" exception is only being requested pursuant to the Final Order.

34.    In addition, the DIP Motion seeks relief pursuant to the Final Order to grant DIP Liens on recoveries of the Debtors, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code (the "Bankruptcy Recoveries"), but only (A) with respect to Bankruptcy Recoveries arising under section 549 of the Bankruptcy Code, the full amount of any such recovery, and (B) with respect to Bankruptcy Recoveries arising under all other sections of chapter 5 of the Bankruptcy Code, the amounts necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such recovery. The Motion seeks to have the DIP Superpriority Claim and the Adequate Protection Superpriority Claim be payable out of all Bankruptcy Recoveries.  See Interim Order ¶ 8(b).

35.    These terms are justified because the Debtors are in immediate and critical need of the DIP Facility and the use of cash collateral. As discussed in the Declarations, the Debtors were unable to obtain financing on a *pari passu* basis with the Debtors' existing secured lenders, on a junior secured basis, or on an unsecured, administrative expense basis, or,

22

132917634 v4

alternatively, by refinancing the existing secured debt. The only acceptable proposal that would provide the critical liquidity to the Debtors was provided after extensive negotiations with the DIP Agent on the terms set forth in the DIP Credit Agreement and the proposed DIP Orders. Without this financing, the Debtors would not be able to pay their employees or vendors, or continue to operate as a going concern, which would doom the Debtors' sale process and any attempt to maximize value in these Cases.

## BASIS FOR RELIEF

I.    **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and (d) of the Bankruptcy Code.**

36.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense . . . ." 11 U.S.C. § 364(c).

37.    Section 364(d) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis senior or equal in priority to existing secured debt cannot "obtain such credit otherwise . . . . [and] there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

38.    In evaluating proposed postpetition financing under section 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

   a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

   b.    the credit transactions are necessary to preserve assets of the estate;

   c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.   the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.   the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

39.   For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing under section 364(c) and (d) of the Bankruptcy Code.

## II.   The Debtors Were Unable to Obtain Financing on More Favorable Terms.

40.   Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

24

41.     Here, as detailed above, despite their efforts, the Debtors have been unable to (i) procure sufficient financing on a *pari passu* basis with the Debtors' existing secured creditors, on a junior secured basis, or on an unsecured, administrative expense basis, or, alternatively, by refinancing the existing secured debt, or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Indeed, as explained above, prior to the Petition Date, FTI contacted a cross-section of potential lenders to determine whether they would be willing to provide postpetition financing to the Debtors. However, given the Debtors' liquidity needs and the fact that substantially all of the Debtors' material assets are encumbered, only the DIP Lenders were willing to provide postpetition financing.

42.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standards required under section 364(c) and (d) of the Bankruptcy Code. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## III.     <u>The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.</u>

43.     As described above, the Debtors intend to operate their business in the ordinary course while they run a value-maximizing sale process. The Debtors require the

proposed financing and use of cash collateral to provide the necessary capital with which to operate their business, including funding the Debtors' obligations to employees, and to preserve their business for the benefit of their estates and creditors pending the outcome of the Debtors' sale process.

44.    Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing. The Debtors' ability to maintain their business pending the outcome of the sale process is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for postpetition rent, payroll, goods, services and other operating expenses. The DIP Facility thus is essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business for purposes of the ongoing sale process.

45.    As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require postpetition financing and the use of cash collateral under the terms of the DIP Credit Agreement and proposed DIP Orders to continue their operations pending the outcome of an orderly sale process.

**IV.    The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

46.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D.

26

Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

47.    The terms of the DIP Credit Agreement and the proposed DIP Orders were highly negotiated between the Debtors and the DIP Agent (including their respective counsel and other advisors), resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through an orderly sale process. The terms are fair, reasonable and appropriate under the circumstances, and should be approved.

## V.    Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.

48.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

49.    Here, the Debtors' sound business judgment clearly supports entry into the DIP Credit Agreement to gain access to needed funding and maximize value for all constituents.

## VI.    The DIP Lenders Are Extending Credit in Good Faith.

50.    Section 364(e) of the Bankruptcy Code provides that:

27

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.     As set forth in the Declarations, the Debtors and the Agent negotiated the Loan Agreement and Interim Order at arm's length and good faith. Accordingly, the DIP Orders should provide that the Agent and DIP Lenders are entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

## VII.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.

52.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).

53.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

54.     Section 361 of the Bankruptcy Code provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
>> 1.  requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay

132917634 v4

under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

2.  providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

3.  granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

55.     Here, the interests of the Prepetition ABL Parties and Prepetition Term Lenders are adequately protected for purposes of section 363(e) of the Bankruptcy Code for the following reasons.  First, the Prepetition ABL Parties and Prepetition Term Parties consent to the Debtors' use of property, including cash collateral, on the terms of the DIP Credit Agreement and proposed DIP Orders.   Second, the Debtors intend to preserve value by maintaining operations pending the outcome of an orderly sale process. Third, the Prepetition ABL Parties and Prepetition Term Parties will be adequately protected through the grant of adequate protection (which adequate protection they have consented to).

56.     Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting

such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property," *See* 11 U.S.C. § 361.  Pursuant to the DIP Orders, the Prepetition ABL Parties and Prepetition Term Parties will have the benefit of, among other things, superpriority claims and replacement liens (subject to the limitations and priorities set forth in the DIP Orders) and will receive, among other things, regular payments of interest at the default rate.

57.    The Debtors believe that such protections are adequate under the circumstances. Further, given the significant value that the Debtors stand to lose in the event they are denied access to continued use of cash collateral, such protections are wholly appropriate and justified.

## VIII.  Repayment of the Prepetition Obligations Is Necessary and Appropriate.

58.    Repayment of the Prepetition ABL Loans in accordance with the Interim and Final Orders is necessary and appropriate, as the DIP Agent and DIP Lenders have not otherwise consented to the use of cash collateral and are not otherwise willing to provide the DIP Facility unless the Prepetition ABL Loans are permitted to be paid down, without further order of the Court, from amounts received by the Debtors following the Petition Date.

59.    Such payments will not prejudice the Debtors or their estates, because such payments are subject to the rights of parties in interest under Section [] of the Interim Order to assert an Objection. If an Objection is successful, the Court may grant appropriate relief.

60.    Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured. As the United States District Court for the District of Delaware recently observed:

132917634 v4

> [P]repetition secured claims can be paid off through a "roll-up."
> Most simply, a [roll up] is the payment of a pre-petition debt with
> the proceeds of a post-petition loan. Roll-ups most commonly arise
> where a pre-petition secured creditor is also providing a post-
> petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code. The proceeds of the DIP loan are used to pay off
> or replace the pre-petition debt, resulting in a post-petition debt
> equal to the pre-petition debt plus any new money being lent to the
> debtor. As a result, the entirety of the pre-petition and post-
> petition debt enjoys the post-petition protection of section 364(c)
> and/or (d) as well as the terms of the DIP order. In both a
> refinancing and a roll-up, the pre-petition secured claim is paid
> through the issuance of new debt rather than from unencumbered
> cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (*quoting In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)). *See also, e.g., In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

## INTERIM ORDER AND FINAL HEARING

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

62.     The urgent need to preserve the Debtors' business, and thereby avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain postpetition financing and use cash collateral as soon as possible, pending

31

132917634 v4

the Final Hearing. Without the ability to obtain access to such funding and use cash collateral, the Debtors would be unable to meet their postpetition obligations, including payroll obligations, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' efforts to maintain operations through an orderly sale process.

63.     Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY

64.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF ANY APPLICABLE STAY

65.     The Debtors also request that the Court waive any applicable stay of the DIP Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates. The exigent nature of the relief sought herein justifies immediate relief.[8]

---

[8]     The Debtors also seek waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent applicable.

132917634 v4

## NOTICE

66.     Notice of this Motion has been or will be given to (i) the U.S. Trustee, (ii) BofA; (iii) Pathlight, (iv) the holders of the thirty (30) largest unsecured claims, on a consolidated basis, against the Debtors, (v) the Internal Revenue Service and applicable state taxing authorities, (vi) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; (vii) the Debtors' landlords, and (viii) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m). Due to the volume of the exhibits attached to this Motion and any interim or final orders approving this Motion, the Debtors do not intend to serve such exhibits, but will note in the orders approving this Motion and any related notices that such exhibits are available, free of charge, at www.hastingsbankruptcy.com.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

67.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors request entry of the DIP

Orders granting the relief requested herein and such other relief the Court deems just and proper.

Dated: June 13, 2016                     Respectfully submitted,
      Wilmington, Delaware

                                          */s/ Katherine Good*
                                          Christopher M. Samis (No. 4909)
                                          L. Katherine Good (No. 5101)
                                          Chantelle D. McClamb (No. 5978)
                                          WHITEFORD, TAYLOR & PRESTON LLC
                                          The Renaissance Centre, Suite 500
                                          405 North King Street
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 353-4144
                                          Email:     csamis@wtplaw.com
                                                      kgood@wtplaw.com
                                                        cmcclamb@wtplaw.com

                                          - and –

                                          Cathy Hershcopf, Esq.
                                          Michael Klein, Esq.
                                          Robert Winning, Esq.
                                          COOLEY LLP
                                          1114 Avenue of the Americas
                                          New York, New York 01136
                                          Telephone: (212) 479-6000
                                          Email:     chershcopf@cooley.com
                                                      mklein@cooley.com
                                                        rwinning@cooley.com

                                          *Proposed Counsel for the Debtors and Debtors*
                                          *in Possession*

**Exhibit A**

**Interim Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16- ( _____ )<br><br>(Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507
AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS
AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING,
(II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS
AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of Draw Another Circle, LLC, on behalf of itself and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, 363, 364, and 507 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq*. (the "***Bankruptcy Code***"), and in accordance with Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure (the "***Local Rules***") of the United States Bankruptcy Court for the District of Delaware (this "***Court***"), in these chapter 11 cases (the "***Chapter 11 Cases***"), for entry of an interim order (this "***Interim Order***"), granting the following relief on an interim basis until the date that a Final Order (as defined below) has been entered (the "***Interim Period***"):

    **(I)**     **Interim DIP Financing**

        **(A)**     Authorizing the Debtors to obtain up to $90,000,000.00 in post-petition financing (the "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain *Senior Secured, Superiority Debtor-in-Possession Loan and Security Agreement*

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809). The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

[2]    Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements (as defined below).

(as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form as filed with the Court, by and among the Debtors, as borrowers, Bank of America, N. A., as administrative agent and collateral agent (the "***DIP Agent***"), and each Revolving Credit Lender party thereto (collectively, the "***DIP Lenders***"), which may be used for the following in accordance with and as limited by the Approved Budget (as defined below) (subject to permitted variances) and subject to Paragraph 51 hereof (where applicable):

(i)     to pay fees, costs, and expenses as provided in the DIP Financing Agreements (as defined below), including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(ii)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(iii)   for making adequate protection payments and other payments as provided in this Interim Order (and upon its entry, the Final Order (as defined below));

(iv)    to fund the Prepetition Indemnity Account (as defined below) for the benefit of the Prepetition ABL Agent and the Prepetition ABL Lenders (each as defined below);

(v)     for payment of the outstanding prepetition Revolving Credit Loans constituting Prepetition ABL Debt (each as defined below) in the manner set forth in Paragraph 5 hereof (the "***Interim Roll-Up***");

(vi)    upon entry of a Final Order, for the payment in full of all outstanding prepetition amounts under the Prepetition ABL Credit Agreement (as defined below) in the manner set forth in Paragraph 6 hereof (the "***Final Roll-Up***"); and

(vii)   upon either (x) a DIP Maturity Event, so long as all Prepetition ABL Debt and all DIP Obligations have been paid in full in cash, or (y) after the occurrence of a DIP Order Event of Default (as defined below) as provided in Paragraph 32 below, to fund the Carve Out Account (as defined below).

(B)     Authorizing the Debtors to enter into the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and

in effect from time to time, the "***DIP Financing Agreements***");

(C)   Approval of the Interim Roll-Up;

(D)   Granting the DIP Agent for the benefit of the DIP Lenders the following Liens (as defined in section 101(37) of the Bankruptcy Code) (the "***DIP Liens***") and claims:

   (i)    first priority priming, valid, perfected, and enforceable Liens, subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), as provided in and as contemplated by this Interim Order and the DIP Financing Agreements;

   (ii)   a first-priority senior lien on the Debtors' unencumbered assets, but excluding leasehold interests of the Debtors ("***Leases***") and actions arising under chapter 5 of the Bankruptcy Code; provided, however, (A) the DIP Liens shall include, upon entry of the Interim Order, first-priority senior liens on the proceeds of Leases (the "***Lease Proceeds***"), and (B) the DIP Liens shall include, upon entry of the Final Order, first-priority senior liens on Specified Bankruptcy Recoveries (defined below); and

   (iii)  allowed superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject to the Carve Out as provided herein.

**(II)**   **Interim Use of Cash Collateral** – During the Interim Period, authorizing the Debtors' use of "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***")) in which the Prepetition ABL Agent and the Prepetition Term Loan Agent have an interest;

**(III)**  **Adequate Protection** – Granting certain adequate protection, including, among other things, Adequate Protection Liens and Adequate Protection Superiority Claims (each as defined below) and certain other adequate protection as described in this Interim Order, to (A) Bank of America, N. A., as administrative agent and as collateral agent (the "***Prepetition ABL Agent***") under that certain Amended and Restated Loan and Security Agreement, dated July 22, 2010 (as amended and in effect, the "***Prepetition ABL Credit Agreement***"), by and among the Debtors that comprised the "Loan Parties" thereunder, the Prepetition ABL Agent, and each Revolving Credit Lender party thereto (the "***Prepetition ABL Lenders***"), and (B) Pathlight Capital, LLC, as term loan agent (the "***Prepetition Term Loan Agent***" and, together with the Prepetition ABL Agent, the "***Prepetition Agents***") under that certain Term Loan and Security Agreement dated as of July 15, 2014 (as amended and in effect, the "***Prepetition Term Loan Credit Agreement***"), by and among the Debtors that comprised the "Borrowers" and "Guarantors" thereunder, the Prepetition Term Loan Agent, and the "Term Lenders" party thereto (the "***Prepetition Term Loan Lenders***" and, together with the Prepetition ABL Lenders, the "***Prepetition Secured Lenders***"), in each case, to the extent of any Diminution in the Value (as defined below) of the Prepetition Agents' respective interests in the Prepetition Collateral (as defined below), having the priority set forth in this Interim Order, as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, subordination to the Carve Out, and for the imposition of the automatic stay;

3

**(IV)**      **Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

**(V)**      **Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

**(VI)**      **Final Hearing –** Scheduling a final hearing (the "*Final Hearing*") to consider entry of an order (the "*Final Order*") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

and upon the *Declaration of Duane A. Huesers in Support of First Day Pleadings* (the "***First Day Declaration***") and the *Declaration of Mike Nowlan in Support of Debtors' (i) Financing Motion; (ii) Bidding Procedures and Sale Motion; and (iii) Emergency Store Closing Sales Motion* (the "***Nowlan Declaration***"), each of which was filed contemporaneously with the Motion; and this Court having reviewed the Motion and held a hearing with respect to the Motion (the "***Interim Hearing***"); and upon the Motion, the First Day Declaration, the Nowlan Declaration, and the record of the Interim Hearing and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

     **THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I.    Procedural Findings of Fact

     **A.**      **Petition Date.** On June 13, 2016 (the "***Petition Date***"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

     **B.**      **Jurisdiction and Venue.** This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

**C.      Statutory Predicates**.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 and the applicable Local Rules.

**D.      Committee Formation.**  No official committee (a "***Committee***") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

**E.      Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors to certain parties-in-interest, including: (i) the Office of the United States Trustee ("***U.S. Trustee***"); (ii) those creditors holding the 30 largest unsecured claims against the Debtors' estates, on a consolidated basis; (iii) counsel to the Prepetition ABL Agent and the DIP Agent; (iv) counsel to the Prepetition Term Loan Agent; and (v) all other secured creditors of record.  Notice has been given in accordance with Local Rule 9013-1(m), and no other or further notice need be given.

## II.      Debtors' Acknowledgements and Agreements

**F.      Without prejudice to the rights of parties-in-interest as set forth in Paragraphs 24-26 below, each of the Debtors admits, stipulates, acknowledges, and agrees that (collectively, Paragraphs F(1) through F(7) hereof shall be referred to herein as the "***Debtors' Stipulations***"):

>       (1)      Prepetition ABL Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to (A) the Prepetition ABL Credit Agreement, (B) that certain Guaranty dated August 29, 2000 (as amended, restated, modified and supplemented from time to time and in effect), and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition ABL Agent or Prepetition ABL Lenders, including, without limitation, the Prepetition Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "***Prepetition ABL Financing Documents***").

>       (2)      Prepetition Term Loan Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to (A) the Prepetition Term Loan Credit Agreement, (B) that certain Guaranty dated July 15, 2014, (C) that certain Security Agreement dated July 15, 2014, (D) that certain Aircraft Security Agreement dated July 15, 2014, and (E) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders, including, without limitation,

the Prepetition Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "***Prepetition Term Loan Financing Documents***" and, together with the Prepetition ABL Financing Documents, the "***Prepetition Financing Documents***").

(3)    Prepetition ABL Debt Amount.  As of the Petition Date, the Debtors were liable to the Prepetition ABL Lenders under the Prepetition ABL Financing Documents, on account of "Revolving Credit Loans" in the approximate principal amount of $[____] million, plus letters of credit in the approximate stated amount of not less than $[____] million, plus interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, leasing, hedging and other banking or financial services secured by the Prepetition ABL Financing Documents (collectively the "***Prepetition ABL Debt***").

(4)    Prepetition Term Loan Debt Amount.  As of the Petition Date, the Debtors were liable to the Prepetition Term Loan Lenders in the total aggregate principal amount of $10 million, plus interest accrued and accruing at the default rate, costs, expenses, and fees (including attorneys' fees and legal expenses).  All obligations of the Prepetition Loan Party Debtors arising under the Prepetition Term Loan Credit Agreement or any other Prepetition Term Loan Financing Document, including all principal, accrued or hereafter accruing interest, fees, and costs, payable under the Prepetition Term Loan Credit Agreement shall hereinafter be referred to as the "***Prepetition Term Loan Debt***" and, together with the Prepetition ABL Debt, the "***Prepetition Secured Debt***."

(5)    Prepetition Collateral.  To secure the Prepetition Secured Debt, each of the Debtors granted continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition Agents and the Prepetition Secured Lenders upon substantially all of its property, including the following (but excluding the "Exempt Assets" (as defined in the Prepetition Financing Documents)), all as defined in the Prepetition Financing Documents (collectively, the "***Prepetition Collateral***"), including, without limitation:

> All: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims (d) Deposit Accounts, (e) Documents, (f) Equipment, (g) Fixtures, (h) General Intangibles (including Payment Intangibles), (i) Goods, (j) Instruments, (k) Inventory, (l) Investment Property, (m) Letter-of-Credit Rights, (n) Software, (o) Supporting Obligations, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all books, records, and information relating to any of the foregoing ((a) through (p)) and/or to the operation of any Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (r) all A/C Collateral, (s) insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing ((a) through (r)) or otherwise, (t) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (t)), including the right of stoppage in transit, and (u) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

6

Pursuant to that certain Intercreditor Agreement (as amended, supplemented, and confirmed from time to time, and as currently in effect, the "***Prepetition Intercreditor Agreement***") dated as of July 15, 2014, the Prepetition ABL Agent and Prepetition Term Loan Agent have agreed to their respective rights and priorities with respect to the Prepetition Collateral and the DIP Collateral, including that (x) the Prepetition ABL Debt is secured by the first priority Lien upon the "Collateral" (as defined therein) and (y) the Prepetition Term Loan Debt is secured by the second priority Lien on the "Collateral" (as defined therein).

(6)    <u>Prepetition Liens</u>.    The Prepetition Liens of the Prepetition Agents and the Prepetition Secured Lenders have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***").

(a)    As of the Petition Date, (i) the Prepetition Liens are valid, binding, enforceable, and perfected first priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) (a) the Prepetition Secured Debt constitutes legal, valid, and binding obligations of the Prepetition Loan Party Debtors, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any Prepetition Secured Lender with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code, (iv) the Prepetition Secured Debt constitutes allowed secured claims and (v) the value of the Prepetition Collateral is greater than the amount of the Prepetition Secured Debt.

(b)    On the date that this Interim Order is entered, each of the Debtors has waived, discharged, and released the Prepetition Agents and the Prepetition Secured Lenders, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "***Released Parties***"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt, and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise, subject to paragraphs 44, 45 and 55.

(c)    None of the Debtors possesses and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens,

or any claim of the Prepetition Secured Lenders pursuant to the Prepetition Financing Documents, or otherwise.

(7)    <u>Cash Collateral</u>.  The Prepetition Agents have a continuing security interest in and Lien on all or substantially all of the Debtors' Cash Collateral, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Secured Debt.

## III.    <u>Findings Regarding the Post-Petition Financing.</u>

**G.    Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

**H.    No Credit Available on More Favorable Terms**.  As discussed in the First Day Declaration and the Nowlan Declaration, the Debtors have been unable to obtain any of the following:

(1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien,

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Lenders the DIP Protections (as defined below).

**I.    Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens or Prepetition Liens are valid, senior, perfected, or unavoidable.  Moreover, except as provided in Paragraphs 24-26 below, nothing shall prejudice the following:

(1)      the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Lenders, the Prepetition Agents, Prepetition Secured Lenders, and any Committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2)      the rights of any Committee appointed pursuant to section 1102 of the Bankruptcy Code or any other party-in-interest (other than the Debtors) with requisite standing to challenge the validity, priority, perfection, and extent of the Prepetition Liens as set forth in this Interim Order.

**J.      Adequate Protection for Prepetition Secured Lenders.**  As a result of the granting of the DIP Liens and the incurrence of the DIP Obligations, subordination to the Carve Out, the use of Cash Collateral authorized herein, and the imposition of the automatic stay, the Prepetition Agents and Prepetition Secured Lenders are entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code to the extent of any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral) during these Chapter 11 Cases.  As adequate protection, the Prepetition Secured Lenders will receive the Adequate Protection (as defined below) described in Paragraph 16 of this Interim Order.

**K.      Prepetition Secured Lenders Governed By Prepetition Intercreditor Agreement**.  The Prepetition ABL Agent and Prepetition Term Loan Agent are parties to the Prepetition Intercreditor Agreement.  The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.  The Prepetition Agents and Prepetition Secured Lenders have stipulated that their respective interests in the Prepetition Collateral and the DIP Collateral shall continue to be governed by the Prepetition Intercreditor Agreement.

**L.      Prepetition Agents' and Prepetition Secured Lenders' Consent**.  In exchange for such Adequate Protection, the Prepetition Secured Lenders have agreed to the Debtors' use of Cash Collateral on the terms set forth in this Interim Order and to the subordination of their Prepetition Liens to the Carve Out as set forth herein. The Prepetition Agents and the Prepetition Secured Lenders have consented to the priming of the Prepetition Liens by the DIP Liens to the extent set forth herein.

**M.      Adequacy of the Approved Budget.**  The Prepetition Agents, the DIP Agent, and the Debtors have agreed that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same

may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, this Interim Order, and upon its entry, the Final Order, the "***Approved Budget***")[3] is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the Interim Period.

N.     **Conditions Precedent to DIP Lenders' Extension of Financing.**  The DIP Lenders have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Financing Agreements, subject to the following:

(1)     the entry of this Interim Order (and the Final Order), and

(2)     findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lenders are good faith financiers, and that the DIP Lenders' claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Interim Order (or the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

O.     **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.**  The extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and (iii) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Agent, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lenders are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

P.     **Relief Essential; Best Interest.**  The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets during the Interim Period.  It is in the best

---

[3]     All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference, including accruals for professional fee estimates.

interest of the Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements. The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

## I.

### DIP FINANCING

**A.     Approval of Entry into the DIP Financing Agreements**

1.      The Motion is granted as set forth herein.

2.      The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements. The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the "Closing Fee" (as defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph 51 below, reasonable attorneys', financial advisors', consultants', and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court. Upon the entry of this Interim Order, all letters of credit outstanding under the Prepetition ABL Financing Documents shall be deemed to have been issued pursuant to and shall be deemed to be outstanding under the DIP Credit Agreement.

**B.     Authorization to Borrow**

3.      In order to enable them to continue to operate their businesses during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, the other DIP

Financing Agreements, and the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtors are hereby authorized under the DIP Facility to borrow an amount up to $90,000,000.00 in accordance with the terms and conditions of the DIP Credit Agreement.

**C.      Application of DIP Facility Proceeds**

4.      The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:

(a)      to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(b)      for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(c)      for making payments in respect of Adequate Protection and other payments as provided in this Interim Order;

(d)      to fund the Prepetition ABL Indemnity Account;

(e)      upon entry of a Final Order, for the payment of the Final Roll-Up;

(f)      upon the payment in full of the DIP Obligations and the Prepetition ABL Debt, to fund the Prepetition Term Indemnity Account; and

(g)      to fund the Carve Out Account (as defined below).

**D.**      **Roll-Up Authorization**

5.      <u>Interim Roll-Up</u>.  During the Interim Period, all cash, collections, and proceeds of the Prepetition Collateral and DIP Collateral, including all proceeds realized in connection with inventory liquidations for the MovieStop locations (the "***MovieStop Store Closing Sales***") conducted pursuant to the "*Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Continuation of Store Closing Sales in Accordance with the Disposition Agreement and Sale Guidelines, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (II) Authorizing the Assumption of the Disposition Agreement; and (III) Granting Related Relief*" (the "***MovieStop Store Closing Motion***"), or proceeds realized in connection with the Sale Motion (as defined below), shall be immediately paid to the Prepetition ABL Agent for application in reduction of the Revolving Credit Loans outstanding under the Prepetition ABL Credit Agreement in accordance with the Prepetition ABL Financing Documents, and upon payment in full thereof, to the DIP Agent for application in reduction of the Revolving Credit Loans outstanding under the DIP Credit Agreement.

6.      <u>Final Roll-Up</u>.  Solely upon entry of the Final Order, and subject to the rights of parties set forth in Paragraphs 24-26 below, the Debtors shall use the proceeds of the next advance under the DIP Credit Agreement to satisfy all Prepetition ABL Debt in full in accordance with the terms of the Prepetition ABL Credit Agreement ("***Final Roll-Up***"). The Final Roll-Up will be without prejudice to the rights of any third party, including, without limitation, any Committee, to seek an appropriate remedy from the Court upon a successful Challenge (defined below).

**E.**      **Conditions Precedent**

7.      The DIP Lenders shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

**F.**      **The DIP Liens**

8.      Pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and subject to the limitations set forth in Paragraph 9 below (and such limitations as may appear in the

Prepetition Intercreditor Agreement, if any), effective immediately upon the entry of this Interim Order the DIP Agent is hereby granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out) for the ratable benefit of the DIP Lenders, which DIP Liens constitute priming, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, and except as otherwise expressly provided in this Interim Order, upon and to all of the following (but excluding the "Excluded Collateral"[4]) (collectively, the "***DIP Collateral***"):

    (a)    The Collateral, as defined in the DIP Financing Agreements, including:

All: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims (d) Deposit Accounts, (e) Documents, (f) Equipment, (g) Fixtures, (h) General Intangibles (including Payment Intangibles), (i) Goods, (j) Instruments, (k) Inventory, (l) Investment Property, (m) Letter-of-Credit Rights, (n) Software, (o) Supporting Obligations, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all books, records, and information relating to any of the foregoing ((a) through (p)) and/or to the operation of any Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (r) all A/C Collateral, (s) all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance (whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing (a) through (r) or otherwise), (t) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (s)), including the right of stoppage in transit, and (u) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

    (b)    Subject to entry of the Final Order, the Bankruptcy Recoveries (as defined below), <u>but only</u> (A) with respect to Bankruptcy Recoveries arising under section 549 of the Bankruptcy Code, the full amount of any such recovery, and (B) with respect to Bankruptcy Recoveries arising under all other sections of chapter 5 of the

---

[4]    As defined in the DIP Credit Agreement, "Excluded Collateral" means, in addition to such assets as are excluded from the Collateral pursuant to the terms of the Collateral Documents, (a) Equity Interests constituting more than 65% of the total outstanding voting or nonvoting Equity Interests of any CFC or Foreign Holding Company, (b) Equity Interests constituting more than 65% of the total outstanding Equity Interests of any Disregarded Entity that owns an interest in a CFC or CFC Debt and, (c) any property or assets of any CFC (whether held directly or indirectly) and CFC Debt, (d) Leases (but not the proceeds derived or realized upon the sale, disposition and/or termination of any Lease(s)), and (e) Avoidance Actions and the proceeds thereof; <u>provided that</u>, upon entry of the Final Financing Order, the Liabilities shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agent and the Revolving Credit Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions. For the sake of clarity, no Excluded Collateral shall be required to be pledged as Collateral to secure any of the Loans.

Bankruptcy Code, the amounts necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such recovery (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "***Specified Bankruptcy Recoveries***"); provided, however, for the avoidance of doubt, the DIP Superpriority Claim (as defined below) and the Adequate Protection Superpriority Claim (as defined below) of the Prepetition Agents and the Prepetition Secured Lenders as provided in Paragraph 16 below shall be payable out of all Bankruptcy Recoveries, among other things.

As used herein, "***Bankruptcy Recoveries***" shall mean any recoveries of the Debtors, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code.

(c)     The Lease Proceeds, but not the Leases themselves, whether or not so perfected prior to the Petition Date.

(d)     Any cash held in any escrow or other account of the Debtors in respect of accrued and/or accruing employee benefit obligations as provided for in the Budget.

## G.     DIP Lien Priority

9.     The DIP Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, are:

(a)     created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code,

(b)     other than as set forth in (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

(c)     subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Credit Agreement, subject to the Prepetition Intercreditor Agreement, the terms of this Interim Order, and upon its entry, the terms of the Final Order. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Cases. The DIP Liens shall not be subject to sections 510(c), 549, 550, or 551 of the Bankruptcy Code.

10.     Except as otherwise expressly set forth herein, (x) the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall remain bound by the terms and conditions set forth in the Prepetition Intercreditor Agreement, including, without limitation, with respect to the Prepetition Collateral and the DIP Collateral, (y) nothing contained in this Interim Order shall be deemed to abrogate or limit  the respective, rights, claims and obligations of each of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders under the Prepetition Intercreditor Agreement, and (z) the Prepetition Intercreditor Agreement shall apply and govern the respective rights, obligations, and priorities of each of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties in these Chapter 11 Cases.  All loans and advances made by the DIP Agent and/or the DIP Lenders pursuant to and under the DIP Facility and all other DIP Obligations outstanding thereunder shall be deemed to be "ABL Obligations" under the Prepetition Intercreditor Agreement.

**H.     Enforceable Obligations**

11.     The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, and shall be enforceable against the Debtors, their estates, and any successors thereto, and their creditors in accordance with their terms.

**I.     Protection of the DIP Lenders and Other Rights**

12.     From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Interim Order, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

**J.     Superpriority Administrative Claim Status**

13.     Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature

whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment; provided, however, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.

14.    Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Lenders arising hereunder.

## II.

### AUTHORIZATION FOR USE OF CASH COLLATERAL; ADEQUATE PROTECTION

15.    Pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to permitted variances), the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the Interim Period and terminating upon notice being provided by (i) the DIP Agent to the Debtors that a DIP Order Event of Default (as defined below) has occurred and is continuing, or (ii) the Prepetition Term Loan Agent that a Cash Collateral Termination Event (as defined below) has occurred and is continuing, in the manner set forth in Paragraphs 36 and 38 below.

16.    As adequate protection for any diminution in the value of the interests of the Prepetition Secured Lenders in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens and the incurrence of the DIP Obligations, the subordination to the Carve Out, and the Debtors' use of Cash Collateral, and any other diminution in value arising out of the imposition of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral and Cash Collateral during the pendency of these Chapter 11 Cases, including the disposition of assets as contemplated by the

Sale Motion (as defined below) (collectively, "***Diminution in Value***"), the Prepetition Secured Lenders shall receive adequate protection as follows (collectively, "***Adequate Protection***"):

(a)    **Adequate Protection Liens**.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, and solely to the extent of the Diminution in Value of the interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral (including Cash Collateral), the Prepetition Agent (for the benefit of the Prepetition Secured Lenders) shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the DIP Collateral (the "***Adequate Protection Liens***") which shall be (i) junior only to the Carve Out, the DIP Liens securing the DIP Obligations, and Permitted Prior Liens, and (ii) in all instances, subject to the Prepetition Intercreditor Agreement.

(b)    **Adequate Protection Superpriority Claim**.    Solely to the extent of the diminution in the value of the interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have an allowed superpriority administrative expense claim (the "***Adequate Protection Superpriority Claim***") which shall have priority (except with respect to (i) the Carve Out and (ii) the DIP Superpriority Claim), in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claim.

(c)    **Adequate Protection Payments**.

(i)    Until the repayment in full of the obligations under the Prepetition ABL Credit Agreement (including pursuant to the Final Roll-Up), on the last business day of each month, the Prepetition ABL Agent shall receive, for the benefit of the Prepetition ABL Lenders, payment of all accrued and unpaid interest at the default rate set forth in the Prepetition ABL Credit Agreement;

(ii)    Subject to the provisions of Paragraph 51 hereof, the Prepetition ABL Agent and the Prepetition ABL Lenders shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition ABL Credit Agreement;

(iii)    Until the repayment in full of the obligations under the Prepetition Term Loan Financing Documents, on the last business day of each month, the Prepetition Term Loan Agent shall receive, for the benefit of the Prepetition Term Lenders, payment of all

accrued and unpaid interest at the default rate set forth in the Prepetition Term Loan Financing Documents;

(iv)    Subject to the provisions of Paragraph 51 hereof, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders shall receive the current payment of the reasonable documented post-petition out-of-pocket fees, costs and expenses of financial advisors, appraisers, and attorneys engaged by such parties, solely to the extent permitted under the Prepetition Term Loan Credit Agreement; provided however, that if the claims of the Prepetition Term Loan Lenders are determined by this Court to have been undersecured as of the Petition Date, then any payments authorized pursuant to this provision shall be reallocated and applied to reduce the outstanding principal balance owed to the Prepetition Term Loan Lenders; and

(v)    The Prepetition Term Loan Agent shall earn and be paid the Consent Fee in accordance with the Fee Letter.

(d)    **Adequate Protection With Respect to Sales.**

(i)    The sale process to be implemented under section 363 of the Bankruptcy Code as contemplated by the MovieStop Store Closing Motion shall be approved by order of the Court not later than June 14, 2016, failing which there shall occur an Event of Default under the DIP Credit Agreement and this Interim Order.

(ii)    The comprehensive sale process to be implemented under section 363 of the Bankruptcy Code as contemplated by the *Debtors' Combined Motion for Entry of Orders: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* (the "***Sale Motion***"), including the timeline and milestones contained therein, shall not be materially modified without the prior written consent of the Prepetition Agents and the DIP Agent, failing which there shall occur an Event of Default under the DIP Credit Agreement and this Interim Order.

(iii)    Upon the disposition of Prepetition Collateral as contemplated in the MovieStop Store Closing Motion and the Sale Motion (collectively, the "***Sales***"), any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Liens, and the DIP Liens; provided, however, that such Prepetition Liens, Adequate Protection Liens, and DIP Liens shall attach to the proceeds of any such Sales in the same extent, validity and priority as such Liens attached to the Prepetition Collateral and proceeds of DIP Collateral, which proceeds shall be promptly paid at closing on the Sales (including if such Sale(s) constitutes a DIP Maturity Event): first, to the DIP Agent for application to the Prepetition ABL Debt or the DIP Obligations in accordance with the terms of the DIP Credit Agreement, and after payment in full of the DIP Obligations in the event the Final Roll-Up has not occurred to the Prepetition ABL Agent to be applied to the Prepetition ABL Debt in accordance with the Prepetition ABL Credit Agreement; second, to fund the Carve Out Account (subject to the Carve Out Cap) in accordance with Paragraph 32 hereof; and third, to the Debtors (provided, that either (x) subject to the Final Order or (y) absent an agreement among the Term Loan Agent and the Debtors in furtherance of paragraphs 33-34 hereof, any remaining proceeds of the Prepetition Collateral and/or Postpetition Collateral shall be deposited in the Concentration Account.

(iv)    The Debtors shall keep the DIP Agent and Prepetition Agents fully informed of the Debtors' efforts to consummate the Sales and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the

generality of the foregoing, the Debtors shall (A) promptly provide to the DIP Agent and Prepetition Agents copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtors and copies of all bids from liquidators, (B) provide, no less frequently than weekly, status updates on the Debtors' efforts to consummate the Sales and/or any other sales, and (C) promptly advise the DIP Agent and Prepetition Agents of any expressions of interest in any or all of the Debtors' assets and/or equity interests.

(v)    In connection with any sale process authorized under the Sale Motion, the Prepetition Agents and Prepetition Secured Lenders may seek to credit bid some or all of their claims for their respective collateral (each a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code. A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds a security interest.  Each of the Prepetition Agents shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid.

(e)    **Access to Records; Reporting**.  In addition to, and without limiting, whatever rights to access the Prepetition Agents and Prepetition Secured Lenders have under the Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition Agents and Prepetition Secured Lenders (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors, and (iv) otherwise to have the full cooperation of the Debtors.  In addition, the Debtors shall provide to the Prepetition Agents and Prepetition Secured lenders all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided to the DIP Agent under the DIP Credit Agreement.

(f)    **Prepetition Indemnity Account.**  (i)  Upon entry of this Interim Order, the Debtors shall establish a segregated account in the control of the Prepetition ABL Agent (the "**Prepetition ABL Indemnity Account**"), into which the sum of $250,000.00 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition ABL Financing Documents, including without limitation, the provisions of Section 19-12 of the Prepetition ABL Credit Agreement (the "**Prepetition ABL Indemnity Obligations**").

(ii)    Upon the payment in full of all DIP Obligations and Prepetition ABL Debt, the Debtors shall establish a segregated account in the control of the Prepetition Term Loan Agent (the "**Prepetition Term Indemnity Account**", and together with the Prepetition ABL Indemnity Account, the "**Prepetition Indemnity Accounts**" ), into which the sum of $250,000 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders under the Prepetition Term Loan Financing Documents, including without limitation, the provisions of Section 19.12 of the Prepetition Term Loan Credit Agreement (the "**Prepetition Term Indemnity Obligations**", and together with the Prepetition ABL Indemnity Obligations, the "**Prepetition Indemnity Obligations**").

(A)    The funds in the respective Prepetition Indemnity Accounts shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) (x) in the case of the Prepetition ABL Indemnity

Account, incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders, and (y) in the case of the Prepetition Term Indemnity Account, incurred by the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, in connection with or responding to (1) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 24 hereof, or (2) any Challenge Proceeding (i) against the Prepetition ABL Agent or Prepetition ABL Lenders related to the Prepetition ABL Financing Documents, the Prepetition ABL Liens, or the Prepetition ABL Debt, or (ii) against the Prepetition Term Loan Agent or Prepetition Term Loan Lenders related to the Prepetition Term Loan Financing Documents, the Prepetition Term Loan Liens, or the Prepetition Term Loan Debt, as applicable, whether in the Chapter 11 Cases or independently in another forum, court, or venue.

(B)    The Prepetition Indemnity Obligations shall be secured by a first priority lien on the respective Prepetition Indemnity Account and the funds therein and by a lien on the Prepetition Collateral (subject in all respects to the Prepetition Intercreditor Agreement).

(C)    The Prepetition ABL Agent and Prepetition ABL Lenders may apply amounts in the Prepetition ABL Indemnity Account against the Prepetition ABL Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of Paragraph 51 below.

(D)    The Prepetition Term Loan Agent and Prepetition Term Loan Lenders may apply amounts in the Prepetition Term Indemnity Account against the Prepetition Term Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of Paragraph 51 below.

(E)    In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Challenge Period Termination Date (as defined below) the Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Lenders), and the Prepetition Term Loan Agent (for itself and on behalf of the Prepetition Term Loan Lenders), as the context makes applicable, shall retain and maintain the Prepetition ABL Liens and Prepetition Term Loan Liens, respectively, as security for any the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the respective Prepetition Indemnity Accounts; provided, that the Prepetition ABL Lien and Prepetition Term Loan Lien retention herein shall in all respects remain subject to the terms of the Prepetition Intercreditor Agreement; provided further that, (i) any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition ABL Financing Documents and the Prepetition Term Loan Financing Documents, as applicable, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 24-26 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

(g)    **Approved Budget**.  The Debtors shall endeavor to consult with and provide prior notice to the Prepetition Term Loan Agent prior to agreeing to any of the following with respect to the Approved Budget and DIP Financing Agreements, as applicable: (a) material changes to the Approved Budget; and (b) extensions of the case and/or sale milestones set forth in the DIP Credit Agreement that would extend the sale closing deadline beyond July 15, 2016, in the event that a liquidation bid is selected as the highest and best bid, and July 22, 2016, in the event that a going-concern bid is selected as the highest and best bid (collectively, the "***Subject Amendments***"); provided, however, that the Debtors shall not incur any liability to the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders or any other Person in consequence of its failure to make any consultation or provide such prior notice with respect to the Subject Amendments pursuant to the provisions hereof.  For the avoidance of doubt, but subject in all respects to the Prepetition Intercreditor Agreement, nothing contained in this subsection (g) shall be deemed to limit, restrict, or constitute a waiver of any of the respective rights and remedies of the Debtors, Prepetition Term Loan Agent or Prepetition Term Loan Lenders under the Bankruptcy Code or other applicable law, including, without limitation, any right of the Prepetition Term Loan Agent to file an objection or other appropriate pleading with the Court in the event that it does not agree with any amendment, change, or extension of any of the Subject Amendments to which the Debtors have consented or the Debtors' rights to contest such objection.

(h)    **Term Loan Reserve**.  In accordance with the Prepetition ABL Financing Documents and the DIP Credit Agreement, the Prepetition Term Loan Agent may notify the DIP Agent as to the amount of the Term Loan Reserve, if any, and the DIP Agent shall implement and maintain such Term Loan Reserve.

17.    Nothing herein shall impair or modify the Prepetition Agents' or the Prepetition Secured Lenders' rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Lenders hereunder is insufficient to compensate for the diminution in value of the interest of the Prepetition Agents and Prepetition Secured Lenders in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case; provided, however, that (a) nothing herein shall impair the Debtors' or any other party in interest's right to seek to contest any request for additional or different adequate protection, and (b) any section 507(b) claim granted in the Chapter 11 Cases to the Prepetition Agents and/or Prepetition Secured Lenders shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

## III.

### POST-PETITION LIEN PERFECTION

18.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or

document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.

19.    Notwithstanding the foregoing, the DIP Agent and/or the Prepetition Agents may, in their discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or the Adequate Protection Liens granted pursuant hereto, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

20.    The Debtors shall execute and deliver to the DIP Agent and the Prepetition Agents all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents as the DIP Agent and the Prepetition Agents may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or the Adequate Protection Liens granted pursuant hereto.

21.    The DIP Agent and the Prepetition Agents, in their discretion, may file a photocopy of the entered, docketed version of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

22.    The DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition ABL Agent and succeed to the rights of the Prepetition ABL Agent with respect to all third party notifications in connection with the Prepetition ABL Financing Documents, all prepetition collateral access agreements, and all other

agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

23.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

(a)    permit the Debtors to grant the DIP Liens and the Adequate Protection Liens, and to incur all liabilities and obligations to the DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and

(b)    authorize the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Interim Order.

## IV.

### RESERVATION OF CERTAIN THIRD-PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS

24.    Nothing in this Interim Order or the DIP Credit Agreement or the other DIP Financing Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by this Court may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Agents, the Prepetition Secured Lenders, the Prepetition Liens or the Prepetition Secured Debt (collectively, a "***Challenge Proceeding***"), including but not limited to any of the following:

(a)    an objection to or challenge of the Debtors' Stipulations set forth in Paragraphs F(1) through F(7), including (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Agents and Prepetition Secured Lenders in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt, or

(b)    a suit against the Prepetition Agents or Prepetition Secured Lenders in connection with or related to the Prepetition Secured Debt or the Prepetition Liens, or the actions or inactions of the Prepetition Agents or Prepetition Secured Lenders arising out of or related to the Prepetition Secured Debt or Prepetition Liens;

provided, however, that any Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against the Prepetition Agents or Prepetition Secured Lenders in the nature of a setoff, counterclaim, or defense to the Prepetition Secured Debt or Prepetition Liens (including but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Agents or Prepetition Secured Lenders), by the later of (x) for any Committee, sixty (60) days following the appointment of the first official Committee or (y) for any party-in-interest other than an official Committee, seventy-five (75) days following entry of this Interim Order (collectively, (x) and (y) shall be referred to as the "***Challenge Period***", and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been commenced during the Challenge Period, shall be referred to as the "***Challenge Period Termination Date***"; provided that, the Challenge Period shall be tolled for a period not to exceed thirty (30) days upon the filing of a motion by an interested party seeking standing to commence a Challenge in accordance with the terms of this Interim Order).  In the event a third party, including any Committee, files a motion seeking standing to commence a Challenge in accordance with the terms of this Interim Order, any such motion shall, at a minimum, include a copy of any proposed objection or adversary complaint containing a detailed description of the claims and causes of action such party proposes to pursue. The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents or Prepetition Secured Lenders, if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and Prepetition Secured Lenders.  For the avoidance of doubt, in the event any of the Chapter 11 Cases is converted to a case under Chapter 7 or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then the Challenge Period shall not expire until sixty (60) days after the trustee's appointment.  In the event that the Committee or any other party in interest with requisite standing has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge

Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding commenced within the Challenge Period, the trustee shall not be bound by the Debtors' Stipulations in this Order.

25.     Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Agents and Prepetition Secured Lenders, as the case may be, any and all such challenges and objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) ***shall be deemed to be forever waived and barred*** with respect to the applicable Prepetition Agent(s) and Prepetition Secured Lender(s), and the Prepetition Secured Debt as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be deemed to be an allowed fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be binding on all creditors, interest holders, and parties-in-interest.

26.     To the extent any such Challenge Proceeding is commenced, the Prepetition Agents and Prepetition Secured Lenders, or any of them, as the case may be, shall be entitled to include the costs and expenses, including but not limited to reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Prepetition Secured Debt to the extent permitted pursuant to the relevant Prepetition Financing Documents.  To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Agents and the Prepetition Secured Lenders, or any of them, as the case may be, shall, be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of the Prepetition Secured Debt and as part of the Prepetition Indemnity Obligations which shall be reimbursed by the Debtors including (x) each month as provided for in Paragraph 51, below and (y) out of the respective Prepetition Indemnity Accounts, and as one of the

Adequate Protection Superpriority Claims, and the applicable Prepetition Indemnity Account(s) shall be maintained until the final resolution of all such objections or claims against the applicable Prepetition Agent(s) and/or the applicable Prepetition Secured Lenders. The Debtors shall remain liable to the applicable Prepetition Agent(s) and Prepetition Secured Lenders, or any of them, as the case may be, for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the applicable Prepetition Indemnity Account(s) are insufficient to satisfy them in full.

## V.

### CARVE OUT AND PAYMENT OF PROFESSIONALS.

27.     Subject to the terms and conditions contained in this Paragraph 27, the DIP Liens, DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims are all subordinate to the following (collectively, the "*Carve Out*"):

(a)     (i) statutory fees and interest payable to the Office of the U.S. Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (ii) 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(b)     all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or a Committee, if any (collectively, the "*Case Professionals*"), through the date of service by the DIP Agent of a Carve Out Trigger Notice (as defined below), up to and as limited by the aggregate Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable budget variances),[5] less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; and

(c)     all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice in an aggregate amount not to exceed $250,000 (the "*Carve Out Cap*"), less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.

---

[5]     Accordingly, to the extent that a particular Case Professional is over budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice.

For the avoidance of doubt, fees, disbursements, costs and expenses incurred by Case Professionals cannot be paid to Case Professionals unless and until allowed by the Court.

For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered (i) by the DIP Agent to the Debtors and their counsel, counsel to the Prepetition Term Loan Lenders, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any DIP Order Event of Default and shall specify that it is a "Carve Out Trigger Notice", or (ii) by the Prepetition Term Loan Agent to the Debtors and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of a Cash Collateral Termination Event.

28.     For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, Liens or claims securing the DIP Obligations and/or the Prepetition Secured Debt granted or recognized as valid.

29.     Further, the Carve Out shall exclude, and neither advances under the DIP Facility nor proceeds of the Prepetition Collateral and the DIP Collateral shall be used to pay, any fees and expenses incurred in connection with the assertion or joinder in any Challenge Proceeding or any other claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief:

(A)     invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Agent's Liens in the DIP Collateral, (iii) the Prepetition Secured Debt, (iv) the Prepetition Agents' and the Prepetition Secured Lenders' Liens in the Prepetition Collateral, and/or (v) the Adequate Protection Liens; or

(B)     preventing, hindering, or delaying, whether directly or indirectly, the DIP Agent's, the DIP Lenders', the Prepetition Agents', or the Prepetition Secured Lenders' assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Liens, or the respective Prepetition Indemnity Accounts;

 provided, however, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by any Committee, but only up to $50,000.00 of the Carve Out may be used for such investigative work.

30.     Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expenses

of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders to object to the allowance and payment of such fees and expenses.

## VI.

### MATURITY; DIP ORDER EVENTS OF DEFAULT; REMEDIES

**A.    Maturity**

31.    All DIP Obligations shall be due and payable on the date that is the earliest to occur of any of the following (each, a "***DIP Maturity Event***"):

    (a)    December 12, 2016;

    (b)    the closing of a sale of all or substantially all of the working capital assets of the Debtors pursuant to the provisions of section 363 of the Bankruptcy Code; or

    (c)    the effective date of any chapter 11 plan of reorganization/liquidation for the Debtors (a "***Plan***").

32.    Following a DIP Maturity Event, and unless the DIP Facility has been extended, the Debtors shall be required to transfer to a segregated account subject to the control of an escrow agent reasonably acceptable to the Debtors and the Prepetition Term Loan Agent (the "***Carve Out Account***"), an amount of Cash Collateral equal (i) to the Carve Out Cap, plus (ii) the then accrued and unpaid fees and expenses of the Case Professionals through the date on which a DIP Maturity Event first occurs, to the extent in compliance with the Approved Budget (after giving effect to all carryforwards and carrybacks from prior favorable budget variances for each Case Professional), which Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out.  All funds on deposit in the Carve Out Account, however funded and from whatever source derived, shall at all times continue to constitute Cash Collateral, subject to the prior payment of all amounts covered by the Carve Out.  Once the Carve Out Account has been funded, either by the Debtors as provided in this Paragraph 32 or by the DIP Agent as provided in Paragraph 41 below, none of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, nor the DIP Lenders shall have any further liability for nor responsibility with respect to the Carve Out, including any application or disbursement of funds in the Carve Out Account.

33.     In the event that (A) all Prepetition ABL Debt and DIP Obligations have been paid in full in cash and (B) the DIP Commitments have irrevocably terminated, the Debtors, in consultation with any Committee, the Prepetition ABL Agent, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders shall consult with each other as to the terms and conditions of continued consensual use of Cash Collateral in light of the then present circumstances of these Chapter 11 Cases.  If the Debtors, any Committee, the Prepetition ABL Agent, the Prepetition Term Loan Agent, and Prepetition Term Loan Lenders are not able to agree on such terms and conditions, the Prepetition Term Loan Agent shall be entitled to declare that the Debtors' rights to use Cash Collateral on the terms provided in this Interim Order are terminated (a "*Cash Collateral Termination Event*")  with such termination to take effect immediately upon delivery of notice (a "*Cash Collateral Termination Notice*") by the Prepetition Term Loan Agent to the Debtors and their counsel, the U.S. Trustee, and lead counsel to any Committee.

34.     Following the delivery of the Cash Collateral Termination Notice, the Debtors shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than three (3) days' notice to the Committee, the Prepetition ABL Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, including for the purposes of determining whether the use of Cash Collateral by the Debtors should be granted and on what terms and conditions, even if on a non-consensual basis.  In the event that the Debtors either accept the termination of use of Cash Collateral (by written correspondence to the Prepetition Term Loan Agent) or the Court determines that the Debtors are not permitted to use Cash Collateral, the delivery of the Cash Collateral Termination Notice shall automatically constitute delivery of a Carve Out Trigger Notice as set forth in Paragraph 27 hereof. Unless and until the Court enters an order authorizing the use of Cash Collateral, the Debtors may not use Cash Collateral without the prior written consent of the Prepetition Term Loan Agent; provided, however, that the Debtors' may use Cash Collateral solely to meet payroll (other than severance) during the one-week period following the delivery of a Cash Collateral Termination Notice.

35.     Unless and until the Prepetition ABL Debt and the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of (i) the Prepetition ABL Debt satisfactory to the

Prepetition ABL Agent and (ii) the DIP Obligations satisfactory to the DIP Agent, in each case in their sole and exclusive discretion have been made) and all DIP Commitments have been irrevocably terminated, the protections afforded to the Prepetition ABL Agent, the Prepetition ABL Lenders, the DIP Agent, and the DIP Lenders pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

36.     Unless and until the Prepetition Term Loan Debt has been irrevocably repaid in full in cash, the protections afforded to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders pursuant to this Interim Order and any actions taken pursuant thereto shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such Adequate Protection Liens and Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

**B.     DIP Order Events of Default**

37.     All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (each, a "***DIP Order Event of Default***"):

(a)     the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement; or

(b)     the failure of the Debtors to obtain entry of the Final Order on or before July 14, 2016;

**C.     Rights and Remedies Upon DIP Order Event of Default**

38.     Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence of any DIP Order Event of Default, upon five (5) days prior written

notice (a "*Remedies Notice*") of such occurrence (the "*Remedies Notice Period*"), in each case given to each of (v) the Debtors, (w) counsel to the Debtors, (x) counsel to each of the Prepetition Agents, (y) counsel for any Committee, and (z) the U.S. Trustee, the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Financing Agreements.

39.     Upon the service of a Remedies Notice after the occurrence of a DIP Order Event of Default:

(a)     the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition ABL Agent and the DIP Collateral to the DIP Agent as provided in this Interim Order and in the DIP Financing Agreements;

(b)     the Prepetition ABL Agent and the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Financing Agreements and the Prepetition ABL Financing Agreements, as applicable;

(c)     the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the Prepetition ABL Debt, the DIP Obligations, and the Carve Out; provided that, the Debtors shall be permitted to use Cash Collateral to pay their employees ordinary wages accrued up to the date of service of the Remedies Notice; and

(d)     any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion.

40.     Following the giving of a Remedies Notice by the DIP Agent, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than three (3) days' notice to the Committee, the Prepetition ABL Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders.  If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement

thereof, the automatic stay, solely as to the DIP Agent and the DIP Lenders, shall automatically terminate at the end of the Remedies Notice Period.

41.    Subject to the provisions of Paragraphs 38-40 above, upon the occurrence of a DIP Order Event of Default, the DIP Agent and the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that, (A) with respect to any of the Debtors' leasehold locations, the DIP Agent's and the DIP Lenders' rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii) which the DIP Agent and the DIP Lenders have under applicable non-bankruptcy law, and (B) prior to exercising any such remedies, the DIP Agent shall fund the Carve Out Account as set forth in Paragraph 32 hereof (provided that such Carve Out Account shall be subject to the control of the DIP Agent).

42.    Nothing included herein shall prejudice, impair or otherwise affect the Prepetition Agents' or the DIP Agent's rights to seek any other or supplemental relief from the Court in respect of the Debtors, nor the DIP Lenders' rights, as provided herein and in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D.    No Waiver of Remedies**

43.    The delay in or the failure of the Prepetition Agents or the DIP Agent to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Agents', the Prepetition Secured Lenders', or the DIP Agent's rights and remedies.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Prepetition Agents and the DIP Agent to: (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the

33

provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the Prepetition Agents and the DIP Agent may have.

## VII.

### CERTAIN LIMITING PROVISIONS

**A.    Section 506(c) Claims and Waiver**

44.    Nothing contained in this Interim Order shall be deemed a consent by the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent or the DIP Lenders to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Adequate Protection Liens under section 506(c) of the Bankruptcy Code or otherwise; provided, however, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

45.    As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Financing Agreements, and in consideration of the Prepetition Agents' and Prepetition Secured Lenders' consent to the use of their Cash Collateral, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and the DIP Lenders, the Prepetition Collateral, and the DIP Collateral.

**B.    Proceeds of Subsequent Financing**

46.    If at any time prior to the irrevocable repayment in full in cash of all Prepetition Secured Debt and DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over first, to the Prepetition ABL Agent to be applied in reduction of the Prepetition ABL Debt, second, to the DIP Agent to be applied

in reduction of the DIP Obligations, and then to the Prepetition Term Loan Agent to be applied to the Prepetition Term Loan Debt, unless otherwise agreed to by the DIP Agent, DIP Lenders, Prepetition ABL Agent and Prepetition ABL Lenders, in their sole respective discretion.

**C.      No Priming of DIP Facility**

47.      In entering into the DIP Financing Agreements, and consenting to the use of Cash Collateral, and as consideration therefor, each of the Debtors hereby agrees that until such time as all Prepetition ABL Debt and all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of the Prepetition ABL Debt and the DIP Obligations satisfactory to the Prepetition ABL Lenders and the DIP Lenders, as applicable, in their sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the DIP Agent, DIP Lenders, Prepetition ABL Agent and Prepetition ABL Lenders, in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders or the Prepetition Liens or Adequate Protection Liens granted to the Prepetition ABL Agent or Prepetition ABL Lenders under this Interim Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise; provided, that this Paragraph 47 shall not be deemed to amend the Prepetition Intercreditor Agreement.

48.      In consenting to the use of Cash Collateral and the other provisions hereof, and as consideration therefor, each of the Debtors hereby agrees that until such time as all of the Prepetition Term Loan Debt has been irrevocably paid in full in cash (or other arrangements for payment of such obligations satisfactory to the Prepetition Term Loan Lenders, in their sole and exclusive discretion have been made) and the Prepetition Term Loan Credit Agreement and the Loan Documents (as defined in the Prepetition Term Loan Credit Agreement) have been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, in their sole respective discretion) in any way prime or seek to prime the security interests and Prepetition Liens of the Prepetition Term Loan Agent or Adequate Protection Liens granted to the Prepetition Term

Loan Agent or Prepetition Term Loan Lenders under this Interim Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise (other than as permitted under Paragraph 18 above).

## VIII.

### OTHER RIGHTS AND OBLIGATIONS

**A.      Good Faith Under Section 364(e) of the Bankruptcy Code;
No Modification or Stay of this Interim Order**

49.      Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

50.      Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Interim Order, any claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and/or the DIP Lenders hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, or the DIP Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the Adequate Protection and the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.      Prepetition Agents', Prepetition Secured Lenders',
DIP Agent's, and DIP Lenders' Expenses**

51.      All reasonable out-of-pocket costs and expenses of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal,

accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders be required to comply with the U.S. Trustee fee guidelines; provided, however, the Debtors shall provide to the U.S. Trustee and any Committee a copy of any invoices received from the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders for professional fees and expenses during the pendency of the Chapter 11 Cases.  Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information).  If the Debtors, U.S. Trustee or counsel for any Committee object to the reasonableness of the invoices submitted by the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders, and the parties cannot resolve such objection within 10 days of receipt of such invoices, the Debtors, U.S. Trustee or the Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent, DIP Lender, Prepetition Agent, or Prepetition Secured Lender an objection (a "***Fee Objection***") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall promptly pay, and/or the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, only the undisputed amount of the invoice shall be paid and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

**C.      Binding Effect**

52.      The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Secured Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 24-26 above), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D.      No Third Party Rights**

53.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders.

**E.      No Marshaling**

54.      The DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

**F.      Section 552(b) of the Bankruptcy Code**

55.      Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

**G.      Amendments**

56.      The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court, but only after notice to the

Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, and any Committee; provided, however, that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court and the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, and any Committee shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided, further, that if the Prepetition Term Loan Agent, or Committee timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 57, a "material" amendment shall include, but not be limited to, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, (iii) changes the maturity date of the DIP Facility or any DIP Maturity Date, (iv) amends or waives any Event of Default under the DIP Credit Agreement, (v) revises any case or sale milestone set forth in the DIP Credit Agreement, or (vi) otherwise modifies the DIP Financing Agreements in a manner materially less favorable to the Debtors, the Prepetition Term Loan Agent, or the Prepetition Term Loan Lenders.  All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the DIP Agent, the Prepetition Agents, and/or the Prepetition Secured Lenders, and, if required, approved by this Court.

## H.    Survival of Interim Order

57.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

      (a)    confirming any Plan in the Chapter 11 Cases,

      (b)    converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

      (c)    dismissing the Chapter 11 Cases,

      (d)    withdrawing of the reference of the Chapter 11 Cases from this Court, or

      (e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

58.     The terms and provisions of this Interim Order including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements and any protections granted the Prepetition Agents or the Prepetition Secured Lenders shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 49, and such DIP Protections and protections for the Prepetition Secured Lenders shall maintain their priority as provided by this Interim Order until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Financing Agreements and the Prepetition Secured Debt has been irrevocably paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

## I.     Inconsistency

59.     In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, and this Interim Order, the provisions of this Interim Order shall govern and control.

## J.     Enforceability

60.     This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

## K.     Objections Overruled

61.     Notwithstanding any reservations of rights made on the record at the Interim Hearing with respect to this Interim Order, all objections to the Motion to the extent not withdrawn or resolved, are hereby overruled.

## L.     Waiver of Any Applicable Stay

62.     Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h) is hereby waived and shall not apply to this Interim Order.

**M.    Proofs of Claim**

63.    The Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition Secured Lenders, the DIP Agent, and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Cases or in any Successor Case.

**N.    Headings**

64.    The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**O.    Retention of Jurisdiction.**

65.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## IX.

### FINAL HEARING

66.    The Final Hearing on the Motion shall be held before this Court on _____ __, 2016, at __:00 _.m. (ET) before the Honorable _____, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Delaware, located at 824 Market Street North, Wilmington, Delaware 19801.

67.    The Debtors shall, within three (3) business days of the entry of this Interim Order, serve (A) the U.S. Trustee; (B) counsel to (i) the DIP Agent, (ii) the DIP Lenders, and (iii) the Prepetition ABL Agent, (x) Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), and (y) Ashby & Geddes, P.A. (Attn:  Gregory Taylor, Esq.); (C) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (D) counsel for the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, (x) Choate, Hall & Stewart LLP (Attn: Kevin Simard), and (y) Richards, Layton & Finger, P.A. (Attn:  Mark D. Collins, Esq and John H. Knight, Esq.); (E) the Internal Revenue Service; (F) all appropriate state taxing authorities; (G) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located; and (H) any other party that files a request for notices with the Court as of the date of such service, a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order.

68.     If no objections to the relief sought in the Motion are filed and served in accordance with this Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

69.     Any party in interest objecting to the relief sought in the Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **_____ __, 2016 at 4:00 p.m. (ET)** on the following parties:

| *Proposed Counsel for the Debtors* | *Office of the United States Trustee* |
|---|---|
| Cooley LLP<br>1114 Avenue of the Americas<br>New York New York 10036<br>Attn:   Cathy Hershcopf, Esq.<br>Email:  chershcopf@cooley.com<br><br>and<br><br>Whiteford Taylor Preston LLP<br>The Renaissance Centre, Suite 500<br>405 North King Street<br>Wilmington, DE 19801-3700<br>Attn:   Christopher Samis, Esq.<br>           L. Katherine Good, Esq.<br>Email:  csamis@wtplaw.com<br>           kgood@wtplaw.com | Office Of The United States Trustee<br>844 King Street<br>Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>Attn:   Hannah McCollum, Esq.<br>Email:  Hannah.mccollum@usdoj.gov |

| *Counsel for the DIP Agent* | *Counsel for the Prepetition Term Loan Agent* |
|---|---|
| Riemer & Braunstein LLP<br>Three Center Plaza,<br>Boston, Massachusetts 02108<br>Attn:    Donald E. Rothman, Esq.<br>Email:  drothman@riemerlaw.com<br><br>and<br><br>Riemer & Braunstein LLP<br>Times Square Tower<br>Seven Times Square, Suite 2506<br>New York, New York 10036<br>Attn:    Steven E. Fox, Esq.<br>Email:  sfox@riemerlaw.com<br><br>and<br><br>Ashby & Geddes, P.A.<br>500 Delaware Avenue<br>P.O. Box 1150<br>Wilmington, DE 19899<br>Attn:    Gregory Taylor, Esq.<br>Email:  GTaylor@ashby-geddes.com | Choate, Hall & Stewart LLP<br>Two International Place<br>Boston Massachusetts 02110<br>Attn:    Kevin J. Simard, Esq.<br>Email:  ksimard@choate.com<br><br>and<br><br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn:    Mark D. Collins, Esq.<br>           John H. Knight, Esq.<br>Email:  collins@rlf.com<br>           knight@rlf.com |

Dated: _____ __, 2016



_____

UNITED STATES BANKRUPTCY JUDGE

**Exhibit "1"**

**Approved Budget**

1995626.1

**DAC - Weekly DIP Budget**
$ in Millions

| | Cash Flow Forecast Week | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|---|
| | Week Ending | 6/17 | 6/24 | 7/1 | 7/8 | 7/15 | |
| 1 | **I. Cash Flow Summary** | | | | | | |
| 2 | Hastings | 3.2 | 5.6 | 4.5 | 4.8 | 87.9 | 106.0 |
| 3 | MovieStop | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 3.8 |
| 4 | SP Images | 0.2 | 0.1 | 0.1 | 0.3 | 0.6 | 1.3 |
| 5 | **Total Cash Receipts** | **4.3** | **6.6** | **5.5** | **5.7** | **89.0** | **111.1** |
| 6 | **Operating Disbursements** | | | | | | |
| 7 | Merchandise Payments | (1.2) | (1.2) | - | - | - | (2.4) |
| 8 | Rental Related Payments | (0.1) | (0.1) | (0.1) | (0.1) | - | (0.6) |
| 9 | Rent [1] | - | - | (2.7) | - | (1.2) | (3.9) |
| 10 | Payroll & Benefits | (0.3) | (2.2) | (0.4) | (2.3) | (0.3) | (5.5) |
| 11 | Sales Tax Remittance | (2.0) | (0.1) | - | (0.0) | (1.7) | (3.8) |
| 12 | Other Operating Disbursements | (1.4) | (1.3) | (1.1) | (1.2) | (1.1) | (6.0) |
| 13 | Subtotal | **(5.1)** | **(4.9)** | **(4.3)** | **(3.6)** | **(4.3)** | **(22.2)** |
| 14 | **Non-Operating Disbursements** | | | | | | |
| 15 | Capital Expenditures | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.4) |
| 16 | Revolver/DIP Interest and Fees | (0.1) | (0.1) | (0.1) | (1.1) | (0.1) | (1.5) |
| 17 | Professional Fees [2] | - | - | - | - | - | - |
| 18 | Other Non-operating Items | (1.0) | - | - | (0.0) | (0.6) | (1.6) |
| 19 | Subtotal | **(1.2)** | **(0.2)** | **(0.2)** | **(1.1)** | **(0.7)** | **(3.5)** |
| 20 | Utility/Vendor/Escrow Deposits and LC Cash Collateralization | (1.5) | (0.2) | (0.2) | (0.2) | (1.2) | (3.3) |
| 21 | **Total Disbursements** | **(7.8)** | **(5.4)** | **(4.7)** | **(4.9)** | **(6.3)** | **(29.0)** |
| 22 | **Net Cash Flow** | **(3.5)** | **1.2** | **0.8** | **0.8** | **82.7** | **82.1** |
| 23 | Change in O/S Checks | 0.3 | 0.0 | 2.0 | (2.1) | 0.8 | 1.1 |
| 24 | **Total Cash Flow Before Borrowings / Paydowns** | **(3.1)** | **1.2** | **2.8** | **(1.3)** | **83.5** | **83.1** |
| 25 | **II. Cash Roll Forward** | | | | | | |
| 26 | Starting Cash Balance | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| 27 | Net Cash Flow Before Borrowing / Paydown | (3.1) | 1.2 | 2.8 | (1.3) | 83.5 | 83.1 |
| 28 | Revolver Borrowing / Paydown | 3.1 | (1.2) | (2.8) | 1.3 | (68.0) | (67.6) |
| 29 | **Ending Cash Balance** | **0.5** | **0.5** | **0.5** | **0.5** | **16.0** | **16.0** |
| 30 | **III. Revolver Roll Forwards** | | | | | | |
| 31 | **Pre-Petition Revolver** | | | | | | |
| 32 | Starting Revolver Balance | 67.6 | 63.3 | 56.8 | 51.3 | - | 67.6 |
| 33 | Borrowing / Paydown | (4.3) | (6.6) | (5.5) | (5.7) | - | (22.0) |
| 34 | Conversion to DIP | - | - | - | (45.6) | - | (45.6) |
| 35 | **Ending Revolver Balance** | 63.3 | 56.8 | 51.3 | - | - | - |
| 36 | **DIP Loan Revolver** | | | | | | |
| 37 | Starting DIP Loan Balance | - | 7.4 | 12.8 | 15.4 | 68.0 | - |
| 38 | Borrowing / Paydown | 7.4 | 5.4 | 2.6 | 7.0 | (68.0) | (45.6) |
| 39 | Conversion from Pre-Petition | - | - | - | 45.6 | - | 45.6 |
| 40 | **Ending Revolver Balance Before LCs and Accr. Int.** | 7.4 | 12.8 | 15.4 | 68.0 | - | - |
| 41 | Accrued Interest | 0.0 | 0.0 | 0.0 | 0.0 | | |
| 42 | Letters of Credit ("LCs") | 1.2 | 1.2 | 1.2 | 1.2 | | |
| 43 | **Ending DIP Loan Balance** | **8.6** | **14.0** | **16.6** | **69.2** | **-** | **-** |
| 44 | **IV. Obligations** | | | | | | |
| 45 | Pre-Petition Revolver | 63.3 | 56.8 | 51.3 | - | - | - |
| 46 | DIP Revolver | 8.6 | 14.0 | 16.6 | 69.2 | - | - |
| 47 | Total Revolver | **72.0** | **70.8** | **68.0** | **69.2** | **-** | **-** |
| 48 | Term Loan | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 |
| 49 | **Total Obligations** | **82.1** | **80.9** | **78.1** | **79.3** | **10.1** | **10.1** |
| 50 | **V. Revolver Excess Availability and Liquidity** | | | | | | |
| 51 | Revolver Excess Availability [2] | 5.2 | 4.6 | 5.2 | 1.6 | - | |
| 52 | Cash Balance | 0.5 | 0.5 | 0.5 | 0.5 | 16.0 | |
| 53 | **Total Liquidity** | **5.7** | **5.1** | **5.7** | **2.1** | **16.0** | |

[1] Includes June stub rent paid week ending 7/15. The payment of postpetition rent for June 2016 is conditioned upon a Final DIP order being entered that provides for a 506(c) waiver for the Prepetition Lenders.

[2] DIP Revolver borrowing base includes reserve for accrued and unpaid professional fees.

**<u>Exhibit B</u>**

**DIP Credit Agreement**

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**BANK OF AMERICA, N.A.**
AS AGENT

AND

THE LENDERS REFERENCED HEREIN,

AND

**BANK OF AMERICA, N.A.**
AS SOLE LEAD ARRANGER AND BOOKRUNNER

AND

**DRAW ANOTHER CIRCLE, LLC**
THE BORROWER

AND

THE BORROWERS REFERENCED HEREIN

June [___], 2016

**TABLE OF CONTENTS**

ARTICLE 1 - Definitions ..................................................................................................... 8

ARTICLE 2 - The Revolving Credit: ................................................................................... 38

2-1.    Establishment of Revolving Credit. .................................................................. 38
2-2.    Advances in Excess of Borrowing Base (OverLoans)...................................... 39
2-3.    Risks of Value of Collateral ............................................................................. 39
2-4.    Commitment to Make Revolving Credit Loans and Support Letters of Credit..... 39
2-5.    Revolving Credit Loan Requests. ..................................................................... 39
2-6.    Making of Revolving Credit Loans. ................................................................. 41
2-7.    Reserved. ........................................................................................................... 42
2-8.    The Loan Account. ............................................................................................ 42
2-9.    The Revolving Credit Notes .............................................................................. 43
2-10.   Payment of The Loan Account. ........................................................................ 43
2-11.   Interest on Revolving Credit Loans. ................................................................ 44
2-12.   Revolving Credit Commitment Fee. ................................................................. 45
2-13.   Reserved ............................................................................................................ 45
2-14.   Unused Line Fee. .............................................................................................. 45
2-15.   Certain Bankruptcy Matters. ............................................................................ 45
2-16.   Concerning Fees. ............................................................................................... 47
2-17.   Agent's and Revolving Credit Lenders' Discretion. ........................................ 48
2-18.   Procedures For Issuance of L/C's...................................................................... 49
2-19.   Fees For L/C's. .................................................................................................. 50
2-20.   Concerning L/C's. ............................................................................................. 51
2-21.   Changed Circumstances. ................................................................................... 53
2-22.   Lenders' Commitments. .................................................................................... 53
2-23.   Joint and Several Obligations. .......................................................................... 55
2-24.   Designation of Hastings Entertainment as Borrowers' Agent.......................... 57

ARTICLE 3 - Conditions Precedent: ................................................................................. 58

3-1.    Reserved. ........................................................................................................... 58
3-2.    Reserved ............................................................................................................ 58
3-3.    Additional Documents....................................................................................... 58
3-4.    Officers' Certificates ........................................................................................ 58
3-5.    Representations and Warranties ........................................................................ 59
3-6.    Reserved ............................................................................................................ 59
3-7.    All Fees and Expenses Paid.
3-8.    Borrower Not In Default ................................................................................... 59
3-9.    Reserved ............................................................................................................ 59
3-10.   Bankruptcy Matters. ......................................................................................... 59
3-11.   Budget.. .............................................................................................................. 59
3-12.   Approvals.. ......................................................................................................... 60
3-13.   Benefit of Conditions Precedent....................................................................... 60
3-14.   Representations and Warranties. ....................................................................... 60
3-15.   No Default.......................................................................................................... 60
3-16.   Budget Compliance. .......................................................................................... 60
3-17.   No Challenge. .................................................................................................... 60

ARTICLE 4 - GENERAL REPRESENTATIONS, COVENANTS AND WARRANTIES: ........................................ 61

4-1.    Payment and Performance of Liabilities ............................................................. 61
4-2.    Due Organization.  Authorization.  No Conflicts. ............................................ 61
4-3.    Trade Names. ..................................................................................................... 63
4-4.    Infrastructure. .................................................................................................... 63
4-5.    Locations. ........................................................................................................... 63
4-6.    Title to Assets. ................................................................................................... 65
4-7.    Indebtedness ...................................................................................................... 66
4-8.    Insurance. ........................................................................................................... 67
4-9.    Licenses ............................................................................................................. 67
4-10.   Leases ................................................................................................................ 68
4-11.   Requirements of Law ........................................................................................ 68
4-12.   Labor Relations. ................................................................................................ 68
4-13.   Maintain Properties ........................................................................................... 69
4-14.   Taxes. ................................................................................................................. 70
4-15.   No Margin Stock ............................................................................................... 71
4-16.   ERISA. ............................................................................................................... 71
4-17.   Hazardous Materials. ........................................................................................ 72
4-18.   Litigation ........................................................................................................... 72
4-19.   Reserved ............................................................................................................ 72
4-20.   Loans ................................................................................................................. 72
4-21.   Protection of Assets .......................................................................................... 73
4-22.   Line of Business ................................................................................................ 73
4-23.   Affiliate Transactions ........................................................................................ 73
4-24.   Further Assurances. ........................................................................................... 73
4-25.   Adequacy of Disclosure. ................................................................................... 74
4-26.   No Restrictions on Liabilities ........................................................................... 75
4-27.   Anti-Corruption Laws and Sanctions. .............................................................. 75
4-28.   PATRIOT Act. ................................................................................................... 75
4-29.   Financing Orders. .............................................................................................. 76
4-30.   Other Covenants. ............................................................................................... 76

ARTICLE 5 - FINANCIAL REPORTING AND PERFORMANCE COVENANTS: ........................................... 77

5-1.    Maintain Records .............................................................................................. 77
5-2.    Access to Records. ............................................................................................ 77
5-3.    Prompt Notice to Agent. ................................................................................... 78
5-4.    Borrowing Base Certificate .............................................................................. 79
5-5.    Reports. .............................................................................................................. 79
5-6.    Reserved. ............................................................................................................ 80
5-7.    Reserved. ............................................................................................................ 80
5-8.    Officers' Certificates ......................................................................................... 80
5-9.    Inventories, Appraisals, and Audits .................................................................. 81
5-10.   Additional Financial Information. ..................................................................... 82
5-11.   Reserved. ............................................................................................................ 84
5-12.   Additional Bankruptcy Related Affirmative Covenants. .................................. 84
5-13.   Bankruptcy-Related Negative Covenants .......................................................... 87
5-14.   Use of Loan Proceeds. ...................................................................................... 90

ARTICLE 6 - USE OF COLLATERAL: ....................................................................................................... 90

6-1.    Use of Inventory Collateral. ............................................................................. 90

6-2.    Inventory Quality ............................................................................ 90
6-3.    Adjustments and Allowances .......................................................... 90
6-4.    Validity of Accounts. ...................................................................... 91
6-5.    Notification to Account Debtors .................................................... 91

ARTICLE 7 - CASH MANAGEMENT, PAYMENT OF LIABILITIES: ......................... 91

7-1.    Depository Accounts. ...................................................................... 91
7-2.    Credit Card Receipts. ...................................................................... 91
7-3.    The Concentration, Blocked, and Operating Accounts. ................ 92
7-4.    Proceeds and Collections. ............................................................... 92
7-5.    Payment of Liabilities. .................................................................... 93
7-6.    The Operating Account ................................................................... 94

ARTICLE 8 - GRANT OF SECURITY INTEREST: ................................................. 94

8-1.    Grant of Security Interest ............................................................... 94
8-2.    Extent and Duration of Security Interest. ...................................... 95

ARTICLE 9 - AGENT AS BORROWERS' ATTORNEY-IN-FACT: ........................... 96

9-1.    Appointment as Attorney-In-Fact. ................................................. 96
9-2.    No Obligation to Act ....................................................................... 97

ARTICLE 10 - EVENTS OF DEFAULT: ............................................................... 97

10-1.    Failure to Pay the Revolving Credit ............................................. 97
10-2.    Failure To Make Other Payments. ............................................... 97
10-3.    Failure to Perform Covenant or Liability .................................... 97
10-4.    Reporting Requirements. ............................................................... 97
10-5.    Misrepresentation. ......................................................................... 98
10-6.    Acceleration of Other Debt. Breach of Lease. ............................ 98
10-7.    Default Under Other Agreements. ................................................ 98
10-8.    Uninsured Casualty Loss. .............................................................. 98
10-9.    Attachment. Judgment. Restraint of Business. ............................ 98
10-10.   Reserved. ....................................................................................... 99
10-11.   Reserved. ....................................................................................... 99
10-12.   Default by Guarantor ..................................................................... 99
10-13.   Indictment – Forfeiture. ................................................................ 99
10-14.   Termination of Guaranty ............................................................... 99
10-15.   Challenge to Loan Documents. ..................................................... 99
10-16.   Change in Control .......................................................................... 99
10-17.   Budget.. ......................................................................................... 100
10-18.   Subrogation. ................................................................................. 100
10-19.   Cases, Motions, Etc. ..................................................................... 100
10-20.   Restrainment. ............................................................................... 101
10-21.   Challenge. ..................................................................................... 101
10-22.   Sections 506(c) and 552(b). ........................................................ 102
10-23.   Chapter 11 Case Milestones ........................................................ 102

ARTICLE 11 - RIGHTS AND REMEDIES UPON DEFAULT: ................................. 102

11-1.    Acceleration. ................................................................................. 102
11-2.    Rights of Enforcement. ................................................................ 103
11-3.    Sale of Collateral.  Subject to the Financing Orders, ................ 103
11-4.    Occupation of Business Location ................................................ 104

11-5.   Grant of Nonexclusive License ..................................................................... 104
11-6.   Assembly of Collateral ................................................................................. 104
11-7.   Rights and Remedies .................................................................................... 104
11-8.   No Challenge ................................................................................................ 105

ARTICLE 12 - REVOLVING CREDIT FUNDINGS AND DISTRIBUTIONS: ..................... 105

12-1.   Revolving Credit Funding Procedures .......................................................... 105
12-2.   Reserved. ...................................................................................................... 106
12-3.   Agent's Covering of Fundings. ..................................................................... 106
12-4.   Ordinary Course Distributions ..................................................................... 108

ARTICLE 13 – RESERVED. ............................................................................................ 109

ARTICLE 14 -THE AGENT: ............................................................................................ 109

14-1.   Appointment of The Agent. .......................................................................... 109
14-2.   Responsibilities of Agent. ............................................................................ 109
14-3.   Concerning Distributions By the Agent. ...................................................... 110
14-4.   Dispute Resolution ....................................................................................... 111
14-5.   Distributions of Notices and of Documents ................................................ 111
14-6.   Confidential Information. ............................................................................. 112
14-7.   Reliance by Agent ........................................................................................ 112
14-8.   Non-Reliance on Agent and Other Revolving Credit Lenders. .................... 112
14-9.   Indemnification ............................................................................................ 113
14-10.  Resignation of Agent. .................................................................................. 113

ARTICLE 15 - ACTION BY AGENT - CONSENTS - AMENDMENTS - WAIVERS: ......... 114

15-1.   Administration of Credit Facilities. ............................................................. 114
15-2.   Actions Requiring or On Direction of Majority Lenders ............................. 115
15-3.   Actions Requiring or On Direction of SuperMajority Lenders .................... 115
15-4.   Actions Requiring Certain Consent. ............................................................. 115
15-5.   Actions Requiring or Directed By Unanimous Consent .............................. 116
15-6.   Reserved ....................................................................................................... 117
.        117
15-7.   Actions Requiring Agent's Consent. ............................................................. 117
15-8.   Miscellaneous Actions. ................................................................................ 117
15-9.   Actions Requiring Borrowers' Consent ........................................................ 118
15-10.  NonConsenting Revolving Credit Lender. .................................................... 118

ARTICLE 16 -  ASSIGNMENTS BY REVOLVING CREDIT LENDERS: ........................... 119

16-1.   Assignments and Assumptions. .................................................................... 119
16-2.   Assignment Procedures ................................................................................ 120
16-3.   Effect of Assignment. .................................................................................. 120

ARTICLE 17 - NOTICES: ............................................................................................... 121

17-1.   Notice Addresses .......................................................................................... 121
17-2.   Notice Given ................................................................................................. 122

ARTICLE 18 - TERM: .................................................................................................... 123

18-1.   Termination of Revolving Credit ................................................................. 123
18-2.   Actions On Termination. .............................................................................. 123

4

ARTICLE 19 - GENERAL: ......................................................................................................... 124
   19-1.    Protection of Collateral .................................................................................. 124
   19-2.    Publicity. ....................................................................................................... 124
   19-3.    Successors and Assigns .................................................................................. 124
   19-4.    Severability .................................................................................................... 125
   19-5.    Amendments .................................................................................................. 125
   19-6.    Application of Proceeds ................................................................................. 126
   19-7.    Increased Costs .............................................................................................. 126
   19-8.    Costs and Expenses of the Agent. .................................................................. 127
   19-9.    Copies and Facsimiles ................................................................................... 127
   19-10.   Massachusetts Law ........................................................................................ 127
   19-11.   Consent to Jurisdiction. ................................................................................. 128
   19-12.   Indemnification .............................................................................................. 129
   19-13.   Rules of Construction .................................................................................... 129
   19-14.   Intent .............................................................................................................. 131
   19-15.   Participations ................................................................................................. 131
   19-16.   Right of Set-Off ............................................................................................. 131
   19-17.   Pledges To Federal Reserve Banks ............................................................... 131
   19-18.   Maximum Interest Rate. ................................................................................. 132
   19-19.   Waivers .......................................................................................................... 133
   19-20.   ENTIRE AGREEMENT ................................................................................ 134
   19-21.   Foreign Asset Control Regulations ............................................................... 134
   19-22.   USA PATRIOT Act Notice ........................................................................... 134
   19-23.   No Advisory or Fiduciary Responsibility ..................................................... 135

***EXHIBITS***

| | | |
|---|---|---|
| 2-9 | : | Revolving Credit Note |
| 2-22 | : | Revolving Credit Lenders' Commitments |
| 3-10(a) | : | Form of Interim Financing Order |
| 4-2 | : | Subsidiaries |
| 4-3 | : | Trade Names |
| 4-5 | : | Locations, Leases, and Landlords |
| 4-6 | : | Encumbrances |
| 4-7 | : | Indebtedness |
| 4-8 | : | Insurance Policies |
| 4-10 | : | Capital Leases |
| 4-14 | : | Taxes |
| 4-16(a) | : | ERISA |
| 4-18 | : | Litigation |
| 5-4 | : | Borrowing Base Certificate |
| 7-1 | : | DDAs |
| 7-2 | : | Credit Card Arrangements |
| 16-2 | : | Assignment / Assumption |

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement") is made between **BANK OF AMERICA, N.A.** (in such capacity, herein the "**Agent**"), a national banking association with offices at 100 Federal Street, Boston, Massachusetts 02110, as agent for the ratable benefit of the "**Revolving Credit Lenders**", who are, at present, those financial institutions identified on the signature pages of this Agreement and who in the future are those Persons (if any) who become "Revolving Credit Lenders" in accordance with the provisions of Section 2-22, below, **DRAW ANOTHER CIRCLE, LLC**, a Delaware limited liability company ("**DAC**"), with its principal executive offices at 3601 Plains Boulevard, Amarillo, Texas 79102, **HASTINGS ENTERTAINMENT, INC.**, a Texas corporation ("**Hastings Entertainment**"), with its principal executive offices at 3601 Plains Boulevard, Amarillo, Texas 79102, **MOVIESTOP LLC**, a Delaware limited liability company ("**MovieStop**"), with its principal executive offices at 1300 Cobb International Drive, Suite C, Kennesaw, Georgia 30152, and **SP IMAGES, INC.**, a Nevada corporation with its principal executive offices at 603 Sweetland Avenue, Hillside, New Jersey 07205 ("**SP Images**"); **HASTINGS INTERNET, INC.** ("**Hastings Internet**"; and together with DAC, Hastings Entertainment, MovieStop, and SP Images, individually a "**Borrower**", and collectively the "**Borrowers**", as the context requires).

### W I T N E S E T H:

WHEREAS, prior to the date hereof Borrowers (either as a "Borrower" or "Guarantor" thereof) entered into that certain (i) Amended and Restated Loan and Security Agreement, dated as of July 22, 2010 (as amended, modified, restated and supplemented and in effect from time to time, the "Existing Credit Agreement"), among the Borrowers, the "Revolving Credit Lenders" (as defined therein (the "Prepetition Lenders")), and Bank of America, N.A., as agent for the Prepetition Lenders (in such capacity, the "Prepetition Agent"), and (ii) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or Prepetition Lenders, including, without limitation, the Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, and collectively with the Existing Credit Agreement, the "Prepetition Financing Documents");

7

WHEREAS, on June [  ], 2016 (the "Petition Date"), each of the Loan Parties (as defined herein, collectively, the "Debtors") filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code (defined herein) with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors have requested that the Agent and Revolving Credit Lenders (as defined herein make available to the Debtors, from and after the date of entry of the Interim Financing Order (defined herein) (the "Interim Financing Order Date"), a senior secured, superpriority debtor-in-possession revolving credit loan facility; and

WHEREAS, to provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents (defined herein), and in addition to all other property of any Loan Party that is subject to the Liens granted on the "Collateral" (as defined in the Existing Credit Agreement) in favor of the Prepetition Agent securing the Existing Liabilities (as defined herein) (such Liens, the "Existing Liens"), each of the Debtors will provide to the Agent (for the benefit of the Credit Parties (defined herein)) the DIP Protections (as defined in the Financing Orders).

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree follows:

## ARTICLE 1 - DEFINITIONS

As used herein, the following terms have the following meanings or are defined in the section of this Agreement so indicated:

"**363 Sale**" has the meaning specified in Section 5.12(c).

"**Acceleration**":  The making of demand or declaration that any indebtedness, not otherwise due and payable, is due and payable. Derivations of the word "Acceleration" (such as "Accelerate") are used with like meaning in this Agreement.

"**Acceptable Liquidator**" means Gordon Brothers Retail Partners, LLC, Hilco Merchant Resources, LLC, Tiger Capital Group, LLC, SB Capital Group, LLC, Great American Group (or any of their respective Affiliates), and any other liquidator approved by the Agent, in its Permitted Discretion.

"**Account Debtor**":      Has the meaning given that term in the UCC.

"**Accounts**" and "**Accounts Receivable**" include, without limitation, "accounts" as defined in the UCC, and also all:  accounts, accounts receivable, receivables, and rights to payment

8

(whether or not earned by performance) for: property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; services rendered or to be rendered; a policy of insurance issued or to be issued; a secondary obligation incurred or to be incurred; energy provided or to be provided; for the use or hire of a vessel; arising out of the use of a credit or charge card or information contained on or used with that card; winnings in a lottery or other game of chance; and also all Inventory which gave rise thereto, and all rights associated with such Inventory, including the right of stoppage in transit; all reclaimed, returned, rejected or repossessed Inventory (if any) the sale of which gave rise to any Account.

"**ACH**":        Automated clearing house.

"**Affiliate**":        The following:

(a)        With respect to any two Persons, a relationship in which (i) one holds, directly or indirectly, not less than twenty five percent (25%) of the Voting Stock, beneficial interests, partnership interests, or other equity interests of the other; or (ii) one has, directly or indirectly, the right, under ordinary circumstances, to vote for the election of a majority  of the directors (or other body or Person who has those powers customarily vested in a board of directors of a corporation); or (iii) not less than twenty five percent (25%) of their respective ownership is directly or indirectly held by the same third Person.

(b)        Any Person which has its tax returns or financial statements consolidated with the Borrowers' or the Parent's; or is a member of the same controlled group of corporations (within the meaning of Section 1563(a)(1), (2) and (3) of the Internal Revenue Code of 1986, as amended from time to time) of which the Borrower or the Parent is a member.

"**Agency Agreement**" means that certain letter agreement dated as of May 13, 2016 among the Borrowers and Gordon Brothers Retail Partners, LLC relating to the Initial Store Closing Sale, as in effect on the Closing Date and as may be amended with the consent of the Agent.

"**Agent**":  Is referred to in the Preamble.

"**Agent's Cover**":  Is defined in Section 12-3(c)(i).

"**Agreement**":  Is referred to in the Preamble.

"**Agent's Rights and Remedies**":  Is defined in Section 11-7.

"**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction applicable to the Borrowers or their Subsidiaries from time to time concerning or relating to bribery or

corruption, including the United States Foreign Corrupt Practices Act of 1977, and other similar anti-corruption legislation in other jurisdictions applicable to any of the Loan Parties.

"**Applicable Fee Rate**":  For any period of calculation, 0.375% per annum.

"**Applicable Law**": As to any Person:  (i)  All statutes, rules, regulations, orders, or other requirements having the force of law and (ii) all court orders and injunctions, arbitrator's decisions, and/or similar rulings, in each instance ((i) and (ii)) of or by any federal, state, municipal, and other governmental authority, or court, tribunal, panel, or other body which has or claims jurisdiction over such Person, or any property of such Person.

"**Appraised Inventory Liquidation Value**":  The net orderly liquidation recovery value of the Borrowers' Inventory (expressed as a percentage of the Cost of such Inventory) as determined from time to time by an independent appraiser engaged by the Agent using a methodology acceptable to the Agent.

"**Assignee Revolving Credit Lender**": Is defined in Section 16-1(a).

"**Assigning Revolving Credit Lender**": Is defined in Section 16-1(a).

"**Assignment and Acceptance**":  Is defined in Section 16-2.

"**Availability**":  The lesser of (a) or (b), where:

> (a) is the result of:
>
> > (i)  The Revolving Credit Ceiling,
> >
> > *Minus*
> >
> > (ii)  The aggregate unpaid balance of the Loan Account,
> >
> > *Minus*
> >
> > (iii)  The aggregate undrawn Stated Amount of all then outstanding L/C's,
> >
> > *Minus*
> >
> > (iv)  The Aggregate unpaid balance of the Existing Liabilities.
>
> (b) is the result of:
>
> > (i)  The Borrowing Base,
> >
> > *Minus*
> >
> > (ii)  The aggregate unpaid balance of the Loan Account,
> >
> > *Minus*
> >
> > (iii)  The aggregate undrawn Stated Amount of all then outstanding L/C's,
> >
> > *Minus*

(iv) The Aggregate unpaid balance of the Existing Liabilities.

"**Availability Reserves**": collectively, (a) the Term Loan Reserve, (b) the Carve Out Reserve, (c) prior to the repayment in full of the "Revolving Credit Loans" under the Existing Credit Agreement, a reserve equal to the Revolving Credit Loans (but not, for the avoidance of doubt, Letters of Credit) outstanding under the Existing Credit Agreement, (d) a reserve equal to the greater of $10.0 million or 10% of the Borrowing Base ("***Availability Block***"), and (e) without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves, if any, as the Agent from time to time determines in its Permitted Discretion as being reasonably required pursuant to this Agreement, equal to the sum of: (1) the amount of all sales taxes that have been collected by the Borrowers and not remitted to any state taxing authority when due, (2) an amount equal to two (2) months gross rent for (i) each leased Store of the Borrowers located in a Landlord Lien State (consistent with the Agent's usual practices) other than those Stores with respect to which the Agent has received a Collateral Access Agreement, and (ii) each distribution center or other location at which Inventory is maintained (but excluding any Store) other than those distribution centers and other locations with respect to which the Agent has received a Collateral Access Agreement, (3) Customer Credit Liabilities and customer deposits, (4) an amount based on rent which is past due for more than ten days for any of the Borrowers' leased locations, with the exception of past due rent that is the subject of a Permitted Protest as determined by the Agent in its Permitted Discretion, (5) such other reserves as the Agent from time to time determines in its Permitted Discretion as being reasonably required pursuant to this Agreement, including, without limitation, reserves implemented in connection with Permitted Liens, Permitted Encumbrances, but in the case of each of the foregoing, only to the extent such Liens, encumbrances and Indebtedness relate or in any way affect the Borrowing Base, (6) Bank Product Reserves, (7) Cash Management Reserves, (8) reserves implemented in order to protect the Credit Parties from any Liens, encumbrances or claims that could, in the reasonable judgment of the Agent, take priority over the Liens of the Agent in the Collateral, and (9) to reflect the amount of any priority or administrative expense claims that, in the Agent's reasonable determination, require payment during the Cases.

"**Avoidance Action**" means any causes of action under chapter 5 of the Bankruptcy Code.

"**Bank of America**" means Bank of America, N.A. and its successors.

"**Banker's Acceptance**" means a time draft or bill of exchange or other deferred payment obligation relating to a documentary L/C which has been accepted by the Issuer.

"**Bank Products**" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates (but excluding Cash Management Services) on account of (a) credit or debit cards, (b) Swap Contracts and foreign exchange facilities, (c) purchase cards and private label credit cards, (d) merchant services constituting a line of credit, and (e) leasing, (f) factoring, and (g) supply chain finance services (including, without limitation, trade payable services and supplier accounts receivable purchases). "Bank Products" shall include, without limitation, Existing Bank Products.

"**Bank Product Reserves**" means such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Borrowers and their Subsidiaries with respect to Bank Products then provided or outstanding.

"**Bankruptcy Code**":   Title 11, United States Code, 11 U.S. C. § 101, *et seq.*, as amended and in effect from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or such other court having competent jurisdiction over the Cases.

"**Base Rate**":    For any day a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the Libor Offer Rate for a 30 day interest period as determined on such day, plus 1.0%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in Bank of America' s prime rate, the Federal Funds Rate or the Libor Offer Rate, respectively, shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Margin**":   means two percent (2%).

"**Base Margin Loan**":  Any Revolving Credit Loan which bears interest at the Base Margin Rate.

"**Base Margin Rate**":   That rate per annum which is the aggregate of Base Rate plus the Base Margin.

"**Bidding Procedures Order**" has the meaning specified in Section 5.12(c).

"**Blocked Account**":  Is defined in Section 7-3(a)(ii).

"**Blocked Account Agreement**":  An Agreement, in form reasonably satisfactory to the Agent, which Agreement recognizes the Agent's Collateral Interest in the contents of the DDA

12

which is the subject of such Agreement and agrees that such contents shall be transferred only to the Concentration Account or as otherwise instructed by the Agent.

"**Borrower**":    Is defined in the Preamble.

"**Borrowing Base**":    At any time of calculation, the sum of:

(a)    90% of Eligible Credit Card Receivables;

*plus*

(b)    (i) ninety percent (90%), *multiplied by* (ii) the Appraised Inventory Liquidation Value, *multiplied by* (iii) the Cost of the Borrowers' Eligible Inventory (net of Inventory Reserves);

*less*

(c)    Reserves, including Availability Reserves (including, without limitation, the Carve Out Reserve, and the Term Loan Reserve), as may be instituted by Agent in its exclusive discretion.

"**Borrowing Base Certificate**": Is defined in Section 5-4.

"**Budget**" means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the form of the initial Budget annexed hereto as Schedule 1, and any subsequent projections furnished as required hereunder, in each case, in form and substance reasonably satisfactory to the Agent. The Agent acknowledges and agrees that the Budget attached hereto as Schedule 1 and in effect as of the date of this Agreement is in form and substance satisfactory to the Agent, in its exclusive discretion.

"**Business Day**":  Any day other than (a) a Saturday or Sunday; (b) any day on which banks in Boston, Massachusetts or in Amarillo, Texas generally are not open to the general public for the purpose of conducting commercial banking business; or (c) a day on which the principal office of the Agent is not open to the general public to conduct business.

"**Business Plan**":  The Borrowers' business plan previously delivered to the Agent for Fiscal year 2015, and any revision, amendment, or update of such business plan.

"**Capital Expenditures**": The expenditure of funds or the incurrence of liabilities which is required to be capitalized in accordance with GAAP.

"**Capital Lease**":  Any lease which is required to be capitalized in accordance with GAAP.

"**Carve Out**" has the meaning specified therefor in the Financing Orders.

"**Carve Out Reserve**" means an Availability Reserve established by the Agent in the amount of the Carve Out.

"**Case Professionals**" has the meaning specified therefor in the Financing Orders.

"**Cases**" has the meaning set forth in the Recitals hereto.

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, (i) approving and authorizing the Debtors to use their existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of section 345(b) of the Bankruptcy Code and (v) authorizing the Debtors to use existing bank accounts and existing business forms, as such order may be amended or modified as may be consented to by the Agent.

"**Cash Management Services**" means any one or more of the following types or services or facilities provided to the Borrower or any guarantor of the Liabilities by the Agent or any Lender or any of their respective Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, and (c) merchant services not constituting a Bank Product.

"**Change in Control**":    The occurrence of any of the following:

(a)    The acquisition, by any group of persons (within the meaning of the Securities Exchange Act of 1934, as amended) or by any Person of beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission) of 25% or more of the issued and outstanding equity interests of the Parent having the right, under ordinary circumstances, to vote for the election of managers of the Parent.

(b)    More than half of the persons who were managers of the Parent on the first day of any period consisting of twelve (12) consecutive calendar months (commencing January 1, 2016), cease, for any reason other than death, disability, or retirement, to be managers of the Parent.

(c)    The Parent fails at any time to own, directly or indirectly, 100% of the equity interests of the Borrower and the other guarantors in respect of the Liabilities free and clear of all Liens (other than the Liens in favor of the Agent or the Term Loan Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"**Chattel Paper**":  Has the meaning given that term in the UCC.

"**Collateral**":    Is defined in Section 8-1, but excludes Excluded Collateral.

"**Collateral Documents**": means, collectively, any security agreement, pledge agreement, intellectual property security agreement, mortgage, blocked account agreement, intercreditor agreement, collateral assignment, security agreement, pledge agreement or other similar agreements delivered to the Agent, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Agent for the benefit of the Lenders.

"**Collateral Interest**":  Any interest in property to secure an obligation, including, without limitation, a security interest, mortgage, and deed of trust.

"**Commercial Tort Claim**":  Has the meaning given that term in the UCC.

"**Committee**" means an official statutory committee appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

"**Committee Investigation Budget**": has the meaning specified in Section 5.13(d).

"**Commodity Exchange Act**": means the Commodity Exchange Act (7 U.S.C. § 1, *et seq.*).

"**Concentration Account**":  Is defined in Section 7.3.

"**Consent**":  Actual consent given by the Revolving Credit Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Revolving Credit Lender from the Agent of a proposed course of action to be followed by the Agent without such Revolving Credit Lender's giving the Agent written notice of that Revolving Credit Lender's objection to such course of action, *provided that* the Agent may rely on such passage of time as consent by a Revolving Credit Lender only if such written notice states that consent will be deemed effective if no objection is received within such time period.

"**Consolidated**":   When used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"**Contract Rate"**:  Is defined in Section 19-18(b).

"**Cost**": Cost of purchases, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Interim Financing Order Date as such calculated cost is determined from: invoices received by the Borrower; the Borrowers' purchase journal; or the Borrowers' By-Department monthly report generated by the Borrowers' inventory control system.  ("Cost" does not include inventory capitalization costs or other non-

purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold).

"**Costs of Collection**":  Includes, without limitation, all reasonable fees and reasonable out-of-pocket expenses incurred by the Credit Parties, and all attorneys' reasonable fees and reasonable out-of-pocket expenses incurred by the Agent's attorneys, and all reasonable out-of-pocket costs incurred by the Agent in the administration of the Liabilities and/or the Loan Documents, including, without limitation, reasonable costs and expenses associated with travel on behalf of the Agent, where such costs and expenses are directly or indirectly related to or in respect of the Agent's:  administration and management of the Liabilities; negotiation, documentation, and amendment of any Loan Document; or efforts to preserve, protect, collect, or enforce the Collateral, the Liabilities, and/or the Agent's Rights and Remedies and/or any of the rights and remedies of the Agent against or in respect of any guarantor or other person liable in respect of the Liabilities (whether or not suit is instituted in connection with such efforts).  "Costs of Collection shall also include the reasonable fees and expenses of Lenders' Special Counsel.  The Costs of Collection are Liabilities, and at the Agent's option may bear interest at the then effective Base Margin Rate.

"**Credit Card Receivables**"  Each Account or Payment Intangible, together with all income, payments and proceeds thereof, owed by a major credit or debit card issuer (including, but not limited to, Visa, MasterCard, American Express, and Discover and such other issuers approved by the Agent) to the Borrower resulting from charges by a customer of the Borrower on credit or debit cards issued by such issuer in connection with the sale of goods by the Borrower, or services performed by the Borrower, in each case in the ordinary course of its business.

"**Credit Party**" means, individually, and "Credit Parties" means collectively, the following: (a) the Revolving Credit Lenders and their Affiliates, (b) the Agent, and each co-agent or sub-agent appointed by the Agent from time to time, (c) the L/C Issuer, (d) the Arranger, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, (f) any other Person to whom Liabilities under this Agreement and other Loan Documents are owing, and (g) the successors and assigns of each of the foregoing.

"**Current Aircraft**": refers to the following aircraft:

(FAA registration number, manufacturer, model, and serial number):

N68HS / Cessna / 441 Conquest II / 441-0331

ENGINES (manufacturer, model, and serial number):
        Garrett / TPE 331-10N-515F / P77666
        Garrett / TPE 331-10N-515F / P77679

together with all equipment and accessories attached thereto or used in connection therewith, all of which are included in the term aircraft as used herein.

"**Customer Credit Liabilities**" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards sold by the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits issued by the Borrowers.

"**CFC**" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"**DAC**":   Is defined in the Preamble.

"**DDA**":   Any checking or other demand daily depository account maintained by the Borrower.

"**Debtors**" has the meaning set forth in the Recitals hereto.

"**Delinquent Revolving Credit Lender**":   Is defined in Section 12-3(c).

"**Deposit Account**":   Has the meaning given that term in the UCC.

"**Disregarded Entity**" means any entity treated as disregarded as an entity separate from its owner under Treasury Regulations Section 301.7701-3.

"**DIP Superpriority Claim**" means the allowed superpriority administrative expense claim granted to the Credit Parties in the Cases and any Successor Cases pursuant to section 364(c)(1) of the Bankruptcy Code for all of the Liabilities with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth in the Financing Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; provided, further, that the DIP Superpriority Claim shall be subject to the Carve Out.

"**Documents**":   Has the meaning given that term in the UCC.

"**Documents of Title**":   Has the meaning given that term in the UCC.

"**Eligible Assignee**":   A bank, insurance company, or company engaged in the business of making commercial loans having a combined capital and surplus in excess of $300 Million or any Affiliate of any Revolving Credit Lender, or any Person to whom a

Revolving Credit Lender assigns its rights and obligations under this Agreement as part of a programmed assignment and transfer of such Revolving Credit Lender's rights in and to a material portion of such Revolving Credit Lender's portfolio of asset based credit facilities, all of which assignees must be acceptable to the Borrower pursuant to Section 2-22(e).

"**Eligible Credit Card Receivables**" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a credit card payment processor and/or credit card issuer, and in each case originated in the ordinary course of business of the Borrower, and (ii) in each case is acceptable to the Agent in its exclusive discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (i) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, an Account or Payment Intangible shall indicate no Person other than the Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account or Payment Intangible shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a credit card payment processor, or credit card issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account or Payment Intangible but not yet applied by the Borrower to reduce the amount of such Credit Card Receivable.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(b)     Credit Card Receivables (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which the Borrower does not have good, valid and marketable title thereto, free and clear of any Encumbrance (other than Encumbrances granted to the Agent);

18

(c)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(d)     Credit Card Receivables as to which the processor has the right under certain circumstances to require the Borrower to repurchase the Accounts or Payment Intangibles from such credit card processor;

(e)     Credit Card Receivables due from an issuer or payment processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;

(f)      Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable issuer with respect thereto;

(g)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(h)     Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(i)      Credit Card Receivables which the Agent determines in its sole discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine.

(j)      Credit Card Receivables which constitute "Receivables" under the Accounts Receivable Servicing Agreement between SP Images and Merchant Factors Corp.

"**Eligible Inventory**":   will be calculated in a manner consistent with current tracking practices, based on the Borrowers' By-Department monthly report generated by the  Borrowers' inventory control system, which report reflects the functional equivalent of a stock ledger inventory at cost, and shall consist of the following: Such of the Borrowers' Inventory as to which the Agent has a perfected security interest which is prior and superior to all security interests, claims, and all Encumbrances other than Permitted Encumbrances. ("Eligible Inventory" includes traditional rental videos and  DVD's and similar items (net of accumulated depreciation) but does not include, nor, to the extent such items may have been included at any time in the Agent's sole discretion, is the Agent under any obligation to continue to include: any revenue sharing video tapes or DVD's or similar items;   non-merchandise inventory (such as labels, bags, and packaging materials); damaged goods; packaways; consigned inventory; inventory in-transit to the Borrower from a foreign location prior to such inventory arriving at a domestic distribution center of the Borrower; Borrower's "Pop Goes The Shop" (including Elvis Presley exhibition)

inventory located in its Las Vegas, NV Store; any inventory of SP Images; and other similar categories of Goods).

"**Employee Benefit Plan**":  As defined in ERISA.

"**Encumbrance**":  Each of the following:

> (a)     A Collateral Interest or agreement to create or grant a Collateral Interest; the interest of a lessor under a Capital Lease; conditional sale or other title retention agreement; sale of accounts receivable or chattel paper; or other arrangement pursuant to which any Person is entitled to any preference or priority with respect to the property or assets of another Person or the income or profits of such other Person; each of the foregoing whether consensual or non-consensual and whether arising by way of agreement, operation of law, legal process or otherwise.

> (b)     The filing of any financing statement under the UCC or comparable law of any jurisdiction.

"**End Date**":  The date upon which both (a) all Liabilities have been paid in full and (b) all obligations of any Revolving Credit Lender to make loans and advances and to provide other financial accommodations to the Borrower hereunder shall have been irrevocably terminated.

"**Environmental Laws**":  All of the following:

> (a)     Applicable Law which regulates or relates to, or imposes any standard of conduct or liability on account of or in respect to environmental protection matters, including, without limitation, Hazardous Materials, as are now or hereafter in effect.

> (b)     The common law relating to damage to Persons or property from Hazardous Materials.

"**Equipment**":  Includes, without limitation, "equipment" as defined in the UCC, and also all furniture, store fixtures, rolling stock, machinery, office equipment, plant equipment, tools, dies, molds, and other goods, property, and assets which are used and/or were purchased for use in the operation or furtherance of the Borrowers' business, and any and all accessions or additions thereto, and substitutions therefor, but does not include motor vehicles.

"**Equity Interests**":  means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such

Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**":  The Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**":  Any Person which is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group which includes the Borrower and which would be treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended.

"**Events of Default**":  Is defined in Article 10.  Subject to the Financing Orders, an "Event of Default" shall be deemed to have occurred and to be continuing unless and until that Event of Default has been duly waived by the requisite Revolving Credit Lenders or by the Agent as applicable (following which, and in the event of such waiver, that Event of Default shall be deemed not to have occurred).

"**Excess Availability**" shall mean an amount equal to if a positive number (i) the Revolving Loan Ceiling, minus (ii) the amount of Revolving Credit Loans and Letters of Credit outstanding under the DIP Facility (including for these purposes any existing Letters of Credit under the Existing Credit Agreement and converted to Letters of Credit under this Agreement in accordance with the Interim Financing Order).

"**Excluded Collateral**" means, in addition to such assets as are excluded from the Collateral pursuant to the terms of the Collateral Documents, (a) Equity Interests constituting more than 65% of the total outstanding voting or nonvoting Equity Interests of any CFC or Foreign Holding Company, (b) Equity Interests constituting more than 65% of the total outstanding Equity Interests of any Disregarded Entity that owns an interest in a CFC or CFC Debt and, (c) any property or assets of any CFC (whether held directly or indirectly) and CFC Debt, (d) Leases (but not the proceeds derived or realized upon the sale, disposition and/or termination of any Lease(s)), and (e) Avoidance Actions and the proceeds of thereof; provided that, upon entry of the Final Financing Order, the Liabilities shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agent and the Revolving Credit Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions. For the sake of clarity, no

Excluded Collateral shall be required to be pledged as Collateral to secure any of the Loans.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guaranty of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"**Exempt DDA**":  Depository Accounts maintained by the Borrower, the only contents of which may be transfers *from* the Operating Account or the Payroll Account and actually used solely (i) for petty cash purposes; (ii) for payroll; or (iii) employee benefits.

"**Existing Bank Products**" means those Bank Products described on Schedule 1.01(a) hereto.

"**Existing Revolver Loans**" has the meaning provided in Section 2.17(a).

"**Existing Liabilities**" means (i) the "Liabilities" as defined in the Existing Credit Agreement, and (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Existing Credit Agreement.

"**Existing Liens**" has the meaning provided in the Recitals hereto.

"**Existing Loan Documents**" means the "Loan Documents" as defined in the Existing Credit Agreement.

"**Existing Loan Parties**" means the "Prepetition Agent", the "Prepetition Lenders", the "SwingLine Lender" and the other credit parties under (and as defined in) the Existing Credit Agreement.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such

rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Agent.

"**Fee Letter**": That letter dated June [ ], 2016 and styled "DIP Fee Letter" between the Borrowers and the Agent, as such letter may from time to time be amended.

"**Final Financing Order**" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Financing Order, with only such modifications as are satisfactory in form and substance to the Agent, which order shall (x) have been entered on such prior notice to such parties as may be satisfactory to the Agent and Term Loan Agent, respectively, and (y) not have been vacated, reversed, modified, amended or stayed.

"**Final Financing Order Date**" means the date of the entry of the Final Financing Order.

"**Financing Orders**" means, collectively, the Interim Financing Order and Final Financing Order.

"**Financial Advisor**" means FTI Consulting, Inc. (or another independent financial advisor reasonably acceptable to the Agent).

"**Fiscal**": When followed by "month", "quarter" or "year", the relevant fiscal period based on the Parent's fiscal year and the Parent's practices. (e.g., the Parent's fiscal year ends in January 2010, reference to that year would be to the Parent's "Fiscal 2009").

"**Foreign Holding Company**" means any Subsidiary of the Borrower organized under the laws of the United States or a political subdivision thereof substantially all of the assets of which consist of Equity Interests or other securities of one or more CFCs.

"**GAAP**": Generally accepted accounting principles in the United States which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made.

"**General Intangibles**": Includes, without limitation, "general intangibles" as defined in the UCC; and also all: rights to payment for credit extended; deposits; amounts due to the Borrower; credit memoranda in favor of the Borrower; warranty claims; tax refunds and abatements; insurance refunds and premium rebates; all means and vehicles of investment or hedging, including, without limitation, options, warrants, and futures contracts; records; customer lists; telephone numbers; goodwill; causes of action; judgments; payments under any settlement or other agreement; literary rights; rights to

performance; royalties; license and/or franchise fees; rights of admission; licenses; franchises; license agreements, including all rights of the Borrower to enforce same; permits, certificates of convenience and necessity, and similar rights granted by any governmental authority; patents, patent applications, patents pending, and other intellectual property; internet addresses and domain names; developmental ideas and concepts; proprietary processes; blueprints, drawings, designs, diagrams, plans, reports, and charts; catalogs; manuals; technical data; computer software programs (including the source and object codes therefor), computer records, computer software, rights of access to computer record service bureaus, service bureau computer contracts, and computer data; tapes, disks, semi-conductors chips and printouts; trade secrets rights, copyrights, mask work rights and interests, and derivative works and interests; user, technical reference, and other manuals and materials; trade names, trademarks, service marks, and all goodwill relating thereto; applications for registration of the foregoing; and all other general intangible property of the Borrower in the nature of intellectual property; proposals; cost estimates, and reproductions on paper, or otherwise, of any and all concepts or ideas, and any matter related to, or connected with, the design, development, manufacture, sale, marketing, leasing, or use of any or all property produced, sold, or leased, or credit extended or services performed, by the Borrower, whether intended for an individual customer or the general business of the Borrower, or used or useful in connection with research by the Borrower.

"**Goods**": Has the meaning given that term in the UCC, and also includes computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program if (i) the program is associated with the goods in such manner that it customarily is considered part of the goods or (ii) by becoming the owner of the goods, a Person acquires a right to use the program in connection with the goods.

"**Hastings Entertainment**":   Is defined in the Preamble.

"**Hastings Internet**":   Is defined in the Preamble.

"**Hazardous Materials**":  Any substance which is defined or regulated as a hazardous material or oil in or under any Environmental Law.

"**Indebtedness**":  All indebtedness and obligations of or assumed by any Person on account of or in respect to any of the following:

(a)    In respect of money borrowed (including any indebtedness which is non-recourse to the credit of such Person but which is secured by an Encumbrance on any

asset of such Person) whether or not evidenced by a promissory note, bond, debenture or other written obligation to pay money.

(b)       In connection with any letter of credit or acceptance transaction (including, without limitation, the face amount of all letters of credit and acceptances issued for the account of such Person or reimbursement on account of which such Person would be obligated).

(c)       In connection with the sale or discount of accounts receivable or chattel paper of such Person.

(d)       As lessee under Capital Leases.

(e)       In connection with any sale and leaseback transaction.

"Indebtedness" also includes:

(x)       Indebtedness of others secured by an Encumbrance on any asset of such Person, whether or not such Indebtedness is assumed by such Person.

(y)       Any guaranty, endorsement, suretyship or other undertaking pursuant to which that Person may be liable on account of any obligation of any third party.

(z)       The Indebtedness of a partnership or joint venture for which such Person is liable as a general partner or joint venturer.

"**In Default**":   Any occurrence, circumstance, or state of facts with respect to the Borrower which (a) is an Event of Default; or (b) would become an Event of Default if any requisite notice were given and/or any requisite period of time were to run and such occurrence, circumstance, or state of facts were not absolutely cured within any applicable grace period.

"**Indemnified Person**": Is defined in Section 19-12.

"**Instruments**": Has the meaning given that term in the UCC.

"**Intercreditor Agreement**:" The Intercreditor Agreement, dated as of July 15, 2014, among the Agent, the Term Agent and acknowledged by the Borrower, Parent and Hastings Internet, Inc., as amended and in effect from time to time.

"**Interest Payment Date**":   With reference to:

(a)       Each Libor Loan: The last day of the Interest Period relating thereto (and on the last day of month three for any such Libor Loan which has a six month Interest Period); the Termination Date; and the End Date.

(b)      Each Base Margin Loan: The first Business Day of each month; the Termination Date; and the End Date.

"**Interest Period**":  The following:

(a)      With respect to each Libor Loan: Subject to Subsection (c) below, the period commencing on the date of the making or continuation of, or conversion to, the subject Libor Loan and ending one, two, three, or six months thereafter, as the Borrower may elect by notice (pursuant to Section 2-5) to the Agent.

(b)      With respect to each Base Margin Loan: Subject to Subsection (c) below, the period commencing on the date of the making or continuation of or conversion to such Base Margin Loan and ending on that date (i) as of which the subject Base Margin Loan is converted to a Libor Loan, as the Borrower may elect by notice (pursuant to Section 2-5) to the Agent, or (ii) on which the subject Base Margin Loan is paid by the Borrower.

(c)      The setting of Interest Periods is in all instances subject to the following:

(i)      Any Interest Period for a Base Margin Loan which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day.

(ii)      Any Interest Period for a Libor Loan which would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day, unless that succeeding Business Day is in the next calendar month, in which event such Interest Period shall end on the last Business Day of the month during which the Interest Period ends.

(iii)      Subject to Subsection (iv) below, any Interest Period applicable to a Libor Loan, which Interest Period begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period ends, shall end on the last Business Day of the month during which that Interest Period ends.

(iv)      Any Interest Period which would otherwise end after the Termination Date shall end on the Termination Date.

(v)      The number of Interest Periods in effect at any one time is subject to Section 2-11(d) hereof.

"**Interim Financing Order**" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of **EXHIBIT 3-10(a)** hereto and otherwise acceptable to the Revolving Credit Lenders, the

Agent and Term Loan Agent, respectively, approving, <u>inter alia</u>, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrowers of interim secured indebtedness in accordance with this Agreement, (b) approving the Interim Roll-Up, (c) granting adequate protection to the Prepetition Agent and Prepetition Lenders, and (d) subject to the terms thereof, approving the payment by the Borrowers of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed.

"**Interim Financing Order Date**" has the meaning set forth in the Recitals hereto.

"**Interim Financing Order Period**" means the period of time from the time at which the Bankruptcy Court enters the Interim Financing Order until the time at which the Bankruptcy Court enters the Final Financing Order.

"**Interim Roll-Up**" has the meaning set forth in the Interim Financing Order.

"**Inventory**":    Includes, without limitation, "inventory" as defined in the UCC and also all: (a) Goods which are leased by a Person as lessor; are held by a Person for sale or lease or to be furnished under a contract of service; are furnished by a Person under a contract of service; or consist of raw materials, work in process, or materials used or consumed in a business; (b) Goods of said description in transit; (c) Goods of said description which all returned, repossessed and rejected; (d) packaging, advertising, and shipping materials related to any of the foregoing; (e) all names, marks, and General Intangibles affixed or to be affixed or associated thereto; and (f) Documents and Documents of Title  which represent any of the foregoing.

"**Inventory Reserves**": Such Reserves as may be established from time to time by the Agent in the Agent's Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory.

"**Investment Property**":  Has the meaning given that term in the UCC.

"**Issuance Conditions**":  The satisfaction of each of the following conditions:

(a)    no order, judgment or decree of any governmental authority or arbitrator shall by its terms purport to enjoin or restrain the Issuer from issuing such L/C, or any Applicable Law applicable to the Issuer or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over the Issuer shall not prohibit, or request that the Issuer refrain from, the issuance of letters of credit generally or such L/C in particular or shall not impose upon the Issuer with respect to such L/C any restriction, reserve or capital requirement (for which the Issuer is not otherwise

compensated hereunder) not in effect on the date hereof, or shall not impose upon the Issuer any unreimbursed loss, cost or expense which was not applicable on the date hereof and which the Issuer in good faith deems material to it;

(b)      the issuance of such L/C would not violate one or more policies of the Issuer applicable to letters of credit generally;

(c)      such L/C is not to be denominated in a currency other than Dollars; and

(d)      such L/C does not contain any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder.

"**Issuer**":  The issuer of any L/C.

"**L/C**":  Any letter of credit, the issuance of which is procured by the Agent for the account of the Borrower and any Banker's Acceptance made on account of such letter of credit.

"**Landlord Lien State**" means such state(s) in which a landlord's claim for rent has priority over the lien of the Agent in any of the Collateral.

"**Lease**":  Any lease or other agreement, no matter how styled or structured, pursuant to which the Borrowers are entitled to the use or occupancy of any space.

"**Lenders' Special Counsel**": Counsel (and local counsel (as and to the extent required), selected by the Agent to represent the interests of the Agent and the Revolving Credit Lenders in connection with the Cases, and/or the enforcement, attempted enforcement, or preservation of any rights and remedies under this, or any other Loan Document, as well as in connection with any "workout", forbearance, or restructuring of the credit facility contemplated hereby.

"**Lender Group Consultant**" has the meaning specified in Section 5.10(g).

"**Letter-of-Credit Right**":   Has the meaning given that term in UCC and also refers to any right to payment or performance under an L/C, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"**Liabilities**":   Includes, without limitation, the following:

(a)      All and each of the following, whether now existing or hereafter arising under this Agreement or under any of the other Loan Documents:

(i)      Any and all direct and indirect liabilities, debts, and obligations of the Borrower to the Agent or any Revolving Credit Lender, each of every kind, nature, and description.

(ii)      Each obligation to repay any loan, advance, indebtedness, note, obligation, overdraft, or amount now or hereafter owing by the Borrower to the Agent or any Revolving Credit Lender (including all future advances whether or not made

28

pursuant to a commitment by the Agent or any Revolving Credit Lender), whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Agent or any Revolving Credit Lender may hold against the Borrower.

(iii)    All notes and other obligations of the Borrower now or hereafter assigned to or held by the Agent or any Revolving Credit Lender, each of every kind, nature, and description, including, without limitation, on account of Bank Products and Cash Management Services.

(iv)    All interest, fees, and charges and other amounts which may be charged by the Agent or any Revolving Credit Lender to the Borrower and which may be due from the Borrower to the Agent or any Revolving Credit Lender from time to time.

(v)    All costs and expenses incurred or paid by the Agent or any Revolving Credit Lender in respect of any Loan Document between the Borrower and the Agent or any Revolving Credit Lender or Loan Document furnished by the Borrower to the Agent or any Revolving Credit Lender (including, without limitation, Costs of Collection, attorneys' reasonable fees, and all court and litigation costs and expenses (including for th4ese purposes all costs of Lenders' Special Counsel and Lender Group Consultant)) and which are required to be paid by the Borrower.

(vi)    Any and all covenants of the Borrower to or with the Agent or any Revolving Credit Lender and any and all obligations of the Borrower to act or to refrain from acting in accordance with any Loan Document between the Borrower and the Agent or any Revolving Credit Lender or Loan Document furnished by the Borrower to the Agent or any Revolving Credit Lender.

(vii)    Each of the foregoing as if each reference to the "the Agent or any Revolving Credit Lender" were to each Affiliate of the Agent.

(b)    Any and all direct or indirect liabilities, debts, and obligations of the Borrower or any guarantor of the Borrowers' Liabilities to the Agent or any Affiliate of the Agent, each of every kind, nature, and description owing on account of any service or accommodation provided to, or for the account of the Borrower or any guarantor of the Borrowers' Liabilities pursuant to this or any other Loan Document, including Bank Products, Cash Management Services and the issuances of L/C's.

"**Libor Business Day**": Any day which is both a Business Day and a day on which the principal interbank market for Libor deposits in London in which Bank of America participates is open for dealings in United States Dollar deposits.

"**Libor Loan**":  Any Revolving Credit Loan which bears interest at the Libor Margin Rate.

"**Libor Offer Rate**":

(a) for any Interest Period with respect to a Libor Loan, the rate per annum equal to the London interbank offered rate administered by ICE Benchmark Administration Limited ("ICE LIBOR"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period.  If such rate is not available at such time for any reason, then the "Libor Offer Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b) for any interest calculation with respect to a Base Margin Loan on any date, the rate per annum equal to (i) ICE LIBOR, at approximately 11:00 a.m., London time determined two Business Days prior to such date for dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Agent to be the rate at which deposits in dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Margin Loan being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"**Libor Margin**":  Commencing on the Interim Financing Order Date, and on the first day of each Fiscal quarter thereafter, the Libor Margin shall be 3.0% (provided that, LIBOR may never be less than zero).

"**Libor Margin Rate**": The rate per annum which is the aggregate of the Libor Rate *plus* the Libor Margin.

"**Libor Rate**":  With respect to any Libor Loan for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent (1%)) equal to the Libor Offer Rate for such Interest Period multiplied by the Statutory Reserve Rate.  The Libor Rate will be adjusted automatically as to all Libor Loans then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"**Liquidation**": The exercise, by the Agent, of those rights accorded to the Agent under the Loan Documents as a creditor of the Borrower following and on account of the occurrence of an Event of Default and Acceleration looking towards the realization on the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"**Loan Account**":  Is defined in Section 2-8(a).

"**Loan Commitment**":  With respect to each Revolving Credit Lender, that Revolving Credit Lender's Revolving Credit Dollar Commitment.

"**Loan Documents**": This Agreement, each instrument and document executed and/or delivered as contemplated by Article 3 below, and each other instrument or document from time to time executed and/or delivered in connection with the arrangements contemplated hereby or in connection with any transaction with the Agent or any Affiliate of the Agent, including, without limitation, any Bank Product, Cash Management Services, and any transaction which arises out of any investment, letter of credit, interest rate protection, or equipment leasing services provided by the Agent or any Affiliate of the Agent, as each may be amended from time to time.

"**Loan Party**":  Is defined in Section 2-23.

"**Majority Lenders**":   So long as there are only two (2) Revolving Credit Lenders party to this Agreement, "Majority Lenders" shall mean both such Revolving Credit Lenders (unless one of the Revolving Credit Lenders is a Delinquent Revolving Credit Lender, in which case, "Majority Lenders shall mean the other Revolving Credit Lender), and if there are more than two (2) Revolving Credit Lenders party to this Agreement, "Majority Lenders" shall mean Revolving Credit Lenders (other than Delinquent Revolving Credit Lenders) holding 51% or more of the Revolving Credit Dollar Commitment (other than any Loan Commitments held by Delinquent Revolving Credit Lenders).

"**Maturity Date**":  December 12, 2016.

"**Maximum Rate**":  The maximum non-usurious rate of interest permitted by applicable law.

"**MovieStop**":   Is defined in the Preamble.

"**Nominee**":  A business entity (such as a corporation or limited partnership) formed by the Agent to own or manage any Post Foreclosure Asset.

"**NonConsenting Revolving Credit Lender**": Is defined in Section 15-10.

"**Operating Account**":  Is defined in Section 7-3.

"**OverLoan**":  A loan, advance, or providing of credit support (such as the issuance of any L/C) to the extent that, immediately after its having been made, Availability is less than zero.

"**Parent**": Draw Another Circle, LLC.

"**Participant**":  Is defined in Section 19-15, hereof.

"**PATRIOT Act**" means the Trading With the Enemy Act (50 U.S.C. §§ 1-44, as amended) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107 56, signed into law October 26, 2001.

"**Payment Intangible**": Has the meaning given that term in UCC and also refers to any general intangible under which the Account Debtor's primary obligation is a monetary obligation.

"**Payroll Account**": Is defined in Section 7-3.

"**Permissible OverLoans**":  Revolving Credit Loans which  are OverLoans, but as to which each of the following conditions is satisfied: (a) the Revolving Credit Ceiling is not exceeded; and (b) when aggregated with all other Permissible OverLoans, such Revolving Credit Loans do not aggregate more than 10% of the aggregate of the Borrowing Base; and (c) such Revolving Credit Loans are made or undertaken in the Agent's exclusive discretion to protect and preserve the interests of the Revolving Credit Lenders.

"**Permitted Discretion**" means: a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment, it being agreed that the contributing factors to the imposition of any Reserve herein will not duplicate any reserves deducted in computing book value.

"**Permitted Encumbrances**":   Those Encumbrances permitted as provided in Section 4-6(a) hereof.

"**Permitted Prior Liens**" has the meaning provided therefor in the Financing Orders.

"**Permitted Protest**" shall mean the right of the Borrowers to protest any Lien (other than any such Lien that secures the Obligations), taxes, or rental payment, provided that (a) a reserve with respect to such obligation is established on the books and records in such amount (if any) to the extent required under GAAP, (b) any such protest is prosecuted diligently by the Borrowers in good faith, by appropriate proceedings, (c) such contest

effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, and (d) the failure to make payment, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect.

"**Permitted Variances**" has the meaning set forth in Section 5.10(h) hereof.

"**Person**":  Any natural person, and any corporation, limited liability company, trust, partnership, joint venture, or other enterprise or entity.

"**Petition Date**" has the meaning set forth in the Recitals hereto.

"**Post Foreclosure Asset**":  All or any part of the Collateral, ownership of which is acquired by the Agent or a Nominee on account of the "bidding in" at a disposition as part of a Liquidation or by reason of a "deed in lieu" type of transaction.

"**Proceeds**":  Includes, without limitation, "Proceeds" as defined in the UCC and each type of property described in Section 8-1 hereof.

"**Protective Advances**": The aggregate of Revolving Credit Loans and expenditures and incurrences of obligations by the Agent respectively which are made or undertaken in the Agents' exclusive discretion to: protect or preserve the Collateral Interests which secure the Liabilities and the Agent's rights upon an Event of Default or which the Agent determines in its exclusive discretion, are appropriate to facilitate a Liquidation.

"**Receipts**":  All cash, cash equivalents, checks, and credit card slips, receipts and other Proceeds from any sale of the Collateral.

"**Receivables Collateral**":  That portion of the Collateral which consists of the Borrowers' Accounts, Accounts Receivable, General Intangibles, Chattel Paper, Instruments, Documents of Title, Documents, Investment Property, Payment Rights, Letter-of-Credit Rights, bankers' acceptances held by the Borrower, and all other rights to payment.

"**Register**":  Is defined in Section 16-2(c).

"**Reported Fee Accruals**" means all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Bankruptcy Court and incurred by the Case Professionals.

"**Requirements of Law**":  As to any Person:

        (a)      Applicable Law.

        (b)      That Person's organizational documents, if any.

        (c)      That Person's by-laws and/or other instruments which deal with corporate or similar governance, as applicable.

"**Reserves**":  The following: Availability Reserves and Inventory Reserves.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, any executive or senior vice president, treasurer, assistant treasurer or controller of a Loan

Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Revolving Credit**":  Is defined in Section 2-1(a).

"**Revolving Credit Ceiling**":  $[100,000,000.00].

"**Revolving Credit Commitment Fee**": Is defined in Section 2-12.

"**Revolving Credit Dollar Commitment**":  As set forth on **EXHIBIT 2-22**, annexed hereto (as such amounts may change in accordance with the provisions of this Agreement).

"**Revolving Credit Lenders**":   Each Revolving Credit Lender to which reference is made in the Preamble of this Agreement and any other Person who becomes a "Revolving Credit Lender" in accordance with the provisions of this Agreement.

"**Revolving Credit Loans**":  Loans made under the Revolving Credit, except that where the term "Revolving Credit Loan" is used with reference to available interest rates applicable to the loans under the Revolving Credit, it refers to so much of the unpaid principal balance of the Loan Account as bears the same rate of interest for the same Interest Period. (*See* Section 2-11(c)).

"**Revolving Credit Note**":  Is defined in Section 2-9.

"**Revolving Credit Percentage Commitment**": As set forth on **EXHIBIT 2-22**, annexed hereto (as such amounts may change in accordance with the provisions of this Agreement).

"**Sale Motion**" has the meaning specified in Section 5.12.

"**Sale Process**" has the meaning specified in Section 5.12.

"**Sanctioned Country**" means at any time, a country or territory which is itself the subject or target of any Sanctions.

"**Sanctioned Person**" means at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person.

"**Sanctions**" means international economic sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by

the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or any other relevant sanctions authority.

"**SEC**":  The Securities and Exchange Commission.

"**SP Images**": Is defined in the Preamble.

"**Stated Amount**": The maximum amount for which an L/C may be honored.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States (the "Board") to which the Agent is subject with respect to the Libor Offer Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  Libor Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Store**" or "**Stores**" means any retail store operated, or to be operated, by any Loan Party.

"**Subsidiary**":   for any Person, any corporation or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other Persons having similar powers is at the time directly or indirectly owned by such Person.

"**Successor Cases**" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any proceedings superseding or related to any of the foregoing.

"**SuperMajority Lenders**":  Revolving Credit Lenders (other than Delinquent Revolving Credit Lenders) holding 66-2/3% or more of the Revolving Credit Dollar Commitment (other than Loan Commitments held by a Delinquent Revolving Credit Lender), *except that* unless and until there are more than two Revolving Credit Lenders, "SuperMajority Lenders shall refer to all Revolving Credit Lenders who are not Delinquent Revolving Credit Lenders.

"**Supporting Obligation**":  Has the meaning given that term in UCC and also refers to a Letter-of-Credit Right or secondary obligation which supports the payment or performance of an

Account, Chattel Paper, a Document, a General Intangible, an Instrument, or Investment Property.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Term Agent**": Pathlight Capital, LLC, as administrative agent and collateral agent under the Term Facility.

"**Term Facility**": The term loan facility in the original principal amount of $15,000,000 established pursuant to the Term Facility Agreement.

"**Term Facility Agreement**": That certain Term Loan Agreement, dated as of July 15, 2014, by and among the Borrower, the Term Agent, and the lenders party thereto, as amended,

restated, supplemented, modified, or replaced in accordance with the Intercreditor Agreement.

"**Termination Date**":  means the earliest to occur of: (i) the Maturity Date, (ii) the date on which the maturity of the Loans is accelerated and the Revolving Credit Dollar Commitment(s) are terminated, (iii) the effective date of any plan in the Cases that has been confirmed by an order of the Bankruptcy Court, and (iv) the closing of a sale of all or substantially all of the working capital assets of the Borrowers under Section 363 of the Bankruptcy Code.

"**Term Loan Reserve**": Has the meaning specified in the Term Facility Agreement as in effect on the date hereof in the amount specified by the Term Agent in a writing delivered to the Agent; it being agreed that the Agent shall have no liability to the Borrower with respect to the Term Loan Reserve.

"**Term Loan Agent**" means the administrative agent and collateral agent under the Term Facility.

"**Testing Period**" has the meaning set forth in Section 5.10(h) hereof.

"**Total Disbursements**" means the sum of total operating disbursements, total non-operating disbursements and total bankruptcy disbursements as provided in the Budget.

"**Transfer**":  Wire transfer pursuant to the wire transfer system maintained by the Board of Governors of the Federal Reserve Board, or as otherwise may be agreed to from time to time by the Agent making such transfer and the subject Revolving Credit Lender. Wire instructions may be changed in the same manner that Notice Addresses may be changed (Section 17-1), except that no change of the wire instructions for Transfers to any Revolving Credit Lender shall be effective without the consent of the Agent.

"**UCC**":  The Uniform Commercial Code as in effect from time to time in Massachusetts.

"**Unanimous Consent**": Consent of Revolving Credit Lenders (other than Delinquent Revolving Credit Lenders) holding 100% or more of the Revolving Credit Dollar Commitment (other than Loan Commitments held by a Delinquent Revolving Credit Lender).

"**United States Trustee**" means the Office of the United States Trustee.

"**Unused Line Fee**":      Is defined in Section 2-14.

"**Variance Report**" has the meaning set forth in Section 5.5(b).

"**Voting Stock**":  shares of any class or classes (however designated) of any corporation having ordinary voting power for the election of at least a majority of the members of the board of directors (or other governing bodies) of such corporation.

**ARTICLE 2 - THE REVOLVING CREDIT:**

**2-1.    Establishment of Revolving Credit.**

(a)     The Revolving Credit Lenders hereby establish a revolving line of credit (the "**Revolving Credit**") in the Borrowers' favor pursuant to which each Revolving Credit Lender, subject to, and in accordance with, this Agreement, acting through the Agent, shall make loans and advances and otherwise provide financial accommodations to and for the account of the Borrower as provided herein.

(b)     Loans, advances, and financial accommodations under the Revolving Credit shall be made with reference to the Borrowing Base and shall be subject to Availability.  The Borrowing Base and Availability shall be determined by the Agent by reference to Borrowing Base Certificates furnished as provided in Section 5-4, below, and shall be subject to the following:

(i)     Such determination shall take into account those Reserves as the Agent may determine as being applicable thereto.

(ii)     The Cost of Eligible Inventory will be determined in a manner consistent with current tracking practices, based on the Borrowers' By-Department monthly report generated by the Borrowers' inventory control system, which report reflects the functional equivalent of a stock ledger inventory.

(c)     The commitment of each Revolving Credit Lender to provide such loans, advances, and financial accommodations is subject to Section 2-22.

(d)     The proceeds of borrowings under the Revolving Credit shall be used solely in accordance with the Budget.  No proceeds of a borrowing under the Revolving Credit may be used, nor shall any be requested, with a view towards the accumulation of any general fund or funded reserve of the Borrower other than in the ordinary course of the Borrowers' business and consistent with the provisions of this Agreement.  Subject to the foregoing, the proceeds of borrowings under the Revolving Credit Facility shall be used for the following purposes:

(i)     Working capital, capital expenditures, and other general corporate purposes of the Borrowers and Guarantors subject to the Budget;

(ii)     To support issuance of letters of credit by the letter of credit issuer for the account of the Borrower;

(iii)     The payment of transaction expenses; and

(iv)     The payment of fees, expenses and costs incurred in connection with the Cases.

**2-2.    Advances in Excess of Borrowing Base (OverLoans).**

(a)    No Revolving Credit Lender has any obligation to make any loan or advance, or otherwise to provide any credit to or for the benefit of any Borrower where the result of such loan, advance, or credit is an OverLoan.

(b)    The Revolving Credit Lenders' obligations, among themselves, are subject to Section 12-3(a) (which relates to each Revolving Credit Lender's making amounts available to the Agent) and to Section 15-3(a) (which relates to Permissible OverLoans).

(c)    The Revolving Credit Lenders' providing of an OverLoan on any one occasion does not affect the obligations of the Borrowers hereunder (including the Borrowers' obligation to immediately repay any amount which otherwise constitutes an OverLoan) nor obligate the Revolving Credit Lenders to do so on any other occasion.

**2-3.    Risks of Value of Collateral.**   The Agent's reference to a given asset in connection with the making of loans, credits, and advances and the providing of financial accommodations under the Revolving Credit and/or the monitoring of compliance with the provisions hereof shall not be deemed a determination by the Agent or any Revolving Credit Lender relative to the actual value of the asset in question.   All risks concerning the value of the Collateral are and remain upon the Borrowers.   All Collateral secures the prompt, punctual, and faithful performance of the Liabilities whether or not relied upon by the Agent in connection with the making of loans, credits, and advances and the providing of financial accommodations under the Revolving Credit.

**2-4.    Commitment to Make Revolving Credit Loans and Support Letters of Credit.**   Subject to the provisions of this Agreement, the Revolving Credit Lenders shall make a loan or advance under the Revolving Credit and the Agent shall have an L/C issued for the account of the Borrowers, in each instance if duly and timely requested by the Borrowers as provided herein; *provided that:*

(a)    The Borrowing Base will not be exceeded,

(b)    The amount of the loan or advance or L/C so requested does not exceed Availability, and

(c)    The Borrowers are not In Default.

**2-5.    Revolving Credit Loan Requests.**

(a)    Requests for loans and advances under the Revolving Credit or for the continuance or conversion of an interest rate applicable to a Revolving Credit Loan may be requested by the Borrowers in the manner set forth herein or in such other manner as may from time to time be reasonably acceptable to the Agent.

(b)     Subject to the provisions of this Agreement, the Borrowers may request a Revolving Credit Loan and elect an interest rate and Interest Period to be applicable to that Revolving Credit Loan by giving notice to the Agent by no later than the following:

(i)     If such Revolving Credit Loan is to be or is to be converted to a Base Margin Loan: By 11:30AM (ET) on the Business Day on which the subject Revolving Credit Loan is to be made or is to be so converted.  Base Margin Loans requested by the Borrowers, other than those resulting from the conversion of a Libor Loan, shall not be less than $10,000.00.

(ii)     If such Revolving Credit Loan is to be, or is to be continued as, or converted to, a Libor Loan: By 1:00PM (ET) three (3) Libor Business Days before the commencement of any new Interest Period or the end of the then applicable Interest Period.  Libor Loans and conversions to Libor Loans shall each be not less than $1,000,000.00 and in increments of $250,000.00 in excess of such minimum.

(iii)     Any Libor Loan which matures while the Borrowers are In Default shall be converted, at the option of the Agent, to a Base Margin Loan notwithstanding any notice from the Borrower that such Loan is to be continued as a Libor Loan.

(c)     Any request for a Revolving Credit Loan or for the continuance or conversion of an interest rate applicable to a Revolving Credit Loan which is made after the applicable deadline therefor, as set forth above, shall be deemed to have been made at the opening of business on the then next Business Day or Libor Business Day, as applicable.

(d)     The Borrowers may request that the Agent cause the issuance by the Issuer of L/C's for the account of the Borrower as provided in Section 2-18.

(e)     The Agent may rely on any request for a loan or advance, or other financial accommodation under the Revolving Credit which the Agent, in good faith, believes to have been made by a Person duly authorized to act on behalf of the Borrowers and may decline to make any such requested loan or advance, or issuance, or to provide any such financial accommodation pending the Agent's being furnished with such documentation concerning that Person's authority to act as may be reasonably satisfactory to the Agent.

(f)     A request by the Borrowers for loan or advance, or other financial accommodation under the Revolving Credit shall be irrevocable and shall constitute certification by the Borrowers that as of the date of such request, each of the following is true and correct:

(i)     There has been no material adverse change in the Parent's and it's Subsidiaries' or any Borrowers' financial condition from the most recent financial information furnished to the Agent pursuant to this Agreement.

(ii)     Each representation which is made herein or in any of the Loan Documents is then true and complete in all material respects as of and as if made on the date of such request.

(iii)     The Borrowers are not In Default.

(g)     If, at any time or from time to time, the Borrowers are In Default:

(i)     The Agent may suspend the Revolving Credit immediately.

(ii)     Neither the Agent nor any Revolving Credit Lender shall be obligated, during such suspension, to make any loans or advance, or to provide any financial accommodation hereunder or to seek the issuance of any L/C.

(iii)     The Agent may suspend the right of the Borrowers to request any Libor Loan or to convert any Base Margin Loan to a Libor Loan.

**2-6.     Making of Revolving Credit Loans.**

(a)     A Revolving Credit Loan shall be made by the transfer of the proceeds of such Revolving Credit Loan to the Operating Account or as otherwise instructed by the Borrowers.

(b)     A Revolving Credit Loan shall be deemed to have been made under the Revolving Credit (and the Borrowers shall be indebted to the Agent and the Revolving Credit Lenders for the amount thereof immediately) at the following:

(i)     The Agent's initiation of the transfer of the proceeds of such Revolving Credit Loan in accordance with the Borrowers' instructions (if such Revolving Credit Loan is of funds requested by the Borrowers).

(ii)     The charging of the amount of such Revolving Credit Loan to the Loan Account (in all other circumstances).

(c)     There shall not be any recourse to or liability of the Agent or any Revolving Credit Lender, on account of any of the following which is beyond the reasonable control of the Agent:

(i)     Any delay in the making of any loan or advance requested under the Revolving Credit.

(ii)     Any delay by any bank or other depository institution in treating the proceeds of any such loan or advance as collected funds.

(iii)     Any delay in the receipt, and/or any loss, of funds which constitute a Revolving Credit Loan under the Revolving Credit, the wire transfer of which was properly initiated by the Agent in accordance with wire instructions provided to the Agent by the Borrower.

41

**2-7.    Reserved.**

**2-8.    The Loan Account.**

(a)    An account ("**Loan Account**") shall be opened on the books of the Agent in which a record shall be kept of all Revolving Credit Loans.

(b)    The Agent shall also keep a record (either in the Loan Account or elsewhere, as the Agent may from time to time elect) of all interest, fees, service charges, costs, expenses, and other debits owed to the Agent and each Revolving Credit Lender on account of the Liabilities and of all credits against such amounts so owed.

(c)    All credits against the Liabilities shall be conditional upon final payment to the Agent for the account of each Revolving Credit Lender of the items giving rise to such credits.  The amount of any item credited against the Liabilities which is charged back against the Agent or any Revolving Credit Lender for any reason or is not so paid shall be a Liability and shall be added to the Loan Account, whether or not the item so charged back or not so paid is returned.

(d)    Except as otherwise provided herein, all fees, service charges, costs, and expenses for which the Borrowers are obligated hereunder are payable on demand.  In the determination of Availability, the Agent may deem fees, service charges, accrued interest, and other payments which will be due and payable between the date of such determination and the first day of the then next succeeding month as having been advanced under the Revolving Credit whether or not such amounts are then due and payable.

(e)    The Agent, without the request of the Borrowers, may advance under the Revolving Credit any interest, fee, service charge, or other payment to which the Agent or any Revolving Credit Lender is entitled and which are due and payable from the Borrowers pursuant hereto and may charge the same to the Loan Account notwithstanding that such amount so advanced may result in Borrowing Base's being exceeded.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2-10(b). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2-8(e) shall bear interest at the interest rate then and thereafter applicable to Base Margin Loans.

(f)    Any statement rendered by the Agent or any Revolving Credit Lender to the Borrowers concerning the Liabilities shall be considered correct and accepted by the Borrowers and shall be conclusively binding upon the Borrowers unless the Borrowers provide the Agent with written objection thereto within twenty (20) days from the mailing of such statement, which written objection shall indicate, with particularity, the reason for such objection.  In the absence of manifest error, the Loan

Account and the Agent's books and records concerning the loan arrangement contemplated herein and the Liabilities shall be prima facie evidence and proof of the items described therein.

**2-9.** **The Revolving Credit Notes**.  At the election of the Agent and each Revolving Credit Lenders, the Borrowers' obligation to repay loans and advances under the Revolving Credit, with interest as provided herein, shall be evidenced by Notes (each, a "**Revolving Credit Note**") in the form of **EXHIBIT 2-9**, annexed hereto, executed by each Borrower, one payable to each Revolving Credit Lender.  Neither the original nor a copy of any Revolving Credit Note shall be required, *however,* to establish or prove any Liability.  In the event that any Revolving Credit Note is ever lost, mutilated, or destroyed, the Borrowers shall execute a replacement thereof and deliver such replacement to the Agent.

**2-10.** **Payment of The Loan Account.**

(a)    The Borrowers *may* repay all or any portion of the principal balance of the Loan Account from time to time until the Termination Date.  Prepayments made first, shall repay outstanding revolving loans under the Existing Credit Agreement and, upon repayment in full of the revolving loans under the Existing Credit Agreement, any payments shall be applied in the order and manner as provided herein. All payments (iii) to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.

(b)    The Borrowers, without notice or demand from the Agent or any Revolving Credit Lender, *shall* pay the Agent that amount, from time to time, which is necessary so that there is no OverLoan outstanding.

(c)    The Borrowers *shall* repay the then entire unpaid balance of the Loan Account and all other Liabilities on the Termination Date.

(d)    The Agent shall endeavor to cause the application of payments (if any), pursuant to Sections 2-10(a) and 2-10(b) against Libor Loans then outstanding in such manner as results in the least cost to the Borrowers, but shall not have any affirmative obligation to do so nor liability on account of the Agent's failure to have done so.  In no event shall action or inaction taken by the Agent excuse the Borrowers from any indemnification obligation under Section 2-10(e).

(e)    Within ten (10) days from the date a Revolving Credit Lender or the Agent (as the case may be) makes written demand therefor, the Borrowers shall indemnify the Agent and each Revolving Credit Lender and hold the Agent and each Revolving Credit Lender harmless from and against any loss, cost or expense (including loss of anticipated profits and amounts payable by the Agent or such Revolving Credit Lender on account of "breakage fees" (so-called)) which the Agent or such Revolving Credit Lender may sustain or incur (including, without limitation, by virtue of acceleration after the occurrence of any Event of Default) as a consequence of the following:

(i)      Default by the Borrowers in payment of the principal amount of or any interest on any Libor Loan as and when due and payable, including any such loss or expense arising from interest or fees payable by such Revolving Credit Lender in order to maintain its Libor Loans.

(ii)      Default by the Borrowers in making a borrowing or conversion after the Borrowers have given (or is deemed to have given) a request for a Revolving Credit Loan or a request to convert a Revolving Credit Loan from one applicable interest rate to another.

(iii)      The making of any payment on a Libor Loan or the making of any conversion of any such Loan to a Base Margin Loan on a day that is not the last day of the applicable Interest Period with respect thereto.

**2-11.   Interest on Revolving Credit Loans.**

(a)      Each Revolving Credit Loan shall be a Base Margin Loan and shall bear interest at the Base Margin Rate unless timely notice is given (as provided in Section 2-5) that the subject Revolving Credit Loan (or a portion thereof) is, or is to be converted to, a Libor Loan.

(b)      Each Revolving Credit Loan which consists of a Libor Loan shall bear interest at the applicable Libor Margin Rate.

(c)      Subject to, and in accordance with, the provisions of this Agreement, the Borrowers may cause all or a part of the unpaid principal balance of the Loan Account to bear interest at the Base Margin Rate or the Libor Margin Rate as specified from time to time by the Borrowers.

(d)      The Borrowers shall not select, renew, or convert any interest rate for a Revolving Credit Loan such that, in addition to interest at the Base Margin Rate, there are more than six (6) Libor Margin Rates applicable to the Revolving Credit Loans at any one time.

(e)      The Borrowers shall pay accrued and unpaid interest on each Revolving Credit Loan in arrears as follows:

(i)      On the applicable Interest Payment Date for that Revolving Credit Loan.

(ii)      On the Termination Date and on the End Date.

(iii)      Following the occurrence of any Event of Default, with such frequency as may be reasonably determined by the Agent.

(f)      Following the occurrence of any Event of Default (and whether or not the Agent exercises the Agent's rights on account thereof), each Revolving Credit Loan shall bear interest, at the

44

option of the Agent or at the instruction of the SuperMajority Lenders, at rate which is the rate then in effect for such Revolving Credit Loan, *plus* two percent (2%) per annum.

      **2-12.    Revolving Credit Commitment Fee**.  In consideration of the commitment to make loans and advances to the Borrowers under the Revolving Credit,  and to maintain sufficient funds available for such purpose, there has been earned and the Borrowers shall pay the "**Revolving Credit Commitment Fee**" (so referred to herein) in the amount and payable as provided in the Fee Letter.

      **2-13.    Reserved**.

      **2-14.    Unused Line Fee**.  In addition to any other fee to be paid by the Borrowers on account of the Revolving Credit, the Borrowers shall pay the Agent the "***Unused Line Fee***" (so referred to herein) equal to the Applicable Fee Rate multiplied by the difference, during the quarter just ended (or relevant period with respect to the payment being made on the Termination Date) between the Revolving Credit Ceiling and the average of the unpaid principal balance of the Loan Account and the undrawn Stated Amount of L/C's outstanding during the relevant period.  The Unused Line Fee shall be paid in arrears, on the first day of each quarter after the execution of this Agreement and on the Termination Date.

      **2-15.    Certain Bankruptcy Matters.**

        (a)    Except to the extent expressly provided otherwise in a Financing Order, the Loan Parties hereby agree that, subject only to the Carve Out, the Liabilities shall be deemed to (i) constitute DIP Superpriority Claims, with priority over all administrative expense claims and claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by order of the Court in one or more Financing Orders, and (ii) pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the  Bankruptcy Code, be secured by first priority, duly perfected Liens and security interests in and upon the Collateral, in each case to the extent provided in any of the Financing Orders.

        (b)    In the event of a conflict between, or inconsistency among, any Financing Order, on the one hand, and any Loan Document, on the other hand, the applicable Financing Order shall control.

        (c)    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)        the parties hereto agree, and the Financing Orders shall provide, that the Credit Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Financing Orders or any other Loan Document. If the Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Financing Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.15(c) or of the perfection of any other Liens in favor of the Agent, for the benefit of the Lenders and the other Credit Parties, on the Collateral; and

(ii)        except as otherwise agreed to by the Lenders, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Agent and the Revolving Credit Lenders pursuant to this Agreement, the Financing Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever.

(d)        Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)        subject only to the Carve Out and to the extent provided in any of the Financing Orders, and subject to the Financing Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Revolving Credit Lender or the Agent against the Borrowers in respect of any Liabilities;

(ii)        other than as provided in the Financing Orders or the Loan Documents, the Agent's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out and Permitted Prior Liens (and as otherwise set forth in the

Intercreditor Agreement and in the Financing Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the parties hereto agree, and the Financing Orders shall provide, that the Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Agent's Liens under applicable non-bankruptcy law.

(e)     In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Agent, in accordance with Applicable Law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Loan Party hereby gives the Agent (at the direction of the Majority Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Liabilities and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**2-16.    Concerning Fees.**

(a)     In addition to any other right to which the Agent is then entitled on account thereof, the Agent may assess an additional fee payable by the Borrowers on account of the accommodation, from time to time, by the Agent of the Borrowers' request that the Agent depart or dispense with one or more of the administrative provisions of this Agreement and/or the Borrowers' failure to comply with any of such provisions, which additional fee shall be reasonable.

(i)     By way of non-exclusive example, the Agent may assess a fee on account of any of the following:

(A)     The Borrowers' failure to pay that amount which is necessary so that no OverLoan is outstanding (as required under Section 2-10(b) hereof).

(B)     The providing of a loan or advance under the Revolving Credit or charging of the Loan Account such that an OverLoan is made.

(C)     The foreshortening of any of the time frames with respect to the making of Revolving Credit Loans as set forth in Section 2-5.

(D)     The Borrowers' failure to provide a financial statement or report within the applicable time frame provided for such report under Article 5 hereof.

47

(ii)    The inclusion of the foregoing right on the part of the Agent to assess a fee does not constitute an obligation, on the part of the Agent, to waive any provision of this Agreement under any circumstances.  The assessment of any such fee in any particular circumstance shall not constitute the Agent's waiver of any breach of this Agreement on account of which such fee was assessed nor a course of action on which the Borrower may rely.

(b)    The Borrowers shall not be entitled to any credit, rebate or repayment of any fee earned by the Agent or any Revolving Credit Lender pursuant to this Agreement or any Loan Document notwithstanding any termination of this Agreement pursuant to the terms hereof or suspension or termination pursuant to the terms hereof of the Agent's and any Revolving Credit Lender's respective obligation to make loans and advances hereunder.

**2-17.    Agent's and Revolving Credit Lenders' Discretion.**

(a)    Except as otherwise provided herein, each reference in the Loan Documents to the exercise of discretion, "Permitted Discretion", or the like by the Agent or any Revolving Credit Lender shall be to such Person's exercise of its reasonable judgment, in good faith (which shall be presumed), based upon such Person's consideration of any such factors as the Agent or that Revolving Credit Lender, taking into account information of which that Person then has actual knowledge, reasonably believes:

(i)    Will or reasonably could be expected to adversely affect the value of the Collateral, the enforceability of the Agent's Collateral Interests therein, or the amount which the Agent would likely realize therefrom (taking into account delays which may possibly be encountered in the Agent's realizing upon the Collateral and likely Costs of Collection).

(ii)    Indicates that any report or financial information delivered to the Agent or any Revolving Credit Lender by or on behalf of the Borrowers or the Parent is incomplete, inaccurate, or misleading in any material manner or was not prepared in any material respect in accordance with the requirements of this Agreement.

(iii)    Suggests an increase in the likelihood that the Borrowers or the Parent will become the subject of a bankruptcy or insolvency proceeding.

(iv)    Suggests that the Borrowers are In Default.

(b)    In the exercise of such judgment, the Agent and each Revolving Credit Lender also may take into account any of the following factors:

(i)      Those included in, or tested by, the definitions of "Eligible Inventory" and "Cost".

(ii)      The current financial and business climate of the industry in which the Borrower competes (having regard for the Borrowers' position in that industry).

(iii)      General macroeconomic conditions which have a material effect on the Borrowers' cost structure.

(iv)      Material changes in or to the mix of the Borrowers' Inventory.

(v)      Seasonality with respect to the Borrowers' Inventory and patterns of retail sales.

(vi)      Such other factors as the Agent and each Revolving Credit Lender reasonably determines as having a material bearing on credit risks associated with the providing of loans and financial accommodations to the Borrowers.

(c)      The burden of establishing the failure of the Agent or any Revolving Credit Lender to have acted in a reasonable manner in such Person's exercise of such discretion shall be the Borrowers'.

**2-18.    Procedures For Issuance of L/C's.**

(a)      The Borrowers may request that the Agent cause the issuance by the Issuer of L/C's for the account of a Borrower, and the Issuer shall, if so requested, issue one or more L/C's for the account of such Borrower from time to time pursuant to the terms hereof.  Each such request shall be in the manner set forth herein or in such other manner as may from time to time be reasonably acceptable to the Agent.

(b)      The Agent shall cause the issuance of any L/C so requested by the Borrowers, *provided that*, at the time that the request is made, both the Issuance Conditions are satisfied and Revolving Credit has not been suspended as provided in Section 2-5(g) and if so issued:

(i)      The aggregate Stated Amount of all L/C's then outstanding, does not exceed $5,000,000.00,

(ii)      The expiry of the L/C is not later than the earlier of thirty (30) days prior to the Maturity Date or the following:

(A)      Standby L/Cs: One (1) year from initial issuance.

(B)      Documentary L/Cs: Sixty (60) days from issuance.

(iii)      An OverLoan will not result from the issuance of the subject L/C.

(c)      The Borrowers shall execute such documentation to apply for and support the issuance of an L/C as may be required by the Issuer.

(d)      Unless within the control of the Agent or a Revolving Credit Lender, there shall not be any recourse to, nor liability of, the Agent or any Revolving Credit Lender on account of:

(i)      Any delay or refusal by an Issuer to issue an L/C; or

(ii)      Any action or inaction of an Issuer on account of or in respect to, any L/C.

(e)      The Borrowers shall reimburse the Issuer for the amount of any honoring of a drawing under an L/C on the same day on which such honoring takes place. The Agent, without the request of the Borrowers, may advance under the Revolving Credit (and charge to the Loan Account) the amount of any honoring of any L/C and other amount for which the Borrowers, the Issuer, or the Revolving Credit Lenders become obligated on account of, or in respect to, any L/C.  Such advance shall be made whether or not the Borrowers are In Default or such advance would result in an OverLoan.  Such action shall not constitute a waiver of the Agent's rights under Section 2-10(b) hereof.

**2-19.    Fees For L/C's.**

(a)      The Borrowers shall pay to the Agent a fee, on account of L/C's, monthly in arrears, and on the Termination Date and on the End Date, determined at the following per annum rate of the weighted average Stated Amount of all L/C's outstanding during the period in respect of which such fee is being paid *except that,* following the occurrence of any Event of Default, such fee shall be increased by two percent (2%) per annum:

(i)      Standby L/Cs:              300 basis points.

(ii)      Documentary L/Cs:      250 basis points.

(b)      In addition to the fee to be paid as provided in Subsection 2-19(a) above, the Borrowers shall pay to the Agent (or to the Issuer, if so requested by Agent), on demand, all customary issuance, processing, negotiation, amendment, and administrative fees and other amounts customarily charged by the Issuer on account of, or in respect to, any L/C.

(c)      If any change in Applicable Law after the date of this Agreement shall either:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirements against letters of credit heretofore or hereafter issued by any Issuer or with respect to which any Revolving Credit Lender or any Issuer has an obligation to lend to fund drawings under any L/C; or

(ii)      impose on any Issuer any other condition or requirements relating to any such letters of credit;

and the result of any event referred to in Section 2-19(c)(i) or 2-19(c)(ii), above, shall be to increase the cost to any Revolving Credit Lender or to any Issuer of issuing or maintaining any L/C (which increase in

cost shall be the result of such Issuer's reasonable allocation among that Revolving Credit Lender's or Issuer's letter of credit customers of the aggregate of such cost increases resulting from such events), then within ten (10) days after demand by the Agent and delivery by the Agent to the Borrowers of a certificate of an officer of the subject Revolving Credit Lender or the subject Issuer describing, with reasonable particularity, such change in law, executive order, regulation, directive, or interpretation thereof, its effect on such Revolving Credit Lender or such Issuer, and the basis for determining such increased costs and their allocation, the Borrowers shall immediately pay to the Agent, from time to time as specified by the Agent, such amounts as shall be sufficient to compensate the subject Revolving Credit Lender or the subject Issuer for such increased cost.  In the absence of manifest error, any Revolving Credit Lender's or any Issuer's determination of costs incurred under Section 2-19(c)(i) or 2-19(c)(ii), above, and the allocation, if any, of such costs among the Borrowers and other letter of credit customers of such Revolving Credit Lender or such Issuer, if done in good faith and made on an equitable basis and in accordance with such officer's certificate, shall be conclusive and binding on the Borrowers. Notwithstanding the foregoing, any demand for such increased letter of credit costs shall not include any increased letter of credit costs of which the Issuer, any Revolving Credit Lender, or the Agent making demand therefor had knowledge more than 90 days prior to the date that the Issuer, any Revolving Credit Lender or the Agent makes demand therefor.

**2-20.   Concerning L/C's.**

(a)     None of the Issuer, the Issuer's correspondents, any Revolving Credit Lender, the Agent, or any advising, negotiating, or paying bank with respect to any L/C shall be responsible in any way for:

(i)      The performance by any beneficiary under any L/C of that beneficiary's obligations to the Borrowers.

(ii)     The form, sufficiency, correctness, genuineness, authority of any person signing; falsification; or the legal effect of any documents called for under any L/C if (with respect to the foregoing) such documents on their face appear to be in order.

(b)     The Issuer may honor, as complying with the terms of any L/C and of any drawing thereunder, any drafts or other documents otherwise in order, but signed or issued by an administrator, executor, conservator, trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, liquidator, receiver, or other legal representative of the party authorized under such L/C to draw or issue such drafts or other documents.

(c)     Unless otherwise agreed to, in the particular instance, the Borrower hereby authorizes any Issuer to:

        (i)        Select an advising bank, if any.

        (ii)       Select a paying bank, if any.

        (iii)      Select a negotiating bank.

(d)      All directions, correspondence, and funds transfers relating to any L/C are at the risk of the Borrowers. The Issuer shall have discharged the Issuer's obligations under any L/C which, or the drawing under which, includes payment instructions, by the initiation of the method of payment called for in, and in accordance with, such instructions (or by any other commercially reasonable and comparable method). None of the Agent, any Revolving Credit Lender, or the Issuer shall have any responsibility for any inaccuracy, interruption, error, or delay in transmission or delivery by post, telegraph or cable, or for any inaccuracy of translation, except through its gross negligence or willful misconduct.

(e)      The Agent's, each Revolving Credit Lender's, and the Issuer's rights, powers, privileges and immunities specified in or arising under this Agreement are in addition to any heretofore or at any time hereafter otherwise created or arising, whether by statute or rule of law or contract.

(f)      Except to the extent otherwise expressly provided hereunder or agreed to in writing by the Issuer and the Borrowers, documentary L/C's will be governed by the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce, Publication No. 500, and standby L/C's will be governed by International Standby Practices ISP98 (adopted by the International Chamber of Commerce on April 6, 1998) and any respective subsequent revisions thereof.

(g)      The obligations of the Borrowers under this Agreement with respect to L/C's are absolute, unconditional, and irrevocable and shall be performed strictly in accordance with the terms hereof under all circumstances, whatsoever including, without limitation, the following:

        (i)        Any lack of validity or enforceability or restriction, restraint, or stay in the enforcement of this Agreement, any L/C, or any other agreement or instrument relating thereto.

        (ii)       The Borrowers' consent to any amendment or waiver of, or consent to the departure from, any L/C.

        (iii)      The existence of any claim, set-off, defense, or other right which the Borrower may have at any time against the beneficiary of any L/C.

        (iv)      Any good faith honoring of a drawing under any L/C, which drawing possibly could have been dishonored based upon a strict construction of the terms of the L/C.

**2-21.    Changed Circumstances.**

(a)    The Agent may advise the Borrowers that the Agent has made the good faith determination (which determination shall be final and conclusive) of any of the following:

(i)    Adequate and fair means do not exist for ascertaining the rate for Libor Loans.

(ii)    The continuation of or conversion of any Revolving Credit Loan to a Libor Loan has been made impossible or unlawful by the occurrence after the date of this Agreement of a contingency that materially and adversely affects the applicable market or the compliance by the Agent or any Revolving Credit Lender in good faith with any Applicable Law.

(iii)    The indices on which the interest rates for Libor Loans are based shall no longer fairly and adequately represent the effective cost to the Agent or any Revolving Credit Lender for U.S. dollar deposits in the interbank market for deposits in which it regularly participates.

(b)    In the event that the Agent advises the Borrowers of an occurrence described in Section 2-21(a), then, until the Agent notifies the Borrowers that the circumstances giving rise to such notice no longer apply:

(i)    The obligation of the Agent or each Revolving Credit Lender to make loans of the type affected by such changed circumstances or to permit the Borrower to select the affected interest rate as otherwise applicable to any Revolving Credit Loans shall be suspended.

(ii)    Any notice which the Borrowers had given the Agent with respect to any Libor Loan, the time for action with respect to which has not occurred prior to the Agent's having given notice pursuant to Section 2-21(a) above, shall be deemed to be given for a Base Margin Loan.

**2-22.    Lenders' Commitments.**

(a)    Subject to Section 16-1 (which provides for assignments and assumptions of commitments), each Revolving Credit Lender's "***Revolving Credit Percentage Commitment***" and "***Revolving Credit Dollar Commitment***" (respectively so referred to herein) are set forth on **EXHIBIT 2-22**, annexed hereto. Upon the consummation of a 363 Sale, each Revolving Credit Lender's respective Revolving Credit Dollar Commitment (and corresponding Revolving Credit Percentage Commitment) shall be reduced to a dollar amount to be determined by the Agent and the Revolving Credit Lenders, in

their exclusive discretion, after giving effect to the amount of any repayment made with proceeds of such 363 Sale.

(b)    The obligations of each Revolving Credit Lender are several and not joint.  No Revolving Credit Lender shall have any obligation to make any loan or advance under the Revolving Credit in excess of the lesser of the following:

(i)    That Revolving Credit Lender's Revolving Credit Commitment Percentage of the subject loan or advance or of Availability.

(ii)    that Revolving Credit Lender's Revolving Credit Dollar Commitment.

(c)    No Revolving Credit Lender shall have any liability to the Borrowers on account of the failure of any other Revolving Credit Lender to provide any loan or advance under the Revolving Credit nor any obligation to make up any shortfall which may be created by such failure.

(d)    In the event of the Borrowers' exercise of its right to reduce the Revolving Credit Ceiling, the effect of such reduction shall be distributed, *pro rata*, amongst the Revolving Credit Lenders based on their then respective Revolving Credit Dollar Commitments.

(e)    The Revolving Credit Dollar Commitments, Revolving Credit Commitment Percentages, and identities of the Revolving Credit Lenders may be changed, from time to time by the reallocation or assignment of Revolving Credit Dollar Commitments and Revolving Credit Commitment Percentages amongst the Revolving Credit Lenders or with other Persons who determine to become "Revolving Credit Lenders".

(f)    Upon written notice given the Borrowers from time to time by the Agent, of any assignment or allocation referenced in Section 2-22(e):

(i)    The Borrowers shall execute one or more replacement Revolving Credit Notes to reflect such changed Revolving Credit Dollar Commitments, Revolving Credit Commitment Percentages, and identities and shall deliver such replacement Revolving Credit Notes to the Agent (which promptly thereafter shall deliver to the Borrower the Revolving Credit Notes so replaced); *provided, however*, in the event that a Revolving Credit Note is to be exchanged following its acceleration or the entry of an order for relief under the Bankruptcy Code with respect to the Borrowers, the Agent, in lieu of causing the Borrowers to execute one or more new Revolving Credit Notes, may issue the Agent's Certificate confirming the resulting Revolving Credit Dollar Commitments and Revolving Credit Percentage Commitments.

(ii)    Such change shall be effective from the effective date specified in such written notice and any Person added as a Revolving Credit Lender shall have all

rights and privileges of a Revolving Credit Lender hereunder thereafter as if such Person had been a signatory to this Agreement and any other Loan Document to which a Revolving Credit Lender is a signatory and any Person removed as a Revolving Credit Lender shall be relieved of any obligations or responsibilities of a Revolving Credit Lender hereunder thereafter.

**2-23.  Joint and Several Obligations.**

(a)  The Liabilities are the joint and several obligation of each Borrower and each Guarantor of the Liabilities (collectively, the "***Loan Parties***"). To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of the Agent or any Revolving Credit Lender to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Revolving Credit Lender, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Liabilities, or, except as otherwise expressly provided in Section 4-13(d)(vii), by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Liabilities (other than contingent indemnification obligations for which no claim has been asserted) after the termination of the Loan Commitments).  The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Liabilities (other than contingent indemnification obligations for which no claim has been asserted) after the termination of the Loan Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Liabilities (other than as expressly provided in Section 4-13(d)(vii)), and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Liabilities or otherwise.

(b)  To the fullest extent permitted by Applicable Law, and subject to the Financing Orders, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Liabilities or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Liabilities (other than contingent indemnification obligations for which no claim has been asserted) and the termination of the Loan Commitments. Subject to the Financing Orders, this Agreement and the

other Loan Documents, the Agent and the Revolving Credit Lenders may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Liabilities, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any other Loan Party hereunder except to the extent that all of the Liabilities (other than contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash and the Loan Commitments have been terminated.  Subject to the Financing Orders, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party.

(c)    Upon payment by any Loan Party of any Liabilities, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all of the Liabilities (other than contingent indemnification obligations for which no claim has been asserted) and the termination of the Loan Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party or any Subsidiary thereof is hereby subordinated in right of payment to the prior indefeasible payment in full of the Liabilities (other than contingent indemnification obligations for which no claim has been asserted), and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness prior to the indefeasible payment in full of the Liabilities (other than contingent indemnification obligations for which no claim has been asserted).  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Agent and the Revolving Credit Lenders and shall forthwith be paid to the Agent to be credited against the payment of the Liabilities, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Liabilities constituting loans made to another Loan Party hereunder or other Liabilities incurred directly and primarily by any other Loan Party (an "***Accommodation Payment***"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount, for each of such other Loan Parties, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties.  As

of any date of determination, the "***Allocable Amount***" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("***UFTA***") or Section 2 of the Uniform Fraudulent Conveyance Act ("***UFCA***"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**2-24.    Designation of Hastings Entertainment as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints Hastings Entertainment as such Borrowers' agent to (i) obtain Revolving Credit Loans and other financial accommodations pursuant to the Loan Documents, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement, and to receive on its behalf any funds or other amounts that may, pursuant to the Loan Documents, be payable to any or all of the Borrowers, (ii) provide the Agent and each Revolving Credit Lender with all notices with respect to Revolving Credit Loans and other financial accommodations pursuant to the Loan Documents for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Hastings Entertainment shall be deemed to be given by the Borrowers hereunder and shall bind each Borrower), (iii) receive notices and instructions from the Agent and the Revolving Credit Lenders (and any notice or instruction provided by the Agent or any Revolving Credit Lender to Hastings Entertainment in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (iv) take such action as Hastings Entertainment deems appropriate on its behalf to obtain Revolving Credit Loans and other financial accommodations and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to the Agent and each Revolving Credit Lender on account of Revolving Credit Loans and other financial accommodations so made as if made directly by the applicable Agent or Revolving Credit Lender to such Borrower, notwithstanding the manner by which such Revolving Credit Loans or financial accommodations are recorded on the books and records of Hastings Entertainment and of any other Borrower.

(b)    Each Borrower recognizes that (i) credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers and (ii) it is a part of a consolidated enterprise under the Parent, and that it will receive both direct and indirect benefits from

becoming a co-Borrower.  Consequently, each Borrower hereby assumes and agrees to discharge all Liabilities of each of the other Borrowers.

(c)     Hastings Entertainment shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf Hastings Entertainment has requested a Revolving Credit Loan or other financial accommodation.  Neither the Agent nor any other Revolving Credit Lender shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE 3 - CONDITIONS PRECEDENT:

**(a)     Closing Date Conditions.** As a condition to the effectiveness of this Agreement, the establishment of the Revolving Credit, and the making of the first loan under the Revolving Credit, each of the documents respectively described in Sections 3-1 through and including 3-4, (each in form and substance reasonably satisfactory to the Agent) shall have been delivered to the Agent, and the conditions respectively described in Sections 3-5 through and including 3-12, shall have been satisfied:

**3-1.     Reserved.**

**3-2.     Reserved**.

**3-3.     Additional Documents**.  Agent shall have received the following:

(a)     executed counterparts of this Agreement by each of the Borrowers and Guarantors and the Revolving Credit Lenders;

(b)     if requested by a Revolving Credit Lender in accordance with Section 2-9 hereof, a Note executed by the Borrowers in favor of each Revolving Credit Lender requesting a Note;

(c)     After giving effect to (i) any funding of the Loans on the Closing Date, (ii) any charges to the Loan Account made in connection with the credit facility contemplated hereby, and (iii) all existing Letters of Credit and all Letters of Credit to be issued at, or immediately subsequent to, the Closing Date, for the avoidance of doubt after the Availability Block, Excess Availability shall be not less than $4.0 million.  The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on June 10, 2016, and executed by a Responsible Officer of the Borrowers;

(d)     The Borrowers shall have filed a motion reasonably acceptable to the Agent seeking approval of the Agency Agreement in connection with the closing of the stores pursuant to the Initial Store Closing Sale; and

(e)     Such additional instruments and documents as the Agent or its counsel reasonably may require or request.

**3-4.     Officers' Certificates**.  Certificates executed by Responsible Officer stating that the representations and warranties made by the Borrowers to the Agent and the Revolving Credit Lenders in the Loan Documents are true and complete in all material respects as of the date of such Certificate (other

than those representations and warranties which are qualified by "materiality", each of which are true and correct in all respects), and that no event has occurred which is or which, solely with the giving of notice or passage of time (or both) would be an Event of Default.

**3-5.     Representations and Warranties**.  Each of the representations made by or on behalf of the Borrowers in this Agreement or in any of the other Loan Documents or in any other report, statement, document, or paper provided by or on behalf of the Borrowers shall be true and complete in all material respects as of the date as of which such representation or warranty was made.

**3-6.     Reserved**.

**3-7.     All Fees and Expenses Paid.**  All fees due at or immediately after the first funding under the Revolving Credit and all reasonable costs and expenses incurred by the Agent in connection with the negotiation, documentation and implementation of the credit facility contemplated hereby (including the reasonable fees and expenses of counsel to the Agent, Lender's Special Counsel and Lenders' Consultant) shall have been paid in full.

**3-8.     Borrower Not In Default.**  No Borrower is In Default.

**3-9.     Reserved**.

**3-10.     Bankruptcy Matters.**

(a)     The Interim Financing Order shall be reasonably satisfactory to the Agent, and be substantially in the form of **EXHIBIT 3-10(a)** hereto.

(b)     All "first day" motions and proposed orders to be filed with and submitted to the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Agent and Revolving Credit Lenders.

(c)     The Borrowers shall have filed the Sale Motion reasonably acceptable to the Agent seeking approval of the Sale Process, and seeking entry of the Bidding Procedures Order in connection therewith.

(d)     The Agent shall have received copies of the engagement letter with the Financial Advisor.

(e)     The Interim Financing Order shall have been entered on or before June 14, 2016, and shall be in full force and effect and not subject to a stay or appeal.

**3-11.     Budget**.  The Agent shall have received the Budget and such other financial information regarding the Loan Parties as the Agent may require.

**3-12.   Approvals**.  Agent shall have received the consent of the Prepetition Lenders under the Existing Credit Agreement to the credit facility evidenced hereby and the terms hereof.

**3-13.   Benefit of Conditions Precedent.**  The conditions set forth in this Article 3 are for the sole benefit of the Agent and the Revolving Credit Lenders and may be waived by the Agent in whole or in part without prejudice to the Agent or any Revolving Credit Lender. No document shall be deemed delivered to the Agent or any Revolving Credit Lender until received and accepted by the Agent or its counsel at its offices in Boston, Massachusetts.  Under no circumstances shall this Agreement take effect until executed and accepted by the Agent at said offices.

**(b)   Conditions to all Credit Extensions**. The obligation of each Lender to honor any request for credit extension is subject to the following conditions precedent:

**3-14.   Representations and Warranties.**  The representations and warranties of the Borrowers and each other Loan Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

**3-15.   No Default.**  No Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof.

**3-16.   Budget Compliance.**  Such Loan shall be made in accordance with the Budget.

**3-17.   No Challenge.**  (a) There shall not have been (i) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (ii) any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Existing Loan Documents, the Existing Liabilities, or any Lien granted pursuant to the Existing Loan Documents, and (iii) no Existing Lien granted pursuant to the Existing Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee.

(b)   Each Request for a Loan submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in this Article 3(b) have been satisfied on and as of the date of the applicable Revolving Credit Loan. The conditions set forth in this Article 3(b) are for

the sole benefit of the Credit Parties but until the Revolving Credit Lenders otherwise direct the Agent to cease making Revolving Credit Loans, the Revolving Credit Lenders will fund their Revolving Credit Percentage Commitment of all Revolving Credit Loans and L/Cs and participate in all L/Cs whenever made or issued, which are requested by the Borrowers and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article 3(b), are agreed to by the Agent; provided, however, the making of any such Revolving Credit Loans or the issuance of any L/Cs shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article 3(b) on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

### ARTICLE 4 - GENERAL REPRESENTATIONS, COVENANTS AND WARRANTIES:

To induce each Revolving Credit Lender to establish the credit facility contemplated herein and to induce the Revolving Credit Lenders to provide Revolving Credit Loans (each of which Revolving Credit Loans shall be deemed to have been made in reliance thereupon) the Borrowers, in addition to all other representations, warranties, and covenants made by the Borrowers in any other Loan Document, makes those representations, warranties, and covenants included in this Agreement.

**4-1.    Payment and Performance of Liabilities**.  Subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, the Borrowers shall pay each payment Liability when due (or when demanded, if payable on demand) and shall promptly, punctually, and faithfully perform each other Liability.

**4-2.    Due Organization.  Authorization.  No Conflicts.**

(a)    Each Borrower presently is and shall hereafter remain in good standing in its jurisdiction of organization and is and shall hereafter remain duly qualified and in good standing in every other State in which, by reason of the nature or location of the Borrowers' assets or operation of the Borrowers' business, such qualification may be necessary, except where the failure to so qualify would not have a material adverse effect on the business or assets of such Borrower.

(i)    Hastings Entertainment's organizational identification number assigned to it by the State of Texas is 306162-0 and its federal employer identification number is 75-1386375.

(ii)    MovieStop's organizational identification number assigned to it by the State of Delaware is 8545746 and its federal employer identification number is 27-4829645.

(iii)    SP Images' organizational identification number assigned to it by the State of Nevada is NV20141449955 and its federal employer identification number is 47-1357773.

(iv) Draw Another Circle, LLC's  organizational identification number assigned to it by the State of Delaware is 5495632 and its federal employer identification number is 47-1142102.

(v)    Hastings Internet, Inc.'s organizational number assigned to it by the State of Nevada is NV19981160991 and its federal employer identification number is 85-0450809.

(b)    No Borrower shall change its State of organization; any organizational identification number assigned to such Borrower by that State; or such Borrower's federal employer identification number without giving the Agent thirty (30) days prior written notice thereof.

(c)    Each Subsidiary is listed on **EXHIBIT 4-2**, annexed hereto. The Borrowers shall provide the Agent with prior written notice of any entity's becoming or ceasing to be a Subsidiary.

(d)    Subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, the Borrowers have all requisite power and authority to execute and deliver all Loan Documents to which the Borrowers are party and have and will hereafter retain all requisite power to perform all Liabilities.

(e)    The execution and delivery by each Borrower of each Loan Document to which it is a party; the Borrowers' consummation of the transactions contemplated by such Loan Documents (including, without limitation, the creation of Collateral Interests by the Borrowers to secure the Liabilities); each Borrower's performance under those of the Loan Documents to which it is a party; the borrowings hereunder; and the use of the proceeds thereof:

(i)    Subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, have been duly authorized by all necessary action.

(ii)    Subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, do not, and will not, contravene in any material respect any provision of any Requirement of Law or obligation of the Borrowers, except to the extent such contravention would not have a material adverse effect on the business or assets of the Borrowers.

(iii)    Will not result in the creation or imposition of, or the obligation to create or impose, any Encumbrance upon any assets of the Borrowers pursuant to any Requirement of Law or obligation, except pursuant to the Loan Documents.

62

(f)    The Loan Documents have been duly executed and delivered by the Borrowers and are the legal, valid and binding obligations of the Borrowers, enforceable against the Borrowers in accordance with their respective terms except as such enforceability may be limited by the effect of bankruptcy, insolvency, or similar laws affecting creditors' rights generally or by general equitable principles.

**4-3.    Trade Names.**

(a)    **EXHIBIT 4-3**, annexed hereto, is a listing of:

(i)    All names under which the Borrowers ever conducted their respective businesses since May 1, 2014.

(ii)    All Persons with whom the Borrowers, since May 1, 2014, consolidated or merged, or from whom the Borrowers ever acquired in a single transaction or in a series of related transactions substantially all of such Person's assets.

(b)    The Borrowers will provide the Agent with not less than twenty-one (21) days prior written notice (with reasonable particularity) of any change to any Borrowers' name from that under which such Borrowers are conducting its business at the execution of this Agreement and will not effect such change unless such Borrowers are then in compliance in all material respects with all provisions of this Agreement.

**4-4.    Infrastructure.**

(a)    The Borrowers own and possesses, or has the right to use (and will hereafter own, possess, or have such right to use) all patents, industrial designs, trademarks, trade names, trade styles, brand names, service marks, logos, copyrights, trade secrets, know-how, confidential information, and other intellectual or proprietary property of any third Person necessary for the Borrowers' conduct of the Borrowers' business, except where the failure to do so would not have a material adverse effect on the business or assets of the Borrowers.

(b)    The conduct by the Borrowers of the Borrowers' business does not presently infringe (nor will the Borrowers conduct their business in the future so as to infringe) the patents, industrial designs, trademarks, trade names, trade styles, brand names, service marks, logos, copyrights, trade secrets, know-how, confidential information, or other intellectual or proprietary property of any third Person.

**4-5.    Locations.**

(a)    The Collateral, and the books, records, and papers of Borrowers pertaining thereto, are kept and maintained solely at the following locations:

(i) (A)  Hastings Entertainment's chief executive offices which are at 3601 Plains Boulevard, Amarillo, Texas 79102.

(B)     MovieStop's chief executive offices which are at 1300 Cobb International Drive, Suite C, Kennesaw, Georgia 30152.

(C)     SP Images' chief executive offices which are at 603 Sweetland Avenue, Hillside, New Jersey 07205.

(D)     DAC's chief executive offices, which are at 603 Sweetland Avenue, Hillside, New Jersey 07205.

(E)     Hastings Internet's chief executive offices, which are at 3601 Plains Boulevard, Amarillo, Texas 79102.

(ii)     Those locations which are listed on **EXHIBIT 4-5**, annexed hereto, which EXHIBIT includes, with respect to each such location, the name and address of the landlord on the Lease which covers such location (or an indication that a Borrower owns the subject location) and of all service bureaus with which any such records are maintained.

(b)     The Borrowers shall not remove any of the Collateral from said chief executive office or those locations listed on **EXHIBIT 4-5** except for the following purposes:

(i)     To accomplish sales or rentals of Inventory in the ordinary course of business.

(ii)     To move Inventory from one such location to another such location.

(iii)     To utilize such of the Collateral as is removed from such locations in the ordinary course of business.

(iv)     To accomplish other sales and dispositions as are permitted hereunder.

(c)     Except as is contemplated by the Sale Motion and the Sale Process, the Borrowers will not:

(i)     Execute, alter, modify, or amend any Lease after the occurrence of any Event of Default.

(ii)     Commit to, or open or close any location at which the Borrowers maintain, offer for sale, or store any of the Collateral, except that upon notice to and consent of the Agent and *provided that* no Event of Default then exists, the Borrower may close one or more store locations upon such terms, and at such times, as may be acceptable to the Agent, in its exclusive discretion.

(d)    Except as otherwise disclosed pursuant to, or permitted by, this Section 4-5, no tangible personal property of the Borrowers are in the care or custody of any third party or stored or entrusted with a bailee or other third party and none shall hereafter be placed under such care, custody, storage, or entrustment.

**4-6.    Title to Assets.**

(a)    Each Borrower is, and shall hereafter remain, the owner of the Collateral free and clear of all Encumbrances with the exceptions of the following (the "**Permitted Encumbrances**"):

(i)    Encumbrances in favor of the Agent.

(ii)    Liens securing the payment of taxes, either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings and provided that no lien has been filed in respect thereof.

(iii)    Non-consensual statutory liens (other than liens securing the payment of taxes) arising in the ordinary course of the Borrowers' business to the extent: such liens secure obligations which are not overdue or such liens secure obligations relating to claims or liabilities which are fully insured (subject to commercially reasonable deductibles) and are being defended at the sole cost and expense and at the sole risk of the insurer or are being contested in good faith by appropriate proceedings diligently pursued and available to the Borrowers, in each instance prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on the Borrowers' books.

(iv)    Carriers', warehousemen's, materialmen's, mechanics, repairmen's or similar liens incurred in the ordinary course of business.

(v)    Purchase money security interests in equipment securing obligations not in excess of $1.0 Million unpaid principal balance outstanding at any one time on account of the purchase of new equipment.

(vi)    Zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of real property.

(vii)    Deposits under workmen's compensation, unemployment insurance, pensions, and other employee benefits, and social security laws, or to secure the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or to secure statutory obligations or surety or appeal bonds, or to secure indemnity, performance or other similar bonds arising in the ordinary course of business.

(viii)    Landlord's Liens by operation of law where waivers thereof have not been obtained.

(ix)    Interests of lessors under Capital Leases.

(x)    Liens consisting of security deposits made by the Borrowers.

(xi)    Those Encumbrances (if any) listed on **EXHIBIT 4-6**, annexed hereto.

(xii)    Liens on the Collateral in favor of the Term Agent to secure the obligations under the Term Facility; provided that, such Liens shall be subject to the terms of the Intercreditor Agreement.

(xiii)    Permitted Prior Liens.

(b)    No Borrower shall have possession of any property on consignment to the Borrowers having a Cost aggregating more than $600,000.00 at any one time.

(c)    The Borrowers shall not acquire or obtain the right to use any Equipment, the acquisition or right to use of which Equipment is otherwise permitted by this Agreement, in which Equipment any third party has an interest, except for:

(i)    Equipment which is merely incidental to the conduct of the Borrowers' business.

(ii)    Equipment, the acquisition or right to use of which has been consented to by the Agent, which consent may be conditioned upon the Agent's receipt of such agreement with the third party which has an interest in such Equipment as is satisfactory to the Agent.

**4-7.    Indebtedness**.  The Borrowers do not and shall not hereafter have any Indebtedness with the exceptions of:

(a)    Any Indebtedness on account of the Liabilities.

(b)    The Indebtedness (if any) listed on **EXHIBIT 4-7**, annexed hereto and all renewals, extensions, refinancings, and modifications (but not increases) thereof.

(c)    Current liabilities for taxes incurred in the ordinary course of business which are not yet due and payable or which are being contested in good faith by appropriate proceedings for which adequate reserves, if required by GAAP, have been established.

(d)    Except for events leading up to and as a result of filing the Cases, trade payables arising in the ordinary course of business (i) that are paid within the earlier of (A) 60 days of the date when payment thereof is due and payable and (B) 180 days of the date the respective goods are delivered

66

or services are rendered or (ii) which are being contested in good faith by appropriate proceedings for which adequate reserves, if required by GAAP, have been established.

(e)     Purchase money Indebtedness for equipment purchases which does not exceed, in aggregate, $1.0 million principal outstanding at any one time.

(f)     Indebtedness under the Term Facility in a principal amount not to exceed $15,000,000 minus any repayments and prepayments thereof.

**4-8.    Insurance.**

(a)     **EXHIBIT 4-8**, annexed hereto, is a schedule of all insurance policies owned by the Borrowers or under which the Borrowers are the named insured.  Each of such policies is in full force and effect.  Neither the Borrowers nor, to the Borrowers' knowledge, the issuer of any such policy is in default or violation of any such policy.

(b)     The Borrowers shall have and maintain at all times from responsible companies insurance covering such risks, in such amounts, containing such terms, in such form, for such periods, and written by such companies as may be reasonably satisfactory to the Agent.

(c)     All insurance carried by the Borrowers shall provide for a minimum of thirty (30) days' written notice of cancellation to the Agent and all such insurance which covers the Collateral shall include an endorsement in favor of the Agent, which endorsement shall provide that the insurance, to the extent of the Agent's interest therein, shall not be impaired or invalidated, in whole or in part, by reason of any act or neglect of the Borrowers or by the failure of the Borrowers to comply with any warranty or condition of the policy.

(d)     The coverage reflected on **EXHIBIT 4-8** presently satisfies the foregoing requirements, *it being recognized by the Borrowers, however,* that such requirements may change hereafter to reflect changing circumstances.

(e)     The Borrowers shall furnish the Agent from time to time with certificates or other evidence reasonably satisfactory to the Agent regarding compliance by the Borrowers with the foregoing requirements.

(f)     In the event of the failure by the Borrowers to maintain insurance as required herein, the Agent, at its option, may obtain such insurance, *provided, however,* the Agent's obtaining of such insurance shall not constitute a cure or waiver of any Event of Default occasioned by the Borrowers' failure to have maintained such insurance.

**4-9.    Licenses**.  Each license, distributorship, franchise, and similar agreement issued to, or to which the Borrowers are a party is in full force and effect, except where the failure to do so would not have a material adverse effect on the business or assets of the Borrowers.  To the Borrowers' knowledge,

no party to any such license or agreement is in default or violation thereof. No Borrower has received any notice or threat of cancellation of any such license or agreement.

**4-10. Leases**. **EXHIBIT 4-10**, annexed hereto, is a schedule of all presently effective Capital Leases. To the Borrowers' knowledge, each of such Capital Leases is in full force and effect. To the Borrowers' knowledge, no party to any Capital Lease is in default or violation of any such Capital Lease. The Borrowers have not received any notice or threat of cancellation of any such Capital Lease. The Borrowers hereby authorize the Agent at any time and from time to time, after the occurrence of an Event of Default (subject to the Financing Orders), to contact any of the Borrowers' landlords in order to confirm the Borrowers' continued compliance with the terms and conditions of the Lease(s) between the Borrowers and that landlord and to discuss such issues, concerning the Borrowers' occupancy under such Lease(s), as the Agent may determine.

**4-11. Requirements of Law**. The Borrowers are in compliance with, and shall hereafter comply with and use its assets in compliance with, all Requirements of Law except where the failure of such compliance would not have a material adverse effect on the Borrowers' business or assets. The Borrowers have not received any notice of any violation of any Requirement of Law (other than of a violation which would not have a material adverse effect on the Borrowers' business or assets), which violation has not been cured or otherwise remedied.

**4-12. Labor Relations.**

(a) The Borrowers have not been and are not presently a party to any collective bargaining or other labor contract.

(b) There is not presently pending and, to the Borrowers' knowledge, there is not threatened any of the following:

(i) Any strike, slowdown, picketing, work stoppage, or employee grievance process.

(ii) Any proceeding against or affecting the Borrowers relating to the alleged violation of any Applicable Law pertaining to labor relations or before the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable governmental body, organizational activity, or other labor or employment dispute against or affecting the Borrowers, which, if determined adversely to the Borrowers could reasonably be expected to have a material adverse effect on the business or assets of the Borrowers.

68

        (iii)     Any lockout of any employees by the Borrowers (and no such action is contemplated by the Borrowers).

        (iv)     Any application for the certification of a collective bargaining agent.

(c)     No event has occurred or circumstance exists which could reasonably be expected to provide the basis for any work stoppage or other labor dispute.

(d)     The Borrowers:

        (i)     Have complied in all material respects with all Applicable Law relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing.

        (ii)     Are not liable for the payment of compensation, damages, taxes, fines, penalties, or other amounts, however designated, for the Borrowers' failure to comply with any Applicable Law referenced in Section 4-12(d)(i), the amount of which would have a material adverse effect on the business or assets of the Borrowers.

**4-13. Maintain Properties**. The Borrowers shall:

(a)     Keep the Collateral in good order and repair (ordinary reasonable wear and tear and insured casualty excepted).

(b)     Not suffer or cause the waste or destruction of any material part of the Collateral.

(c)     Not use any of the Collateral in violation of any policy of insurance thereon.

(d)     Not sell, lease, or otherwise dispose of any of the Collateral, other than the following:

        (i)     The sale or rental of Inventory in compliance with this Agreement.

        (ii)     The disposal of Equipment which is obsolete, worn out, or damaged beyond repair, which Equipment is replaced to the extent necessary to preserve or improve the operating efficiency of the Borrowers.

        (iii)     The turning over to the Agent of all Receipts as provided herein.

        (iv)     The sales of previously viewed movies and games.

        (v)     The sales of fixed assets (which shall not include sale of previously viewed movies and games) during each Fiscal year which have an aggregate book value not in excess of 10% of the book value of the Borrowers' total fixed assets as of the beginning of such Fiscal year.

        (vi)     Sales of inventory and fixed assets contemplated by the Sale Process.

(vii)     So long as (1) no Event of Default then exists (or would arise as a result of the sale), and Borrowers are not In Default (and would not become In Default as a result of the sale), and (2) the Net Proceeds are used to prepay the Liabilities (the term "Net Proceeds" as used herein shall not include trade-in value), the sale of the Current Aircraft.  The Agent agrees to execute any consents and releases reasonably requested by the purchaser of the Current Aircraft to evidence the release of its security interest in the Current Aircraft, in each case, at the sole cost and expense of the Borrowers. The Borrowers agree to promptly execute and deliver any such additional security agreements or other documents, and take any further actions as may be reasonably requested by the Agent to grant, preserve, protect, or perfect its security interest in the replacement aircraft, or the validity or priority of such liens, in all cases, at the expense of the Borrowers.

(viii)    The sale of "Purchased Receivables" in accordance with the terms and conditions set forth in the Accounts Receivable Servicing Agreement between SP Images and Merchant Factors Corp., as in effect on the date hereof.

**4-14.   Taxes.**

(a)     With respect to the Borrowers' federal, state, and local tax liability and obligations:

(i)     The Borrowers, in compliance with all Applicable Law, have properly filed all returns due to be filed up to the date of this Agreement, except to the extent any failure to file would not have a material adverse effect on the business or assets of the Borrowers, and except to the extent failure to do so is permitted by the Bankruptcy Code or pursuant to the Financing Orders.

(ii)     Except as described on **EXHIBIT 4-14**:

(A) No Borrower has received from any taxing authority any request to perform any examination of or with respect to the Borrowers nor any other written or verbal notice in any way relating to any claimed failure by the Borrowers to comply with all Applicable Law concerning payment of any taxes or other amounts in the nature of taxes, in each case that has not been resolved.

(B) No agreement is extant which waives or extends any statute of limitations applicable to the right of any taxing authority to assert a deficiency or make any other claim for or in respect to federal income taxes.

(C) No issue has been raised in any tax examination of the Borrowers which, by application of similar principles, reasonably could be expected to result in the assertion by any taxing authority of a material deficiency for any Fiscal year open for examination, assessment, or claim.

(b)     Except to the extent failure to do so is permitted by the Bankruptcy Code, pursuant to the Financing Orders, or pursuant to one or more other orders of the Bankruptcy Court, the Borrowers hereafter shall: pay, as they become due and payable, all taxes and unemployment contributions and other charges of any kind or nature levied, assessed or claimed against the Borrowers or the Collateral by any person or entity, except those taxes, contributions and charges that are being contested in good faith by appropriate proceedings for which adequate reserves, if required by GAAP, have been established, and provided that no lien has been filed in respect thereto, properly exercise any trust responsibilities imposed upon the Borrower by reason of withholding from employees' pay or by reason of the Borrowers' receipt of sales tax or other funds for the account of any third party; timely make all contributions and other payments as may be required pursuant to any Employee Benefit Plan now or hereafter established by the Borrowers; and timely file all tax and other returns and other reports with each governmental authority to whom the Borrowers are obligated to so file, except where the failure to file would not have a material adverse effect on the business or assets of the Borrowers, or where failure to do so is permitted by the Bankruptcy Code or pursuant to the Financing Orders.

**4-15.    No Margin Stock**.  The Borrowers are not engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulations U, T, and X of the Board of Governors of the Federal Reserve System of the United States).   No part of the proceeds of any Revolving Credit Loan hereunder will be used at any time to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

**4-16.    ERISA.**

(a)     Except as disclosed on **EXHIBIT 4-16(a)**, annexed hereto, neither the Borrowers nor any ERISA Affiliate is aware of or has knowingly:

(i)     Violated or failed to be in full compliance with the Borrowers' Employee Benefit Plan.

(ii)     Failed timely to file all reports and filings required by ERISA to be filed by the Borrowers.

(iii)     Engaged in any nonexempt "prohibited transactions" or "reportable events" (respectively as described in ERISA).

(iv)    Engaged in, or committed, any act such that a tax or penalty reasonably could be imposed upon any Borrower on account thereof pursuant to ERISA, which tax or penalty would have a material adverse effect on the business or assets of the Borrowers.

(v)    Accumulated any material cumulative funding deficiency within the meaning of ERISA.

(vi)    Terminated any Employee Benefit Plan such that a lien could be asserted against any assets of the Borrowers on account thereof pursuant to ERISA.

(vii)    Been a member of, contributed to, or have any obligation under any Employee Benefit Plan which is a multiemployer plan within the meaning of Section 4001(a) of ERISA.

(b)    Neither the Borrowers nor any ERISA Affiliate shall ever knowingly or intentionally engage in any action of the type described in Section 4-16(a).

**4-17.    Hazardous Materials.**

(a)    To the best of the Borrowers' knowledge the Borrowers have never: (i) been legally responsible for any release or threat of release of any Hazardous Material or (ii) received notification of the incurrence of any material expense in connection with the assessment, containment, or removal of any Hazardous Material for which the Borrowers would be responsible.

(b)    The Borrowers shall: (i) dispose of any Hazardous Material only in compliance with all Environmental Laws and (ii) have possession of any Hazardous Material only in the ordinary course of the Borrowers' business and in compliance with all Environmental Laws.

**4-18.    Litigation**.  Except as described in **EXHIBIT 4-18**, annexed hereto, and except for those suits, actions, proceedings, or investigations that are stayed by operation of Section 362(a) of the Bankruptcy Code, there is not presently pending or, to the knowledge of the Borrowers, threatened by or against the Borrowers any suit, action, proceeding, or investigation which, if determined adversely to the Borrowers, would have a material adverse effect upon the Borrowers' financial condition or ability to conduct its business as such business is presently conducted or is contemplated to be conducted in the foreseeable future.

**4-19.    Reserved**.

**4-20.    Loans**. The Borrowers shall not make any loans or advances to, nor acquire the Indebtedness of, any Person, *provided, however,* the foregoing does not prohibit (a) advances to the

Borrowers' officers, employees, and salespersons with respect to reasonable expenses to be incurred by such officers, employees, and salespersons for the benefit of the Borrowers, which expenses are properly substantiated by the person seeking such advance and properly reimbursable by the Borrowers, and (b) advances and loans to the Borrowers' Subsidiaries; *provided further*, that Borrowers shall maintain full and complete records of any such inter-company transactions so as to be able to report the results of same to the Agent, the Revolving Credit Lenders, the United States Trustee, and any Committee.

**4-21.   Protection of Assets**   The Agent, in the Agent's exclusive discretion, and from time to time, may discharge any tax or Encumbrance on any of the Collateral, or take any other action which the Agent may deem reasonably necessary to repair, insure, maintain, preserve, collect, or realize upon any of the Collateral.  The Agent shall not have any obligation to undertake any of the foregoing and shall have no liability on account of any action so undertaken except where there is a specific finding in a judicial proceeding (in which the Agent has had an opportunity to be heard), from which finding no further appeal is available, that the Agent had acted in actual bad faith or in a grossly negligent manner.  The Borrowers shall pay to the Agent, on demand, or the Agent, in its discretion, may add to the Loan Account, all amounts paid or incurred by the Agent pursuant to this Section 4-21.

**4-22.   Line of Business**.  The Borrowers shall not engage in any business other than the business in which they are currently engaged.  Further, the Borrowers shall not permit Hastings Internet, Inc. to: (a) engage in any line of business substantially different from the business conducted by Hastings Internet, Inc. as of the Petition Date, or (b) own or otherwise control assets in excess of $150,000 at any time, in each case, without the prior written consent of the Agent.

**4-23.   Affiliate Transactions**.  The Borrowers shall not enter into any transaction with any Affiliate, other than transactions in the ordinary course of business which are on fair and reasonable terms, no less favorable to the Borrowers than those which would have been imposed in a comparable arms-length transaction with a person who is not an Affiliate; *provided that*, that Borrowers shall maintain full and complete records of any such Affiliate transactions so as to be able to report the results of same to the Agent, the Revolving Credit Lenders, the United States Trustee, and any Committee.

**4-24.   Further Assurances.**

(a)   The Borrowers are not the owner of, nor have they any interest in, any property or asset that will not be subject to a perfected Collateral Interest in favor of the Agent (subject only to Permitted Encumbrances) to secure the Liabilities.

(b)    The Borrowers will not hereafter acquire any asset or any interest in property which is not, immediately upon such acquisition, subject to such a perfected Collateral Interest in favor of the Agent to secure the Liabilities (subject only to Permitted Encumbrances).

(c)    The Borrowers shall execute and deliver to the Agent such instruments, documents, and papers, and shall do all such things from time to time hereafter as the Agent may reasonably request to carry into effect the provisions and intent of this Agreement; to protect and perfect the Agent's Collateral Interests in the Collateral; and to facilitate the collection of the Receivables Collateral.  Subject to the Financing Orders, the Borrowers shall execute all such instruments as may be reasonably required by the Agent with respect to the recordation and/or perfection of the Collateral Interests created or contemplated herein.

(d)    Subject to the Financing Orders, the Borrowers hereby designate the Agent as and for the Borrowers' true and lawful attorney, with full power of substitution, to sign and file any financing statements in order to perfect the Agent's Collateral Interests in the Collateral.

(e)    Subject to the Financing Orders, the Borrowers hereby authorize the Agent to file such financing statements as the Agent determines as appropriate to perfect or protect the Agent's Collateral Interests in the Collateral.

(f)    Subject to the Financing Orders, a carbon, photographic, or other reproduction of this Agreement or of any financing statement or other instrument executed pursuant to this Section 4-24 shall be sufficient for filing to perfect the security interests granted herein.

**4-25.    Adequacy of Disclosure.**

(a)    All financial statements furnished to the Agent and to each Revolving Credit Lender by the Parent and the Borrower have been prepared in accordance with GAAP consistently applied and present fairly in all material respects the financial condition of the Parent and the Borrowers at the date(s) thereof and the results of operations and cash flows for the period(s) covered (*provided however,* that unaudited financial statements are subject to normal year end adjustments and to the absence of footnotes).  There has been no change in the financial condition, results of operations, or cash flows of the Parent and the Borrowers since the date(s) of such financial statements, other than changes in the ordinary course of business and except for the effects of the filing of the Cases on the Petition Date, which changes have not been materially adverse, either singularly or in the aggregate.

(b)    Neither the Parent nor the Borrowers has any contingent obligations or obligation under any Lease or Capital Lease which is required to be reflected in financial statements prepared in accordance with GAAP and that is not noted in the Parent's or Borrowers', as applicable, financial statements furnished to the Agent.

(c)    Subject to the effects of the filing of the Cases on the Petition Date, to the Borrowers' knowledge, no document, instrument, agreement, or paper now or hereafter given to the Agent and to each Revolving Credit Lender by or on behalf of the Borrowers or any guarantor of the Liabilities in connection with the execution of this Agreement by the Agent and to each Revolving Credit Lender contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements therein not misleading.  Subject to the effects of the filing of the Cases on the Petition Date, there is no fact known to the Borrowers which has, or which, in the foreseeable future could reasonably be expected to have, a material adverse effect on the financial condition of the Borrowers or any such guarantor which has not been disclosed in writing to the Agent and to each Revolving Credit Lender.

**4-26.    No Restrictions on Liabilities**.  Except as provided in the Intercreditor Agreement, the Borrowers shall not enter into or directly or indirectly become subject to any agreement which prohibits or restricts, in any manner, the Borrowers':

(a)    Creation of, and granting of Collateral Interests in favor of the Agent.

(b)    Incurrence of Liabilities.

**4-27.    Anti-Corruption Laws and Sanctions.**  Each Borrower has implemented and maintains procedures designed to promote and achieve compliance by such Borrower, its Subsidiaries and their respective directors,  officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and each Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of each Borrower and its Subsidiaries, their directors and agents (acting in their capacity as such), are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in such Borrower being designated as a Sanctioned Person. None of (a) any Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of any Borrower, any agent of any Borrower or any Subsidiary (acting in its capacity as such) that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds thereof or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

**4-28.    PATRIOT Act.**  To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as

amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.

**4-29.   Financing Orders.**  The Loan Parties are in compliance with the terms and conditions of the Financing Orders. Each of the Interim Financing Order (to the extent necessary during the Interim Financing Order Period) or the Final Financing Order (from after the Final Financing Order Date) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Agent and each Revolving Credit Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Financing Orders shall be made, in each case, that is adverse to the interests of the Revolving Credit Lenders.

**4-30.   Other Covenants.**

**(a)**   The Collateral Documents, taken together with the Financing Orders, are effective to create in favor of the Agent (for the benefit of itself and the other applicable Credit Parties) a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than the Carve Out and Permitted Liens.  Pursuant to the terms of the Financing Orders, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Financing Order and/or the Final Financing Order, the Liabilities of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (excluding, for the avoidance of doubt, Avoidance Actions and the proceeds of thereof; *provided that*, the Liabilities shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agent and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions), subject only to the Carve Out and the Intercreditor Agreement. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Liabilities, the Loan Parties' Prepetition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Liabilities and Prepetition obligations granted or recognized as valid, including the Liens, security interests, and

claims (including administrative claims and DIP Superpriority Claims) granted to the Agent and the other Credit Parties.

(b)     The Borrowers shall not indirectly do or cause to be done any act which, if done directly by the Borrowers, would breach any covenant contained in this Agreement.

### ARTICLE 5 - FINANCIAL REPORTING AND PERFORMANCE COVENANTS:

**5-1.     Maintain Records**.  The Borrowers shall:

(a)     At all times, keep proper books of account, in which full, true, and accurate entries shall be made of all of the Parent's and the Borrowers' financial transactions, all in accordance with GAAP applied consistently with prior periods to fairly reflect in all material respects the financial condition of the Parent and the Borrowers at the close of, and its results of operations for, the periods in question.

(b)     Timely provide the Agent with those financial reports, statements, and schedules required by this Article 5 or otherwise, each of which reports, statements and schedules shall be prepared, to the extent applicable, in accordance with GAAP applied consistently with prior periods to fairly reflect in all material respects the financial condition of the Parent and the Borrowers at the close of, and the results of operations for, the period(s) covered therein.

(c)     At all times, keep accurate current records of the Collateral including, without limitation, accurate current stock, cost, and sales records of its Inventory, accurately and sufficiently itemizing and describing the kinds, types, and quantities of Inventory and the cost and selling prices thereof.

(d)     At all times, retain an independent certified public accounting firm which is reasonably satisfactory to the Agent and instruct such accountants to discuss with the Agent the Parent's and the Borrowers' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants (and subject to work product and accountant/client privileged information), as may be requested by the Agent.

(e)     Not change the Parent's, the Borrowers' or any of their Subsidiaries' fiscal year, except to conform MovieStop's and SP Images' fiscal calendar to the fiscal calendar of the Parent.

**5-2.     Access to Records.**

(a)     The Borrowers shall accord the Agent with access from time to time as the Agent may require to all properties owned by or over which the Borrowers have control.  The Agent shall have the right, and the Borrowers will permit the Agent from time to time as Agent may reasonably request, to examine, inspect, copy, and make extracts from any and all of the Borrowers' books, records,

electronically stored data, papers, and files.  The Borrowers shall make all of the Borrowers' copying facilities available to the Agent.

     (b)     The Borrowers hereby authorize the Agent to:

          (i)     Inspect, copy, duplicate, review, cause to be reduced to hard copy, run off, draw off, and otherwise use any and all computer or electronically stored information or data which relates to the Borrowers, of the Borrowers, or any service bureau, contractor, accountant, or other person, and directs any such service bureau, contractor, accountant, or other person fully to cooperate with the Agent with respect thereto.

          (ii)     Verify at any time the Collateral or any portion thereof, including verification with Account Debtors, and/or with the Borrowers' computer billing companies, collection agencies, and accountants.

     (c)     The Agent from time to time may designate one or more representatives to exercise the Agent's rights under this Section 5-2 as fully as if the Agent were doing so.

**5-3.    Prompt Notice to Agent.**

     (a)     The Borrowers shall provide the Agent with written notice promptly upon the occurrence of any of the following events, which written notice shall be with reasonable particularity as to the facts and circumstances in respect of which such notice is being given:

          (i)     Any change in the Borrowers' or the Parent's President and chief financial officer.

          (ii)     Except for events leading up to and as a result of the commencement of the Cases, any ceasing of the Borrowers' or the Parent's making of payment, in the ordinary course, to any of its creditors (other than its ceasing of making of such payments on account of a *de minimis* dispute).

          (iii)     Except for events leading up to and as a result of the commencement of the Cases, any failure by the Borrowers to pay rent at any of the Borrowers' locations, which failure continues for more than three (3) days following the last day on which such rent was payable (including any grace periods therefor) without more than a *de minimis* adverse effect to the Borrowers.

          (iv)     Except for events leading up to and as a result of the commencement of the Cases, any material adverse change in the business, operations, or financial condition of the Borrower or the Parent.

          (v)     The Borrowers' becoming In Default.

(vi)   Any intention on the part of the Parent or the Borrowers to discharge the Parent's and the Borrowers' present independent certified public accounting firm or any withdrawal or resignation by such independent certified public accounting firm from their acting in such capacity.

(vii)   Any litigation which, if determined adversely to the Parent or the Borrowers, might reasonably be expected to have a material adverse effect on the financial condition of the Parent or the Borrowers.

(b)   The Borrowers shall:

(i)   Provide the Agent, when so distributed, with copies of any materials distributed to the shareholders of the Borrowers.

(ii)   Provide the Agent:

(A)   When filed, copies of the Borrowers' Form 10-K, Form 8-K, Form 10-Q and Form 14A filed with the SEC.

(B)   When received, copies of all correspondence from the SEC, other than routine non-substantive general communications from the SEC.

(iii)   Provide the Agent, when received by the Borrowers, with a copy of any management letter or similar communications from any accountant of the Borrowers.

**5-4.   Borrowing Base Certificate**.   The Borrowers shall provide the Agent by 11:30 a.m. Central time, on a weekly basis, on Wednesday of each week (as of the immediately preceding Saturday), with a Borrowing Base Certificate (in the form of **EXHIBIT 5-4** annexed hereto, as such form may be revised from time to time by the Agent (the "**Borrowing Base Certificate**")).   The Agent acknowledges that so long as the Borrowers are required to provide such information to the Agent on a weekly basis, the Borrowers will be providing such weekly information based upon its good faith estimates of its Inventory (except for the information provided for the final week of each Fiscal month, which shall not be based upon estimates); *provided, however*, the Borrowers acknowledge and agree with the Agent that the Borrowers shall use their best efforts and good faith to provide the Agent with as accurate information as possible for such weekly Borrowing Base Certificates.   Such Certificate may be sent to the Agent by facsimile transmission, electronic mail transmission, or may otherwise be posted on a secure Internet or intranet website, if any, to which the Agent and Lenders have access, provided that the original thereof is forwarded to the Agent on the date of such transmission.

**5-5.   Reports.**

(a)   Within thirty (30) days after the Petition Date, a proposed revised Budget inclusive of periods through the Maturity Date, which shall be subject to the reasonable approval of the

Agent and the Majority Lenders, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, (i) the Borrower Representative shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Agent or the Majority Lenders and (ii) until such time as the revised Budget is approved, the then existing Budget will remain in effect as the approved Budget.

(a)    Every Thursday during the Cases, commencing on the Thursday following the first full calendar week after the Closing Date, (i) a weekly cash flow forecast for the subsequent 13-week period prepared by a Responsible Officer of the Borrower Representative, and (ii) a variance report prepared by a Responsible Officer of the Borrower Representative (the "**Variance Report**") setting forth actual cash receipts and disbursements of the Loan Parties for the preceding one calendar week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to the Budget and the most recent weekly cash flow forecast delivered by the Loan Parties, in each case, for each Testing Period (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by a Responsible Officer of the Borrower Representative). Budget and covenant compliance for the applicable Testing Period will be tested against the most recent Budget approved by Agent, in its discretion, and not against any prior approved budget.

(b)    Substantially concurrently with the delivery of the weekly cash flow forecast pursuant to Section 6.02(j), a "flash" cash report detailing all cash and Cash Equivalents on-hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date;

(c)    Upon the reasonable request of the Agent, periodic estimated summaries of the then Reported Fee Accruals.

(d)    All documents and information required to be delivered pursuant to the Financing Orders.

(e)    Cause the Acceptable Liquidator to provide weekly reports in form reasonably satisfactory to the Agent regarding the results and status of the Initial Store Closing Sale, including a schedule of applicable discounts then in effect and to be established in the future.

**5-6.    Reserved**.

**5-7.    Reserved.**

**5-8.    Officers' Certificates**.    The Borrowers shall cause a Responsible Officer, in each instance, to provide a Certificate with those reports required pursuant to Section 5-5, which Certificate shall:

(a)     Indicate that the subject report was prepared in accordance with GAAP consistently applied and presents fairly in all material respects the results of the Borrowers' operations and cash flows for, the period(s) covered.

(b)     Indicate either that (i) the Borrowers are not In Default, or (ii) if such an event has occurred, its nature (in reasonable detail) and the steps (if any) being taken or contemplated by the Borrowers to be taken on account thereof.

**5-9.     Inventories, Appraisals, and Audits.**

(a)     The Borrowers, at their own expense, shall conduct regular cycle inventory counts that determine total inventory value at least twice at each of its locations in each twelve (12) month period during which this Agreement is in effect (the spacing of the scheduling of which inventories shall be subject to the Agent's Permitted Discretion) conducted by such inventory takers as are satisfactory to the Agent and following such methodology as may be satisfactory to the Agent. The Agent, at the expense of the Borrowers, may participate in and/or observe each internal cycle count and/or inventory of so much of the Collateral as consists of Inventory which is undertaken on behalf of the Borrowers.

(i)     The Borrowers shall provide the Agent with a copy of the preliminary results of each such inventory (as well as of any other physical inventory undertaken by the Borrowers) within ten (10) days following the completion of such inventory.

(ii)     The Borrowers, within thirty (30) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of each such inventory (as well as of any other physical inventory undertaken by the Borrowers) and shall post such results to the Borrowers' By-Department monthly report generated by the Borrowers' inventory control system and, as applicable to the Borrowers' other financial books and records.

(iii)     The Agent, in its exclusive discretion, if the Borrowers are In Default, may cause such additional inventories to be taken as the Agent determines (each, at the expense of the Borrowers).

(b)     Upon the request of the Agent after reasonable prior notice, the Borrowers shall permit, and cooperate with, the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base.  The Borrowers shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals. Without limiting the foregoing, the Borrowers acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) appraisals in any Fiscal year, and during the term hereof the

Agent may also obtain "desktop" appraisals on a weekly basis, in each case at the Borrowers' expense. Notwithstanding the foregoing, the Agent may cause additional appraisals to be undertaken (i) as it in its Permitted Discretion deems necessary or appropriate, at its own expense or, (ii) if required by Applicable Law or if the Borrowers are In Default, at the expense of the Borrowers.

(c)     Upon the request of the Agent after reasonable prior notice, the Borrowers shall permit, and cooperate with, the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves.  The Borrowers shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations. Without limiting the foregoing, the Borrowers acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) commercial finance examinations in any Fiscal year at the Borrowers' expense.    Notwithstanding the foregoing, the Agent may cause additional commercial finance examinations to be undertaken (i) as it in its Permitted Discretion deems necessary or appropriate, at its own expense or, (ii) if required by Applicable Law or if the Borrowers are In Default, at the expense of the Borrower.

(d)     The Borrowers recognize that all appraisals, inventories, analysis, financial information, and other materials which the Agent may obtain, develop, or receive with respect to the Parent and the Borrowers are confidential to the Agent and that, except as otherwise provided herein, neither the Parent nor the Borrowers are entitled to receipt of any of such appraisals, inventories, analysis, financial information, and other materials, nor copies or extracts thereof or therefrom.

**5-10.    Additional Financial Information.**

(a)     In addition to all other information required to be provided pursuant to this Article 5, the Borrowers promptly shall provide the Agent with such other and additional information concerning the Parent, the Borrowers, the Collateral, the operation of the Parent's and its Subsidiaries' business, and the Parent's and the Borrowers' financial condition, including original counterparts of financial reports and statements, as the Agent may from time to time reasonably request from the Borrowers.

(b)     In addition to all other information required to be provided pursuant to this Article 5, the Borrowers promptly shall provide the Agent with copies of all reports required to be filed in compliance with any guidelines adopted by the United States Trustee, and any reports or other financial information provided to the Committee.

(c)        As soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Sale Process, the Financing Orders or this Agreement, deliver to the Agent and the Revolving Credit Lenders all such documents to be filed and provide the Agent and Revolving Credit Lenders with a reasonable opportunity to review and comment on all such documents.

(d)        Allow the Agent and the Revolving Credit Lenders access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Loan Parties (which engagement, with respect to any financial professionals engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Majority Lenders).

(e)        Borrowers shall continue to retain the Financial Advisor, the scope and terms of such engagement to be reasonably satisfactory to the Agent and Term Loan Agent (subject to Bankruptcy Court approval). Until such time as all Existing Liabilities and all Liabilities have been repaid in full (or cash collateralized in accordance with the terms hereof) and all Revolving Credit Commitments have been terminated, the  Borrowers shall continue to retain the Financial Advisor to assist the Loan Parties with the Sale Process and with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to the Agent and the Revolving Credit Lenders pursuant to this Agreement. The Borrowers authorize the Agent to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Financial Advisor), which have been engaged from time to time by the Loan Parties, and authorize and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party. Senior management of the Loan Parties and such financial and restructuring consultants shall participate in weekly telephonic calls with the Agent and Revolving Credit Lenders (and/or their advisors and counsel) to discuss various matters, including the Budget, Permitted Variances, and Sale Process.

(f)        Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "**Lender Group Consultant**"), for the sole benefit of the Agent and other Credit Parties, as the Agent may determine to be necessary or appropriate in its sole discretion. Each Loan Party and agrees that (i) such Loan Party shall provide its complete cooperation during business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records, facilities and Collateral); and (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be Costs of Collection; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

(g)    **Performance Within Budget**.  At all times following the Interim Financing Order Date, strictly perform in accordance with the Budget, including having made all scheduled payments to the Existing Loan Parties and Credit Parties as applicable as and when required, subject to the following (the "**Permitted Variances**"):

(i)    the Borrowers' revenues shall be at least 90% of the projected amounts set forth in the Budget;

(ii)    the Borrowers' cumulative Total Disbursements shall be not more than 110% of the projected amounts set forth in the Budget; and

(iii)    the Borrowers' inventory levels, as tested on an average 2 weeks trailing basis, to be not less than 85% of the amount thereof projected in the Budget; provided that, the first such test shall be conducted following the conclusion of the first 4 weeks after the Petition Date.

The foregoing shall be reported on Thursday of each week (commencing with the first such date to occur after the first full calendar week following the Petition Date) (a) with respect to clause (i) above, on a cumulative basis for the first four (4) weeks after the Petition Date and thereafter on a trailing four (4) week basis, and (b) with respect to clause (ii) above, on a cumulative basis after the end of the second (2nd) week following the Petition Date, and thereafter on a trailing four (4) week basis (clauses (a) and (b), collectively, the "**Testing Period**") pursuant to the Variance Report delivered by the Lead Borrower to the Agent in accordance with the terms of this Agreement.

**5-11.    Reserved**.

**5-12.    Additional Bankruptcy Related Affirmative Covenants.**

(a)    Within fourteen days of the Petition Date, the Loan Parties shall file a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Loan Parties must assume or reject leases to 210 days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within thirty (30) days after the Petition Date. The Loan Parties may not, without the prior written consent of the Agent, assume, assume and assign, or reject Leases. The Loan Parties shall use their best efforts to obtain an order from the Bankruptcy Court granting such extension motion.

(b)    On the Petition Date, the Loan Parties shall file motion (the "**Sale Motion**") requesting, among other things, approval of a Section 363 sale process ("**Sale Process**") to sell all of the Loan Parties' business and assets ("**363 Sale**"), which Sale Motion shall include a motion seeking authority to establish bidding procedures for the proposed Sale Process on terms reasonably acceptable to

the Agent. The Sale Motion, as well as the order approving the related bid procedures ("**Bidding Procedures Order**") shall be reasonably acceptable to the Agent.

(d)     Incidental to the filing of the Sale Motion and the entry of the Bidding Procedures Order:

(i)     Upon receipt thereof, the Loan Parties shall deliver to the Agent copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for any sale of any or all its assets or any other investment pursuant to which additional capital is to be received by the Loan Parties.

(ii)     From and after the Petition Date, the Borrowers shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.

(iii)     No later than June 15, 2016, the Borrowers shall forward so-called "bid packages" to any potential bidders (including all Acceptable Liquidators) to whom bid packages had not already been delivered prior to the Petition Date, including, without limitation, to potential bidders identified by the Agent, provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Borrowers, with the deadline for submitting binding bids with respect to the sale of the Borrowers' assets on or before July 11, 2016.

(iv)     No later than July 8, 2016, the Borrowers shall have obtained entry of the Bidding Procedures Order.

(v)     One or more binding bids for some or all of the assets of the Loan Parties upon terms and conditions acceptable to the Agent in its reasonable discretion shall have been received by no later than July 11, 2016.  Without limiting the discretion of the Agent in determining the acceptability of such a bid or bids, in no event shall any bid which contains a financing contingency be reasonably acceptable.

(vi)     On or before July 13, 2016, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Agent and any Committee. To the extent that any binding bids are bids of liquidators related to store closing or going out of business sales, any such bids shall provide that such sales shall be conducted only on an equity/guaranteed basis, supported by cash consideration in an amount and payable at such times as is acceptable to the Agent.

(vii)     No later than July 14, 2016, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale.

(viii)    On or before July 14, 2016, the Bankruptcy Court shall have entered an order approving the Sale Motion and authorizing the Debtors' consummation of the 363 Sale.

(ix)    On or before July 15, 2016, the Borrowers shall consummate the 363 Sale described therein; provided, however, in the event the Sale is a going concern transaction, the closing deadline shall be extended to July 22, 2016.

(e)    The Loan Parties shall promptly, punctually, and faithfully perform all of the terms and conditions of the Financing Orders.

(f)    On or before July 14, 2016, the Bankruptcy Court shall have entered the Final Financing Order acceptable to the Agent.

**5-13.    Bankruptcy-Related Negative Covenants.**

(a)    **Anti-Corruption Laws, PATRIOT Act and Sanctions.**  No Borrower will request any Loan or any other Credit Extension, and the Loan Parties shall not use, and shall procure that their Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or any other Credit Extension (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person or for any purpose in violation of any Anti-Corruption Laws or the PATRIOT Act, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation by any individual or entity (including any individual or entity participating in the transaction, whether as a Revolving Credit Lender, Agent, or otherwise) of any Sanctions.

(b)    **Chapter 11 Claims.**  Until payment in full of the Liabilities under this Agreement, except with respect to the Existing Liabilities and the Carve Out, and otherwise to the extent permitted under the Financing Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is *pari passu* with or senior to the claims or Liens, as the case may be, of the Agent and the Credit Parties hereunder or under the Financing Orders, or apply to the Bankruptcy Court for authority to do so.

(c)    **Compliance with Budget.**

(i)    Except as otherwise provided herein or approved by the Agent, directly or indirectly (a) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Financing Orders and the Budget (and Permitted Variances related thereto), (b) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Agent, or (c) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments set forth in the Budget and authorized by the Bankruptcy Court.

(ii)    Prior to the occurrence of an Event of Default, the Borrowers shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable.  Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice (as defined in the Interim Financing Order), the right of the Borrowers to pay professional fees of Case Professionals outside the Carve Out shall terminate, and the Borrowers shall provide

immediate notice to all Case Professionals informing them that the Borrowers' ability to pay such Case Professionals is subject to and limited by the Carve Out.

(d)      **Use of Collateral.**   Use or permit the use of Collateral, proceeds of Revolving Credit Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)      other than as expressly permitted in the Financing Orders, to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Agent and the Revolving Credit Lenders in "full" in cash; or

(ii)      to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agent, the Revolving Credit Lenders, the other Credit Parties or the Prepetition Agent and/or the Prepetition Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (a) any Avoidance Actions; (b) any so-called "lender liability" claims and causes of action; (c) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Existing Credit Agreement, the Existing Liabilities or the Existing Liens; (d) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Liabilities or the Existing Liabilities; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent or the Revolving Credit Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Financing Orders).

Notwithstanding anything to the contrary herein, the Committee may use up to $50,000 in the aggregate amount of the Carve Out, any cash-collateral, or proceeds of the Loan to investigate the Prepetition Agent and Prepetition Lenders (the "**Committee Investigation Budget**"); *provided that*, the Borrowers' stipulations contained in the Interim Financing Order as to validity, priority and security of the Existing Liabilities shall be binding upon each other party in interest, including the Committee, unless such party in interest commences a challenge by (x) with respect to the Committee, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Financing Order.

(e)    **Additional Covenants**.  The Borrowers will not consent to or permit to exist any of the following:

(i)    Any order which authorizes the rejection or assumption of any Leases of any Loan Party without the Agent's written consent;

(ii)    Any modification, stay, vacation or amendment to the Financing Orders to which the Agent and the Majority Lenders have not consented in writing;

(iii)    A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Prior Liens and the Carve Out;

(iv)    Except as agreed to by the Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(v)    Any order which authorizes the payment of any Indebtedness (other than the Existing Liabilities, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Financing Orders or the Budget); or

(vi)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**5-14.    Use of Loan Proceeds.**  In accordance with and subject to the Budget, and upon entry of the Interim Financing Order, use the proceeds of the Revolving Credit Loans to finance (in accordance with the terms of and procedures set forth in the Interim Financing Order): (i) the payment of transaction expenses, (ii) the payment of fees, expenses and costs incurred in connection with the Cases, (iii) the payment of any adequate protection payments approved in the Financing Orders, and (iv) working capital, capital expenditures, and other general corporate purposes of the Borrowers. Upon entry of the Final Financing Order, in addition to the above, the proceeds of Revolving Credit Loans shall be used for the repayment in cash in full of all Existing Liabilities (but not, for the avoidance of doubt, Letters of Credit, which shall be deemed issued under this Agreement upon entry of the Interim Financing Order) under the Existing Credit Agreement.

### ARTICLE 6 - USE OF COLLATERAL:

**6-1.    Use of Inventory Collateral.**

(a)    Except as is contemplated by the Sale Motion and Sale Process, the Borrowers shall not engage:

(i)    In any sale of the Inventory other than for fair consideration in the conduct of the Borrowers' business in the ordinary course.

(ii)    Sales or other dispositions to creditors.

(iii)    Sales or other dispositions in bulk.

(iv)    Sales of any Collateral in breach of any provision of this Agreement.

(b)    No sale of Inventory shall be on consignment, approval, or under any other circumstances such that, with the exception of the Borrowers' customary return policy applicable to the return of inventory purchased by the Borrowers' retail customers in the ordinary course, such Inventory may be returned to the Borrower without the consent of the Agent.

**6-2.    Inventory Quality**.  All Inventory now owned or hereafter acquired by the Borrowers is and will be of good and merchantable quality and free from defects (other than defects within customary trade tolerances).

**6-3.    Adjustments and Allowances**. Except as may be restricted as a result of the commencement of the Cases and the effect of the Bankruptcy Code, the Borrowers may grant such allowances or other adjustments to the Borrowers' Account Debtors as the Borrowers may reasonably deem to accord with sound business practice, *provided, however,* the authority granted the Borrowers

pursuant to this Section 6-3 may be limited or terminated by the Agent at any time after the occurrence of an Event of Default in the Agent's exclusive discretion.

**6-4.    Validity of Accounts.**

(a)    The amount of each Account shown on the books, records, and invoices of the Borrowers represented as owing by each Account Debtor is and will be the correct amount actually owing by such Account Debtor and shall have been fully earned by performance by the Borrowers.

(b)    The Borrowers have no knowledge of any impairment of the validity or collectibility of any of the Accounts.  The Borrowers shall notify the Agent of any such impairment immediately after the Borrowers become aware of any such impairment.

**6-5.    Notification to Account Debtors**.  The Financing Orders shall provide that Agent shall have the right after the occurrence of an Event of Default to notify any of the Borrowers' Account Debtors to make payment directly to the Agent and to collect all amounts due on account of the Collateral.

## ARTICLE 7 - CASH MANAGEMENT, PAYMENT OF LIABILITIES:

**7-1.    Depository Accounts.**

(a)    Annexed hereto as **EXHIBIT 7-1** is a Schedule of all present DDA's, which Schedule includes, with respect to each depository (i) the name and address of that depository; (ii) the account number(s) of the account(s) maintained with such depository; and (iii) a contact person at such depository.

(b)    The Cash Management Order shall approve, authorize and direct the Debtors to use their existing cash management systems and existing bank accounts and existing business forms, and Borrowers shall continue to use such systems, accounts and forms from and after the Closing Date.

**7-2.    Credit Card Receipts.**

(a)    Annexed hereto as **EXHIBIT 7-2**, is a Schedule which describes all arrangements to which each Borrowers are a party with respect to the payment to such Borrower of the proceeds of credit card charges for sales by such Borrower.

(b)    To the extent not previously delivered, the Borrowers shall deliver to the Agent, as a condition to the effectiveness of this Agreement, notification, executed on behalf of the Borrowers, to each of the Borrowers' credit card clearinghouses and processors of notice (in form reasonably satisfactory to the Agent), which notice provides that payment of all credit card charges submitted by the Borrowers to that clearinghouse or other processor and any other amount payable to the Borrowers by

such clearinghouse or other processor shall be directed to the Blocked Account (or if the Borrowers prefer to so specify in such notice, to the Concentration Account). The Borrowers shall not change such direction or designation except upon and with the prior written consent of the Agent.

**7-3.    The Concentration, Blocked, and Operating Accounts.**

(a)    The following checking accounts have been or will be established (and are so referred to herein):

(i)    The "**Concentration Account**" (so referred to herein): Established by Hastings Entertainment with Bank of America.

(ii)    The "**Blocked Account**" (so referred to herein): Collectively, the accounts established by Hastings Entertainment with Amarillo National Bank, SP Images with SunTrust Bank and MovieStop with Branch Banking and Trust Company.

(iii)    The "**Operating Account**" (so referred to herein):  Collectively, the accounts established by Hastings Entertainment with Amarillo National Bank, SP Images with SunTrust Bank and MovieStop with Branch Banking and Trust Company.

(iv)    The "**Payroll Account**" (so referred to herein):  Collectively, the accounts established by Hastings Entertainment with Amarillo National Bank and MovieStop with Branch Banking and Trust Company.

(b)    The contents of each DDA (other than the Operating Account and the Payroll Account) and of the Blocked Account constitutes Collateral and Proceeds of Collateral.

(c)    The Borrowers shall pay all fees and charges of, and maintain such impressed balances as may be required by the depository  in which any account is opened as required hereby (even if such account is opened by and/or is the property of the Agent).

**7-4.    Proceeds and Collections**.

(a)    All Receipts and all cash proceeds of any sale or other disposition of any of the Borrowers' assets constitute Collateral and proceeds of Collateral.  All Receipts and all cash proceeds of any sale or other disposition of any of the Borrowers' assets shall be held in trust by the Borrowers for the Agent; shall not be commingled with any of the Borrowers' other funds, and shall be deposited and/or transferred only to the Blocked Account or the Concentration Account.

(b)    The Borrowers shall cause the ACH or wire transfer to the Blocked Account, no less frequently than daily (and whether or not there is then an outstanding balance in the Loan Account) of the following:

(i)    The then contents of each DDA (other than any Exempt DDA), each such transfer to be net of any minimum balance, not to exceed $1,500.00  as may be

required to be maintained in the subject DDA by the bank at which such DDA is maintained).

(ii)    The proceeds of all credit card charges not otherwise provided for pursuant hereto.

(c)    Whether or not any Liabilities are then outstanding, the Borrowers shall cause the ACH or wire transfer to the Concentration Account, no less frequently than daily, of the entire ledger balance of the Blocked Account, net of such minimum balance, not to exceed $1,000.00 as may be required to be maintained in the Blocked Account by the depository with which the Blocked Account is maintained. Telephone advice (confirmed by written notice) shall be provided to the Agent on each Business Day on which any such transfer is made.

(d)    In the event that any Borrower receives or otherwise has dominion and control of any Receipts, or any proceeds or collections of any Collateral, such Receipts, proceeds, and collections shall be held in trust by such Borrower for the Agent and shall not be commingled with any of such Borrowers' other funds or deposited in any account of such Borrower other than the Blocked Account.

**7-5.    Payment of Liabilities.**

(a)    Subject to the Financing Orders, the Agent shall apply the then collected balance of the Concentration Account (net of fees charged, and of such impressed balances as may be required by the bank at which the Concentration Account is maintained, not to exceed $1,500.00) towards the unpaid balance of the Loan Account and all other Liabilities, *provided, however,* for purposes of the calculation of interest on the unpaid principal balance of the Loan Account, such payment shall be deemed to have been made one (1) Business Day after such transfer; *provided that*, Interim Financing Order Period the funds on deposit in the Concentration Account shall be applied to repay the Existing Liabilities under the Existing Credit Agreement (but not, for the avoidance of doubt, Letters of Credit under the Existing Credit Agreement, which shall be deemed issued hereunder as of the date of entry of the Interim Financing Order) pursuant to a "creeping roll up" (post-petition collections applied to repay prepetition obligations with corresponding advances to be made with Revolving Credit Loans hereunder).

(b)    For the avoidance of doubt, it is understood and agreed that all cash, money and Proceeds set forth in the foregoing clause (a) shall at all times constitute Collateral, whether or not located in the Concentration Account.

(c)    The following rules shall apply to deposits and payments under and pursuant to this Agreement:

(i)      Funds shall be deemed to have been deposited to the Concentration Account on the Business Day on which deposited, *provided that* notice of such deposit is available to the Agent by 2:00PM (Boston time) on that Business Day.

(ii)     Funds paid to the Agent, other than by deposit to the Concentration Account, shall be deemed to have been received on the Business Day when they are good and collected funds, *provided that* notice of such payment is available to the Agent by 2:00PM (Boston time) on that Business Day.

(iii)    If notice of a deposit to the Concentration Account (Section 7-5(c)(i)) or payment (Section 7-5(c)(ii)) is not available to the Agent until after 2:00PM (Boston time) on a Business Day, such deposit or payment shall be deemed to have been made at 9:00AM on the then next Business Day.

(iv)     All deposits to the Concentration Account and other payments to the Agent are subject to clearance and collection.

(d)      The Agent shall transfer to the Operating Account specified by Hastings Entertainment any surplus in the Concentration Account remaining after the application towards the Liabilities referred to in Section 7-5(a), above, on a daily basis (less those amounts which are to be netted out, as provided therein) *provided, however*, in the event that:

(i)      the Borrowers are In Default; and

(ii)     one or more L/C's are then outstanding,

then the Agent may establish a funded reserve of up to 110% of the aggregate Stated Amounts of such L/C's. Such funded reserve shall either be (i) returned to the Borrower *provided that* the Borrowers are not In Default or (ii) applied towards the Liabilities following the occurrence of any Event of Default described in Section 10-11 or acceleration following the occurrence of any other Event of Default.

**7-6.      The Operating Account**. Except as otherwise specifically provided in, or permitted by, this Agreement, all checks shall be drawn by the Borrowers upon, and other disbursements shall be made by the Borrowers solely from, the Operating Account or the Payroll Account.

### ARTICLE 8 - GRANT OF SECURITY INTEREST:

**8-1.      Grant of Security Interest**. To secure the Borrowers' prompt, punctual, and faithful performance of all and each of the Liabilities, each Borrower hereby grants to the Agent, for the ratable benefit of the Revolving Credit Lenders, a continuing security interest in and to, and assigns to the Agent, for the ratable benefit of the Revolving Credit Lenders, all of its assets (other than Excluded Collateral), including, without limitation, the following, and each item thereof, whether now owned or now due, or in which such Borrower has an interest, or hereafter acquired, arising, or to become due, or in which such

94

Borrower obtains an interest, and all products, Proceeds, substitutions, and accessions of or to any of the following (all of which, together with any other property in which the Agent may in the future be granted a security interest, is referred to herein as the "**Collateral**"):

    (a)      All Accounts and accounts receivable.

    (b)      All Inventory.

    (c)      All General Intangibles.

    (d)      All Equipment.

    (e)      All Goods.

    (f)      All Fixtures.

    (g)      All Chattel Paper.

    (h)      All Letter-of-Credit Rights.

    (i)      All Payment Intangibles.

    (j)      All Supporting Obligations.

    (k)      All Commercial Tort Claims.

    (l)      All books, records, and information relating to the Collateral and/or to the operation of the Borrowers' business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained.

    (m)      All Investment Property, Instruments, Documents, Deposit Accounts, policies and certificates of insurance, deposits, impressed accounts, compensating balances, money, cash, or other property.

    (n)      All insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing ((a) through (m)) or otherwise.

    (o)      Avoidance Actions and the proceeds thereof, limited to: (i) the proceeds of Avoidance Actions arising under section 549 of the Bankruptcy Code, and (ii) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the Agent and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions.

    (p)      Proceeds realized or derived from the sale, disposition, or termination of any Lease(s) (but not the Leases themselves).

    (q)      All liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (n)), including the right of stoppage in transit.

**8-2.**    **Extent and Duration of Security Interest.**

    (a)      The security interest created and granted herein is in addition to, and supplemental of, any security interest previously granted by the Borrower to the Agent and shall continue

in full force and effect applicable to all Liabilities until both (a) all Liabilities have been paid and/or satisfied in full and (b) the Revolving Credit Dollar Commitment of each Revolving Credit Lender is terminated.

(b)     It is intended that the Collateral Interests created herein extend to and cover all assets of the Borrowers, other than Excluded Collateral.

## ARTICLE 9 - AGENT AS BORROWERS' ATTORNEY-IN-FACT:

**9-1.    Appointment as Attorney-In-Fact**.  Subject to the Financing Orders, each Borrower hereby irrevocably constitutes and appoints the Agent as the Borrowers' true and lawful attorney, with full power of substitution, following the occurrence and during the continuance of an Event of Default, to convert the Collateral into cash at the sole risk, cost, and expense of the Borrowers, but for the sole benefit of the Agent and the Revolving Credit Lenders. Subject to the Financing Orders, the rights and powers granted the Agent by this appointment, following the occurrence and during the continuance of an Event of Default, include but are not limited to the right and power to:

(a)     Prosecute, defend, compromise, or release any action relating to the Collateral.

(b)     Sign change of address forms to change the address to which the Borrowers' mail is to be sent to such address as the Agent shall designate; receive and open the Borrowers' mail; remove any Receivables Collateral and Proceeds of Collateral therefrom and turn over the balance of such mail either to the Borrowers or to any trustee in bankruptcy or receiver of the Borrowers, or other legal representative of the Borrowers whom the Agent determines to be the appropriate person to whom to so turn over such mail.

(c)     Endorse the name of the Borrower(s) in favor of the Agent upon any and all checks, drafts, notes, acceptances, or other items or instruments; sign and endorse the name of the Borrower(s) on, and receive as secured party, any of the Collateral, any invoices, schedules of Collateral, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title respectively relating to the Collateral.

(d)     Sign the name of the Borrower(s) on any notice to the Borrowers' Account Debtors or verification of the Receivables Collateral; sign the Borrowers' name on any proof of claim in bankruptcy against Account Debtors, and on notices of lien, claims of mechanic's liens, or assignments or releases of mechanic's liens securing the Accounts.

(e)     Take all such action as may be necessary to obtain the payment of any letter of credit and/or banker's acceptance of which the Borrowers are a beneficiary.

(f)     Repair, manufacture, assemble, complete, package, deliver, alter or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any customer of the Borrowers.

(g)      Use, license or transfer any or all General Intangibles of the Borrowers.

**9-2.      No Obligation to Act**.  The Agent shall not be obligated to do any of the acts or to exercise any of the powers authorized by Section 9-1 herein, but if the Agent elects to do any such act or to exercise any of such powers (in each case subject to the Financing Orders), it shall not be accountable for more than it actually receives as a result of such exercise of power, and shall not be responsible to the Borrowers for any act or omission to act except for any act or omission to act as to which there is a final determination made in a judicial proceeding (in which proceeding the Agent has had an opportunity to be heard), which determination includes a specific finding that the subject act or omission to act had been grossly negligent or in actual bad faith.

### ARTICLE 10 - EVENTS OF DEFAULT:

The occurrence of any event described in this Article 10 respectively shall constitute an "**Event of Default**" herein.  Subject to the Financing Orders, upon the occurrence of any Event of Default described in Section 10-11, any and all Liabilities shall become due and payable without any further act on the part of the Agent. Subject to the Financing Orders, upon the occurrence of any other Event of Default, the Agent may, and on the instruction of the SuperMajority Lenders as provided in Section 15-3, shall, declare any and all Liabilities immediately due and payable.  The occurrence of any Event of Default shall also constitute, without notice or demand, a default under all other agreements between the Agent or any Revolving Credit Lender and the Borrowers and instruments and papers heretofore, now, or hereafter given the Agent or any Revolving Credit Lender by the Borrowers.

**10-1.      Failure to Pay the Revolving Credit**.  The failure by any Borrower to pay when due any principal of, interest on, or fees in respect of, the Revolving Credit.

**10-2.      Failure To Make Other Payments**.  The failure by any Borrower to pay when due (or upon demand, if payable on demand) any payment Liability other than any payment liability on account of the principal of, or interest on, or fees in respect of, the Revolving Credit.

**10-3.      Failure to Perform Covenant or Liability**.  The failure by the Borrowers to promptly, punctually, faithfully and timely perform, discharge, or comply with any covenant or Liability.

**10-4.      Reporting Requirements**.  The failure by the Borrowers to promptly, punctually, faithfully and timely perform, discharge, or comply with the financial reporting requirements included in this Agreement.

**10-5.    Misrepresentation.**  The determination by the Agent that any representation or warranty at any time made by the Borrowers to the Agent or any Revolving Credit Lender was not true or complete in all material respects when given.

**10-6.    Acceleration of Other Debt. Breach of Lease.**  Except as a result of the commencement of the Cases or unless payment, acceleration and/or the exercise of rights and remedies as a result thereof (as applicable) is stayed by the Bankruptcy Court, (a) any event such that any Indebtedness of the Borrowers in excess of $250,000 to any creditor other than the Agent or any Revolving Credit Lender is accelerated or, without the consent of the Borrower, (b) the Borrowers fail to observe or perform any agreement or condition relating to the Term Facility or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of the Indebtedness under the Term Facility to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, or redeem such Indebtedness to be made, prior to its stated maturity, or (c) any Lease with annual rentals in excess of $100,000 is terminated.

**10-7.    Default Under Other Agreements**.  Except as a result of the commencement of the Cases or unless payment, acceleration and/or the exercise of rights and remedies as a result thereof (as applicable) is stayed by the Bankruptcy Court, the occurrence of any breach of any covenant or Liability imposed by, or of any default under, any agreement (including any Loan Document) between the Agent or any Revolving Credit Lender and the Borrowers or instrument given by the Borrowers to the Agent or any Revolving Credit Lender and the expiry, without cure, of any applicable grace period (notwithstanding that the subject Agent or Revolving Credit Lender may not have exercised all or any of its rights on account of such breach or default).

**10-8.    Uninsured Casualty Loss**.  The occurrence of any uninsured loss, theft, damage, or destruction of or to any material portion of the Collateral.

**10-9.    Attachment. Judgment. Restraint of Business.**

(a)      After the Petition Date, the service of process upon the Agent or any Revolving Credit Lender or any Participant seeking to attach, by trustee, mesne, or other process, any funds of the Borrower, in an amount in excess of $100,000, on deposit with, or assets of the Borrower in the possession of, the Agent or that Revolving Credit Lender or such Participant.

(b)      The entry of any judgment after the Petition Date against any Borrower for the payment of money in excess of $100,000, which judgment is not satisfied (if a money judgment) or appealed from (with execution or similar process stayed) within thirty (30) days of its entry.

(c)      The entry of any order or the imposition of any other process after the Petition Date having the force of law, the effect of which is to restrain in any material way the conduct by the Borrower of its business in the ordinary course and such order or imposition is not dismissed or appealed from within thirty (30) days of its entry.

**10-10.   Reserved**.

**10-11.   Reserved**.

**10-12.   Default by Guarantor**.  The occurrence of any of the foregoing Events of Default with respect to any guarantor of the Liabilities, as if such guarantor were a "Borrower" described therein.

**10-13.   Indictment – Forfeiture**.  After the Petition Date, the indictment of, or institution of any legal process or proceeding against, any Borrower, under any Applicable Law where the relief, penalties, or remedies sought or available include the forfeiture of any material property of such Borrower and/or the imposition of any stay or other order, the effect of which could be to restrain in any material way the conduct by such Borrower of its business in the ordinary course, which is not dismissed or appealed from within thirty (30) days when instituted or imposed.

**10-14.   Termination of Guaranty**.  The termination or attempted termination of any guaranty by any guarantor of the Liabilities.

**10-15.   Challenge to Loan Documents.**

(a)      Any challenge by or on behalf of any Borrower or any guarantor of the Liabilities to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto.

(b)      Any determination by any court or any other judicial or government authority that any Loan Document is not enforceable in accordance in all material respects with the subject Loan Document's terms or which voids, avoids, limits, or otherwise adversely affects in any material way any security interest created by any Loan Document or any payment made pursuant thereto.

**10-16.   Change in Control**.  Any Change in Control.

**10-17.  Budget.** Any variance to a Budget shall occur, other than Permitted Variances.

**10-18.  Subrogation.** Any of the Loan Parties shall assert (other than for purposes of disclosure) any right of subrogation or contribution against any other Loan Party prior to the payment in full of the Obligations.

**10-19.  Cases, Motions, Etc.** Any of the following shall occur in any Case:

(i)        the filing by any Borrower of a plan other than (a) a plan that provides for the payment in full in cash of the Liabilities hereunder and the obligations under the Existing Credit Agreement on the effective date of such plan, or (b) as approved by the Agent or the filing by any Borrower of any motion or pleading that is inconsistent with the prosecution of any such plan;

(ii)       any of the Borrowers shall file a pleading seeking to vacate or modify any of the Financing Orders in a manner adverse to the Lenders and/or the Agent;

(iii)      entry of an order without the prior consent of the Agent and/or the Majority Lenders amending, supplementing or otherwise modifying any Order in a manner adverse to the Lenders and/or the Agent;

(iv)      entry of any order without the prior consent of the Agent and/or the Majority Lenders that authorizes any of the following:

(A)       a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Revolving Credit Lenders in respect of the Obligations, except with respect to the Carve Out;

(B)       any Lien on any Collateral having a priority equal or superior to the Lien securing the Liabilities, except (a) with respect to the Carve Out, or (b) Permitted Prior Liens;

(C)       except as consented to by the Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code; or

(D)       the payment of any Indebtedness (other than Indebtedness reflected in the Budget) or as permitted by the Financing Orders.

(v)       reversal, vacation or stay of the effectiveness of any Order;

(vi)      any violation of the terms of any Order;

(vii)   the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party;

(viii)   appointment of a Chapter 11 trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party;

(ix)   the filing by any Borrower of, or the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code that does not conform with the Sale Motion or the Bidding Procedures;

(x)   except as provided for herein or in the Financing Orders, granting of relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of any Borrower;

(xi)   the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Financing Orders) that is senior to or *pari passu* with the Agent's and Revolving Credit Lenders' claims under the Loan Documents and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(xii)   payment of or granting adequate protection with respect to prepetition Indebtedness, other than as expressly set forth in the Financing Orders and the Budget;

(xiii)   any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect.

**10-20.   Restrainment.** Any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole.

**10-21.   Challenge.** Any Loan Party or any third party, including, without limitation, any Committee, engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Credit Agreement or the Existing Loan Documents or the Liens securing the Existing Credit Agreement or the Existing Loan Documents, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Credit Agreement; or any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Existing Loan Parties.

**10-22.   Sections 506(c) and 552(b).** From and after entry of the Final Financing Order, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

**10-23.   Chapter 11 Case Milestones.** The failure to meet any of the following milestones:

(i)        file the Chapter 11 Case on the Petition Date;

(ii)       obtain entry of the Interim Financing Order on or before June 14, 2016; or

(iii)      obtain entry of the Final Financing Order on or before July 14, 2016.

(iv)      obtain entry of the Bidding Procedures Order on or before July 8, 2016.

(v)       receive binding bids for the consummation of a 363 Sale on or before July 11, 2016.

(vi)      conduct an auction with respect the Sale Motion and the 363 Sale on or before July 13, 2016.

(vii)     conduct a hearing before the Bankruptcy Court with respect the Sale Motion and the 363 Sale on or before July 14, 2016.

(viii)    the Bankruptcy Court shall have entered an order approving the Sale Motion and authorizing the Debtors' consummation of a 363 Sale on or before July 14, 2016.

(ix)      the Debtors shall have consummated the 363 Sale on or before July 15, 2016, in the event that a liquidation bid is selected as the highest and best bid, and July 22, 2016, in the event that a going-concern bid is selected as the highest and best bid.

For the avoidance of doubt, none of the existing defaults or events of default under the Existing Credit Agreement, the existing Term Loan Documents outstanding on the Petition Date shall constitute Events of Default hereunder.

## ARTICLE 11 - RIGHTS AND REMEDIES UPON DEFAULT:

**11-1.   Acceleration**.   Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Financing Orders, upon the occurrence of any Event of Default, (a) all Indebtedness of the Borrowers to the Revolving Credit Lenders shall be immediately due and payable, and (b) Agent may exercise all of the Agent's Rights and Remedies as the Agent from time to time thereafter determines as appropriate actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (*provided, that* with respect to the enforcement of Liens with respect to the Collateral under clause (iii) below, the Agent shall provide the Borrowers with five (5) days' written notice (with a copy to counsel for any Committee, to the United States Trustee and to counsel for the agent under the Term Facility) prior to taking the action contemplated thereby.

**11-2.    Rights of Enforcement**.  Subject to the Financing Orders, the Agent shall have all of the rights and remedies of a secured party upon default then available to the Agent under the UCC, in addition to which the Agent shall have all and each of the following rights and remedies upon an Event of Default and Acceleration:

(a)    To give notice to any bank at which any DDA or Blocked Account is maintained and in which Proceeds of Collateral are deposited, to turn over such Proceeds directly to the Agent.

(b)    To give notice to any of the Borrowers' customs brokers to follow the instructions of the Agent as provided in any written agreement or undertaking of such broker in favor of the Agent.

(c)    To collect the Receivables Collateral with or without the taking of possession of any of the Collateral.

(d)    To take possession of all or any portion of the Collateral.

(e)    To sell, lease, or otherwise dispose of any or all of the Collateral, in its then condition or following such preparation or processing as the Agent deems advisable and with or without the taking of possession of any of the Collateral.

(f)    To conduct one or more going out of business sales which include the sale or other disposition of the Collateral.

(g)    To apply the Receivables Collateral or the Proceeds of the Collateral towards (but not necessarily in complete satisfaction of) the Liabilities.

(h)    To exercise all or any of the rights, remedies, powers, privileges, and discretions under all or any of the Loan Documents.

**11-3.    Sale of Collateral.**  Subject to the Financing Orders,

(a)    Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Agent deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Agent's disposition of the Collateral.

(b)    The Agent, in the exercise of the Agent's rights and remedies upon an Event of Default, may conduct one or more going out of business sales, in the Agent's own right or by one or more agents and contractors. Such sale(s) may be conducted upon any premises owned, leased, or occupied by the Borrowers.  The Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the Agent or such agent or contractor).  Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their

disposition) shall be the sole property of the Agent or such agent or contractor and neither the Borrowers nor any Person claiming under or in right of the Borrowers shall have any interest therein.

(c)     The Agent and any Revolving Credit Lender may purchase the Collateral, or any portion of it at any sale held under this Article.

(d)     If any of the Collateral is sold, leased, or otherwise disposed of by the Agent on credit, the Liabilities shall not be deemed to have been reduced as a result thereof unless and until payment is finally received thereon by the Agent.

(e)     The Agent shall apply the proceeds of the Agent's exercise of its rights and remedies upon default pursuant to this Article 11 in accordance with this Agreement and the Financing Orders.

**11-4.    Occupation of Business Location**.  Subject to the Financing Orders, and in connection with the Agent's exercise of the Agent's rights under this Article 11, the Agent may enter upon, occupy, and use any premises owned or occupied by the Borrowers, and may exclude the Borrowers from such premises or portion thereof as may have been so entered upon, occupied, or used by the Agent.  The Agent shall not be required to remove any of the Collateral from any such premises upon the Agent's taking possession thereof, and may render any Collateral unusable to the Borrowers.  In no event shall the Agent be liable to the Borrowers for use or occupancy by the Agent of any premises pursuant to this Article 11, nor for any charge (such as wages for the Borrowers' employees and utilities) incurred in connection with the Agent's exercise of the Agent's Rights and Remedies.

**11-5.    Grant of Nonexclusive License**.  The Borrowers hereby grant to the Agent a royalty free nonexclusive irrevocable license, after the occurrence and during the continuance of an Event of Default to use, apply, and affix any trademark, trade name, logo, or the like in which the Borrowers now or hereafter have rights, such license being with respect to the Agent's exercise of the rights hereunder including, without limitation, in connection with any completion of the manufacture of Inventory or sale or other disposition of Inventory.

**11-6.    Assembly of Collateral**.  Subject to the Financing Orders, the Agent may require the Borrowers to assemble the Collateral and make it available to the Agent at the Borrowers' sole risk and expense at a place or places which are reasonably convenient to both the Agent and the Borrowers.

**11-7.    Rights and Remedies**.  The rights, remedies, powers, privileges, and discretions of the Agent hereunder (herein, the "**Agent's Rights and Remedies**") shall be cumulative and not exclusive of any rights or remedies which it would otherwise have, and shall be subject in all respects to the terms set

forth in the Financing Orders.  No delay or omission by the Agent in exercising or enforcing any of the Agent's Rights and Remedies shall operate as, or constitute, a waiver thereof.  No waiver by the Agent of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement.  No single or partial exercise of any of the Agent's Rights or Remedies, and no express or implied agreement or transaction of whatever nature entered into between the Agent and any person, at any time, shall preclude the other or further exercise of the Agent's Rights and Remedies.  No waiver by the Agent of any of the Agent's Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver.  The Agent's Rights and Remedies may be exercised at such time or times and in such order of preference as the Agent may determine. The Agent's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

**11-8.   No Challenge.**  Subject to the Financing Orders, neither the Loan Parties, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Financing Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Agent and the Revolving Credit Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. Subject to the Financing Orders, the Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agent and the Revolving Credit Lenders set forth in the Financing Orders and in the Loan Documents. Subject to the Financing Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Agent may proceed to protect and enforce the Revolving Credit Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrowers agree that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Agent shall be indemnified by the Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof**.**

### ARTICLE 12 - REVOLVING CREDIT FUNDINGS AND DISTRIBUTIONS:

**12-1.   Revolving Credit Funding Procedures**.  Subject to Section 12-2:

(a)    The Agent shall advise each Revolving Credit Lender, no later than 2:00PM (Boston Time) on a date on which any Revolving Credit Loan is to be made on that date. Such advice, in each instance, may be by telephone or facsimile transmission, *provided that* if such advice is by telephone, it shall be confirmed in writing.  Advice of a Revolving Credit Loan shall include the amount of and interest rate applicable to the subject Revolving Credit Loan.

(b)    Subject to that Revolving Credit Lender's Revolving Credit Dollar Commitment, each Revolving Credit Lender, by no later than the end of business on the day on which the subject Revolving Credit Loan is to be made, shall Transfer that Revolving Credit Lender's Revolving Credit Percentage Commitment of the subject Revolving Credit Loan to the Agent.

**12-2.    Reserved.**

**12-3.    Agent's Covering of Fundings.**

(a)    Each Revolving Credit Lender shall make available to the Agent, as provided herein, that Revolving Credit Lender's Revolving Credit Percentage Commitment of the following:

(i)    Each Revolving Credit Loan, up to the maximum amount of that Revolving Credit Lender's Revolving Credit Dollar Commitment of the Revolving Credit Loans.

(ii)    Up to the maximum amount of that Revolving Credit Lender's Revolving Credit Dollar Commitment of each L/C Drawing (to the extent that such L/C Drawing is not "covered" by a Revolving Credit Loan as provided herein).

(b)    In all circumstances, the Agent may:

(i)    Assume that each Revolving Credit Lender, subject to Section 12-3(a), timely shall make available to the Agent that Revolving Credit Lender's Revolving Credit Percentage Commitment of each Revolving Credit Loan, notice of which is provided pursuant to Section 12-1.

(ii)    In reliance upon such assumption, make available the corresponding amount to the Borrower.

(iii)    Assume that each Revolving Credit Lender timely shall pay, and shall make available, to the Agent all other amounts which that Revolving Credit Lender is obligated to so pay and/or make available hereunder or under any of the Loan Documents.

(c)    In the event that, in reliance upon any of such assumptions, the Agent makes available, a Revolving Credit Lender's Revolving Credit Percentage Commitment of one or more Revolving Credit Loans, or any other amount to be made available hereunder or under any of the Loan

Documents, which amount a Revolving Credit Lender (a "**Delinquent Revolving Credit Lender**") fails to provide to the Agent within one (1) Business Day of written notice of such failure, then:

(i)    The amount which had been made available by the Agent is an **"Agent's Cover"** (and is so referred to herein).

(ii)    All interest paid by the Borrowers on account of the Revolving Credit Loan or coverage of the subject L/C Drawing which consist of the Agent's Cover shall be retained by the Agent until the Agent's Cover, with interest, has been paid by the Delinquent Revolving Credit Lender.

(iii)    The Delinquent Revolving Credit Lender shall pay to the Agent, on demand, interest at a rate equal to the prevailing Federal Funds Rate on any Agent's Cover in respect of that Delinquent Revolving Credit Lender.

(iv)    The Agent shall have succeeded to all rights to payment to which the Delinquent Revolving Credit Lender otherwise would have been entitled hereunder in respect of those amounts paid by or in respect of the Borrowers on account of the Agent's Cover together with interest until it is repaid.  Such payments shall be deemed made first towards the amounts in respect of which the Agent's Cover was provided and only then towards amounts in which the Delinquent Revolving Credit Lender is then participating. For purposes of distributions to be made pursuant to Section 12-4(a) below, amounts shall be deemed distributable to a Delinquent Revolving Credit Lender (and consequently, to the Agent to the extent to which the Agent is then entitled) at the highest level of distribution (if applicable) at which the Delinquent Revolving Credit Lender would otherwise have been entitled to a distribution.

(v)    Subject to Subsection 12-3(c)(iv), the Delinquent Revolving Credit Lender shall be entitled to receive any payments from the Borrower to which the Delinquent Revolving Credit Lender is then entitled, *provided, however,* there shall be deducted from such amount and retained by the Agent any interest to which the Agent is then entitled on account of Section 12-3(c)(ii), above.

(d)    A Delinquent Revolving Credit Lender shall not be relieved of any obligation of such Delinquent Revolving Credit Lender hereunder (all and each of which shall constitute continuing obligations on the part of any Delinquent Revolving Credit Lender).

(e)    A Delinquent Revolving Credit Lender may cure its status as a Delinquent Revolving Credit Lender by paying the Agent the aggregate of the following:

(i)    The Agent's Cover (to the extent not previously repaid by the Borrower and retained by the Agent in accordance with Subsection 12-3(c)(iv), above) with respect to that Delinquent Revolving Credit Lender.

*Plus*

(ii)    The aggregate of the amount payable under Subsection 12-3(c)(iii), above (which relates to interest to be paid by that Delinquent Revolving Credit Lender).

*Plus*

(iii)    All such costs and expenses as may be incurred by the Agent in the enforcement of the Agent's rights against such Delinquent Revolving Credit Lender.

**12-4.    Ordinary Course Distributions**.

(a)    Weekly, on such day as may be set from time to time by the Agent (or more frequently at the Agent's option) the Agent and each Revolving Credit Lender shall settle up on amounts advanced under the Revolving Credit and collected funds received in the Concentration Account.

(b)    The Agent shall distribute to each Revolving Credit Lender, such Person's respective pro-rata share of interest payments on the Revolving Credit Loans when actually received and collected by the Agent (excluding the one (1) Business Day for settlement provided for in Section 7-5(a), which shall be for the account of the Agent only). For purposes of calculating interest due to a Revolving Credit Lender, that Revolving Credit Lender shall be entitled to receive interest on the actual amount contributed by that Revolving Credit Lender towards the principal balance of the Revolving Credit Loans outstanding during the applicable period covered by the interest payment made by the Borrowers.  Any net principal reductions to the Revolving Credit Loans received by the Agent in accordance with the Loan Documents during such period shall not reduce such actual amount so contributed, for purposes of calculation of interest due to that Revolving Credit Lender, until the Agent has distributed to that Revolving Credit Lender its pro-rata share thereof.

(c)    The Agent shall distribute the Unused Line Fee and the fees for L/C's provided for in Section 2-19(a) pro rata to the Revolving Credit Lenders and shall distribute the L/C issuance fee provided for in Section 2-19(b) to the Issuer.

(d)    No Revolving Credit Lender shall have any interest in, or right to receive any part of any interest which reflects "float" as described in the *proviso* included in Section 7-5(a). Any such float shall be for the account of the Agent only.

(e)    No Revolving Credit Lender shall have any interest in, or right to receive any part of, the Agent's Fee to be paid by the Borrowers to the Agent pursuant to this Agreement.

(f)     Any amount received by the Agent as reimbursement for any cost or expense (including, without limitation, attorneys' reasonable fees) shall be distributed by the Agent to that Person which is entitled to such reimbursement as provided in this Agreement (and if such Person(s) is (are) the Revolving Credit Lenders, pro-rata based upon their respective Revolving Credit Commitment Percentages at the date on which the expense, in respect of which such reimbursement is being made, was incurred).

(g)     Each distribution pursuant to this Section 12-4 is subject to Section 12-3(c), above.

## ARTICLE 13 – Reserved.

## ARTICLE 14 -The Agent:

### 14-1.   Appointment of The Agent.

(a)     Each Lender appoints and designates Bank of America, N.A. as the "Agent" hereunder and under the Loan Documents.

(b)     Each Revolving Credit Lender authorizes the Agent:

(i)     To execute those of the Loan Documents and all other instruments relating thereto to which the Agent is a party.

(ii)     To take such action on behalf of the Revolving Credit Lenders and to exercise all such powers as are expressly delegated to the Agent hereunder and in the Loan Documents and all related documents, together with such other powers as are reasonably incident thereto.

### 14-2.   Responsibilities of Agent.

(a)     The Agent shall not have any duties or responsibilities to, or any fiduciary relationship with, any Revolving Credit Lender except for those expressly set forth in this Agreement.

(b)     Neither the Agent nor any of its Affiliates shall be responsible to any Revolving Credit Lender for any of the following:

(i)     Any recitals, statements, representations or warranties made by the Borrower or any other Person.

(ii)     Any appraisals or other assessments of the assets of the Borrower or of any other Person responsible for or on account of the Liabilities.

(iii)     The value, validity, effectiveness, genuineness, enforceability, or sufficiency of the Loan Agreement, the Loan Documents or any other document referred to or provided for therein.

(iv)    Any failure by the Borrowers or any other Person (other than the Agent) to perform its obligations under the Loan Documents.

(c)    The Agent may employ attorneys, accountants, and other professionals and agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such attorneys, accountants, and other professionals or agents or attorneys-in-fact selected by the Agent with reasonable care.  No such attorney, accountant, other professional, agent, or attorney-in-fact shall be responsible for any action taken or omitted to be taken by any other such Person.

(d)    Neither the Agent, nor any of its directors, officers, or employees shall be responsible for any action taken or omitted to be taken or omitted to be taken by any other of them in connection herewith in reliance upon advice of its counsel nor, in any other event except for any action taken or omitted to be taken as to which a final judicial determination has been or is made (in a proceeding in which such Person has had an opportunity to be heard) that such Person had acted in a grossly negligent manner, in actual bad faith, or in willful misconduct.

(e)    The Agent shall not have any responsibility in any event for more funds than the Agent actually receives and collects.

(f)    The Agent in its capacity as a Lender, shall have the same rights and powers hereunder as any other Revolving Credit Lender.

**14-3.    Concerning Distributions By the Agent.**

(a)    The Agent in the Agent's reasonable discretion based upon the Agent's determination of the likelihood that additional payments will be received, expenses incurred, and/or claims made by third parties to all or a portion of such proceeds, may delay the distribution of any payment received on account of the Liabilities.

(b)    The Agent may disburse funds prior to determining that the sums which the Agent expects to receive have been finally and unconditionally paid to the Agent.  If and to the extent that the Agent does disburse funds and it later becomes apparent that the Agent did not then receive a payment in an amount equal to the sum paid out, then any Revolving Credit Lender to whom the Agent made the funds available, on demand from the Agent, shall refund to the Agent the sum paid to that person.

(c)    If, in the opinion of the Agent, the distribution of any amount received by the Agent might involve the Agent in liability, or might be prohibited hereby, or might be questioned by any Person, then the Agent may refrain from making distribution until the Agent's right to make distribution has  been adjudicated by a court of competent jurisdiction.

(d)    The proceeds of any Revolving Credit Lender's exercise of any right of, or in the nature of, set-off shall be deemed, *First,* to the extent that a Revolving Credit Lender is entitled to any

distribution hereunder, to constitute such distribution and *Second*, shall be shared with the other Revolving Credit Lenders as if distributed pursuant to (and shall be deemed as distributions under) Section 12-4.

(e)    Each Revolving Credit Lender recognizes that the crediting of the Borrowers with the "proceeds" of any transaction in which a Post Foreclosure Asset is acquired is a non-cash transaction and that, in consequence, no distribution of such "proceeds" will be made by the Agent to any Revolving Credit Lender.

(f)    In the event that (x) a court of competent jurisdiction shall adjudge that any amount received and distributed by the Agent is to be repaid or disgorged or (y) the SuperMajority Lenders determine to effect such repayment or disgorgement, then each Revolving Credit Lender to which any such distribution shall have been made shall repay, to the Agent which had made such distribution, that Revolving Credit Lender's Pro-Rata share of the amount so adjudged or determined to be repaid or disgorged.

**14-4.    Dispute Resolution**.  Any dispute among the Revolving Credit Lenders and/or the Agent concerning the interpretation, administration, or enforcement of the financing arrangements contemplated by this or any other Loan Document or the interpretation or administration of this or any other Loan Document which cannot be resolved amicably shall be resolved in the United States District Court for the District of Massachusetts, sitting in Boston or in the  Superior Court of Suffolk County, Massachusetts, to the jurisdiction of which courts each Revolving Credit Lender  hereto hereby submits.

**14-5.    Distributions of Notices and of Documents**.  The Agent shall distribute to each Revolving Credit Lender those periodic reports which the Agent customarily distributes in like credits in which it is acting as Agent and will forward to each Revolving Credit Lender, promptly after the Agent's receipt thereof, a copy of each notice or other document furnished to the Agent pursuant to this Agreement, including monthly, quarterly, and annual financial statements received from the Borrower pursuant to Article 5 of this Agreement, other than any of the following:

(a)    Routine communications associated with requests for Revolving Credit Loans and/or the issuance of L/C's.

(b)    Routine or nonmaterial communications.

(c)    Any notice or document required by any of the Loan Documents to be furnished to the Revolving Credit Lenders by the Borrowers.

(d)    Any notice or document of which the Agent has knowledge that such notice or document had been forwarded to the Revolving Credit Lenders other than by the Agent.

**14-6.    Confidential Information.**

(a)    Each Revolving Credit Lender will maintain, as confidential, all of the following:

(i)    Proprietary approaches, techniques, and methods of analysis which are applied by the Agent in the administration of the credit facility contemplated by this Agreement.

(ii)    Proprietary forms and formats utilized by the Agent in providing reports to the Revolving Credit Lenders pursuant hereto, which forms or formats are not of general currency.

(b)    Nothing included herein shall prohibit the disclosure of any such information as may be required to be provided by judicial process or by regulatory authorities having jurisdiction over any party to this Agreement.

**14-7.    Reliance by Agent**.    The Agent shall be entitled to rely upon any certificate, notice or other document (including any cable, telegram, telex, or facsimile) reasonably believed by the Agent to be genuine and correct and to have been signed or sent by or on behalf of the proper person or persons, and upon advice and statements of attorneys, accountants and other experts selected by the Agent.  As to any matters not expressly provided for in this Agreement, any Loan Document, or in any other document referred to therein, the Agent shall in all events be fully protected in acting, or in refraining from acting, in accordance with the applicable Consent required by this Agreement. Instructions given with the requisite Consent shall be binding on all Revolving Credit Lenders.

**14-8.    Non-Reliance on Agent and Other Revolving Credit Lenders.**

(a)    Each Revolving Credit Lender represents to all other Revolving Credit Lenders and to the Agent that such Revolving Credit Lender:

(i)    Independently and without reliance on any representation or act by Agent or by any other Revolving Credit Lender, and based on such documents and information as that Revolving Credit Lender has deemed appropriate, has made such Revolving Credit Lender's own appraisal of the financial condition and affairs of the Borrowers and decision to enter into this Agreement.

(ii)    Has relied upon that Revolving Credit Lender's review of the Loan Documents by that Revolving Credit Lender and by counsel to that Revolving Credit Lender as that Revolving Credit Lender deemed appropriate under the circumstances.

(b)    Each Revolving Credit Lender agrees that such Revolving Credit Lender, independently and without reliance upon Agent or any other Revolving Credit Lender, and based upon such documents and information as such Revolving Credit Lender shall deem appropriate at the time, will

continue to make such Revolving Credit Lender's own appraisals of the financial condition and affairs of the Borrowers when determining whether to take or not to take any discretionary action under this Agreement.

(c)    The Agent, in the discharge of that Agent's duties hereunder, shall not be required to make inquiry of, or to inspect the properties or books of, any Person.

(d)    Except for notices, reports, and other documents and information expressly required to be furnished to the Revolving Credit Lenders by the Agent hereunder (as to which, *see* Section 14-5), the Agent shall not have any affirmative duty or responsibility to provide any Lender with any credit or other information concerning any Person, which information may come into the possession of Agent or any Affiliate of the Agent.

(e)    Each Revolving Credit Lender, at such Revolving Credit Lender's request, shall have reasonable access to all nonprivileged documents in the possession of the Agent, which documents relate to the Agent's performance of its duties hereunder.

**14-9.    Indemnification**.  Without limiting the Liabilities of the Borrowers under this or any of the other Loan Documents, each Revolving Credit Lender shall indemnify the Agent, pro-rata for any and all Liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including attorney's reasonable fees and expenses and other out-of-pocket expenditures) which may at any time be imposed on, incurred by, or asserted against the Agent and in any way relating to or arising out of this Agreement or any other Loan Document or any documents contemplated by or referred to therein or the transactions contemplated thereby or the enforcement of any of terms hereof or thereof or of any such other documents, provided, however, no Revolving Credit Lender shall be liable for any of the foregoing to the extent that any of the foregoing arises from any action taken or omitted to be taken by the Agent as to which a final judicial determination has been or is made (in a proceeding in which the agent has had an opportunity to be heard) that the Agent had acted in a grossly negligent manner, or in actual bad faith, or engaged in willful misconduct.

**14-10.   Resignation of Agent.**

(a)    The Agent may resign at any time by giving 60 days prior written notice thereof to the Revolving Credit Lenders. Upon receipt of any such notice of resignation, the SuperMajority Lenders shall have the right to appoint a successor to such Agent.  If a successor Agent shall not have been so appointed and accepted such appointment within 30 days after the giving of notice by the resigning Agent, then the resigning Agent  may appoint a successor Agent, which shall be a financial institution having a combined capital and surplus in excess of $1,000,000,000.00.   The consent of the

Borrowers otherwise required by this Section 14-10(a) shall not be required if an Event of Default has occurred.

(b)     Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor shall thereupon succeed to, and become vested with, all the rights, powers, privileges, and duties of the (resigning) Agent so replaced, and the (resigning) Agent shall be discharged from the (resigning) Agent's duties and obligations hereunder, other than on account of any responsibility for any action taken or omitted to be taken by the (resigning) Agent as to which a final judicial determination has been or is made (in a proceeding in which the (resigning) Person has had an opportunity to be heard) that such Person had acted in a grossly negligent manner or in bad faith.

(c)     After any retiring Agent's resignation, the provisions of this Agreement and of all other Loan Documents shall continue in effect for the retiring Person's benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

### ARTICLE 15 - ACTION BY AGENT - CONSENTS - AMENDMENTS - WAIVERS:

**15-1.     Administration of Credit Facilities.**

(a)     Except as otherwise specifically provided in this Agreement, the Agent may take any action with respect to the credit facility contemplated by the Loan Documents as the Agent determines to be appropriate, *provided, however*, the Agent is not under any affirmative obligation to take any action which it is not required by this Agreement or the Loan Documents specifically to so take.

(b)     Except as specifically provided in the following Sections of this Agreement, whenever a Loan Document or this Agreement  provides that action may be taken or omitted to be taken in an Agent's discretion, the Agent shall have the sole right to take, or refrain from taking, such action without, and notwithstanding, any vote of the Revolving Credit Lenders:

| Actions Described in Section | Type of Consent Required |
|---|---|
| 15-2 | Majority Lenders |
| 15-3 | SuperMajority Lenders |
| 15-4 | Certain Consent |
| 15-5 | Unanimous Consent |
| 15-7 | Consent of the Agent |

(c)     The rights granted to the Revolving Credit Lenders in those sections referenced in Section 15-1(b) shall not otherwise limit or impair the Agent's exercise of its discretion under the Loan Documents.

**15-2.    Actions Requiring or On Direction of Majority Lenders**.   Except as otherwise provided in this Agreement, the Consent or direction of the Majority Lenders is required for any amendment, waiver, or modification of any Loan Document.

**15-3.    Actions Requiring or On Direction of SuperMajority Lenders**.   The Consent or direction of the SuperMajority Lenders is required as follows:

(a)    The Revolving Credit Lenders agree that any loan or advance under the Revolving Credit which results in a Permissible OverLoan may be made by the Agent in its Permitted Discretion without the Consent of the Revolving Credit Lenders and that each Revolving Credit Lender shall be bound thereby, *provided, however,* the Consent or direction of the SuperMajority Lenders is required to permit a Permissible OverLoan  (other than any Permissible OverLoan to the extent that it is also a Protective Advance as to which no such Consent or direction is so required)  to be outstanding for more than 45 consecutive Business Days or more than twice in any twelve month period.

(b)    If the Borrowers are then In Default, the SuperMajority Lenders may direct the Agent to suspend the Revolving Credit (including the making of any Permissible OverLoans), whereupon, as long as the Borrowers are In Default, the only Revolving Credit Loans which may be made are either

(i)    Revolving Credit Loans made or undertaken in the Agent's Permitted Discretion to protect and preserve the interests of the Revolving Credit Lenders; or

(ii)    Revolving Credit Loans made with Consent of the SuperMajority Lenders.

(c)    If an Event of Default has occurred and not been duly waived, the SuperMajority Lenders may:

(i)    Give the Agent a notice requiring the Agent to declare an Acceleration in accordance with Section 11-1**Error! Reference source not found.**.

(ii)    Direct the Agent to increase the rate of interest to the default rate of interest as provided in, and to the extent permitted by, this Agreement.

**15-4.    Actions Requiring Certain Consent.**   The Consent of the Revolving Credit Lender whose Revolving Credit Lender's Revolving Credit Dollar Commitment or Revolving Credit Percentage Commitment is to be so increased is required for any increase in any Revolving Credit Lender's Revolving Credit Dollar Commitment or Revolving Credit Percentage Commitment (other than by reason of the application of Section 15-10 (which deals with NonConsenting Revolving Credit Lenders) or Section 16-1 (which deals with assignments and participations).

**15-5.   Actions Requiring or Directed By Unanimous Consent**.  None of the following may take place except with the Consent of each Revolving Credit Lender adversely affected thereby or with Unanimous Consent:

(a)      Any decrease in any interest rate or fee payable to the Revolving Credit Lenders on account of the Revolving Credit Loans.

(b)      Any extension of the Maturity Date.

(c)      Any forgiveness of all or any portion of any payment Liability.

(d)      Any decrease in any interest rate or fee payable under any of the Loan Documents (other than any Agent's Fee (for which the consent of only the Agent shall be required)) and of any fee payable to the Revolving Credit Lenders provided for by the Fee Letter (which may be amended by written agreement between the Borrowers on the one hand, and the Agent on the other).

(e)      Any release of a material portion of the Collateral not otherwise required or provided for in the Loan Documents or to facilitate a Liquidation.

(f)      Any amendment of the definition of the terms "Borrowing Base" or "Availability" or of any Definition of any component thereof, such that more credit would be available to the Borrower, based on the same assets, as would have been available to the Borrowers immediately prior to such amendment , *it being understood, however*, that:

(i)      The foregoing shall not limit the adjustment by the Agent of any Reserve in the Agent's administration of the Revolving Credit as otherwise permitted by this Agreement.

(ii)      The foregoing shall not prevent the Agent, in its administration of the Revolving Credit, from restoring any component of Borrowing Base which had been lowered by the Agent back to the value of such component, as stated in this Agreement or to an intermediate value.

(g)      Any release of any Person obligated on account of the Liabilities.

(h)      The making of any Revolving Credit Loan which, when made, exceeds Availability and is not a Permissible OverLoan, *provided, however,*

(i)      no Consent shall be required in connection with the making of any Revolving Credit Loan to "cover" any honoring of a drawing under any L/C; and

(ii)      each Lender recognizes that subsequent to the making of a Revolving Credit Loan which does not constitute a Permissible OverLoan, the unpaid principal balance of the Loan Account may exceed Borrowing Base on account of changed circumstances beyond the control of the Agent (such as a drop in collateral value).

(i)       The waiver of the obligation of the Borrowers to reduce the unpaid principal balance of loans under the Revolving Credit to an amount which does not exceed a Permissible OverLoan or, subject to the time limits included in Section 15-3(a) (which places time and frequency limits on Permissible OverLoans), to eliminate an OverLoan.

(j)       Any amendment of this Article 15.

(k)      Amendment of any of the following Definitions:

> "Appraised Inventory Liquidation Value"
>
> "Majority Lender"
>
> "Permissible OverLoan"
>
> "Protective Advances"
>
> "SuperMajority Lenders"
>
> "Unanimous Consent"

**15-6.   Reserved.**

**15-7.   Actions Requiring Agent's Consent.**

(a)      No action, amendment, or waiver of compliance with, any provision of the Loan Documents or of this Agreement which affects the Agent in its capacity as Agent may be undertaken without the written consent of the Agent.

(b)      No action referenced herein which affects the rights, duties, obligations, or liabilities of the Agent shall be effective without the written consent of the Agent.

**15-8.   Miscellaneous Actions.**

(a)      Notwithstanding any other provision of this Agreement, no single Revolving Credit Lender independently may exercise any right of action or enforcement against or with respect to the Borrowers.

(b)      The Agent shall be fully justified in failing or refusing to take action under this Agreement or any Loan Document on behalf of any Revolving Credit Lender unless the Agent shall first

> (i)      receive such clear, unambiguous, written instructions as the Agent deems appropriate; and
>
> (ii)      be indemnified to the Agent's satisfaction by the Revolving Credit Lenders against any and all liability and expense which may be incurred by the Agent by reason of taking or continuing to take any such action, unless such action had been grossly negligent, in willful misconduct, or in bad faith.

(c)      The Agent may establish reasonable procedures for the providing of direction and instructions from the Revolving Credit Lenders to the Agent, including its reliance on multiple counterparts, facsimile transmissions, and time limits within which such direction and instructions must be received in order to be included in a determination of whether the requisite Loan Commitments has provided its direction, Consent, or instructions.

**15-9.    Actions Requiring Borrowers' Consent**.  The Borrowers' consent is required for any amendment of this Agreement.

**15-10.   NonConsenting Revolving Credit Lender.**

(a)      In the event that a Revolving Credit Lender (in this Section 15-10, a "**NonConsenting Revolving Credit Lender**") does not provide its Consent to a proposal by the Agent to take action which requires consent under this Article 15, then one or more Revolving Credit Lenders who provided Consent to such action may require the assignment, without recourse and in accordance with the procedures outlined in Section 16-1, below, of the NonConsenting Revolving Credit Lender's commitment hereunder on fifteen (15) days written notice to the Agent and to the NonConsenting Revolving Credit Lender.

(b)      At the end of such fifteen (15) days, *and provided that* the NonConsenting Revolving Credit Lender delivers the Revolving Credit Note held by the NonConsenting Revolving Credit Lender to the Agent, the Revolving Credit Lenders who have given such written notice shall Transfer the following to the NonConsenting Revolving Credit Lender:

(i)      Such NonConsenting Revolving Credit Lender's Pro-Rata share of the principal and interest of the Revolving Credit Loans to the date of such assignment.

(ii)     All fees distributable hereunder to the NonConsenting Revolving Credit Lender to the date of such assignment.

(iii)    Any reasonable out-of-pocket costs and expenses for which the NonConsenting Revolving Credit Lender is entitled to reimbursement from the Borrowers.

(c)      In the event that the NonConsenting Revolving Credit Lender fails to deliver to the Agent the Revolving Credit Note held by the NonConsenting Revolving Credit Lender as provided in Section 15-10(b), then:

(i)      The amount otherwise to be Transferred to the NonConsenting Revolving Credit Lender shall be Transferred to the Agent and held by the Agent, without interest, to be turned over to the NonConsenting Revolving Credit Lender upon

delivery of the Revolving Credit Note held by that NonConsenting Revolving Credit Lender.

        (ii)      The Revolving Credit Note held by the NonConsenting Revolving Credit Lender shall have no force or effect whatsoever.

        (iii)      The NonConsenting Revolving Credit Lender shall cease to be a "Revolving Credit Lender".

        (iv)      The Revolving Credit Lender(s) which have Transferred the amount to the Agent as described above shall have succeeded to all rights and become subject to all of the obligations of the NonConsenting Revolving Credit Lender as "Revolving Credit Lender".

(d)      In the event that more than one (1) Revolving Credit Lender wishes to require such assignment, the NonConsenting Revolving Credit Lender's commitment hereunder shall be divided among such Revolving Credit Lenders, pro-rata based upon their respective Revolving Credit Percentage Commitments, with the Agent coordinating such transaction.

(e)      The Agent shall coordinate the retirement of the Revolving Credit Note held by the NonConsenting Revolving Credit Lender and the issuance of Revolving Credit Notes to those Revolving Credit Lenders which "take-out" such NonConsenting Revolving Credit Lender, *provided, however,* no processing fee otherwise to be paid as provided in Section 16-2(b) shall be due under such circumstances.

### ARTICLE 16 - ASSIGNMENTS BY REVOLVING CREDIT LENDERS:

**16-1.    Assignments and Assumptions.**

(a)      Except as provided herein, each Revolving Credit Lender (in this Section 16-1(a), an "**Assigning Revolving Credit Lender**") may assign to one or more Eligible Assignees (in this Section 16-1(a), each an "**Assignee Revolving Credit Lender**") all or a portion of that Revolving Credit Lender's interests, rights and obligations under this Agreement and the Loan Documents (including all or a portion of its Commitment) and the same portion of the Revolving Credit Loans at the time owing to it, and of the Revolving Credit Note held by the Assigning Revolving Credit Lender, *provided that:*

        (i)      The Agent shall have given its prior written consent to such assignment, which consent shall not be unreasonably withheld, but need not be given if the proposed assignment would result in Bank of America's holding a Revolving Credit Dollar Commitment of less than $15 Million.

(ii)     Each such assignment shall be of a constant, and not a varying, percentage of all the Assigning Revolving Credit Lender's rights and obligations under this Agreement.

(iii)     Such assignment shall not result in Bank of America holding a Loan Commitment of less than $15,000,000.00, *provided, however*, Bank of America shall be relieved of any "minimum hold" obligation following the occurrence of any Event of Default.

**16-2.   Assignment Procedures**.  (This Section 16-2 describes the procedures to be followed in connection with an assignment effected pursuant to this Article 16 and permitted by Section 16-1).

(a)     The parties to such an assignment shall execute and deliver to the Agent, for recording in the Register, an Assignment and Acceptance substantially in the form of **EXHIBIT 16-1**, annexed hereto (an "***Assignment and Acceptance***").

(b)     The Assigning Revolving Credit Lender shall deliver to the Agent, with such Assignment and Acceptance, the Revolving Credit Note held by the subject Assigning Revolving Credit Lender and the Agent's processing fee of $3,500.00, *provided, however*, no such processing fee shall be due where the Assigning Revolving Credit Lender is one of the Revolving Credit Lenders at the initial execution of this Agreement.

(c)     The Agent shall maintain a copy of each Assignment and Acceptance delivered to it and a register or similar list (the "**Register**") for the recordation of the names and addresses of the Revolving Credit Lenders and of the Revolving Credit Percentage Commitment and Revolving Credit Percentage Commitment of each Revolving Credit Lender. The Register shall be available for inspection by the Revolving Credit Lenders and the Borrowers at any reasonable time and from time to time upon reasonable prior notice.  In the absence of manifest error, the entries in the Register shall be conclusive and binding on all Revolving Credit Lenders.  The Agent and the Revolving Credit Lenders may treat each Person whose name is recorded in the Register as a "Revolving Credit Lender" hereunder for all purposes of this Agreement.

(d)     The Assigning Revolving Credit Lender and Assignee Revolving Credit Lender, directly between themselves, shall make all appropriate adjustments in payments for periods prior to the effective date of an Assignment and Assumption.

**16-3.   Effect of Assignment.**

(a)     From and after the effective date specified in an Assignment and Acceptance which has been executed, delivered, and recorded (which effective date the Agent may delay by up to five (5) Business Days after the delivery of such Assignment and Acceptance):

(i)    The Assignee Revolving Credit Lender:

(A) Shall be a party to this Agreement and the Loan Documents (and to any amendments thereof) as fully as if the Assignee Revolving Credit Lender had executed each.

(B) Shall have the rights of a Revolving Credit Lender hereunder to the extent of the Revolving Credit Percentage Commitment and Revolving Credit Percentage Commitment assigned by such Assignment and Acceptance.

(ii)    The Assigning Revolving Credit Lender shall be released from the Assigning Revolving Credit Lender's obligations under this Agreement and the Loan Documents to the extent of the Commitment assigned by such Assignment and Acceptance.

(iii)    The Agent shall undertake to obtain and distribute replacement Revolving Credit Notes to the subject Assigning Revolving Credit Lender and Assignee Revolving Credit Lender.

(b)    By executing and delivering an Assignment and Acceptance, the parties thereto confirm to and agree with each other and with all parties to this Agreement as to those matters which are set forth in the subject Assignment and Acceptance.

### ARTICLE 17 - NOTICES:

**17-1.    Notice Addresses**.  All notices, demands, and other communications made in respect of any Loan Document (other than a request for a loan or advance or other financial accommodation under the Revolving Credit) shall be made to the following addresses, each of which may be changed upon seven (7) days written notice to all others given by certified mail, return receipt requested:

If to the Agent:

> Bank of America, N.A.
> 100 Federal Street
> Boston, Massachusetts 02110
> Attention:  Andrew Cerussi
> Fax:    617.310.2686
> E-mail: andrew.cerussi@baml.com

*With a copy to (which shall not constitute notice)*:

> Riemer & Braunstein LLP
> Three Center Plaza
> Boston, Massachusetts  02108
> Attention:  Donald E. Rothman, Esquire
> Fax:  617-880-3556
> Email:  drothman@riemerlaw.com

If to the Borrower:

> Hastings Entertainment, Inc.
> 3601 Plains Boulevard
> Amarillo, Texas 79102
> Attention: Duane Huesers
> Fax: 806 351 2424
> Email: Duane.Huesers@goHastings.com

*With a copy to (which shall not constitute notice)*:

> Cooley LLP
> 1114 Avenue of the Americas
> New York NY 10036-7798
> Attention:  Cathy Hershcopf
> Fax:  (212) 479-6275
> Email:  chershcopf@cooley.com

**17-2.   Notice Given.**

(a)      Except as otherwise specifically provided herein, notices shall be deemed made and correspondence received, as follows (all times being local to the place of delivery or receipt):

(i)      By mail: the sooner of when actually received or three (3) days following deposit in the United States mail, postage prepaid.

(ii)      By recognized overnight express delivery: the Business Day following the day when sent.

(iii)      By Hand: If delivered on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, when delivered.  Otherwise, at the opening of the then next Business Day.

(iv)      By Facsimile transmission (which must include a header on which the party sending such transmission is indicated): If sent on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, one (1) hour after being sent.  Otherwise, at the opening of the then next Business Day.

(v)      By electronic mail transmission (which must include a header on which the party sending such transmission is indicated): Upon receipt of a return e-mail

from the recipient confirming such notice has been received, or upon receipt of an automatically generated e-mail confirmation that such communication has been delivered, i.e. by the "*return receipt requested*" function).

(b)     Rejection or refusal to accept delivery and inability to deliver because of a changed address or Facsimile Number for which no due notice was given shall each be deemed receipt of the notice sent.

## ARTICLE 18 - TERM:

**18-1.     Termination of Revolving Credit**.  The Revolving Credit shall remain in effect (subject to suspension as provided in Section 2-5(g) hereof) until the Termination Date.

**18-2.     Actions On Termination.**

(a)     On the Termination Date, the Borrowers shall pay the Agent (whether or not then due), in immediately available funds, all then Liabilities including, without limitation: the following:

(i)     The entire balance of the Loan Account (including the unpaid principal balance of the Revolving Credit Loans).

(ii)     Any then remaining installments of the Revolving Credit Commitment Fee.

(iii)     Any then remaining installments of the Agent's Fee.

(iv)     Any payments due on account of the indemnification obligations included in Section 2-10(e).

(v)     Any accrued and unpaid Unused Line Fee.

(vi)     All unreimbursed costs and expenses of the Agent and of Lenders' Special Counsel for which the Borrowers are responsible.

(b)     On the Termination Date, the Borrowers shall also make such arrangements concerning any L/C's then outstanding as are reasonably satisfactory to the Agent.

(c)     Until such payment (Section 18-2(a)) and arrangements concerning L/C's (Section 18-2(b)), all provisions of this Agreement, other than those included in Article 2 which place any obligation on the Agent or any Revolving Credit Lender to make any loans or advances or to provide any financial accommodations to the Borrowers shall remain in full force and effect until all Liabilities shall have been paid in full.

(d)     The release by the Agent of the Collateral Interests granted the Agent by the Borrowers hereunder may be upon such conditions and indemnifications as the Agent may require. Without limiting the foregoing, in connection with the termination of this Agreement and the release and

termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Agent and the Lenders against (x) loss on account of credits previously applied to the Liabilities that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to Bank Products and Cash Management Services, and (z) any Liabilities that may thereafter arise under Section 19-12 hereof.

### ARTICLE 19 - GENERAL:

**19-1.    Protection of Collateral**.  The Agent has no duty as to the collection or protection of the Collateral beyond the safe custody of such of the Collateral as may come into the possession of the Agent.

**19-2.    Publicity.** (a) The Agent may issue a "tombstone" notice of the establishment of the credit facility contemplated by this Agreement and may make reference to the Borrowers (and may utilize any logo or other distinctive symbol associated with the Borrowers) in connection with any advertising, promotion, or marketing undertaken by the Agent.

(b)        Each Revolving Credit Lender, the Issuer and the Agent agrees to use reasonable precautions to keep confidential, in accordance with customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices, any non-public information supplied to it by the Borrowers pursuant to this Agreement which is identified by the Borrowers as being confidential at the time the same is delivered to the Revolving Credit Lenders, the Issuer or the Agent, provided that nothing herein shall limit the disclosure of any such information (i) to the extent required by statute, rule, regulation or judicial process, (ii) to counsel for any Revolving Credit Lender, the Issuer or the Agent, (iii) to bank examiners, auditors or accountants of any Revolving Credit Lender, the Issuer or the Agent (iv) to any other Revolving Credit Lender, the Issuer or the Agent, (v) in connection with any litigation to which any Revolving Credit Lender, the Issuer or the Agent is a party, provided, further, that, unless specifically prohibited by applicable Law or court order, each Revolving Credit Lender, the Issuer and the Agent shall use best efforts to notify the Borrowers of any request for disclosure of any such non-public information (A) by any governmental agency or representative thereof (other than any such request in connection with an examination of such Revolving Credit Lender's financial condition by such governmental agency) or (B) pursuant to a legal process, (vi) to any Eligible Assignee (or prospective Eligible Assignee) so long as such Eligible Assignee (or prospective Assignee) agrees in writing to be bound by this confidentiality provision in all material respects, or (vii) to the extent necessary in connection with any right or remedy under this Agreement or any other Loan Document.

**19-3.    Successors and Assigns**.  This Agreement shall be binding upon the Borrowers and the Borrowers' representatives, successors, and assigns and shall enure to the benefit of the Agent and each

Revolving Credit Lender and their respective successors and assigns, *provided, however*, no trustee or other fiduciary appointed with respect to the Borrowers shall have any rights hereunder.  In the event that the Agent or any Revolving Credit Lender assigns or transfers its rights under this Agreement, in accordance with this Agreement the assignee shall thereupon succeed to and become vested with all rights, powers, privileges, and duties of such assignor hereunder and such assignor shall thereupon be discharged and relieved from its duties and obligations hereunder.

**19-4.    Severability**.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

**19-5.    Amendments.**

(a)    This Agreement and the other Loan Documents incorporate all discussions and negotiations between the Borrowers and the Agent and each Revolving Credit Lender, either express or implied, concerning the matters included herein and in such other instruments, any custom, usage, or course of dealings to the contrary notwithstanding.  No such discussions, negotiations, custom, usage, or course of dealings shall limit, modify, or otherwise affect the provisions thereof.  No failure by the Agent or any Revolving Credit Lender to give notice to the Borrowers of the Borrowers' having failed to observe and comply with any warranty or covenant included in any Loan Document shall constitute a waiver of such warranty or covenant or the amendment of the subject Loan Document.  No change made by the Agent to the manner by which Borrowing Base is determined shall obligate the Agent to continue to determine Borrowing Base in that manner.

(b)    The Borrowers may undertake any action otherwise prohibited hereby, and may omit to take any action otherwise required hereby, upon and with the express prior written consent of the Agent. Subject to Article 15, no consent, modification, amendment, or waiver of any provision of any Loan Document shall be effective unless executed in writing by or on behalf of the party to be charged with such modification, amendment, or waiver (and if such party is the Agent then by a duly authorized officer thereof).  Any modification, amendment, or waiver provided by the Agent shall be in reliance upon all representations and warranties theretofore made to the Agent by or on behalf of the Borrowers (and any guarantor, endorser, or surety of the Liabilities) and consequently may be rescinded in the event that any of such representations or warranties was not true and complete in all material respects when given.

**19-6.   Application of Proceeds**.   The proceeds of any collection, sale, or disposition of the Collateral, or of any other payments received hereunder, shall be applied towards the Liabilities in such order and manner as may be provided herein and in the Financing Orders.   The Borrowers shall remain liable for any deficiency remaining following such application.

**19-7.   Increased Costs**.   If, as a result of any adoption of, or change in, any requirement of law, or of the interpretation or application thereof by any court or by any governmental or other authority or entity charged with the administration thereof, whether or not having the force of law, which:

(a)        subjects any Revolving Credit Lender to any taxes or changes the basis of taxation, or increases any existing taxes, on payments of principal, interest or other amounts payable by the Borrowers to the Agent or any Revolving Credit Lender under this Agreement (except for taxes on the Agent or any Revolving Credit Lender based on net income or capital imposed by the jurisdiction in which the principal or lending offices of the Agent or that Revolving Credit Lender are located);

(b)        imposes, modifies or deems applicable any reserve, cash margin, special deposit or similar requirements against assets held by, or deposits in or for the account of or loans by or any other acquisition of funds by the relevant funding office of any Revolving Credit Lender;

(c)        imposes on any Revolving Credit Lender any other condition with respect to any Loan Document; or

(d)        imposes on any Revolving Credit Lender a requirement to maintain or allocate capital in relation to the Liabilities;

and the result of any of the foregoing, in such Revolving Credit Lender's reasonable opinion, is to increase the cost to that Revolving Credit Lender of making or maintaining any loan, advance or financial accommodation or to reduce the income receivable by that Revolving Credit Lender in respect of any loan, advance or financial accommodation by an amount which that Revolving Credit Lender deems to be material, then upon written notice from the Agent, from time to time, to the Borrowers (such notice to set out in reasonable detail the facts giving rise to and a summary calculation of such increased cost or reduced income), the Borrowers shall forthwith pay to the Agent, for the benefit of the subject Revolving Credit Lender, within 30 days after receipt of such notice, that amount which shall compensate the subject Revolving Credit Lender for such additional cost or reduction in income.   Each Revolving Credit Lender shall, in accordance with its internal policy, use reasonable efforts to designate a different lending office for funding or booking its Revolving Credit Dollar Commitment hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Revolving Credit Lender, such designation or assignment: (i) would eliminate or reduce such amounts due (with respect to additional costs or reduction in income), and (ii) would not subject such Revolving

Credit Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Revolving Credit Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Revolving Credit Lender in connection with any such designation or assignment.

**19-8.    Costs and Expenses of the Agent.**

(a)    The Borrowers shall pay from time to time on demand all Costs of Collection and all reasonable costs, expenses, and disbursements (including attorneys' reasonable fees and expenses) which are incurred by the Agent in connection with the preparation, negotiation, execution, and delivery of this Agreement and of any other Loan Documents, and all other reasonable costs, expenses, and disbursements which may be incurred by the Agent in connection with or in respect to the credit facility contemplated hereby or which otherwise are incurred with respect to the Liabilities.

(b)    The Borrowers shall pay from time to time on demand all reasonable costs and expenses (including attorneys' reasonable fees and expenses) incurred, following the occurrence of any Event of Default, by the Revolving Credit Lenders to Lenders' Special Counsel.

(c)    The Borrowers authorize the Agent to pay all such fees and expenses and in the Agent's discretion, to add such fees and expenses to the Loan Account.

(d)    The undertaking on the part of the Borrowers in this Section 19-8 shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Agent in favor of the Borrowers, other than a termination, release, or discharge which makes specific reference to this Section 19-8.

**19-9.    Copies and Facsimiles**.  Each Loan Document and all documents and papers which relate thereto which have been or may be hereinafter furnished the Agent or any Revolving Credit Lender may be reproduced by that Revolving Credit Lender or by the Agent by any photographic, microfilm, xerographic, digital imaging, or  other process, and such Person making such reproduction may destroy any document so reproduced.  Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business). Any facsimile which bears proof of transmission shall be binding on the party which or on whose behalf such transmission was initiated and likewise shall be so admissible in evidence as if the original of such facsimile had been delivered to the party which or on whose behalf such transmission was received.

**19-10.    Massachusetts Law**.  This Agreement and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the law of the Commonwealth of Massachusetts and the Bankruptcy Code.

**19-11.   Consent to Jurisdiction.**

(a)      EACH OF THE BORROWER REPRESENTATIVE, THE BORROWERS AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS SITTING IN SUFFOLK COUNTY, MASSACHUSETTS, AND OF THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MASSACHUSETTS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER REPRESENTATIVE, THE BORROWERS OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE A LENDER'S OR PARTICIPANT'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE FINANCING ORDERS. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.

(b)      Each of the parties hereto *WAIVES* personal service of any and all process upon it, and irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, to it at its address for notices as specified herein, such service to become effective five (5) Business Days after such mailing.

(c)      EACH OF THE BORROWER REPRESENTATIVE, THE BORROWERS AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (A) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     Nothing herein shall affect the right of the Agent to bring legal actions or proceedings in any other competent jurisdiction.

**19-12.  Indemnification**.  The Borrowers shall indemnify, defend, and hold the Agent and each Revolving Credit Lender and any of their respective employees, officers, or agents (each, an "**Indemnified Person**") harmless of and from any claim brought or threatened against any Indemnified Person by the Borrower, any guarantor or endorser of the liabilities, or any other Person (as well as from attorneys' reasonable fees, expenses, and disbursements in connection therewith) on account of the relationship between the Agent and Revolving Credit Lenders, on the one hand, and the Borrowers or of any other guarantor or endorser of the Liabilities, on the other hand (each of claims which may be defended, compromised, settled, or pursued by the Indemnified Person with counsel of the Lender's selection, but at the expense of the Borrowers) other than any claim as to which a final determination is made in a judicial proceeding (in which the Agent and the other Indemnified Person has had an opportunity to be heard) which determination includes a specific finding that the Indemnified Person seeking indemnification had acted in a grossly negligent manner or in actual bad faith.  This indemnification shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Agent in favor of the Borrowers, other than a termination, release, or discharge duly executed on behalf of the Agent which makes specific reference to this Section 19-12.

**19-13.  Rules of Construction**.  The following rules of construction shall be applied in the interpretation, construction, and enforcement of this Agreement and of the other Loan Documents:

(a)     Unless otherwise specifically provided for herein, interest and any fee or charge which is stated as a per annum percentage shall be calculated based on a 360 day year and actual days elapsed.

(b)     Words in the singular include the plural and words in the plural include the singular.

(c)     Titles, headings (indicated by being underlined or shown in SMALL CAPITALS) and any Table of Contents are solely for convenience of reference; do not constitute a part of the instrument in which included; and do not affect such instrument's meaning, construction, or effect.

(d)     The words "includes" and "including" are not limiting.

(e)        Text which follows the words "including, without limitation" (or similar words) is illustrative and not limitational.

(f)        Text which is shown in *italics* (other than italicized text in parenthesis), shown in **bold**, shown IN ALL CAPITAL LETTERS, or in any combination of the foregoing, shall be deemed to be conspicuous.

(g)        The words "may not" are prohibitive and not permissive.

(h)        Any reference to a Person's "knowledge" (or words of similar import) are to such Person's knowledge assuming that such Person has undertaken reasonable and diligent investigation with respect to the subject of such "knowledge" (whether or not such investigation has actually been undertaken).

(i)        Terms which are defined in one section of any Loan Document are used with such definition throughout the instrument in which so defined.

(j)        The symbol "$" refers to United States Dollars.

(k)        Unless limited by reference to a particular Section or provision, any reference to "herein", "hereof", or "within" is to the entire Loan Document in which such reference is made.

(l)        References to "this Agreement" or to any other Loan Document is to the subject instrument as amended to the date on which application of such reference is being made.

(m)        Except as otherwise specifically provided, all references to time are to Boston time.

(n)        In the determination of any notice, grace, or other period of time prescribed or allowed hereunder:

(i)        Unless otherwise provided (I) the day of the act, event, or default from which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included unless such last day is not a Business Day, in which event the last day of the relevant period shall be the then next Business Day and (II) the period so computed shall end at 5:00 PM on the relevant Business Day.

(ii)        The word "from" means "from and including".

(iii)        The words "to" and "until" each mean "to, but excluding".

(iv)        The word "through" means "to and including".

(o)        The Loan Documents shall be construed and interpreted in a harmonious manner and in keeping with the intentions set forth in Section 19-14 hereof, *provided, however*, in the event of any inconsistency between the provisions of this Agreement and any other Loan Document, the provisions of this Agreement shall govern and control.

**19-14.  Intent**.  It is intended that:

(a)      This Agreement take effect as a sealed instrument.

(b)      The scope of all Collateral Interests created by the Borrowers to secure the Liabilities be broadly construed in favor of the Agent and that they cover all assets of the Borrower, other than Excluded Collateral.

(c)      All Collateral Interests created in favor of the Agent at any time and from time to time by any the secure all Liabilities, whether now existing or contemplated or hereafter arising.

(d)      All reasonable costs, expenses, and disbursements incurred by the Agent and, to the extent provide in Section 19-8 each Revolving Credit Lender, in connection with such Person's relationship(s) with the Borrowers shall be borne by the Borrowers.

(e)      Unless otherwise explicitly provided herein, the Agent's consent to any action of the Borrower which is prohibited unless such consent is given may be given or refused by the Agent in its sole discretion and without reference to Section 2-17 hereof.

**19-15.  Participations**.  Each Revolving Credit Lender may sell participations to one or more financial institutions (each, a "**Participant**") in that Revolving Credit Lender's interests herein *provided that* no such participation shall include any provision which accords that Participant with any rights, *vis a vis* the Agent, with respect to any requirement herein for approval by a requisite number or proportion of the Revolving Credit Lenders.  No such sale of a participation shall relieve a Revolving Credit Lender from that Revolving Credit Lender's obligations hereunder nor obligate the Agent to any Person other than a Revolving Credit Lender.

**19-16.  Right of Set-Off**.  Except as may be subject to Sections 362 and 553 of the Bankruptcy Code, and subject further to the Financing Orders, any and all deposits or other sums at any time credited by or due to the Borrowers from the Agent or any Revolving Credit Lender, and any cash, securities, instruments or other property of the Borrowers in the possession of any of the foregoing, whether for safekeeping or otherwise (regardless of the reason such Person had received the same) shall at all times constitute security for all Liabilities and for any and all obligations of the Borrowers to the Agent and such Revolving Credit Lender and may be applied or set off against the Liabilities and against such obligations at any time after the occurrence of an Event of Default, whether or not other collateral is then available to the Agent or that Revolving Credit Lender.

**19-17.  Pledges To Federal Reserve Banks**.  Nothing included in this Agreement shall prevent or limit any Revolving Credit Lender, to the extent that such Revolving Credit Lender is subject to any of the twelve Federal Reserve Banks organized under §4 of the Federal Reserve Act (12 U.S.C. §341) from

pledging all or any portion of that Lender's interest and rights under this Agreement, *provided, however*, neither such pledge nor the enforcement thereof shall release the pledging Revolving Credit Lender from any of its obligations hereunder or under any of the Loan Documents.

**19-18.  Maximum Interest Rate.**

(a)    No interest rate specified in this Agreement or any other Loan Document shall at any time exceed the Maximum Rate.

(b)    If at any time the interest rate (the "**Contract Rate**") for any Liability shall exceed the Maximum Rate, so that, as provided in Section 19-18(a),  interest accruing on such Liability is limited to the Maximum Rate, then any subsequent reduction in the Contract Rate for such Liability shall not reduce the rate of interest on such Liability below the Maximum Rate until the aggregate amount of interest accrued on such Liability equals the aggregate amount of interest which would have accrued on such Liability if the Contract Rate for such Liability had at all times been in effect.

(c)    Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, none of the terms and provisions of this Agreement or the other Loan Documents shall ever be construed to create a contract or obligation to pay interest at a rate in excess of the Maximum Rate; and neither the Agent nor any Revolving Credit Lender shall ever charge, receive, take, collect, reserve or apply, as interest on the Liabilities, any amount in excess of the Maximum Rate.  The Agent, each Revolving Credit Lender and the Borrower each agrees  that any interest, charge, fee, expense or other Liability provided for in this Agreement or in the other Loan Documents which constitutes interest under applicable law, *ipso facto* and under any and all circumstances, shall be limited or reduced to an amount equal to the lesser of (x) the amount of such interest, charge, fee, expense or other Liability that would be payable in the absence of this Section 19-18, or (y) an amount, which when added to all other interest payable under this Agreement and the other Loan Documents, equals the Maximum Rate.  If, notwithstanding the foregoing, the Agent or any Revolving Credit Lender ever contracts for, charges, receives, takes, collects, reserves or applies as interest any amount in excess of the Maximum Rate, such amount which would be deemed excessive interest shall be deemed a partial payment or prepayment of principal of the Liabilities and treated hereunder as such; and if the Liabilities, or applicable portions thereof, are paid in full, any remaining excess shall promptly be paid to the Borrowers.  In determining whether the interest paid or payable, under any specific contingency, exceeds the Maximum Rate, the Agent, each Revolving Credit Lender and the Borrower, to the maximum extent permitted by Applicable Law, shall (i) characterize any non-principal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the

actual term of the Liabilities, or applicable portions thereof, so that the interest rate does not exceed the Maximum Rate at any time during the term of the Liabilities.

**19-19.  Waivers.**

(a)     The Borrowers (and all guarantors, endorsers, and sureties of the Liabilities) make each of the waivers included in Section 19-19(b), below, knowingly, voluntarily, and intentionally, and understands that Agent and each Revolving Credit Lender, in establishing the facilities contemplated hereby and in providing loans and other financial accommodations to or for the account of the Borrower as provided herein, whether not or in the future, is relying on such waivers.

(b)     TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWERS, AND EACH SUCH GUARANTOR, ENDORSER, AND SURETY RESPECTIVELY *WAIVES* THE FOLLOWING:

(i)     Except as otherwise specifically required hereby, notice of non-payment, demand, presentment, protest and all forms of demand and notice, both with respect to the Liabilities and the Collateral.

(ii)     Except as otherwise specifically required hereby, the right to notice and/or hearing prior to the Agent's exercising of the Agent's rights upon default.

(iii)     THE RIGHT TO A JURY IN ANY TRIAL OF ANY CASE OR CONTROVERSY IN WHICH THE AGENT OR ANY REVOLVING CREDIT LENDER IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE AGENT OR ANY REVOLVING CREDIT LENDER OR IN WHICH THE AGENT OR ANY REVOLVING CREDIT LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF OR IS IN RESPECT OF, ANY RELATIONSHIP AMONGST OR BETWEEN THE BORROWERS OR ANY OTHER PERSON (AND THE AGENT OR EACH REVOLVING CREDIT LENDER LIKEWISE WAIVES THE RIGHT TO A JURY IN ANY TRIAL OF ANY SUCH CASE OR CONTROVERSY).

(iv)     The benefits or availability of any stay, limitation, hindrance, delay, or restriction (including, without limitation, any automatic stay which otherwise might be imposed pursuant to Section 362 of the Bankruptcy Code) with respect to any action which the Agent may or may become entitled to take hereunder.

(v)     Any defense, counterclaim, set-off, recoupment, or other basis on which the amount of any Liability, as stated on the books and records of the Agent, could

be reduced or claimed to be paid otherwise than in accordance with the tenor of and written terms of such Liability.

       (vi)     Any claim to consequential, special, or punitive damages.

**19-20.  ENTIRE AGREEMENT**.  THIS WRITTEN AGREEMENT AND ALL OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER COVERED HEREBY AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

**19-21.  Foreign Asset Control Regulations**.  Neither the advance of the Revolving Credit Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, neither the Borrowers nor any of their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**19-22.  USA PATRIOT Act Notice**.  Each Revolving Credit Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Revolving Credit Lender) hereby notifies the Borrower and Guarantors that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrower and other information that will allow such Revolving Credit Lender or the Agent, as applicable, to identify the Borrower in accordance with the Act. The Borrowers are in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Revolving Credit Loans will be used by the Borrowers, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official

capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**19-23.  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Borrowers acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrowers, on the one hand, and the Agent and the Revolving Credit Lenders, on the other hand, and the Borrowers are capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Revolving Credit Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrowers or any of their Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Agent or the Revolving Credit Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrowers with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Agent or Revolving Credit Lenders has advised or is currently advising the Borrowers or any of their Affiliates on other matters) and none of the Agent or Revolving Credit Lenders has any obligation to the Borrowers or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agent and the Revolving Credit Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers and their Affiliates, and none of the Agent or the Revolving Credit Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Agent and the Revolving Credit Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrowers have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Agent and Revolving Credit Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

*[Signature Pages Follow]*

**BORROWERS:**

DRAW ANOTHER CIRCLE, LLC
As **BORROWER**

By_____
Print Name:
Title:

HASTINGS ENTERTAINMENT, INC.,
As **BORROWER**

By_____
Print Name:
Title:

MOVIESTOP LLC,
As **BORROWER**

By_____
Print Name:
Title:

SP IMAGES, INC.,
As **BORROWER**

By_____
Print Name:
Title:

HASTINGS INTERNET, INC.,
As **BORROWER**

By_____
Print Name:
Title:

**AGENT AND REVOLVING CREDIT LENDER:**

BANK OF AMERICA, N.A.,
As **AGENT** AND **REVOLVING CREDIT LENDER**


By_____
Print Name:
Title:

**<u>Exhibit C</u>**

**Budget**

**DAC - Weekly DIP Budget**
$ in Millions

| | Cash Flow Forecast Week | 1 | 2 | 3 | 4 | 5 | Total |
| | Week Ending | 6/17 | 6/24 | 7/1 | 7/8 | 7/15 | Total |
|---|---|---|---|---|---|---|---|
| 1 | **I. Cash Flow Summary** | | | | | | |
| 2 | Hastings | 3.2 | 5.6 | 4.5 | 4.8 | 87.9 | 106.0 |
| 3 | MovieStop | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 3.8 |
| 4 | SP Images | 0.2 | 0.1 | 0.1 | 0.3 | 0.6 | 1.3 |
| 5 | **Total Cash Receipts** | **4.3** | **6.6** | **5.5** | **5.7** | **89.0** | **111.1** |
| 6 | **Operating Disbursements** | | | | | | |
| 7 | Merchandise Payments | (1.2) | (1.2) | - | - | - | (2.4) |
| 8 | Rental Related Payments | (0.1) | (0.1) | (0.1) | (0.1) | - | (0.6) |
| 9 | Rent [1] | - | - | (2.7) | - | (1.2) | (3.9) |
| 10 | Payroll & Benefits | (0.3) | (2.2) | (0.4) | (2.3) | (0.3) | (5.5) |
| 11 | Sales Tax Remittance | (2.0) | (0.1) | - | (0.0) | (1.7) | (3.8) |
| 12 | Other Operating Disbursements | (1.4) | (1.3) | (1.1) | (1.2) | (1.1) | (6.0) |
| 13 | Subtotal | **(5.1)** | **(4.9)** | **(4.3)** | **(3.6)** | **(4.3)** | **(22.2)** |
| 14 | **Non-Operating Disbursements** | | | | | | |
| 15 | Capital Expenditures | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.4) |
| 16 | Revolver/DIP Interest and Fees | (0.1) | (0.1) | (0.1) | (1.1) | (0.1) | (1.5) |
| 17 | Professional Fees [2] | - | - | - | - | - | - |
| 18 | Other Non-operating Items | (1.0) | - | - | (0.0) | (0.6) | (1.6) |
| 19 | Subtotal | **(1.2)** | **(0.2)** | **(0.2)** | **(1.1)** | **(0.7)** | **(3.5)** |
| 20 | Utility/Vendor/Escrow Deposits and LC Cash Collateralization | (1.5) | (0.2) | (0.2) | (0.2) | (1.2) | (3.3) |
| 21 | **Total Disbursements** | **(7.8)** | **(5.4)** | **(4.7)** | **(4.9)** | **(6.3)** | **(29.0)** |
| 22 | **Net Cash Flow** | **(3.5)** | **1.2** | **0.8** | **0.8** | **82.7** | **82.1** |
| 23 | Change in O/S Checks | 0.3 | 0.0 | 2.0 | (2.1) | 0.8 | 1.1 |
| 24 | **Total Cash Flow Before Borrowings / Paydowns** | **(3.1)** | **1.2** | **2.8** | **(1.3)** | **83.5** | **83.1** |
| 25 | **II. Cash Roll Forward** | | | | | | |
| 26 | Starting Cash Balance | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| 27 | Net Cash Flow Before Borrowing / Paydown | (3.1) | 1.2 | 2.8 | (1.3) | 83.5 | 83.1 |
| 28 | Revolver Borrowing / Paydown | 3.1 | (1.2) | (2.8) | 1.3 | (68.0) | (67.6) |
| 29 | **Ending Cash Balance** | **0.5** | **0.5** | **0.5** | **0.5** | **16.0** | **16.0** |
| 30 | **III. Revolver Roll Forwards** | | | | | | |
| 31 | **Pre-Petition Revolver** | | | | | | |
| 32 | Starting Revolver Balance | 67.6 | 63.3 | 56.8 | 51.3 | - | 67.6 |
| 33 | Borrowing / Paydown | (4.3) | (6.6) | (5.5) | (5.7) | - | (22.0) |
| 34 | Conversion to DIP | - | - | - | (45.6) | - | (45.6) |
| 35 | **Ending Revolver Balance** | 63.3 | 56.8 | 51.3 | - | - | - |
| 36 | **DIP Loan Revolver** | | | | | | |
| 37 | Starting DIP Loan Balance | - | 7.4 | 12.8 | 15.4 | 68.0 | - |
| 38 | Borrowing / Paydown | 7.4 | 5.4 | 2.6 | 7.0 | (68.0) | (45.6) |
| 39 | Conversion from Pre-Petition | - | - | - | 45.6 | - | 45.6 |
| 40 | **Ending Revolver Balance Before LCs and Accr. Int.** | 7.4 | 12.8 | 15.4 | 68.0 | - | - |
| 41 | Accrued Interest | 0.0 | 0.0 | 0.0 | 0.0 | - | |
| 42 | Letters of Credit ("LCs") | 1.2 | 1.2 | 1.2 | 1.2 | - | |
| 43 | **Ending DIP Loan Balance** | **8.6** | **14.0** | **16.6** | **69.2** | **-** | **-** |
| 44 | **IV. Obligations** | | | | | | |
| 45 | Pre-Petition Revolver | 63.3 | 56.8 | 51.3 | - | - | - |
| 46 | DIP Revolver | 8.6 | 14.0 | 16.6 | 69.2 | - | - |
| 47 | Total Revolver | **72.0** | **70.8** | **68.0** | **69.2** | **-** | **-** |
| 48 | Term Loan | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 |
| 49 | **Total Obligations** | **82.1** | **80.9** | **78.1** | **79.3** | **10.1** | **10.1** |
| 50 | **V. Revolver Excess Availability and Liquidity** | | | | | | |
| 51 | Revolver Excess Availability [2] | 5.2 | 4.6 | 5.2 | 1.6 | - | |
| 52 | Cash Balance | 0.5 | 0.5 | 0.5 | 0.5 | 16.0 | |
| 53 | **Total Liquidity** | **5.7** | **5.1** | **5.7** | **2.1** | **16.0** | |

[1] Includes June stub rent paid week ending 7/15. The payment of postpetition rent for June 2016 is conditioned upon a Final DIP order being entered that provides for a 506(c) waiver for the Prepetition Lenders.

[2] DIP Revolver borrowing base includes reserve for accrued and unpaid professional fees.