## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No.: 16- ( _____ )<br><br>(Joint Administration Requested) |

## DEBTORS' COMBINED MOTION FOR ENTRY OF ORDERS: (I) ESTABLISHING BIDDING AND SALE PROCEDURES; (II) APPROVING THE SALE OF ASSETS; AND (III) GRANTING RELATED RELIEF

Draw Another Circle, LLC ("DAC") and its chapter 11 affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move  the Court (the "Motion"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of:

      (i)     an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A:

         (a)    approving proposed auction and bid procedures (the "Bidding Procedures"), in connection with the sale (the "Sale") of certain of the Debtors' assets (collectively, the "Assets");

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

(b)    scheduling an auction (the "Auction") and a final sale hearing (the "Sale Hearing") in connection with the Sale;

(c)    establishing procedures for the assumption and assignment, or rejection, as the case may be, of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached hereto as Exhibit B (the "Assumption and Assignment Notice"); and

(d)    approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of notice (the "Auction and Hearing Notice") attached hereto as Exhibit C; and

(ii) an order (the "Sale Order"):

(a)    authorizing the Sale to the party or parties that are the successful bidders at the Auction, free and clear of all liens, claims and encumbrances, except for certain assumed liabilities;

(b)    authorizing the assumption and assignment, or rejection, as the case may be,  of certain executory contracts and unexpired leases in connection with the Sale; and

(c)    granting certain related relief as described herein.

The Debtors propose to file a proposed form of the Sale Order no later than 14 days prior to the Sale Hearing, subject to modifications by the Debtors and the Successful Bidders following the Auction.

In support of this motion, the Debtors incorporate the statements contained in the (a) *Declaration of Duane A. Huesers in Support of Debtors' First Day Pleadings* (the "First Day Declaration"), (b) the *Declaration of Mike Nowlan in Support of Debtors' (I) Financing Motion, (II) Bidding Procedures and Sale Motion; and (III) Emergency Store Closing Sales Motion* (the "Nowlan Declaration"); and (c) the *Declaration of Spence Mehl in Support of Debtors' Bidding Procedures and Sale Motion* (the "Mehl Declaration")*,* all filed contemporaneously herewith, and further respectfully represent as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Founded in 1968, Hastings Entertainment, Inc. ("Hastings"), a Texas corporation, is a leading multimedia entertainment and lifestyle retailer.  Hastings operates entertainment superstores that buy, sell, trade and rent various home entertainment products, including books, music, software, periodicals, movies on DVD and Blu-ray, video games, video game consoles, hobby, sports and recreation, lifestyle and consumer electronics.  Hastings also offers consumables and trends products such as apparel, t-shirts, action figures, posters, greeting cards and seasonal merchandise.  With the assistance of over 3,000 employees, Hastings operates 123 superstores, averaging approximately 24,000 square feet, principally in medium-sized markets located in 19 states, primarily in the Western and Midwestern United States.

7.      Hastings also operates a multimedia entertainment e-commerce web site, goHastings.com, which offers a broad selection of books, software, video games, movies on DVD and Blu-ray, music, trends, comics, sports, recreation, and electronics.  Hastings fills orders for new and used products placed at the website and also through Amazon and eBay Marketplaces using its proprietary goShip program, which allows Hastings to ship directly from its stores or distribution center.  Hastings has one wholly-owned subsidiary, Hastings Internet, Inc.  In 2015, Hastings generated revenue totaling approximately $401.1 million.

8.     MovieStop, LLC ("MovieStop"), a Delaware limited liability company, is a leading value retailer of new and used movies based in Atlanta, Georgia.  MovieStop currently operates 39 destination locations in 10 states, primarily along the Eastern United States Coast.  MovieStop is conducting store closing sales at all of its locations, and anticipates completion of all store closings by mid-July.

9.     SP Images, Inc. ("SPI"), a Massachusetts corporation, is a full-service licensed distributor of sports and entertainment products and apparel headquartered in Franklin Massachusetts.  SPI specializes in providing retail partners with an unmatched assortment of licensed merchandise that allows them to maximize turns, sales and gross margins.  SPI stocks over 20,000 individual items licensed by Major League Baseball, the National Football League, the National Hockey League, the National Basketball Association, Marvel Comics, DC Comics and many more.

10.     Hastings, MovieStop and SPI are each wholly-owned subsidiaries of DAC.

11.     As is further discussed in the First Day Declaration, the Debtors commenced these chapter 11 cases to (i) effectuate the sale of Hastings pursuant to a Court-approved bidding and auction process; (ii) complete the liquidation of the MovieStop inventory for the benefit of creditors; (iii) preserve SPI's business through a going concern sale process; and (iv) liquidate all of the Debtors' remaining assets and discontinue all business lines that cannot be sold for value.

12.     By this motion, the Debtors seek approval of a process, to move forward in parallel with the MovieStop store closings, to market and sell the balance of the Debtors'

business and assets through a section 363 asset sale process, which process may include a stalking horse going concern bid.

## I.        Prepetition Sale and Marketing Efforts

13.    This proposed sale process is the culmination of a six-month long effort by the Debtors to recapitalize their operations. Since late 2015, the Debtors have been exploring possible strategic alternatives, including the recapitalization of the Debtors or a sale of all or a portion of the Debtors' businesses.

14.    In the summer of 2015, Hastings' board of directors and prior management retained FTI Consulting, Inc. ("FTI") to advise the company on matters related to performance improvement, expense savings and a potential restructuring.  In December 2015, Hastings' prior President and Chief Operating Officer and a prior Chief Financial Officer under a part-time contract both resigned, and the decision was made to implement a holistic, top-down operational restructuring.  Accordingly, and in consultation with outside restructuring advisors from FTI, Hastings' Chief Executive Officer recruited a new President and Chief Operating Officer, Jim Litwak, who quickly met with the remaining management team met and developed a set of key initiatives to align the company more with a 21st century retail model.  Management's restructuring plan focused on the following company-wide initiatives: (i) remerchandising and changing the layout of stores to find new product lines while deemphasizing and downsizing non-growth business lines; (ii) utilizing increased modeling to more accurately forecast Hastings' financial position; (iii) reducing expenses in all aspects of the Debtors' business; (iv) developing partnerships with third parties to expand and sell product lines; (v) improving customers' online shopping experience by utilizing the Hastings rewards card as a tool to communicate with customers; and (vi) continuing to keep employees upbeat and focused while

introducing new initiatives. The overriding objective of these efforts was to create a core of profitable stores in select Northwest, Midwest and Southeast markets that was coupled with an improved e-commerce platform and supported by low cost social marketing driven by Hastings' customers.

15.     As a result of these initiatives, Hastings began to shift its merchandising strategy to focus more on its trend, children's, comics, electronics, consumables, recreation and hobbies businesses, and experimented with store layout changes at a number of locations. Hastings also embarked on an aggressive reduction of expenses and successfully obtained $12 million in cost reductions, including $2 million in rent concessions from landlords and reduced employee headcount in Hastings' warehouse and corporate headquarters by 15%. Simultaneously with these efforts, the Debtors' principal and their lenders began exploring alternatives for the restructuring of the Debtors' secured obligations and/or the recapitalization of the enterprise.

16.     Notwithstanding the initial positive results generated by Hastings' operational restructuring (particularly the improved performance of the re-merchandised stores utilizing new store layouts), Hastings' top line revenue continued to deteriorate in the first quarter of 2016, as Hastings suffered year-over-year sales decrease of 14%. During this period, the decline of the MovieStop business also continued unabated. This precipitous – and unanticipated – drop in revenue created a short term liquidity crisis in late April 2016. In addition to the liquidity constraints resulting from the decline in revenue, at or around that time, Bank of America, N.A. ("BofA") imposed certain reserves per the terms of the Prepetition Credit Agreement that further limited short term liquidity. These constraints limited the Debtors' ability to (i) pay rent to many of their landlords for the months of May and June 2016; (ii) pay

vendors in accordance with applicable terms; and (iii) purchase new inventory and normalize the inventory mix of their retail locations, all of which is especially essential with trends and new releases to maintain customer loyalty and drive customer traffic into their stores. This inventory shortfall negatively impacted sales even further, creating a vicious cycle that scuttled the Debtors' recapitalization efforts and threatened to destroy value for all of the Debtors' stakeholders.

17.    In light of these results, in early May 2016 the Debtors took a number of steps to conserve liquidity and maximize value for the benefit of creditors. First, the decision was made to immediately commence a chain-wide liquidation of the MovieStop business. With the assistance of Gordon Brothers Retail Partners, MovieStop commenced store closing sales (the "Store Closing Sales") on May 14, 2016. Second, management began to aggressively explore strategic alternatives for the Hastings business. In consultation with FTI and in conjunction with the efforts of RCS Real Estate Advisors ("RCS"), Hastings' real estate disposition consultant and business broker, Hastings management began a targeted outreach to potential investors and strategic acquirers.

18.    Over the subsequent 5 weeks, Hastings management, FTI and RCS contacted approximately 22 strategic acquirers, including Hastings' key competitors, and solicited interest from approximately 10 investors and financial institutions that invest in or acquire distressed retailers. A number of these parties expressed interest in a potential transaction, and several parties have signed non-disclosure agreements, held meetings with management and conducted due diligence with respect to a potential transaction. Nonetheless, to date no indications of interest or letters of intent have been received. Unfortunately, a

transaction in the best interest of Hastings, its creditors and its shareholders was not available outside of chapter 11 and the Debtors have reached the end of their liquidity runway.

19.    As a result, the Debtors ultimately determined that the commencement of these cases would provide the only platform to recapitalize Hastings and SPI or maximize the value of their assets as a going concern or otherwise.

20.    While chapter 11 provides a framework to recapitalize the Debtors or sell substantially all of their assets, the Debtors' limited liquidity mandates an expedited sale process in these chapter 11 cases. The Debtors simply lack the access to capital to sustain operations beyond the middle of July 2016, absent the closing of a sale of substantially all of their assets to one or more purchasers or the receipt of a guaranteed payment from a national liquidator to conduct going out of business sales in the Hastings' retail locations.  The Debtors' prepetition senior lender agreed to provide the Debtors with the additional financing  necessary to support the proposed sale process which, while abbreviated on a post-petition basis, essentially represents the culmination of the more extensive marketing and refinancing efforts conducted by the Debtors prior to the Petition Date.

## II.    **The Proposed Sale Process**

21.    Through this chapter 11 proceeding, the Debtors intend to continue their marketing efforts and are hopeful that a buyer will emerge that is willing to operate Hastings and SPI as going concerns.  In the alternative, the Debtors propose to liquidate substantially all of Hastings' and SPI's assets to the highest or otherwise best bidders pursuant to a Court-supervised auction and sale process.  While the Debtors' hope is that their assets will be purchased by a party that will continue their business as a going concern, management recognizes that such an outcome is far from certain.  Accordingly, through this Motion, the Debtors seek the approval of

an expedited sale process that would allow for an auction in approximately 30 days and would enable liquidation sales to commence shortly thereafter if a going concern purchaser is not located.  The sale process is structured such that it would not foreclose the possibility that a going concern bid could be made for the Debtors' assets, and the Debtors continue to believe that, if available, a going concern sale would provide the best result for all interested parties.

22.    The Debtors propose to sell the Assets free and clear of liens, claims and encumbrances, and contemplate the sale may entail the assumption and assignment of certain executory contracts and unexpired leases in connection therewith.  The Debtors are conducting an auction sale process to provide an opportunity for parties to purchase any portion of the Debtors' assets either as a going concern transaction or a liquidation transaction. As outlined above, with the assistance of FTI and RCS, the Debtors anticipate engaging in a comprehensive marketing process. The Debtors will seek to market a going concern transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic buyers. At the same time, the Debtors will market the liquidation of all of their inventory. The proposed Bidding Procedures are designed to permit the Debtors to pursue both going concern and liquidation transactions to maximize the value of the Debtors' assets for the benefit of their estates.

## <u>RELIEF REQUESTED AND BASIS FOR RELIEF</u>

23.    By this motion, the Debtors seek entry of the Bidding Procedures Order:

a.  approving (i) the Debtors' proposed Bidding Procedures for marketing the Assets, which procedures are attached as <u>Annex 1</u> to the Bidding Procedures Order; (ii) the Auction and Hearing Notice; and (iii) the Assumption and Assignment Notice;

b.  approving procedures to determine cure amounts for the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale;

c.  establishing July 11, 2016 at 4:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "Bid Deadline");

d.  scheduling the Auction, if necessary, no later than July 13, 2016; and

e.  scheduling the Sale Hearing for July 14, 2016, subject to the Court's availability, to consider the sale of the Assets to the Buyer or such other party that is the successful bidder at the Auction.

24.     In addition, the Debtors respectfully request the entry of the Sale Order:

a.  approving the sale of all or any of the Assets to such party that is the successful bidder at the Auction;

b.  approving the assumption and assignment, or rejection, as the case may be, of executory contracts and unexpired leases in connection with the Sale;

c.  finding that the party that is the successful bidder is a "good faith purchaser," as that term is defined in section 363(m) of the Bankruptcy Code, and has not violated section 363(n) of the Bankruptcy Code;

d.  waiving the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d); and

e.  granting certain related relief.

## I.    **The Proposed Bidding Procedures.**

25.     The Debtors are requesting that the Court approve Bidding Procedures for the sale of the Assets with a final sale hearing to occur on July 14, 2016.[2]  The following is a summary of the Debtors' proposed Bidding Procedures.[3]

26.     Participation Requirements. Unless otherwise ordered by the Court, to participate in the bidding process, each person or entity (each, an "Interested Party") will be required to deliver (unless previously delivered) the following materials to (a) Hastings

---

[2] The form of Bidding Procedures Order contains dates proposed by the Debtors. These dates are subject to the availability of the Court and may change.

[3] The summary describes each provision of the Bidding Procedures that Local Rule 6004-1 requires a debtor to highlight in a bidding procedures motion.

Entertainment, Inc., 3601 Plains Boulevard, Amarillo, TX 79102; (Attn: Jim Litwak and Duane A. Huesers; (b) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; (c) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (d) FTI Consulting, Inc., 200 State Street, Boston, MA 02109 (Attn: Mike Nowlan), email: Mike.Nowlan@FTIConsulting.com; and (e) RCS Real Estate Advisors, 460 W 34th St #3, New York, NY 10001 (Attn: Spence Mehl), so as to be received no later than the Bid Deadline: (1) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; (2) a statement and other factual support demonstrating to the Debtors' satisfaction (determined following consultation with the following parties: (i) the professionals retained by any statutory committee appointed in the Debtors' cases (each a "Committee"), and (ii) counsel to BofA and Pathlight Capital LLC ("Pathlight"), in their capacities as the Debtors' prepetition and postpetition secured lenders ((i) and (ii) collectively defined as the "Consultation Parties")) a *bona fide* interest in purchasing or liquidating the Assets; (3) sufficient information, as determined by the Debtors, to allow the Debtors to determine that the Interested Party has the financial wherewithal, and any required internal corporate, legal or other authorizations to complete a Going Concern Transaction or Liquidation Transaction, as applicable (a "Sale Transaction"), including financial statements of the Interested Party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion) and (4) the items comprising a bid. A person or entity that has a *bona fide* interest in any of the Assets and delivers the required information (other than the bid) to the Debtors is hereinafter referred to as a

"Potential Bidder." After a Potential Bidder delivers all of the materials required above (other than the bid), the Debtors will allow each such Potential Bidder access to the data room.

27.    Stalking Horse Bids.    The Bidding Procedures contemplate that the Debtors will continue to solicit "stalking horse" bids, which bid or bids (each a "Stalking Horse Bid", and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid, a "Stalking Horse APA") will be binding on such bidder (the "Stalking Horse Bidder") and set the floor for all Qualified Bids for applicable Assets at the Auction.  In the event that following consultation with the Consultation Parties the Debtors determine to designate one or more Stalking Horse Bid(s) on or before the date of the hearing to approve the Bidding Procedures (the "Stalking Horse Bid Deadline"), the Debtors will announce the designation of such Stalking Horse Bidder by filing a notice (the "Stalking Horse Bid Notice") on the Court's docket containing the identity of the Stalking Horse Bidder and the Assets that are the subject of the Stalking Horse Bid(s) and attaching any agreement accompanying the Stalking Horse Bid.

28.    In the event that a Stalking Horse Bidder is identified prior to the Stalking Horse Bid Deadline, following consultation with the Consultation Parties, the Debtors may seek Court approval at the hearing to approve the Bidding Procedures (the "Bidding Procedures Hearing") to provide customary bid protections to the Stalking Horse Bidder, including but not limited a break-up fee and/or expense reimbursement.

29.    Determination by the Debtors.    Following consultation with the Consultation Parties, the Debtors will (a) determine, with the assistance of their advisors, whether any person or entity is a Qualified Bidder, (b) receive bids from Qualified Bidders, (c) evaluate and negotiate such bids, and (d) conduct the Auction. Except as concerns the

Consultation Parties as provided herein below, neither the Debtors nor their representatives will be obligated to furnish any information relating to the Debtors to any person who is not a Potential Bidder.

30.    <u>Due Diligence.</u> The Debtors will establish an electronic data room into which substantial information about the Debtors and their businesses will be deposited. All Potential Bidders and the Consultation Parties will be granted full access to the data room by RCS, the Debtors' real estate disposition consultant and business broker. The Debtors, with the assistance of RCS and FTI, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the Consultation Parties.  In the event that any such due diligence material is in written form and has not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to (a) all Potential Bidders, and (b) all Consultation Parties. Except as provided above with respect to access to the data room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Acquired Assets or the Other Assets to any party; provided that nothing herein is intended to modify the Debtors' obligations to provide information to BofA or Pathlight pursuant to any financing order or other order of the Court.

31.    <u>Bid Deadline.</u> On or before the Bid Deadline, a Potential Bidder that desires to make a bid is required to deliver written copies of its bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to the Debtors and their advisors.  As soon as reasonably practicable following the Bid Deadline, but in no event later than one day after the Bid Deadline, the Debtors will identify the Baseline Bid(s) and provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

32.   <u>Bid Requirements.</u> All bids must: (a) identify the legal name of the Potential Bidder (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction; (b) with respect to bids for a going concern transaction for any portion of the Assets, provides that the Potential Bidder offers to purchase the assets at the purchase price and upon the terms and conditions set forth in a copy of an asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the form agreement annexed hereto as <u>Exhibit D</u> (the "<u>Marked Agreement</u>"); (c) with respect to bids for a liquidation transaction, is presented on an equity/guaranteed basis, supported by cash consideration in an amount and payable at such times as is consistent with the terms of the proposed agency agreement provided by the Debtors to prospective liquidation transaction bidders (and any such bid shall include a marked draft to show any proposed amendments and modifications to the form agency agreement annexed hereto as <u>Exhibit E</u> (the "<u>Marked Agency Agreement</u>"); (d) states that all necessary filings under applicable regulatory, antitrust and other laws will be made (pursuant to the terms and conditions in the applicable bid documents) and that payment of the fees associated with such filings will be made by the Potential Bidder; (e) is formal, binding and unconditional (except for those conditions expressly set forth in the applicable bid documents), is not subject to any due diligence and is irrevocable until the earlier of July 31, 2016 and the first Business Day following the closing of the Sale Transaction; (f) includes a commitment to close the transactions contemplated by the bid no later than July 31, 2016; (g) other than as may be exclusively applicable to a Stalking Horse Bidder, does not entitle such Potential Bidder to a breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and includes a waiver of any substantial contribution administrative expense

claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets; (h) be accompanied by a cash deposit with an escrow agent selected by the Debtors equal to 10% of the gross consideration payable at closing pursuant to the applicable bid documents, as calculated in good faith by the Debtors; and (i) is received by the Bid Deadline.

33.    In addition, in the event that a Stalking Horse Bid is selected prior to the Stalking Horse Bid Deadline, all bids must provide consideration to the Debtors of at least the sum of (i) the Stalking Horse Bid, (ii) any break-up fee or expense reimbursement approved by the Court, and (iii) a reasonable minimum overbid amount to be calculated in the Debtors' reasonable discretion (as may be determined by the Debtors following consultation with the Consultation Parties (the "Stalking Horse Overbid").

34.    A Potential Bidder must accompany its bid with: (a) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable bid documents) or such other evidence of ability to consummate the transaction contemplated by the bid documents (and, as applicable, to provide adequate assurance of future performance of all obligations to be assumed in such Sale Transaction) as the Debtors may reasonably request; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; (c) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and (d) if the Qualified Bid includes a Marked Agreement that is not executed, a signed statement that such bid is irrevocable until the later of  July 15, 2016 and the first Business Day following the closing of the Sale Transaction. A bid received from a Potential

Bidder for any portion of the Assets that is determined by the Debtors to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."  The Debtors may, in their discretion, with the consent of their secured lenders, withdraw some or all of the Assets from the Auction or sale at any time before entry of an order approving a sale of the Other Assets to a Qualified Bidder.  For the avoidance of doubt, BofA and Pathlight shall be deemed to be Qualified Bidders for all purposes, and shall be entitled (together with their respective retained professionals) to participate in the Auction.  Further, for the avoidance of doubt, each of BofA and Pathlight shall be entitled to credit bid for the Assets at the Auction in accordance with their respective rights under section 363(k) of the Bankruptcy Code.

35.    The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (a) the purported amount of the Qualified Bid, including non-cash consideration, if applicable; (b) the value to be provided to the Debtors under the Qualified Bid; (c) contingencies with respect to the Sale Transaction and the ability to close the proposed Sale Transaction on a basis acceptable to the Debtors, and any incremental costs to the Debtors in closing delays; (d) the ability to obtain any and all necessary antitrust or other applicable regulatory approvals for the proposed transaction; and (e) any other factors the Debtors may deem relevant (as may be determined by the Debtors following consultation with the Consultation Parties).

36.    <u>Baseline Bids.</u> Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction.  Following consultation with the Consultation Parties, the Debtors will select what they determine to be the highest and/or otherwise best Qualified Bid or combination of Qualified Bids for any portion of the Assets (the "<u>Baseline Bid(s)</u>") to serve as the

starting point at the Auction taking into account all relevant considerations, including the financial condition of the applicable bidder and certainty of closing.

37.     <u>Auction.</u> If at least one Qualified Bid in respect of the Assets is received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction will take place at the offices of Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801, on July 13, 2016 or such other time as the Debtors may notify Qualified Bidders who have submitted Qualified Bids. Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose (following consultation with the Consultation Parties).  At the Auction, participants will be permitted to increase their bids and improve their terms; provided that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply). Bidding for any part of the Assets will start at the purchase price and terms proposed in the applicable Baseline Bid.  Following consultation with the Consultation Parties, the Debtors will announce the bidding increments for bids on one or more of the Acquired Assets or Other Assets at the outset of the Auction (the "<u>Minimum Overbid</u>").  Following consultation with the Consultation Parties, the Debtors may at any time adopt rules for the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding Process and not in conflict with the Bidding Procedures, including one or more adjournments of the Auction.

38.     Prior to the conclusion of the Auction, the Debtors will: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (b) in the exercise of their good faith business judgment and consistent with the Bidding Procedures, identify the highest or otherwise best offer or collection

of offers in respect of the Assets (the "Successful Bid(s)"); (c) inform and consult with the Consultation Parties regarding the foregoing; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)") and the amount and other material terms of the Successful Bid(s).  After determining the Successful Bid(s) for the Assets, the Debtors may determine, in their reasonable business judgment, in consultation with the Consultation Parties, which Qualified Bid(s) are the next best bids for the Assets (the "Next Best Bid(s)").

39.     Acceptance of Qualified Bids. The Debtors' selection and submission to this Court of the selected bid as the Successful Bid will not constitute the Debtors' acceptance of the bid. The Debtors will have accepted a Qualified Bid only when a contract therefor has been executed and such Qualified Bid has been approved by the Court at the Sale Hearing. If the Successful Bidder does not close the Sale by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without a further court order.

40.     Modification of Bidding Procedures. Following consultation with the Consultation Parties, the Debtors may amend the Bidding Procedures or the bidding process at any time and from time to time in any manner that they determine in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein (provided, however, that any such extension shall be subject to the prior consent of BofA and Pathlight).

41.     Return of Good Faith Deposit. The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to terms of the applicable

escrow agreement or pursuant to further order of the Court.  At the closing of a Sale Transaction

contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit

for the amount of its Good Faith Deposit to the extent such a deposit was provided.  The Good

Faith Deposits of each Next-Highest Bidder shall be retained until three (3) business days after

the applicable Closing Date.  The Good Faith Deposits of the other Qualified Bidders will be

returned as soon as practicable but no later than seven (7) Business Days following the Auction.

Upon the return of the Good Faith Deposits, their respective owners will receive any and all

interest that has accrued thereon.

> 42.     The Debtors believe that the proposed Bidding Procedures provide an

appropriate framework for selling the Assets and will enable the Debtors to fully review, analyze

and compare all Bids received to determine which Bid is in the best interests of the Debtors'

estates.

**II.    The Flexibility to Obtain Stalking Horse Bids is Appropriate and Warranted.**

> 43.     As discussed above, the Bidding Procedures contemplate that the Debtors

will continue to solicit potential bidders to serve as a Stalking Horse Bidder.  Accordingly, in the

event that a Stalking Horse Bid is obtained prior to the Stalking Horse Bid Deadline, all bidders

will be required to submit a bid in the amount of at least the Stalking Horse Overbid.  In order to

meet the criteria for a Qualified Bid.  Further, the Bidding Procedures contemplate that the

Debtors may seek Court approval at the Bidding Procedures Hearing to provide customary bid

protections to the Stalking Horse Bidder, including a break-up fee and/or expense

reimbursement.

> 44.     Approval of break-up fees and other forms of bid protections in

connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code is

an established practice in chapter 11 cases. In the Third Circuit, termination or break-up fees are

considered administrative expenses and, therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee. *Id.* First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, a break-up fee encourages potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

45.     By conducting due diligence, participating in negotiations for a potential transaction and entering into a Stalking Horse APA, any Stalking Horse Bidder will have established a bid standard, including a price floor, and initiated a legitimate sales process that should serve as a catalyst for other bidders.  As a result, the Debtors would be in a favorable position to solicit competing bids that may be materially higher or otherwise more favorable than the Stalking Horse Bidder's bid. In short, any Stalking Horse Bidder should be compensated for the risk they are taking and the benefit they are providing to the Debtors' estates.

46.     The Debtors submit that (i) the flexibility to designate a Stalking Horse Bidder and (ii) the Debtors' reservation of rights to seek bid protections for any such Stalking Horse Bidder is necessary and appropriate given the significant benefits that a Stalking Horse Bid may provide to the Debtors.

## III.    Proposed Notice of the Sale Hearing.

47.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c),

such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the Sale Motion. The Debtors propose that the deadline for objecting to approval of the proposed Sale be 12:00 p.m. (Eastern Time) on the date of the Sale Hearing.

48.     The Debtors have provided notice of this Motion and the relief requested herein in the form annexed hereto as Exhibit F to all of their creditors contemporaneously with the service of the notice of the commencement of these cases.  In addition, as soon as practicable, but within one business day after entry of the Bidding Procedures Order, the Debtors will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties: (a) the office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) upon appointment, counsel to Committee; (c) the Debtors' thirty largest unsecured creditors on a consolidated basis, as identified in the Debtors' chapter 11 petitions, (d) all parties who have asserted a lien or security interest against any of the Assets, (e) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Assumed and Assigned Agreements"); (f) applicable taxing authorities, including the Internal Revenue Service; (g) all state attorneys' general in which the Assets are located; (h) municipalities in which the Assets are located; (i) all parties known to the Debtors who have expressed an interest to the Debtors' Assets during the past six months; (j) the Debtors' current employees; (k) all parties requesting notice in these chapter 11 cases; and (l) all other known potential creditors in these chapter 11 cases.  The Auction and Hearing Notice shall indicate that copies of the Sale Motion, the Stalking Horse APA (if any) can be obtained on the website of the Debtors' claims and noticing agent.  In addition, the Debtors will serve this motion, including a copy of the Stalking Horse APA (if any), on those persons in categories (a) through (d), above.

Further, within two business days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in the national edition of *The Wall Street Journal*.

49.    The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

**IV.    Proposed Assumption and Assignment Procedures.**

50.    Additionally, the Debtors, as part of the Sale, may assume and assign Assumed and Assigned Agreements. By no later than 21 days prior to the Sale Hearing, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for the Assumed and Assigned Agreements. The Cure Schedule will include a description of each Assumed and Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court.

51.    The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth on such schedule, must be in writing, filed with the Court, and be actually received on

or before  July 7, 2016 by (a) Hastings Entertainment, Inc., 3601 Plains Boulevard, Amarillo, Texas 79102; (Attn: Jim Litwak and Duane Huesers; (b) Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; (c) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, Delaware 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (d) FTI Consulting, Inc., 200 State Street, Boston, Massachusetts 02109 (Attn: Mike Nowlan), email: Mike.Nowlan@FTIConsulting.com; and (e) RCS Real Estate Advisors, 460 W 34th St #3, New York, New York 10001 (Attn: Spence Mehl); (f) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (g) counsel to BofA, (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036 (Attn: Donald E. Rothman, Esq. and Steven E. Fox, Esq.), Email: drothman@rimerlaw.com and sfox@riemerlaw.com; and (2) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Gregory Taylor, Esq.), Email: GTaylor@ashby-geddes.com; (iii) counsel to Pathlight, (1) Choate, Hall & Stewart LLP, Two International Place, Boston Massachusetts 02110 (Attn: Kevin J. Simard, Esq.), Email: ksimard@choate.com; and (2) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.) Email: collins@rlf.com and knight@rlf.com; and (h) once it is formed, counsel to each Committee (collectively, the "Notice Parties"); *provided*, *however*, that the deadline for objecting to the assignment of the Assumed and Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any such objection shall set forth a specific default in any Assumed and Assigned Agreements

and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

52.     If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in these chapter 11 cases and will constitute a final determination of the total Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

53.     Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such consensual resolution, the Debtors shall promptly provide the Consultation Parties and the Successful Bidder notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure

Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of an Assumed and Assigned Agreement will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences with respect to a particular cure amount.

54.    The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabeel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## V.    The Proposed Sale Order.

55.    The Debtors anticipate that the Sale Order will contain certain provisions that require disclosure under Local Rule 6004-1.  For example, Local Rule 6004-1(b)(iv)(L) provides that a sale motion highlight "anti-successor liability" provisions in a sale order.  The Sale Order will likely provide protection to the proposed purchaser against successor liability claims.  The Debtors will have material unpaid pre-petition unsecured claims after the closing of the Sale. No party would likely be willing to purchase the Debtors' assets if it were at risk of liability for those claims under principles of successor liability. In addition, the Debtors are providing direct notice of the sale to all known creditors of the Debtors' estates and are also publishing notice of the sale in the national edition of *The Wall Street Journal*.  The Debtors

submit that such notice, and the notice of this Motion as described below, is sufficient to bind all potentially affected parties.  The Sale Order will also likely provide for a waiver of the 14-day stay period for the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the 14-day stay period provided for in Bankruptcy Rule 6006(d). For the reasons set forth below, the Debtors submit that cause exists for such waivers.

## VI.   Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code.

56.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

57.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

a.      whether a sound business justification exists for the sale;

b.      whether adequate and reasonable notice of the sale was given to interested parties;

c.      whether the sale will produce a fair and reasonable price for the property; and

d.      whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

58.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

59.     In the instant case, a strong business justification exists for the Sale. Any extended delay in selling the Assets could have a severe detrimental effect on the Debtors' ability to continue operations and preserve value to the fullest extent possible. Furthermore, notice of the Sale has been reasonable and adequate. The Debtors are providing direct notice of the sale to all known creditors of the Debtors' estates and are also publishing notice of the sale in the national edition of *The Wall Street Journal*. Further, the Sale has been proposed in good faith. Finally, because the Sale is subject to bid procedures and an auction, the price ultimately received as a result of the successful bid should, based on the process alone, be deemed fair and reasonable.

**VII.    The Purchaser is a Good Faith Purchaser.**

60.     The Debtors anticipate that that any party that is the successful bidder at the Auction will ask the Debtors to request that they receive the protections set forth in section 363(m) of the Bankruptcy Code. Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the United States Court of Appeals for the Third Circuit previously addressed the meaning of the term:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

61.    The Debtors intend to introduce evidence at the Sale Hearing to support such a finding.

**VIII.    Approval of the Sale Free and Clear of Liens, Claims and Encumbrances.**

62.    The Debtors request approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a.    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

63.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of §363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

64.     The Debtors submit that the sale of their assets free and clear of liens, claims and encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code. The Debtors also believe that the service of the Auction and Hearing Notice in accordance with the terms set forth in this motion will afford creditors sufficient notice of the Sale and therefore provides additional justification for approval of the sale free and clear of all liens, claims and encumbrances.

## IX.    Approval of the Assumption and Assignment of Executory Contracts and Unexpired Leases.

65.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

66.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. 365(b)(1).

67.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).   Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exist. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an

assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance

of future performance is not required for every term of an executory contract or unexpired lease,

but only such terms that are "material and economically" significant.  *In re  Fleming Cos., Inc.*,

499 F.3d 300, 305 (3d Cir. 2007). The meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but should be given a "practical, pragmatic

construction."  *In re DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora

Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short

of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating

the assignee's financial health and experience in managing the type of enterprise or property

assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding

that adequate assurance is present when prospective assignee of lease from debtor has financial

resources and has expressed willingness to devote sufficient funding to business to give it

strong likelihood of success).

      68.    The assumption and assignment of certain executory contracts and

unexpired leases is an integral part of the Sale.  It is thus an appropriate exercise of business

judgment for the Debtors to agree to assume and assign the contracts and leases as will be

required by the Stalking Horse APA. Additionally, the Debtors submit that the notice provisions,

and the objection deadline for counterparties to raise objections to the assumption and

assignment of contracts and leases, as proposed in this motion, are adequate to protect the rights

of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate

adequate assurance of future performance at the Sale Hearing.

X.      **Basis for Relief For Liquidation Transaction.**

69.      The proposed Bidding Procedures permit going concern and liquidation bids for the Assets. In the event that the winning bid contemplates a liquidation transaction, the legal basis for relief in connection with a liquidation of the Debtors' Assets is discussed below.

A.      **Waiver of Compliance With Laws Regarding Liquidation Sales**

70.      Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales. By virtue of section 1334 of title 28 of the United States Code, however, this Court has exclusive jurisdiction over the Debtors' property wherever located. 28 U.S.C. § 1334 (2008). As such, in the context of a bankruptcy case, when creditors receive notice of a proposed sale, as well as the opportunity to be heard in court, enforcement of such statutes and regulations is redundant and unnecessary. As a result, the Debtors request that, in the event that the Successful Bid is a liquidation transaction, any order approving a liquidation transaction include a provision that specifically waives the Debtors' or their future agent's obligation to comply with any state or local laws restricting store closing, going out of business or similar sales.

71.      In general, debtors must comply with 28 U.S.C. § 959(b), which provides that a debtor in possession must "manage and operate the property . . . according to the requirements of the valid laws of the state in which such property is situated . . . ." Courts, however, have held that a debtor in possession that is liquidating estate assets does not "manage and operate" the property for the purposes of 28 U.S.C. § 959(b). *Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that 28 U.S.C. § 959(b) does not apply when debtor in possession is liquidating property and no longer operating its business). In addition, the Bankruptcy Code

preempts state and local laws that conflict with its underlying policies. *Belculfine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).[4]

**B.        Unenforceability of Any Restriction in the Leases**

72.        Certain of the Debtors' leases governing the premises of the stores subject to any Liquidation Transaction may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.).[5]

---

[4] *See also In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales "without the necessity of further showing compliance" with going out of business or liquidation laws); *In re Boscov's*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order").

[5] In addition, bankruptcy courts in this District have held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Coldwater Creek*, Case No. 1410867 (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D.

73.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to any Liquidation Transaction, the Debtors request that the Court authorize the Debtors and/or the Successful Bidder to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

### C.     Any Liquidation Sales Should Be Exempt From Any "Fast Pay" Laws

74.     Many states in which the Debtors operate also have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. To the extent that a Liquidation Transaction results in a significant number of employees being terminated, the Debtors respectfully submit that the Debtors should be granted relief from the Fast Pay Laws. As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies. *See, e.g.*, *Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); *Filene's Basement, LLC*, Case No. 11-13511(KJC) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

### WAIVER OF RULES 6004(h) AND 6006(d)

75.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The waiver of the 14 day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition of the Stalking Horse

---

Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

APA. The Debtors respectfully submit that the Court waive the 14 day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

76.     Notice of this motion will be provided to: (i) the U.S. Trustee; (ii) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (iii) BofA; (iv) Pathlight; (v) all parties who are known by the Debtors to assert liens against the Assets; (vi) all state attorneys general in which the Assets are located; (vii) all parties to the Assumed and Assigned Agreements; (viii) municipalities in which the Assets are located; and (ix) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

77.     No prior request for the relief sought herein has been made to this or any other court.

*[remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, in substantially the form attached hereto as <u>Exhibit A</u>, (ii) enter the Sale Order, or such other order approving a sale to such other party that is the successful bidder at the Auction and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: June 13, 2016
      Wilmington, Delaware

Respectfully submitted,

*/s/  Christopher M. Samis*
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Chantelle D. McClamb (No. 5978)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 353-4144
Email:     csamis@wtplaw.com
           kgood@wtplaw.com
           cmcclamb@wtplaw.com

- and –

Cathy Hershcopf, Esq.
Michael Klein, Esq.
Robert Winning, Esq.
COOLEY LLP
1114 Avenue of the Americas
New York, New York 01136
Telephone:  (212) 479-6000
Email:     chershcopf@cooley.com
           mklein@cooley.com
           rwinng@cooley.com

*Proposed Counsel for the Debtors and Debtors in Possession*

# <u>EXHIBIT A</u>

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| DRAW ANOTHER CIRCLE, LLC, *et al.*,[1] | Case No.: 16- ( _____ ) |
| Debtors. | (Joint Administration Requested) |
|  | **Re: Docket No. ___** |

**ORDER (I) APPROVING BID AND SALE PROCEDURES,**
**(II) APPROVING CERTAIN BIDDING PROTECTIONS, (III)**
**APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE**
**AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES AND (IV) SCHEDULING AN AUCTION AND SALE HEARING**

Upon the motion (the "Motion"),[2] of Draw Another Circle, LLC and its chapter 11

affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned jointly

administered chapter 11 cases (the "Cases"), seeking, pursuant to sections 105, 363, 365 and 503

of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9007 and 9014

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1

of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), an order (i) authorizing and approving the

procedures that are attached hereto as Annex 1 (the "Bidding Procedures") for the sale of certain

of the Debtors' assets (the "Sale"), (ii) scheduling an Auction and Sale Hearing in connection

with the Sale, and (iii) approving the form and manner of notice of the Auction and the Sale

Hearing; the Court having reviewed the Motion and conducted a hearing to consider the relief

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

[2] Capitalized terms not otherwise defined in this order shall have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

requested therein regarding the Bidding Procedures and related matters (the "Bidding Procedures Hearing"); and the Court having considered the First Day Declaration, the Nowlan Declaration and the Mehl Declaration and the statements of counsel and the evidence presented at the Bidding Procedures Hearing, it is hereby **FOUND AND DETERMINED THAT**:[3]

A.      The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 363, 364, 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9008, 9014 and 9019. Venue of these Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The Debtors have offered good and sufficient reasons for, and the best interests of their estates will be served by, this Court granting the Motion to the extent provided in this Order, including approval of (i) the Bidding Procedures, attached hereto as Annex 1, (ii) the procedures described below for the determination of the amounts necessary to cure defaults under the Assumed and Assigned Agreements so as to permit the assumption and assignment under section 365 of the Bankruptcy Code of the Assumed and Assigned Agreements, and (iii) the form and manner of notice of the Auction and Sale Hearing described in the Motion and this Order.

C.      Good and sufficient notice of the relief sought in the Motion has been given under the circumstances, and no further notice is required except as set forth herein with respect to the Auction and the Sale Hearing. Subject to the immediately preceding sentence, a

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Bidding Procedures Hearing are hereby incorporated herein to the extent not inconsistent herewith.

reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

D.      In accordance with Local Rules 6004-1(c), Debtors have properly filed and noticed the Motion.  The issuance and immediately effectiveness of this Order as of the date hereof, including approval of the Bidding Procedures, is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary immediate and irreparable harm to the Debtors and their estates.

E.      The proposed notice of the Auction, the Sale Hearing and the Bidding Procedures, as set forth in the Motion and this Order, is appropriate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing and the Bidding Procedures, and no other or further notice shall be required for the Sale or the assumption and assignment of executory contracts and unexpired leases.

F.      The Bidding Procedures were negotiated in good faith and at arms' length.

G.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Assets.

H.      On June [___], 2016, the Debtors filed a schedule of cure obligations (the "Cure Schedule") for the Assumed and Assigned Agreements. The Cure Schedule included a description of each Assumed and Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtors believe is necessary to cure, or compensate the non-Debtor parties for, any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Schedule, together with the Assumption and Assignment Notice, was served on each of the non-Debtor parties listed on the Cure Schedule

by first class mail on the date that the Cure Schedule was filed with the Court.  **THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent provided herein.

2.      All objections to the entry of this Order or to the relief provided herein that have not been withdrawn with prejudice, waived, resolved or settled are hereby denied and overruled on the merits with prejudice.

3.      The Bidding Procedures, as attached as <u>Annex 1</u>, are hereby approved, are incorporated herein by reference, and shall govern all bids and bid proceedings relating to the Assets. The Debtors and their claim agent are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.      The deadline for submitting a Qualified Bid shall be July 11, 2016 at 4:00 p.m. prevailing Eastern Time (the "<u>Bid Deadline</u>").

5.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Assets.

6.      If at least one Qualified Bid in respect of the Assets is received by the Bid Deadline, the Debtors shall conduct the Auction.  The Auction will take place at the offices of Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801 on July 13, 2016, or such other time as the Debtors may notify Qualified Bidders, the Committee and the Debtors' secured lenders. Only Qualified Bidders will be permitted to participate in the Auction.  BofA and Pathlight are deemed to be Qualified Bidders for all purposes, and shall be entitled (together with their respective retained professionals) to participate in the Auction.

7.     Each of BofA and Pathlight shall be entitled to credit bid for the Assets at any such auction, in each case in accordance with their respective rights under section 363(k) of the Bankruptcy Code

8.     Each Qualified Bidder participating at the Auction will be required to confirm in writing, that (a) it has not engaged in any collusion with respect to the bidding process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

9.     The Auction will be conducted openly and will be transcribed or videotaped, at the Debtors' option.

10.     The Court shall convene the Sale Hearing on , July 14, 2016 at __:__ _.m. (prevailing Eastern Time) or as soon thereafter as counsel and interested parties may be heard, at which time the Court will consider approval of the Sale to the Successful Bidder(s) and the entry of the Sale Order. The Debtors shall file a form of Sale Order no later than 14 days before the Sale Hearing. At the Sale Hearing, the Debtors will seek the entry of the Sale Order approving and authorizing the Sale to the Successful Bidder(s).  Subject to consultation with BofA and Pathlight, the Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or other parties in interest other than by announcement of said adjournment at the Sale Hearing.

11.     Objections to approval of the Sale, including the sale of the Debtors' assets free and clear of liens, claims, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code, must be in writing, state the basis of such objection with specificity and be filed with this Court and served so as to be received on or before 12:00 p.m.  (prevailing Eastern Time) on the date of the Sale Hearing (the "Objection Deadline") by: (a) Hastings Entertainment,

Inc., 3601 Plains Boulevard, Amarillo, Texas 79102; (Attn: Jim Litwak and Duane A. Huesers; (b) Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; (c) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, Delaware 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (d) FTI Consulting, Inc., 200 State Street, Boston, Massachusetts 02109 (Attn: Mike Nowlan), email: Mike.Nowlan@FTIConsulting.com; and (e) RCS Real Estate Advisors, 460 W 34th St #3, New York, NY 10001 (Attn: Spence Mehl); (f) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (g) counsel to BofA, (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036 (Attn: Donald E. Rothman, Esq. and Steven E. Fox, Esq.), Email: drothman@rimerlaw.com and sfox@riemerlaw.com; and (2) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899 (Attn: Gregory Taylor, Esq.), Email: gtaylor@ashby-geddes.com; (iii) counsel to Pathlight, (1) Choate, Hall & Stewart LLP, Two International Place, Boston Massachusetts 02110 (Attn: Kevin J. Simard, Esq.), Email: ksimard@choate.com; and (2) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.) Email: collins@rlf.com and knight@rlf.com; and (h) once it is formed, counsel to any Committee (collectively, the "Notice Parties"). Failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, or consummation of the Sale, and shall be deemed to constitute consent to entry of the Sale Order and consummation of

the Sale and all transactions related thereto including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

12.    Objections to (a) the Cure Costs set forth in the Cure Schedule and (b) the assumption and assignment of any executory contract or unexpired lease identified in the Cure Schedule must be in writing, state the basis of such objection with specificity and be filed with the Court, and be actually received on or before July 7, 2016 at 4:00 p.m. Eastern Time by the Notice Parties; *provided*, *however*, that the Debtors shall file a notice identifying the Successful Bidder with the Court and serve such notice upon each party identified in the Cure Schedules, and, if the Successful Bidder is not the Stalking Horse Purchaser, the deadline for objecting to the assignment of the Assumed and Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance shall be the commencement of the Sale Hearing.

13.    Unless a non-Debtor party to an Assumed and Assigned Agreement has timely and properly filed and served an objection to the assumption and assignment of its Assumed and Assigned Agreement, all counterparties to the Assumed and Assigned Agreements shall (a) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors and the Successful Bidder shall be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule; (b) be deemed to have consented to the assumption and assignment; and (c) be forever barred, estopped and permanently enjoined from asserting or claiming against the Debtors, the Successful Bidder or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreement or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreement. In addition, the Cure Costs set forth in the Cure Schedule

shall be binding upon the non-Debtor parties to the Assumed and Assigned Agreements for all purposes in these Cases and otherwise, and will constitute a final determination of the total Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Assumed and Assigned Agreements; *provided, however,* that the Cure Cost set forth in the Cure Schedule may be reduced by any amounts Debtors pay or value Debtors provide under an Assumed and Assigned Agreement on or after the Petition Date.

14.    Where a non-Debtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amounts"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amounts prior to the Sale Hearing, and subject to the Successful Bidder's consent to such resolution, the Debtors shall promptly provide the Consultation Parties and the Successful Bidder notice and an opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or, at the sole discretion of the Debtors (with the consent of the Consultation Parties and Successful Bidder, at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of an Assumed and Assigned Agreement will be heard at the Sale Hearing.

15.    The form of the Auction and Hearing Notice and the Assumption and Assignment Notice are hereby approved and appropriate and sufficient for all purposes and no other or further notice shall be required if the Debtors serve such notices in the manner provided in the Motion and this Order. No finding or ruling is made in this Order as to the merits of any motion for approval of the Sale. Within one (1) business day of the entry of this Order or as soon thereafter as practicable, the Debtors shall cause the Auction and Hearing Notice to be served

upon, without limitation, (i) the U.S. Trustee; (ii) counsel to any Committee; (iii) counsel to BofA; (iv) counsel to Pathlight; (v) the attorneys general for each of the States in which the Debtors are known or reasonably believed by the Debtors to conduct operations; (vi) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (vii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002(i); (viii) all parties that are known or reasonably believed to have expressed an interest in acquiring the Acquired Assets or any of the Other Assets; (ix) all parties that are known or reasonably believed by the Debtors to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets; (x) all governmental agencies that are known or reasonably believed by the Debtors to be an interested party with respect to the Sale and the related transactions; (xi) all non-Debtor parties to the Assumed and Assigned Agreements and (xii) all other known creditors of the Debtors.

16.    All Interested Parties (whether or not Qualified Bidders) that participate in the Bidding Process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the Bidding Process, the Auction and/or the Sale) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

17.    The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied or waived.

18.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), 6006(d), 7062 or 9014, this Order shall be immediately effective and enforceable upon entry of this Order.

All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

> 19.   The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: _____, 2016
      Wilmington, Delaware

_____

UNITED STATES BANKRUPTCY JUDGE

## <u>ANNEX 1</u>

**Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be used with respect to the sale or disposition (the "Sale") of the Assets (as defined below) of Draw Another Circle, LLC, Hastings Entertainment, Inc., Hastings Internet, Inc., MovieStop, LLC and SP Images, Inc. (collectively, the "Debtors").

**Additional information regarding the Assets can be obtained by contacting Spence Mehl of RCS Real Estate Advisors (smehl@rcsrealestate.com and 212-300-5375), the Debtors' proposed real estate disposition consultant and business broker, and Mike Nowlan of FTI Consulting (Mike.Nowlan@fticonsulting.com and 617-897-1505), the Debtors' proposed financial advisor.**

## I.        Description of the Assets to be Sold

The Debtors are seeking to sell all or substantially all of their business as a going concern or subsets of the operating business, including but not limited to the inventory (other than the inventory of MovieStop, LLC), receivables, equipment, intellectual property, unexpired leases, contract rights and other assets related to or necessary to operate the business of selling sporting equipment and related apparel to retail customers in store, online and by catalog, currently operated by the Debtors, but excluding causes of action arising under chapter 5 of the Bankruptcy Code (as defined below) (the "Assets"), in each case free and clear of all liens, claims and encumbrances thereon.

The Sale of the Assets shall be subject to a competitive bidding process as set forth herein and approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Debtors may consider bids for the Assets (or any portion thereof) in a single bid from a single bidder, or in multiple bids from multiple bidders.

## II.       Confidentiality Agreement

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process (as defined below), each person or entity must enter into (unless previously entered into) with the Debtors, on or before the Bid Deadline (as defined below), an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (the "Confidentiality Agreement"). Each person or entity that enters into the Confidentiality Agreement with the Debtors on or before the Bid Deadline is hereinafter referred to as a "Potential Bidder."

After a Potential Bidder enters into the Confidentiality Agreement with the Debtors, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Assets.

**III.**          **Determination by the Debtors**

As appropriate throughout the Bidding Process, the Debtors will consult with (1) Bank of America, N.A., ("BofA") in its capacity as prepetition agent under the Debtors' prepetition revolving credit facility and as DIP agent under the Debtors' postpetition credit facility, (2) Pathlight Capital LLC, as agent (the "Term Agent") under the Debtors' prepetition term loan agreement, (3) any statutory committee appointed in the Debtors' chapter 11 cases, if any (each a "Committee" and, collectively with BofA and the Term Agent, the "Consultation Parties") and shall (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence, (b) evaluate bids from Potential Bidders on any or all of the Assets, (c) following consultation with the Consultation Parties, negotiate any bid made to acquire any or all of the Assets, and (d) following consultation with the Consultation Parties, make such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process"). Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any party that is not a Potential Bidder or a Consultation Party.

**IV.**          **Due Diligence**

Up to and including the Bid Deadline (as defined below) (such period, the "Diligence Period"), the Debtors shall afford any Potential Bidder, and any Consultation Party, such available due diligence access or additional information as may be reasonably requested by the Potential Bidder or Consultation Party, as applicable, that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors will provide, in an electronic data room to be established for these purposes, a form of asset purchase agreements for the sale of substantially all of the Debtors' Assets (the "Form APA"), and will grant each Potential Bidder or Consultation Party, as applicable, access to such data room. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders and/or or Consultation Parties, as applicable. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

**V.**          **Bid Deadline**

A Potential Bidder that desires to make a Bid shall deliver copies of its Bid to: (a) Hastings Entertainment, Inc., 3601 Plains Boulevard, Amarillo, TX 79102; (Attn: Jim Litwak and Duane Huesers; (b) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; (c) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (d) FTI Consulting, Inc., 200 State Street, Boston, MA 02109 (Attn: Mike Nowlan), email: Mike.Nowlan@FTIConsulting.com; and (e) RCS Real Estate Advisors, 460 W 34th St #3, New York, NY 10001 (Attn: Spence Mehl) by no later than July 11, 2016 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").  As soon as reasonably practicable following the Bid Deadline, but in no event later than one day after the Bid Deadline, the Debtors will identify the

Baseline Bid(s) and provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

**VI.**        **Bid Requirements**

All bids (each hereinafter, a "<u>Bid</u>") must (collectively, the "<u>Bid Requirements</u>"):

(a)        be accompanied by a letter or email, or at the request of the Debtors, a non-binding letter of intent:

(i)        stating with specificity the Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(ii)        detailing the following:

(A)        a duly executed purchase agreement (the "<u>Purchase Agreement</u>");

(B)        a redline of the Purchase Agreement marked to reflect any proposed amendments and modifications to the Form APA and the applicable schedules and exhibits; and

(C)        with respect to bids for a liquidation transaction, such transaction shall be presented on an equity/guaranteed basis, supported by cash consideration in an amount and payable at such times as is consistent with the terms of the proposed agency agreement provided by the Debtors to prospective liquidation transaction bidders (and any such bid shall include a marked draft to show any proposed amendments and modifications to the form agency agreement (the "<u>Marked Agency Agreement</u>");

(iii)        agreeing that the Potential Bidder's offer is binding and irrevocable until the earlier of (i) the Closing Date (as defined herein), or (ii) ten (10) days after the Sale Hearing (unless selected as the Next-Highest Bidder (as defined below) in which case such offer will remain open until the Closing Date);

(iv)        providing for a Closing Date that is consistent with the milestones set forth in the Debtors' post-petition financing agreement;

(v)        providing that such Bid is not subject to any due diligence or financing contingency; and

(vii)        providing that the Potential Bidder agrees to serve as a backup bidder (the "<u>Next-Highest Bidder</u>") if the Potential Bidder's Qualified Bid (as defined below) is the next highest and best bid after the Successful Bid

3

(as defined below) (the "<u>Next-Highest Bid</u>") with respect to the relevant Assets.

(b)      be accompanied by any reasonable information requested by a consumer privacy ombudsman, if one is appointed pursuant to section 363(b)(1)(B) of the Bankruptcy Code;

(c)      be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), including (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, (iv) the identity and exact name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale), and (v) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include. By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected landlords, contract counterparties, and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid (as defined below); and

(d)      as and to the extent applicable, be accompanied by a proposed Letter of Intent sufficient for purposes of any required filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "<u>HSR Act</u>") and a statement indicating that the Potential Bidder would cover any filing fees under the HSR Act.

A Bid must be accompanied by (a) a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of ten percent (10%) of the Bid, which funds will be deposited into an interest bearing escrow account to be identified and established by the Debtors (a "<u>Good Faith Deposit</u>") and (b) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (<u>provided</u>, <u>however</u>, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (<u>provided</u> that such commitments may have covenants and conditions acceptable to the Debtors). The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A Bid received from a Potential Bidder that meets the above requirements, and is otherwise satisfactory to the Debtors, will be considered a "<u>Qualified Bid</u>" and each Potential Bidder that

submits a Qualified Bid will be considered a "Qualified Bidder." The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than 48 hours after such Bids are received. For the avoidance of doubt, (a) any stalking horse agreement entered into by the Debtors will be deemed a Qualified Bid, and (b) any stalking horse bidder and each of BofA and Pathlight are hereby deemed a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors reasonably deem pertinent in their reasonable business judgment, including, among others, (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder, (c) any excluded assets or executory contracts and leases, and (d) any other factors that the Debtors (in consultation with the Consultation Parties) may reasonably deem relevant.

The Debtors, in their business judgment, and in consultation with the Consultation Parties, reserve the right to reject any Bid if such Bid, among other things:

(a)     is on terms that are more burdensome or conditional than the terms of any stalking horse agreement, if applicable;

(b)     requires any indemnification of the Potential Bidder in its Purchase Agreement;

(c)     is not received by the Bid Deadline;

(d)     is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or

(e)     does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors estates or the Auction.

Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid. In the event that any Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to it within five (5) business days after the Bid Deadline.

The Debtors may, in consultation with the Consultation Parties, among other things, (i) extend such Bid Deadline with respect to the subject Assets and postpone the Auction, or (ii) cancel the Auction and terminate the proposed Sale for the subject Assets.

## VII.        <u>Credit Bidding</u>

In connection with the Sale of all or any of the Assets, BofA and the Term Agent may seek to credit bid some or all of their claims for their respective collateral (each such bid, a "<u>Credit Bid</u>") pursuant to section 363(k) of the Bankruptcy Code. A Credit Bid may be applied only to reduce the cash consideration with respect to those Assets in which the party submitting such Credit Bid holds a security interest. Each of BofA and the Term Agent shall be considered a Qualified Bidder with respect to its right to acquire all or any of the Assets by Credit Bid. Unless otherwise provided herein, all Qualified Bids shall be cash bids.

## VIII.        <u>Auction</u>

Unless otherwise ordered by the Bankruptcy Court for cause shown, only the Qualified Bidders are eligible to participate at the Auction (as defined below). The Consultation Parties shall be permitted to attend the Auction. At least one (1) day prior to the Auction, each Qualified Bidder must inform the Debtors in writing whether it intends to participate in the Auction. If the Debtors receive only one Qualified Bid with regard to any particular Assets (or all of the Assets), (a) the Debtors shall not hold an Auction with respect to such Assets; (b) the Qualified Bid, as applicable, will be deemed the Successful Bid with respect to such Assets; and (c) the Qualified Bidder will be named the Successful Bidder with respect to such Assets.

If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets, the Debtors will conduct an auction (the "<u>Auction</u>") with respect to such Assets and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for the relevant Assets (the "<u>Starting Bid</u>"), which determination will be communicated to Qualified Bidders prior to the commencement of the Auction. The Auction shall take place on July 13, 2016 (prevailing Eastern Time) at the offices of the Debtors' Delaware counsel, Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801, or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids. Professionals and principals for the Debtors, the Stalking Horse Bidder(s) (if any), each Qualified Bidder and the Consultation Parties shall be able to attend and observe the Auction, along with any other parties the Debtors deem appropriate.

Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

Bidding at the Auction for the Assets (or subset thereof) that are subject to Qualified Bids will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid (defined below) is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid (a "<u>Subsequent Bid</u>") and (ii) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each Subsequent Bid at the Auction shall provide net

value to the estates in an amount to be announced at or prior the Auction ("<u>Incremental Overbid</u>") over the Starting Bid or the Leading Bid (as defined below), as the case may be, as determined by the Debtors in the exercise of their reasonable business judgment and in consultation with the Consultation Parties; <u>provided that</u>: (i) if the Leading Bid was made by a Stalking Horse Bidder, such bid shall be deemed to include any bid protections that were previously approved by the Bankruptcy Court, and (ii) any Subsequent Bid made by any Stalking Horse Bidder shall only be required to equal the sum of the amount of (w) the Starting Bid or the Leading Bid, as applicable, and (x) the Incremental Overbid, less any bid protection amount (if applicable). After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below. Qualified Bidders may pass only once with respect to the subsequent rounds of bidding without forfeiting their standing in the Auction.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bid Procedures; provided that such rules (1) are not materially inconsistent with these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court, and (2) are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed or videotaped and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Immediately prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties will, for the Assets (or subset thereof) that were subject to the Auction: (a) determine, consistent with the Bid Procedures, which bid constitutes the highest or otherwise best bid (the "<u>Successful Bid</u>"); and (b) notify all Qualified Bidders at the Auction for the subject Assets, prior to its conclusion, of the name of the maker of the Successful Bid (the "<u>Successful Bidder</u>") with respect to the subject Assets, and the amount and other material terms of the Successful Bid. The Debtors may, in their sole discretion, designate the Next-Highest Bid (and the corresponding Next-Highest Bidder) to close with respect to the subject Assets in the event that the Successful Bidder does not close the Sale. Unless the Bankruptcy Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction and any and all such Bids and Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

Following conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket identifying (with specificity) the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Next-Highest Bidders.

All bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale and the construction and enforcement of any Stalking

Horse Agreement (if applicable) and all other agreements entered into in connection with any proposed Sale transaction.

## IX.        Acceptance of Qualified Bids

The Debtors may reject at any time, before entry of an order of the Bankruptcy Court approving the Sale, any Bid that, in the Debtors' judgment, upon considering any comments of the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or (iii) contrary to the best interests of the Debtors and their estates.

The Debtors' presentation to the Bankruptcy Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing. The Debtors intend to close the Sale(s) on or before July 31, 2016 unless another time or date, or both, are agreed to in writing by the Debtors and the Successful Bidder (the "Closing Date").

## X.        No Fees for Potential Bidders or Qualified Bidders

Potential Bidders or Qualified Bidders, other than a Stalking Horse Bidder if so approved by the Bankruptcy Court, shall not be allowed any bidding, break-up, termination or other fee (a "Bidding Fee") as a precondition to, or in consideration of, presenting any bid or participating in the Bidding Process provided for herein, and any request by a Potential Bidder for any such Bidding Fee shall disqualify such Potential Bidder from being a Qualified Bidder. Moreover, all Potential Bidders, Qualified Bidders, and the Stalking Horse Bidder (excluding any bid protections approved by the Bankruptcy Court), by participating in the Bidding Process, will be deemed to have waived any right to seek a claim for substantial contribution or any Bidding Fee pursuant to section 503 of the Bankruptcy Code or the payment of any broker fees or cost.

## XI.        Sale Hearing

Each Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of a Stalking Horse Bidder or one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Stalking Horse Bid or the Qualified Bidder, respectively) will be subject to approval by the Bankruptcy Court. The hearing to approve a Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of a Stalking Horse Bidder or one Qualified Bid is received with respect to the Assets (or subset thereof), then the Stalking Horse Bid or the Qualified Bid, respectively) shall take place on July 14, 2016 at _____. (ET) (prevailing Eastern Time) (the "Sale Hearing"). Subject to the prior consent of BofA and Pathlight, the Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of the Debtors' chapter 11 cases.

**XII.**        <u>**Return of Good Faith Deposit**</u>

The Good Faith Deposits of all Potential Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposits of each Next-Highest Bidder shall be retained until three (3) business days after the applicable Closing Date. The Good Faith Deposits of the other Qualified Bidders will be returned as soon as practicable but no later than seven (7) Business Days following the Auction.

If a Successful Bidder (or, if the Sale is to be closed with a Next-Highest Bidder, then the Next-Highest Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or the Stalking Horse Agreement, as applicable (and as such agreements may be amended or modified at the Auction), the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if the Sale is to be closed with the Next-Highest Bidder, then such Next-Highest Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

**XIII.**        <u>**Reservation of Rights and Modifications**</u>

Notwithstanding any of the foregoing, the Debtors and their estates, in consultation with the Consultation Parties, reserve the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all potential bidders, and subject to the prior consent of BofA and Pathlight, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bid Procedures; <u>provided</u>, <u>however</u>, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) that submits a Bid or has a Bid submitted on its behalf for so long as such Bid remains open, including any credit bid, if the Debtors determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection, or determination is (a) likely to have a chilling effect on the potential bidding or (b) otherwise contrary to the goal of maximizing value from the sale process for the Debtors' estates, their creditors, and all other parties in interest.

**XIV.**        <u>**Next-Highest Bidder**</u>

Notwithstanding any of the foregoing, in the event that a Successful Bidder fails to close a Sale prior to such date as specified in the applicable Purchase Agreement (or such date as may be extended by the Debtors), the Debtors, upon written notice to the Next-Highest Bidder, may designate the applicable Next-Highest Bid as the Successful Bid for the Assets (or

9

subset thereof), the Next-Highest Bidder will be deemed to be the Successful Bidder for such Assets, and the Debtors will be authorized, but not directed, to close the Sale to the Next-Highest Bidder subject to the terms of the Next-Highest Bid without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties.

*[The remainder of this page is intentionally left blank.]*

## EXHIBIT B

**Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16- ( _____ )<br><br>(Joint Administration Requested) |

**NOTICE OF (I) POTENTIALLY ASSUMPTION AND ASSIGNMENT OF**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) CURE AMOUNTS**

      **You are receiving this notice because you may be a counterparty to a contract or lease with Hastings Entertainment, Inc., MovieStop, LLC or SP Images, Inc. Please read this notice carefully as your rights may be affected by the transactions described herein.**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      1.      On June 13, 2016, Draw Another Circle, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") filed a motion seeking approval of bidding procedures for the sale of certain of the Debtors' assets (the "Assets") and approval of the sale of the Debtors' Assets (the "Bidding and Sale Motion") to the highest or best qualified bidder (the "Successful Bidder"). The Debtors are seeking the Court's approval the proposed bidding procedures and the form of this notice, and have requested a hearing on July 6, 2016, and requested that the Court schedule the hearing to approve the sale of the Assets (the "Sale Hearing") for July 14, 2016 in the United States Bankruptcy Court for the District of Delaware in Wilmington, Delaware (the "Bankruptcy Court"). The Bankruptcy Court will consider the sale of the Assets to the Successful Bidder and the assumption and assignment of executory contracts and unexpired leases at the Sale Hearing.

      2.      Pursuant to the Bidding and Sale Motion, the Debtors may potentially assume and assign to the Successful Bidder one or more of those executory contracts and unexpired leases listed on Exhibit A annexed hereto (collectively, the "Potentially Assigned Agreements" and each, a "Potentially Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

      3.      The Debtors have indicated on Exhibit A annexed hereto the cure amounts that the Debtors believe must be paid to cure all pre-petition defaults and pay all amounts accrued, under the Potentially Assigned Agreements (in each instance, the "Cure Amount").

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809). The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

4.    Any party seeking to (i) object to the validity of the Cure Amount as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Potentially Assigned Agreements in order for such contract or lease to be assumed and assigned or (ii) object to the assumption and assignment of any Potentially Assigned Agreements on any other basis (including, but not limited to, objections to adequate assurance of future performance), must file an objection (the "Assumption/Assignment Objection") that (a) is in writing, (b) sets forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) is filed with the Clerk of the Bankruptcy Court and (d) is served so as to be actually received by (i) Hastings Entertainment, Inc., 3601 Plains Boulevard, Amarillo, Texas 79102; (Attn: Jim Litwak and Duane A. Huesers; (ii) Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; (iii) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, Delaware 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (iv) FTI Consulting, Inc., 200 State Street, Boston, MA 02109 (Attn: Mike Nowlan), email: Mike.Nowlan@FTIConsulting.com; (v) RCS Real Estate Advisors, 460 W 34th St #3, New York, New York 10001 (Attn: Spence Mehl); (vi) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Hannah McCollum) email: hannah.mccollum@usdoj.gov; (vii) counsel to BofA, (a) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036 (Attn: Donald E. Rothman, Esq. and Steven E. Fox, Esq.), Email: drothman@rimerlaw.com and sfox@riemerlaw.com; and (b) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Gregory Taylor, Esq.), Email: gtaylor@ashby-geddes.com; (viii) counsel to Pathlight, (a) Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin J. Simard, Esq.), Email: ksimard@choate.com; and (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.) Email: collins@rlf.com and knight@rlf.com; and (ix) once it is formed, each statutory committee (the "Committee" and, collectively, the "Notice  Parties"), by July 7, 2016 at [4:00] p.m. (prevailing Eastern Time) (the "Assumption/Assignment Objection Deadline").

5.    The Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court and serve such notice upon parties in interest, and the deadline for objecting to the assignment of the Potentially Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance shall be the commencement of the Sale Hearing.

6.    Unless an Assumption/Assignment Objection is filed and served before the Assumption/Assignment Objection Deadline, all parties shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to the Potentially Assigned Agreements, and the Debtors and the Successful Bidder shall be entitled to rely solely upon the Cure Amount; (ii) be deemed to have consented to the assumption and assignment, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned

Agreements or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreements.

7.    Any hearings with respect to the Assumption/Assignment Objections may be held (i) at the Sale Hearing, or (ii) at such other date as the Bankruptcy Court may designate upon motion by the Successful Bidder and the Debtors. Where a nondebtor counterparty to a Potentially Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amount, (the "Disputed Cure Amount"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, the Debtors shall promptly provide the Notice Parties and the other parties in interest notice and opportunity to object to such proposed resolution or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will be heard at the Sale Hearing.

8.    An Assumption/Assignment Objection shall not constitute an objection to the relief generally requested in the Bidding and Sale Motion. Parties wishing to otherwise object to the relief requested in the Bidding and Sale Motion must file and serve a separate objection, stating with particularity such party's grounds for objection, so as to be received by each of the Notice Parties listed above no later than July 7, 2016 at 4:00 p.m. (prevailing Eastern Time).

9.    If you agree with the Cure Amount indicated on Exhibit A, and otherwise do not object to the Debtors' assignment of your lease or contract, you need not take any further action.

10.    The Debtors' decision to assume and assign the Potentially Assigned Agreements is subject to Bankruptcy Court approval and consummation of the sale of the Assets. Accordingly, the Debtor shall be deemed to have assumed and assigned each of the Assigned Agreements as of the date of, and effective only upon, the closing of the sale of the Assets, and absent such closing, each of the Potentially Assigned Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

**Inclusion of any document on the list of Potentially Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Successful Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are being expressly reserved.**

## EXHIBIT A

### LEASES

| Landlord Name / Address | Address of Subject Property | Cure Amount |
|---|---|---|
| | | |

### EXECUTORY CONTRACTS

| Counterparty Name / Address | Description of Contract | Cure Amount |
|---|---|---|
| | | |

## **EXHIBIT C**

**Auction and Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| DRAW ANOTHER CIRCLE, LLC, *et al.*,[1] | Case No.: 16- ( _____ ) |
| Debtors. | (Joint Administration Requested) |

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      Commencing on June 13, 2016, Draw Another Circle, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), each filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      On the same day, the Debtors filed a motion (the "Bidding Procedures and Sale Motion"), pursuant to sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), seeking entry of an order (the "Bidding Procedures Order") (a) scheduling an auction (the "Auction") for the sale of certain of the Debtors' assets (the "Assets") for July [__], 2016 and a hearing to approve the sale of the Assets (the "Sale Hearing") for July [__], 2016; (b) approving procedures (the "Bidding Procedures") for submitting competing bids for the Assets, (c) approving the form and manner of the notice of the Auction and the Sale Hearing; and (d) approving procedures for the assumption,

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

assignment and sale of the Assumed and Assigned Agreements (as defined in the Bidding Procedures Order) to any purchaser(s) of the Assets, and/or to resolve any objections thereto.

3.     On July __, 2016, the United States Bankruptcy Court for the District of Delaware entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if at least one Qualified Bid in respect of the Assets (as defined in the Bidding Procedures Order) is received by the Bid Deadline, the Debtors will conduct the Auction. The Auction will take place at the offices of Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801, at [ ]:00 [ ].m. (prevailing Eastern Time) on July __, 2016.  Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than July __, 2016 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") may bid at the Auction. Any party that wishes to take part in this process and submit a bid for any portion of the Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.     The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances, will be held before the Honorable [ ], United States Bankruptcy Judge, 824 North Market Street, Wilmington, Delaware 19801 on July ___, 2016 at [ ] (prevailing Eastern Time), or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.     Objections, if any, to the sale, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Rules; and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware

19801, on or before 12:00 p.m. on the date of the Sale Hearing (prevailing Eastern Time); and be served upon (i) *the Debtors,* c/o Hastings Entertainment, Inc., 3601 Plains Boulevard, Amarillo, Texas 79102; (Attn: Jim Litwak and Duane Huesers; (ii) *Debtors' counsel*, (a) Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; and (b) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, Delaware 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com; (iii) *counsel to the DIP Agent* (a) Riemer & Braunstein, LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036 (Attn: Donald E. Rothman, Esq. and Steven E. Fox, Esq.), Email: drothman@rimerlaw.com and sfox@riemerlaw.com; and (b) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Gregory Taylor, Esq.), Email: GTaylor@ashby-geddes.com; (iv) *counsel to the Pre-Petition Term Loan Agent*, Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin Simard, Esq.), Email: ksimard@choate.com; (v) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.), Email: collins@rlf.com and knight@rlf.com; (vi) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Room 2207, Lockbox 35, Wilmington, Delaware 19801, (Attn: Hannah McCollum), Email: hannah.mccollum@usdoj.gov; and (vii) counsel to any committee appointed in these Cases **so as to be received no later than July __ at 4:00 p.m. (prevailing Eastern Time).** UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE

BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

   6. This Notice of Auction and Sale Hearing is subject to the fuller terms and conditions of the Bidding Procedures and Sale Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Stalking Horse APA (as defined in the Bidding Procedures Order), the Bidding Procedures and Sale Motion, or the Bidding Procedures Order, may make a written request to: (a) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Cathy Hershcopf, Esq. and Michael A. Klein, Esq.), email: chershcopf@cooley.com and mklein@cooley.com; and (b) Whiteford, Taylor & Preston LLC, The Renaissance Centre, 405 North King Street, Suite 500, Wilmington, DE 19801 (Attn: Christopher M. Samis, Esq. and L. Katherine Good, Esq.) email: csamis@wtplaw.com and kgood@wtplaw.com.  In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order and this Notice are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 Market Street, Wilmington, Delaware 19801.

Dated: June __, 2016
      Wilmington, Delaware

Respectfully submitted,

/s/ _____

Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Chantelle D. McClamb (No. 5978)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 353-4144
Email:     csamis@wtplaw.com
             kgood@wtplaw.com
             cmcclamb@wtplaw.com

- and –

Cathy Hershcopf, Esq.
Michael Klein, Esq.
Robert Winning, Esq.
COOLEY LLP
1114 Avenue of the Americas
New York, New York 01136
Telephone:  (212) 479-6000
Email:     chershcopf@cooley.com
             mklein@cooley.com
             rwinning@cooley.com

*Proposed Counsel for the Debtors and Debtors in Possession*

5

**<u>EXHIBIT D</u>**
**Form Agreement**

*Cooley 6-9-2016 draft*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**[_____], 2016**

**by and between**

**[Seller]**

**and**

**[Purchaser]**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of [_____], 2016, by and between [_____], a [_____] [_____] (the "**Purchaser**"), and [_____], a [_____] [_____] having a principal place of business at [_____] ("**Seller**").

## RECITALS

WHEREAS, Seller owns and operates [_____] (the "**Business**");

WHEREAS, on [_____], 2016 (the "**Filing Date**"), Seller filed a voluntary petition under chapter 11 of title 11 of the United States Code, Section 101, et seq. (the "**Bankruptcy Code**"), case number [_____] (the "**Bankruptcy Case**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and this Agreement and the transactions contemplated herein are subject to the approval of the Bankruptcy Court; and

WHEREAS, Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller all of the assets that are owned, leased, or licensed by Seller that are used or useful in the operation of the Business as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows:

## AGREEMENT

1.    Definitions

**1.1**    "Actions" has the meaning set forth in Section 3.3 hereof.

**1.2**    "Affiliate" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

**1.3**    "Agreement" means this Asset Purchase Agreement between the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be delivered to Purchaser following the date hereof and amended from time to time.

**1.4**    "Ancillary Agreements" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement.

**1.5**    "Apportioned Obligations" has the meaning set forth in Section 5.5 hereof.

**1.6**    "Auction" means the auction of the Purchased Assets.

**1.7**    "Auction Date" means such date as the Bankruptcy Court may order for the Auction.

**1.8**    "Bankruptcy Case" has the meaning given to it in the recitals hereto.

**1.9**    "Bankruptcy Code" has the meaning given to it in the recitals hereto.

**1.10**    "Bankruptcy Court" has the meaning given to it in the recitals hereto.

**1.11**    "Bidding Procedures Order" means the order approving the bidding procedures at the Auction for the Purchased Assets.

**1.12**    "Business" has the meaning given to it in the recitals hereto.

**1.13**    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

**1.14**    "Closing" means the closing of the transactions contemplated by this Agreement.

**1.15**    "Closing Date" means the date on which the conditions set forth in Article 6 are satisfied or waived, or such other date as the parties may mutually agree upon which the Closing takes place.

**1.16**    "Code" means the Internal Revenue Code of 1986, as amended.

**1.17**    "Competing Transaction" means any transaction (or series of related transactions), whether direct or indirect, concerning a sale, financing, recapitalization, liquidation or other disposition of all of the Purchased Assets, the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement.

**1.18**    "Consent" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement or any Ancillary Agreement, the performance by a Person of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby.

**1.19**    "Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license (written or oral) to which Seller is a party or by which Seller is bound.

**1.20**    "Deposit" has the meaning set forth in Section 2.5 hereof.

**1.21**    "Disclosure Schedule" means each, and collectively all, as the context may require, of the disclosure schedules to be prepared by Seller promptly following the date of this Agreement attached to this Agreement as <u>Exhibit A</u>, and shall include but not be limited to each of the disclosure schedules expressly referred to in Article 3 of this Agreement.

**1.22**    "Excluded Assets" has the meaning set forth in section 2.2 hereof.

**1.23**    "Expense Reimbursement" means the reimbursement of Purchaser's reasonable out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, in an aggregate amount not to exceed [$_____].

**1.24**    "Filing Date" has the meaning given to it in the recitals hereto.

**1.25**    "Final Order" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended as to which no appeals or motions for reconsideration are pending and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.26**    "GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

**1.27**    "Governmental Entity" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

**1.28**    "Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; and (e) all other intellectual property rights arising from or relating to Technology.

**1.29**    "Interests" means (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, interests and claims (as that term is defined in the Bankruptcy Code), (ii) claims in respect of Taxes, and (iii) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

**1.30**    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the Chief Executive Officer of the Seller; provided that such officer shall be deemed to have actual knowledge of any fact or matter such officer would reasonably be expected to have knowledge of in performing his or her duties and responsibilities, in such capacity, for the Seller.

**1.31**    "Loan Documents" means:

**(a)**    That certain Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement (as may be amended, modified, or supplemented and in effect from

time-to-time), by and among Hastings Entertainment, Inc., MovieStop, LLC, and SP Images, Inc., as borrowers, Bank of America, N. A., as administrative agent and collateral agent and each Revolving Credit Lender party thereto;

(b)    That certain Amended and Restated Loan and Security Agreement, dated July 22, 2010 (as amended), by and among Hastings Entertainment, Inc., MovieStop, LLC, and SP Images, Inc., as borrowers, Bank of America, N. A., as administrative agent and collateral agent and each revolving credit lender party thereto; and

(c)    That certain Term Loan and Security Agreement dated as of July 15, 2014 (as amended) by and between Hastings Entertainment, Inc., MovieStop, LLC, and SP Images, Inc., as borrowers, and Pathlight Capital, LLC, as agent and the lenders party thereto.

**1.32**    "Material Adverse Effect" means a material adverse effect (financial or otherwise) on (a) the Purchased Assets or on the results of operations or condition of the the Purchased Assets, taken as a whole, or the ability of Purchaser to succeed to and exercise rights or interests of Seller that are necessary to operate the Purchased Assets, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated by this Agreement other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital-markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Business.

**1.33**    "Permits" means all licenses, certificates of authority, permits, orders, consents, franchises, approvals, registrations, clearances, variances, exemptions, authorizations, qualifications and filings required to be obtained under applicable law or to be filed with any Governmental Entities.

**1.34**    "Person" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.35**    "Post-Closing Tax Period" shall mean (i) any Tax period beginning any time after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

**1.36**    "Pre-Closing Tax Period" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

**1.37**    "Purchased Assets" has the meaning set forth in Section 2.1 hereof.

**1.38**    "Purchase Price" has the meaning set forth in Section 2.5 hereof.

**1.39**    "Purchaser" has the meaning given to it in the recitals hereto.

**1.40**    "Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

**1.41**    "Sale Approval Order" has the meaning set forth in Section 5.4(a) hereof.

**1.42**    "Sale Hearing" means the hearing to approve the sale of the Purchased Assets.

-4-

**1.43**   "Seller" has the meaning given to it in the recitals hereto.

**1.44**   "Stalking Horse Order" has the meaning set forth in Section 6.1(g) hereof.

**1.45**   "Subsidiary" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly fifty percent (50%) or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

**1.46**   "Tangible Personal Property" has the meaning set forth in Section 2.1(c) hereof.

**1.47**   "Taxes" (or "Tax" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto.

**1.48**   "Technology" means, collectively, all algorithms, data, databases, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), any other information technology equipment, techniques, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

2.   <u>Purchase and Sale of Assets</u>

**2.1**   <u>Purchase and Sale of Assets</u>.   Subject to the terms and conditions of this Agreement together with any Bankruptcy Court approval that may be required, including the payment by Purchaser of the Purchase Price, at the Closing, (x) Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of any and all Interests, good, valid and marketable title and interest in and to all of the assets, properties and rights of Seller, other than the Excluded Assets, that are owned, leased, or licensed by Seller and used or useful in the operation of the Business (such assets, properties and rights are hereinafter collectively referred to as the "Purchased Assets"), including, but not limited to, the following assets, properties and rights:

**(a)**   all Intellectual Property owned by Seller, including the name "[_____]";

**(b)**   all Contracts of Seller other than the Loan Documents;

**(c)**   all inventory of Seller used in connection with the Business;

**(d)**      all rights of Seller under Contracts for the lease of real property, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

**(e)**      all Permits used by the Seller that may be transferred to Purchaser;

**(f)**      all supplies owned by Seller and used in the Business; and

**(g)**      all tangible personal property of Seller (collectively, "Tangible Personal Property").

Except as expressly set forth herein, the assets, properties and rights to be conveyed, sold, transferred, assigned and delivered to Purchaser pursuant to this Section 2.1 shall be transferred "as is, where is".

**2.2**      <u>Excluded Assets</u>.  Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in, any of the following assets (the "Excluded Assets"):

**(a)**      all rights of Seller under this Agreement and the Ancillary Agreements;

**(b)**      [the Loan Documents];

**(c)**      all cash on hand or in banks and cash equivalents of Seller;

**(d)**      all interests in and to the capital stock of Seller and in any equity securities of any Subsidiary of Seller and all corporate records, including without limitation, the organizational documents of Seller and any of its Subsidiaries, accounting documents, tax returns, audit materials, legal records, board and member minutes and related correspondence, stock transfer books, blank stock certificates and other documents, qualification to conduct business as a foreign corporation and any Permits held by Seller that are not transferrable as a matter of law;

**(e)**      all human resources material, including, without limitation, employment and compensation records and benefits information, <u>provided</u> that Purchaser shall be granted reasonable access to, and the right to make copies of, any such materials of Seller, for a period of twelve (12) months after the Closing Date;

**(f)**      all bankruptcy avoidance claims of Seller, including without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code;

**(g)**      all claims, causes of action, rights of recovery and rights of set-off that the Seller may hold against any current or former director, officer or employee of Seller for breach of fiduciary duty or claims of a similar nature, in each case, arising out of events occurring on or prior to the Closing Date;

**(h)**      all other claims, causes of action, rights of recovery and rights of set-off that Seller may hold, including any and all enforcement rights to pursue damages, whether currently pending, filed, or otherwise, in each case, arising out of events occurring on or prior to the Closing Date;

132460672 v3

   **(i)** any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery of Taxes, together with any interest due thereon or penalty rebate arising therefrom;

   **(j)** all Tax returns and financial statements of Seller and the Business and all records (including working papers) related thereto;

   **(k)** all employee benefit plans of Seller;

   **(l)** all insurance policies or rights to proceeds thereof;

   **(m)** the assets set forth on Schedule 2.2 hereto [Note to Draft:  Unless otherwise negotiated between the parties, to include, among other things, the debtor's rights under revenue sharing agreements.]**;** and

   **(n)** all intellectual property of the Company not otherwise specifically identified as Purchased Assets herein.

  **2.3** <u>No Liabilities</u>. [Except with respect to future obligations with respect to Contracts or other assets included in the Purchased Assets,] Seller and Purchaser hereby expressly acknowledge and agree that Purchaser is not assuming any liabilities or obligations of Seller (i) in connection with this Agreement and the transactions contemplated hereby or (ii) in connection with Seller's current or past employees, agents, consultants, service providers or advisors.

  **2.4** <u>Closing</u>.  Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, at 10:00 a.m. on [_____], 2016, or at such other place and time as the parties agree in writing, unless this Agreement is before such other time terminated in accordance with the terms hereof.

  **2.5** <u>Consideration</u>.  The aggregate consideration to be paid and delivered by Purchaser and accepted by Seller for the Purchased Assets (the "Purchase Price") shall be a cash amount equal to [$_____], payable by Purchaser at Closing by [(i) release to Seller of the Deposit] and (ii) wire transfer of immediately available funds to such accounts as Seller shall designate in writing in the amount of the Purchase Price [less the Deposit].

  [As of the date hereof, Cooley LLP shall have received a deposit from or on behalf of Purchaser in the amount of [$_____] (the "Deposit"), which shall be held by Cooley LLP separate from its other funds until released to Seller at the Closing or otherwise disposed of as provided hereunder.]

  **2.6** <u>Delivery</u>.  Subject to entry of the Sale Approval Order and such Sale Approval Order becoming a Final Order, at the Closing:

   **(a)** Purchaser shall [release to Seller the Deposit and] deliver to Seller the Purchase Price [less the Deposit];

   **(b)** Seller shall deliver to Purchaser the Purchased Assets;

**(c)**    Seller shall execute and deliver to Purchaser a Bill of Sale, Assignment and Assumption Agreement in substantially the form attached as <u>Exhibit B</u> hereto;

**(d)**    Seller and Purchaser shall execute and deliver an Intellectual Property Assignment in substantially the form attached as <u>Exhibit C</u> hereto;

**(e)**    Seller shall deliver to Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein and to vest in Purchaser all right, title and interest in, to and under the Purchased Assets;

**(f)**    Seller shall deliver to Purchaser any and all trademark, patent and copyright prosecution files included in the Purchased Assets;

**(g)**    Seller shall deliver a copy of the Sale Approval Order; and

**(h)**    Seller shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that the Sale Approval Order is a Final Order unless the requirement that the Sale Approval Order has become a Final Order has been waived by the Purchaser.

**2.7**    <u>Possession</u>.  Subject to entry of the Sale Approval Order, the right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Seller shall transfer and deliver to Purchaser on the Closing Date such usernames, passwords, account numbers, authorization codes, encryption keys, and other similar items with respect to the Purchased Assets as Purchaser shall require to obtain control of the Purchased Assets, and shall also make available to Purchaser at Seller's then existing locations all documents, documentation, software and hardware that are required to be transferred to Purchaser by this Agreement.

**2.8**    <u>Transfer Taxes</u>.  Provided that the Sale Approval Order includes a finding that the sale of the Purchased Assets is in contemplation of a plan to be confirmed under Section 1129 of the Bankruptcy Code, in accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be free and clear of any and all transfer tax, stamp tax or similar taxes.  Such instruments, orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the Southern District of New York in contemplation of a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Purchaser shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes.

3.      Representations and Warranties of Seller

Subject to entry of the Sale Approval Order and except as to be set forth in the Disclosure Schedule (it being understood and hereby agreed that (i) the disclosures to be set forth in the Disclosure Schedule shall be organized under separate section and subsection references that correspond to the sections and subsections of this Article 3 to which such disclosure relates and (ii) the disclosure to be set forth in a particular section or subsection of the Disclosure Schedule shall qualify (A) the representations and warranties set forth in the corresponding section or subsections of this Article 3 and (B) such other representations and warranties set forth in this Article 3 if, and to the extent that, upon a reading of the disclosure, it is reasonably apparent that such disclosure is applicable to such other representations and warranties), Seller hereby represents and warrants to Purchaser as follows:

**3.1**      Authority, Etc.  Seller is a corporation duly organized and in good standing under the laws of the State of [_____].  Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller.  This Agreement has been, and upon execution and delivery thereof each of the Ancillary Agreements will be, duly executed and delivered by Seller and constitutes, and such Ancillary Agreements will constitute, the valid and legally binding obligations of Seller enforceable against Seller in accordance with their respective terms and conditions.

**3.2**      Title.  Seller has good and marketable title to all of the Purchased Assets to be sold by Seller.  Upon the Closing, Seller will convey and transfer to Purchaser all of the Purchased Assets, and Purchaser shall receive good and marketable title to all of the Purchased Assets free and clear of any Interests, pursuant to sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

**3.3**      Brokers.  Other than amounts owed to RCS Real Estate Advisors LLC for services rendered in connection with this Agreement and the transactions contemplated by this Agreement, Seller has no liability or obligation to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement or the transactions contemplated by this Agreement.

**3.4**      Litigation.  Except as set forth in Section 3.4 of the Disclosure Schedule, other than the Bankruptcy Case, there is no claim, action, suit, proceeding, opposition, challenge, cancellation proceeding or investigation (collectively, "Actions") pending or, to the Knowledge of Seller, currently threatened against Seller that questions the validity of this Agreement, any Ancillary Agreement, any of Seller's rights in the Intellectual Property owned by Seller, or the right of Seller to enter into this Agreement or any Ancillary Agreement to which it is a party, or would reasonably be expected to prohibit Seller from entering into this Agreement or any Ancillary Agreement to which it is a party, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of Seller, would reasonably be expected to result, either individually or in the aggregate, in any Material Adverse Effect.  Other than the Bankruptcy Case, there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Purchased Assets or the practice of the Intellectual Property owned by Seller.  Section 3.4 of the Disclosure Schedule sets forth a description of all Actions to which

Seller is a party or to which any of the Purchased Assets or the practice of the Intellectual Property owned by Seller is subject.

**3.5** <u>Intellectual Property</u>.

**(a)** Section 3.5 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by Seller and used in or related to the Business. All such Registered Intellectual Property is subsisting and, to Seller's Knowledge, valid and enforceable, and is not subject to any outstanding Final Order adversely affecting Seller's use thereof or rights thereto.

**(b)** To Seller's Knowledge, the operation of the Business as currently conducted does not infringe, constitute the misappropriation of or otherwise violate the Intellectual Property of any other Person.

**(c)** As of the date hereof, no Action is currently pending or, to Seller's Knowledge, threatened against any Seller, and Seller has not received any notice in the past twelve (12) months (including cease and desist letters and written invitations to take a license) that (i) challenges the validity, ownership, registerability, enforceability or use of any material Intellectual Property owned by Seller or (ii) alleges that the operation of the Business infringes, constitutes the misappropriation of or otherwise violates the Intellectual Property of any other Person.

**(d)** To Seller's Knowledge, in the past twelve (12) months, no Person has gained unauthorized access to the Technology that is material to the Business.

**3.6** <u>Tangible Personal Property</u>. The Tangible Personal Property of Seller included in the Purchased Assets is free from material defects, subject to normal wear and tear and continued repair and replacement in accordance with past practice.

**3.7** <u>Good Faith</u>. This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Seller's Knowledge, in good faith, and neither Seller nor Purchaser engaged in any collusion with respect to setting or fixing the Purchase Price, and to the Knowledge of Seller, there are no facts to support a finding that Purchaser negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

4. <u>Representations and Warranties of Purchaser</u>

Purchaser hereby represents and warrants to Seller as follows:

**4.1** <u>Authority</u>. Purchaser is a [_____] organized and in good standing under the laws of the State of [_____]. Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements to which it is to be a party and to carry out the obligations hereunder and thereunder, without the need for any further approval of its officers and or governing body. All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the Ancillary Agreements to which it is to be a party has been taken. Upon its execution and delivery by Purchaser, this Agreement and each Ancillary Agreement to which it is to be a party will be the valid and legally binding obligations of the Purchaser in accordance with their respective terms.

-10-

**4.2**     <u>Compliance with Other Instruments</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is to be a party, and the consummation of the transactions contemplated hereby and thereby will not result in any violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, a default under any provision of any instrument, judgment, order, writ, decree or contract to which it is a party.

**4.3**     <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements to which it is to be a party or the transactions contemplated by this Agreement and such Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.  All fees associated with brokers shall otherwise be made through section 327, 330, and 331 of the  Bankruptcy Code.

**4.4**     <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the validity of this Agreement or any Ancillary Agreement to which it is to be a party, or the right of Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

**4.5**     <u>Financial Assurance</u>.  The Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable payment of the Purchase Price and any other amounts to be paid by it hereunder.

**4.6**     <u>Good Faith</u>.  This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Purchaser's knowledge, in good faith, and neither Seller nor Purchaser engaged in any collusion with respect to setting or fixing the Purchase Price, and to the knowledge of Purchaser, there are no facts to support a finding that Seller negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

5.     <u>Covenants</u>

**5.1**     <u>Seller Records</u>.     Prior to the Closing Date, and without limiting the other provisions of this Agreement, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to the Purchased Assets and any assets, contracts, facilities, books, records and employees related thereto, at any time and from time to time upon reasonable notice and request, and shall provide to Purchaser and its representatives such additional financial and operating data as Purchaser shall from time to time reasonably request.

**5.2**     <u>Filings and Authorizations</u>.  Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; <u>provided</u> that any provision hereof to the contrary notwithstanding, Seller shall not have any obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to

-11-

take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder. Seller and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

   5.3   Further Assurances; Accounts.

      (a)   At and after the Closing, Seller shall take such reasonable steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets. At or after the Closing, Seller shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably request to implement any provision of this Agreement and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Interests.

      (b)   From and after the date of execution of this Agreement, neither Seller nor any Person acting on behalf and within the control of Seller will operate any of the Purchased Assets in any manner that would adversely affect the value, utility or useful life of such asset.

   5.4   Bankruptcy Covenants.

      (a)   Sale Approval Order.  The sale approval order shall be substantially in the form annexed hereto as Exhibit D (the "Sale Approval Order"), and only such other and further changes as shall be reasonably acceptable in form and substance to Purchaser.

      (b)   Other Bankruptcy Covenants.  Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Seller's receipt thereof a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

   5.5   Apportioned Obligations.  All personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for personal property taxes relating to the Purchased Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 5.5 together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by

-12-

the party owing it to the other within fifteen (15) Business Days after delivery of such statement. In the event that any of Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this Section 5.5, the applicable other party shall make such reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Purchaser shall notify Seller of any audit or examination of the Apportioned Obligations.  The Seller shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination without the consent of Seller, which consent shall not be unreasonably withheld.

**5.6**    <u>Notification</u>.  From time to time prior to the Closing, Seller shall notify Purchaser in writing with respect to any matter hereafter arising or any information obtained after the date hereof that, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule or that is necessary to complete or correct any information in such schedule or in any representation and warranty of Seller that has been rendered inaccurate thereby.

6.    <u>Conditions Precedent to Closing.</u>

**6.1**    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

**(a)**    <u>Representations and Warranties Accurate</u>.  The representations and warranties of Seller contained in this Agreement shall be correct and complete in all material respects as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time). Notwithstanding anything to the contrary herein, in the event that Purchaser has actual knowledge that any of such representations and warranties of Seller contained in this Agreement are not true and correct and complete in all material respects as of the Closing Date, Purchaser's sole remedy shall be to terminate this Agreement in accordance with Section 7.1(b) hereof.

**(b)**    <u>Performance</u>.  Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by Seller hereunder on or prior to the Closing Date.

**(c)**    <u>Consents</u>.  All Consents set forth on Schedule 6.1(c) required in connection with the consummation of the transactions contemplated by this Agreement and the Closing shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser of any material condition, restriction or required undertaking.

**(d)**    <u>No Legal Prohibition</u>.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted and remain in effect or threatened by any Governmental Entity which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any

-13-

Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     No Material Adverse Effect.   No Material Adverse Effect shall have occurred and be continuing.

(f)     Additional Documents, etc.   There shall have been delivered to Purchaser each of the agreements, documents, certificates and other items set forth in Section 2.6 of this Agreement to be delivered to Purchaser.

(g)     Entry of Order; Appeal.   On or before [_____], 2016, the Bankruptcy Court shall have entered an order (the "Stalking Horse Order"), in substantially the form attached hereto as Exhibit E, with only such changes as shall be reasonably acceptable in form and substance to Purchaser.   In addition the Bankruptcy Court shall have entered the Sale Approval Order in accordance with Section 5.4(a) and the Sale Approval Order shall have become a Final Order, unless the finality of such orders is waived by Purchaser in Purchaser's sole discretion.

6.2     Conditions Precedent to Obligations of Seller.   The obligations of Seller under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

(a)     Representations and Warranties Accurate.   The representations and warranties of Purchaser contained in this Agreement shall be correct and complete in all material respects as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

(b)     Performance by Purchaser.   Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)     Consents.   All Consents required to be obtained by Purchaser in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

(d)     No Legal Prohibition.   No injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     Additional Documents, etc.   There shall have been delivered to Seller each of the agreements, documents and other items set forth in Section 2.6 of this Agreement to be delivered to Seller.

6.3     Sale Approval Order as Final Order..   If Purchaser elects in its sole discretion to waive the condition to Closing that the Sale Approval Order shall be a Final Order, then Seller

-14-

shall be obligated to proceed with the Closing except during any period during which the Sale Approval Order is stayed.

7.    Miscellaneous

    **7.1**    Termination.    This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

        **(a)**    any time before the Closing, by mutual written agreement of Seller and Purchaser;

        **(b)**    any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by Seller, on the one hand, or Purchaser, on the other hand, if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party, or (ii) upon written notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party;

        **(c)**    at the election of Purchaser as notified in writing to Seller, if the Schedules, Disclosure Schedules and Exhibits to this Agreement that are not attached to this Agreement as of the date hereof are not delivered to Purchaser, in form and substance reasonably acceptable to Purchaser, on or prior to [_____], 2016;

        **(d)**    if not earlier terminated, at the election of Purchaser as notified in writing to Seller, if the Closing has not occurred on or prior to [_____], 2016 and such failure is not the result of a breach by Purchaser; or

        **(e)**    at the election of the Purchaser as notified in writing to the Seller, if the Auction occurs and Purchaser is not the successful bidder at the Auction or the Back-Up Bidder (as defined in the Bidding Procedures Order) or if the Seller enters into an agreement or transaction, including any Competing Transaction with a third party, that is materially inconsistent with this Agreement and the transactions contemplated hereby in a material respect.

    **7.2**    Effect of Termination.

        **(a)**    If this Agreement is validly terminated pursuant to Section 7.1, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except that the provisions with respect to expenses and fees in Section 7.3 will continue to apply following any such termination.

        **(b)**    Notwithstanding the provisions of Section 7.2(a), above:

            **(i)**    if Purchaser and Seller terminate this Agreement pursuant to Section 7.1(a) or Purchaser terminates this Agreement pursuant to Section 7.1(c) or 7.1(d), Purchaser shall receive the prompt return of the Deposit, which shall constitute Purchaser's sole and exclusive remedy available under any law, including the Bankruptcy Code;

-15-

(ii)    if Purchaser terminates this Agreement pursuant to Section 7.1(b)(i) or Seller or Purchaser terminates this Agreement pursuant to Section 7.1(b)(ii), Purchaser shall receive the prompt return of the Deposit, which shall constitute Purchaser's sole and exclusive remedy available under any law, including the Bankruptcy Code;

(iii)    if Seller terminates this Agreement pursuant to Section 7.1(b)(i), Seller shall receive the Deposit, which shall constitute Seller's sole and exclusive remedy available under any law, including the Bankruptcy Code; and

(iv)    if Purchaser terminates this Agreement pursuant to Section 7.1(e), then Seller shall promptly following the closing of the corresponding transaction pay Purchaser in immediately available funds, and Purchaser shall be deemed to have earned both (i) the Expense Reimbursement and (ii) an amount equal to [$_____] (the "Break-Up Fee"). If this Agreement is terminated by Purchaser for any reason in accordance with Section 7.1 (other than Section 7.1(e)) and the Seller subsequently consummates a sale of all of the Purchased Assets with a Person other than Purchaser within [___ (__)] months following such termination, including in connection with any Competing Transaction, Seller shall promptly pay Purchaser, and Purchaser shall be deemed to have earned, the Expense Reimbursement.  The Break-Up Fee and the Expense Reimbursement shall constitute an administrative expense of Seller with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid and shall be payable from the proceeds of a sale to a third party within two (2) Business Days, notwithstanding Section 507(a) of the Bankruptcy Code.  Purchaser and Seller hereby acknowledge that amounts payable pursuant to this Section 7.2(b)(iv) are commercially reasonable and necessary to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby.  For the avoidance of doubt, the covenants set forth in this Section 7.2(b)(iv) are continuing obligations, separate and independent from the other obligations of Seller and Purchaser, and survive the termination of this Agreement.

**7.3**    <u>Expenses</u>.  Except as otherwise set forth in Section 7.2, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

**7.4**    <u>Compliance with Laws</u>.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

**7.5**    <u>Further Cooperation</u>.  Without limiting Seller's obligations under Section 5.3, at the request of Purchaser, at any time following the Closing Date, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Purchased Assets by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers, using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; <u>provided</u> that Seller shall not be obligated to pay any material consideration or incur any material costs to provide such cooperation.

**7.6**    <u>Governing Law; Jurisdiction</u>.    All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or

effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).

**7.7**    Entire Agreement; Interpretation.  The terms and conditions of this Agreement, including its exhibits and the Ancillary Agreements, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions.  None of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.  The terms "includes" and "including" are not limiting.  These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement.  Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and (ii) reference to any Article or Section means such Article or Section hereof.  Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

**7.8**    Notices:  All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered (i) by hand, (ii) dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, or (iii) sent via electronic mail (with a copy dispatched by prepaid air courier for delivery on the next business day), in each case, addressed as follows:

| If to Purchaser | If to Seller |
|---|---|
| [_____] | [_____] |
| [_____] | [_____] |
| [_____] | [_____] |
| Attn: [_____] | Attn: [_____] |
| Phone: [_____] | Phone: [_____] |
| Email: [_____] | Email: [_____] |

with a copy (which shall not
constitute notice) to:

with a copy (which shall not
constitute notice) to:

[_____]                         Cooley LLP
[_____]                         1114 Avenue of the Americas
[_____]                         New York, New York  10036
Attn: [_____]                     Attn:  Cathy Hershcopf
Phone: [_____]                    Phone: (212) 479-6138
Email: [_____]                    Email:  chershcopf@cooley.com

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery.  Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

**7.9**    Counterparts; Facsimile and Email Transmission.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

**7.10**    No Ongoing Obligations.  Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.11**    Survival of Representations and Warranties.  All of the representations and warranties of Purchaser contained in this Agreement shall survive the Closing Date and the consummation of the transactions contemplated hereby.  All of the representations and warranties of Seller contained in this Agreement shall survive until the Closing Date and terminate upon the closing of the transactions contemplated hereby.

**7.12**    Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.13**    Indemnification Obligations.  After the Closing, Purchaser shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations that were expressly assumed by Purchaser hereunder and only expressly for liabilities, claims or amounts arising or accruing after the

-18-

Closing Date. Seller shall provide written notice to Purchaser of any claim or dispute as to which indemnification is requested under this Section promptly following receipt of written notice by Seller of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Purchaser is materially prejudiced thereby. Seller, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding with Purchaser's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; provided that, if within said thirty-day period Purchaser shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Seller for the expenses incurred by Seller in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

7.14   No Agency.  The parties hereto are independent contractors.  Except as may be provided in this Agreement, no party has any express or implied right or authority to assume or create any obligations on behalf of any other party or to bind any other party to any contract, agreement or undertaking with any third party.  Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Purchaser.

7.15   Specific Performance.  Notwithstanding anything to the contrary contained herein (other than Section 7.2(b) hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm.  Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other parties hereto shall (except to the extent Section 7.2(b) is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

7.16   Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

7.17   Waivers.  Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

7.18   Binding Effect; Third Party Beneficiaries; Assignment.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their

-19-

respective successors and permitted assigns.  Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  No party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other parties, except that Purchaser may assign its rights under this Agreement in whole or in part to any Affiliate or to any Person providing financing for the transaction, and to any purchaser of all or substantially all of the Purchased Assets from Purchaser.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

SELLER:                                    PURCHASER:

[_____]                         [_____]



By: _____    By: _____
    Name:                                    Name:
    Title:                                   Title:

*[Signature Page to Asset Purchase Agreement]*

<u>EXHIBIT A</u>

Disclosure Schedule

[To be delivered to Purchaser promptly following execution of the Agreement.]

<u>Section 3.4 of the Disclosure Schedule</u>

Actions

<u>Section 3.5 of the Disclosure Schedule</u>

Registered Intellectual Property

## EXHIBIT B

Form of Bill of Sale, Assignment and Assumption

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

This **BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "***Agreement***") is entered into as of [●], 2016, by and between [_____], a [_____] [_____] ("***Purchaser***") and [_____], a [_____] [_____] ("***Seller***"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "***Party***" and collectively as the "***Parties***." All capitalized terms used but not defined herein have the meanings assigned to them in the Purchase Agreement as defined below.

**W I T N E S S E T H**:

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, dated as of [_____], 2016 agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, the Purchased Assets; and

WHEREAS, the Parties wish formally to acknowledge such sale, assignment and assumption.

NOW, THEREFORE, for good and valuable consideration paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged, pursuant to the terms of the Purchase Agreement, Seller and Purchaser hereby agree as follows:

1. <u>Purchase and Sale of Assets</u>. Subject to the terms and conditions set forth in the Purchase Agreement, Seller does hereby sell, convey, assign, transfer and deliver to Purchaser all right, title and interest of Seller in and to all of the Purchased Assets, free and clear of all Interests thereon. Notwithstanding anything to the contrary contained herein, the Excluded Assets are specifically excluded from the Purchased Assets sold, conveyed, assigned, transferred or delivered to Purchaser hereby and are retained by Seller.

2. <u>Conflicts with Purchase Agreement</u>. Each party acknowledges and agrees that neither the representations and warranties nor the rights, remedies or obligations of any party under the Purchase Agreement shall be deemed to be enlarged, modified or altered in any way by this Agreement. In the event of any conflict or inconsistency between the terms of this Agreement and the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

3. <u>Entire Agreement</u>. This Agreement and the Purchase Agreement contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way.

4. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

5. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules). All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the

extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.

6.      No Modifications.  No modification of this Agreement shall be binding unless in writing and signed by the Party or Parties against which it is sought to be enforced.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**[SELLER]**

By: _____
Name:
Title:

**[PURCHASER]**

By: _____
Name:
Title:

132460672 v3

## EXHIBIT C

Intellectual Property Assignment

# INTELLECTUAL PROPERTY ASSIGNMENT

This **INTELLECTUAL PROPERTY ASSIGNMENT** (the "*IP Assignment*"), dated as of [●], 2016, is entered into by and among [_____], a [_____] [_____] (the "*Assignor*") and [_____], a [_____] [_____] (the "*Assignee*").

# RECITALS:

**WHEREAS**, pursuant to the terms and conditions of an Asset Purchase Agreement, dated as of [_____], 2016 (the "*Asset Purchase Agreement*"), by and between the Assignor, Assignee and the other parties thereto, the Assignor wishes to sell, transfer, convey, assign and deliver to the Assignee, and the Assignee has agreed to acquire and accept, all of the Assignor's right, title and interest in and to the Intellectual Property owned by Assignor (the "*IP Assets*"), all on the terms and subject to the conditions set forth in the Asset Purchase Agreement (capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Asset Purchase Agreement);

**WHEREAS**, the Assignee wishes to acquire, and the Assignor wishes to transfer all right, title and interest in and to the IP Assets of the Assignor;

**WHEREAS,** in connection with the Closing, Assignee and Assignor have entered into that certain Bill of Sale, Assignment and Assumption Agreement, dated as of even date herewith, (the "*Bill of Sale*") pursuant to which, among other things, the parties consummated the sale, conveyance, assignment, transfer and delivery to Assignee of the Purchased Assets including the IP Assets of the Assignor; and

**WHEREAS,** Assignor and Assignee now desire to enter into this IP Assignment for the purpose of recording the sale, conveyance, assignment, transfer and delivery to Assignee of the IP Assets of the Assignor with any applicable Governmental Entity worldwide.

**NOW, THEREFORE**, for good and valuable consideration, including the consideration set forth in the Asset Purchase Agreement and the Bill of Sale, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     <u>Assignment</u>. Assignor hereby irrevocably sells, assigns, transfers, conveys

and delivers to Assignee without any restrictions, limitations or reservations, and Assignee

hereby accepts the sale, assignment, transfer, conveyance and delivery of, all of Assignor's right,

title and interest in and to the IP Assets, including, without limitation:

(a)     the Trademarks listed on **Exhibit A** and all Trademark Rights associated therewith; and

(b)     the domain names and web sites (including all sub-domains and related URLs) listed on **Exhibit B**;

(c)     all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world; and

(d)     any and all rights to the IP Assets included in the Purchased Assets.

2.      Authorization. Assignor hereby authorizes and requests the Commissioner of Patents of the United States, the Commissioner of Trademarks of the United States, the Librarian of Congress of the United States and any other official of any applicable Governmental Entity worldwide and each registrar of a domain name or web site set forth in **Exhibit B**, to record all registrations and applications for registration included in such IP Assets in the name of Assignee and issue any and all registrations from any and all applications for registration included in such IP Assets to and in the name of Assignee.

3.      Further Assurances. The Assignor agrees to execute all documents necessary to perfect, register, and/or record this IP Assignment and the rights of the Assignee to the IP Assets as the Assignee reasonably deem appropriate provided, however, that the Assignee shall not be obligated to pay any material consideration or incur any material costs in connection therewith. If the Assignor does not, within five (5) business days of presentment by the Assignee of documents necessary to register the transfer to the Assignee of the rights of the Assignor in and to the IP Assets, execute and return such documents to the Assignee, then the Assignee is hereby granted a limited power of attorney to execute such documents on behalf of the Assignor.  This power of attorney is coupled with an interest and is irrevocable.

4.      Interpretation.  This IP Assignment has been executed and delivered by the Assignor for the purpose of recording the sale, conveyance, assignment, transfer and delivery to Assignee of the IP Assets with any applicable Governmental Entity worldwide. This IP Assignment is intended to implement the provisions of the Asset Purchase Agreement and the Bill of Sale, is expressly subject to the terms and conditions thereof, and shall not be construed to enhance, extend or limit the representations and warranties, rights, obligations or remedies of any party thereunder. In the event of any conflict or inconsistency between the terms of this IP Assignment and the terms and conditions of the Asset Purchase Agreement or the Bill of Sale, the terms and conditions of the Asset Purchase Agreement or the Bill of Sale, as the case may be, shall govern.

5.      Successors and Assigns. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.      Counterparts.  This IP Assignment may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

7.      <u>Governing Law; Jurisdiction</u>. This IP Assignment shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).  All disputes arising out of or related to this IP Assignment, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this IP Assignment, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this IP Assignment to be duly executed as of the day and year first above written.

**[SELLER]**

By: _____
Name:
Title:

STATE OF _____
COUNTY OF _____

On this __ day of _____ 2016, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of [_____], who is duly authorized to execute this IP Assignment on behalf of [_____] and who signed and executed the foregoing instrument on behalf of [_____]

Notary Public: _____
My Commission Expires: _____

**[PURCHASER]**

By: _____
Name:
Title:

STATE OF _____
COUNTY OF _____

On this __ day of _____ 2016, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of [_____], who is duly authorized to execute this IP Assignment on behalf of [_____] and who signed and executed the foregoing instrument on behalf of [_____].

Notary Public: _____
My Commission Expires: _____

**Exhibit A to IP Assignment**

Trademarks

| Mark | Territory | Application Serial No. or Registration No. | International Classes | Date Filed | Status |
|------|-----------|--------------------------------------------|-----------------------|------------|--------|
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |
|      |           |                                            |                       |            |        |

## **Exhibit B to IP Assignment**

Domain Names and Web Sites
(including all sub-domains and related URLs)

## EXHIBIT D

Sale Approval Order

EXHIBIT E

Stalking Horse Order

**EXHIBIT E**
**Form Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of _____ __, 2016 by and between _____ ("Merchant") and [_____] ("Agent").

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined; and including any Distribution Center Merchandise (as hereinafter defined)) from Merchant's retail store locations identified on Exhibit 1(a) attached hereto (each individually a "Store," and collectively the "Stores") by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores, Merchant's corporate offices (the "Corporate Offices") and Distribution Centers (as defined below).

WHEREAS, on June __, 2016, Merchant filed a chapter 11 case in the United States Bankruptcy Court for the District of _____ (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction over the Bankruptcy Case, the "Bankruptcy Court").

WHEREAS, on June __, 2016, an official committee of unsecured creditors (the "Committee") was appointed in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)     Subject to entry of an order authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)     The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that: (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) subject to Section 15 below, upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated

hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) (collectively, the "IP") relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement and solely in accordance with the Merchant's policies relating to personally identifiable information; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, and subject further to Section 15 below, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") senior to all other superpriority claims, including (without limitation) to the superpriority claims of (A) Bank of America, N.A., as administrative agent and collateral agent (the "DIP Agent") under that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement by and among Bank of America, N.A., as administrative agent and collateral agent, _____ as borrowers (as amended from time to time, the "DIP Loan"), (B) Bank of America, N.A., as agent (the "ABL Agent") under that certain _____ (as amended, amended and restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement") by and among _____, as borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto, which provides up to $_____ million in aggregate loans in the form of an asset-based revolving credit facility; and (C) Pathlight Capital, LLC (the "Term Agent") under that certain _____, by and among _____, as borrowers, and Pathlight Capital, LLC (the "Term Lender"), whereby the Term Lender extended a term loan in the original principal amount of $___ million (each of (A), (B), and (C) being a "Lender," and collectively, the "Lenders"); (xiii) subject to Section 15 below, Agent shall be granted a valid, binding, enforceable and perfected security interest (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was

negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, firearms sales, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive [•] percent ([•]%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"). The Agent shall pay to the DIP Agent, as Merchant's designee,- the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (i) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, (ii) the aggregate Cost Value of the Merchandise subject to Gross Rings (as calculated pursuant to Section 5.1(b) below); and (iii) any other adjustments to Cost Value as expressly contemplated by this Agreement.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to the Agent (x) an amount equal to [•] percent ([•]%) of the aggregate Cost Value of the Merchandise included in the Sale, and (y) [•] percent ([•]%) of the aggregate Proceeds attributable to the sale of the Additional Agent Goods included in the Sale (the aggregate of (x) and (y) being collectively defined as the (the "Agent's Fee"); and THEREAFTER: [•] percent ([•]%) to Agent and  [•] percent ([•]%) to Merchant ("Sharing Amounts").

(b)    Agent shall exercise commercially reasonable efforts to dispose of all of the Merchandise and the Additional Agent Goods during the Sale Term.  To the extent that there is Merchandise and Additional Agent Goods remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent (provided that no Event of Default has occurred and continues to exist on the part of Agent) free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder, and Agent shall be required to account to Merchant and Lenders for Merchant's allocable amount of Proceeds realized upon the sale of Remaining Merchandise not later than five (5) business days after Agent's receipt thereof.

### 3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise and Additional Agent Goods made under this Agreement and all service revenue at the Stores, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or Additional Agent Goods arising from events occurring during the Sale Term; (c) any and all proceeds (including any commissions paid by consignors) received by Agent from the sale of consigned merchandise located in the Stores or the Distribution Centers on the Sale Commencement Date; (d) any and all proceeds received by the Agent from the sale or other disposition of Remaining Merchandise; and (e) any Delivery Commissions.  For the avoidance of doubt, proceeds from the sale of Owned FF&E shall not be "Proceeds".

(b)    On the first business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to the DIP Agent, as Merchant's designee, an amount equal to (i) [•] percent ([•]%) of the estimated Guaranteed Amount of the Cost Value of Merchandise in the Stores and Distribution Centers as of the Sale Commencement Date (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date) (the "Initial Guaranty Payment"), and (ii) all Occupancy Expenses for the balance of the month of _____ __, 2016 (the "May Occupancy Expenses") by wire transfer to an account designated in writing by Merchant ("Merchant's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Merchant's Account on the earlier of (i) 30 days after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent, Merchant, and the Lenders (the "Final Inventory Report" with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date").  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7.  To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount (and any Sharing Amount allocable to Merchant) to Merchant as part of the Final Reconciliation.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may (but shall not be required to) establish its own accounts (including, without limitation, credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Subject to Agent's compliance with all representations, warranties and covenants herein, Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts (defined below) as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts contemplated by this Agreement, then Merchant, Agent and Lenders shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Merchant, Lenders and Agent, as their interests may appear, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)     Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts

contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to Agent's satisfaction of the conditions set forth in Section 15 hereof, the Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest solely upon such amounts that constitute Proceeds (or other amounts contemplated hereunder) deposited in each Designated Deposit Account from and after the Sale Commencement Date.  If, notwithstanding the provisions of this Section 3.3(c), Merchant receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant shall be deemed to hold such Proceeds and other amounts due to Agent (including Proceeds and other amounts in depository accounts with the Lender) "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.  Lenders shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Lenders' other funds or deposit such Proceeds or other amounts due to the Agent in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)     On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall have ten (10) calendar days after the date of each such payment by Merchant to notify Merchant and Lenders of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.

(d)     If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder, and such over-funding or payment cannot be recovered by the Agent from Merchant under Section 3.3(a) or Section 3.3(e) by means of an offset or otherwise, then Merchant agrees (or if Merchant shall be unable to or otherwise for any reason fails to, and Lenders have received such payment, the Lenders agree (limited to the extent of their respective interests therein)) to reimburse the undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent.

(e)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)     In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis

and shall pay the amount of such cash to the Merchant on the Payment Date or as soon thereafter as such amount is determined.

          3.4    <u>Security</u>.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish to the DIP Agent, as Merchant's designee, with an irrevocable standby Letter of Credit (issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Lenders) naming Merchant and the DIP Agent as co-beneficiaries in the aggregate original face amount equal to the sum of: (a) [•] percent ([•]%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "<u>Letter of Credit</u>").   The Letter of Credit shall have an expiry date of no earlier than seventy-five (75) days after the Sale Termination Date.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, Merchant and the DIP Agent shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If Merchant and the DIP Agent fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then Merchant and/or the DIP Agent shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, Merchant and/or the DIP Agent may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.  Subject to the Lenders' prior consent (which consent shall not be unreasonably withheld, denied or delayed), Merchant and Agent agree that, from time to time, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount and other amounts due to Merchant hereunder at the time of each such request, <u>provided</u>, <u>however</u>, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of estimated Expenses.

    Section 4.  <u>Expenses of the Sale</u>.

          4.1    <u>Expenses</u>.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

          (a)    all payroll with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term as well as payroll for any temporary employees engaged for the Sale, including any reimbursable expense obligations to Retained Employees;

          (b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount equal to [•]% of the base payroll for each Retained Employee (the "<u>Payroll Benefits Cap</u>");

(c)    Occupancy Expenses for the Stores on a per location and per diem basis in an amount equal to the per Store per diem amount, whether due and owing or accrued during the Sale Term and due and payable after the Sale Term, set forth on Exhibit 4.1(c) hereto; provided; further, that the Parties hereby acknowledge that the amounts set forth on Exhibit 4.1(c) include Merchant's estimates of percentage rent that may become due and payable under Merchant's leases;

(d)    Distribution Center Expenses in an amount not to exceed $_____ per week, prorated for partial weeks;

(e)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(f)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(g)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(h)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(i)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(j)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(k)    Store cash theft and other store cash shortfalls in the registers;

(l)    all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(m)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(n)    fifty percent (50%) of cost of the Inventory Taking Service;

(o)    Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(p)    Agent's out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and

execution of this Agreement and any ancillary documents, and the Sale, in an amount not to exceed $[•];

(q)      third party payroll processing expenses associated with the Sale;

(r)      costs of transfers initiated by Agent of Merchandise between and among the Stores and between the Merchant's Distribution Centers and the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e) and provided, however, that, for the avoidance of doubt, any costs associated with transferring goods to or from the Existign Closing Stores shall not constitute an Expense under the Agreement nor shall the Agent be responsible for paying any such costs;

(s)      all actual and documented costs and expenses incurred in connection with the shipping, delivery, processing and transfer of any Merchandise that is in-transit as of the Sale Commencement Date;

(t)      all actual and documented costs and expenses incurred in connection with the acquisition (including costs of goods), receipt, shipping, delivery, processing and transfer of any Additional Agent Goods;

(u)      Central Service Expenses in an amount equal to $_____ per week, prorated for partial weeks;

(v)      costs of maintaining and operating Merchant's website during the Sale Term in connection with Merchant's e-commerce platform, solely to extent Agent elects to use said website to promote the Sale;

w)      pest control services;

x)      routine repair and maintenance costs (including landscaping), solely to the extent such costs result from Agent's acts or omissions during the Sale Term;

y)      the actual costs and expenses of Agent providing such additional services as are reasonable for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)      "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, asset protection services, operations, human resources, cash and inventory reconciliation, data processing and reporting, email preparation and distribution,

store level information technology maintenance, POS systems maintenance, e-commerce site updates and maintenance, and accounting (collectively, "Central Services").

(ii)    "Excluded Payroll Benefits" means (A) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (B) any payments due under the Worker Adjustment Retraining Notification Act ("WARN Act") and any benefits in excess of the Payroll Benefits Cap.

(iii)    "Occupancy Expenses" means rent, percentage rent, common-area maintenance, real estate and use taxes, HVAC, utilities, telecom/telephone/wi-fi charges, point-of-sale systems maintenance, store security systems, repairs and maintenance, taxes and licenses, and all other categories of expenses (i) at the Closing Stores, as set forth on Exhibit 4.1(a)(1) attached hereto, in an amount up to the specific amounts set forth on Exhibit 4.1(a)(1) attached hereto, plus (ii) any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the Sale of Merchandise and Additional Agent Goods during the Sale Term. Merchant and Agent agree that Exhibit 4.1(a)(1) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent's obligation to pay percentage rent, if any, shall be limited as provided in Exhibit 4.1(a) only.

(iv)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (A) Excluded Payroll Benefits, (B) Central Service Expenses (except for amounts due under section 4.1(t)), (C) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (D) any expenses of any kind relating to or arising from Merchant's home office or Distribution Centers (except for amounts due under section 4.1(d)); and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2    Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of

such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

4.3      Distribution Center Expenses

Agent shall be responsible for allocating and designating the shipment of Merchandise from the Merchant's Distribution Centers to the Stores.  Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule within fourteen (14) days of the Sale Commencement Date and allocation to the Stores of the Merchandise located at the Distribution Centers and on-order Merchandise; provided, however, that the Parties agree that the allocation schedule shall provide that all Merchandise (including any on-order Merchandise) shall be allocated and shipped to the Stores no later than sixty (60) days after the Sale Commencement Date.  Subject to Section 4.1(d), costs and expenses of operating the Distribution Centers, including, but not limited to, use and Occupancy Expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses") from the Sale Commencement Date through and including the date that is the earlier of (x) three (3) days after Agent provides Merchant with notice that all Merchandise in the Distribution Centers has been shipped from the Distribution Centers and (y) _____, shall be Expenses to the extent set forth in Section 4.1(d).  Agent shall not use Merchant's Distribution Centers for purposes of receiving or shipping Additional Agent Goods unless otherwise agreed to by Merchant and Agent.

Section 5.  Gross Rings; Merchandise.

5.1      Inventory Taking.

(a)      Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores and count the Merchandise in the Distribution Centers in accordance with this section 5.1(a) (collectively, the "Inventory Taking").  The Inventory Taking shall (x)(i) be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than [•] days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service) and (ii) include Distribution Center Merchandise received at such Store prior to such Store's Inventory Date, (y) with respect to Merchandise on-order or in-transit to a Store that arrives after the Inventory Date for such Store, such Merchandise shall be counted by representatives of Agent and Merchant upon receipt at such Store, and (z) be completed in each of the Distribution Centers as soon as practicable, but in any event no later than [•] days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service), it being understood that no Merchandise shall be moved from a Distribution Center to any Stores prior to the completion of the Inventory Taking for such Distribution Center and that no Merchandise shall be moved from any Distribution Centers into a Store (or transferred from Store to Store) prior to the Inventory Taking for such Store.  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service as an Expense.  Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service.  Merchant and Agent

shall each bear their respective costs and expenses relative to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the Benefits Cap) for Store-level and Distribution Center Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking, in each case calculated on a location-by-location basis.  Merchant, Lenders, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including, without limitation, by making available to Agent information relating to sales, units, costs, Cost Value, and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Price of the Merchandise).  Each Store will be closed during the Inventory Taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to, the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant, Lenders and Agent in writing as soon as practicable following the Inventory Taking.

(b)    At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), (ii) cash reports of sales within such Store, and (iii) all Returned Merchandise (as defined below).  Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of [•]% of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2    Merchandise Subject to This Agreement.

(a)    For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, (iii) Display Merchandise, (iv) Distribution Center Merchandise and In-Transit Merchandise received at the Stores no later than sixty (60) days after the Sale Commencement Date, provided that if such goods are received at the Stores after such 60-day period, but on or before [•] days after the Sale Commencement Date (the "Receipt Deadline"), such goods shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each good multiplied by the inverse of the prevailing Sale discount for each such good as of the date on which each such good is

received in the applicable Store, and (v) Returned Merchandise (defined below) included as Merchandise in accordance with Section 8.5 hereof.  "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; (5) Additional Agent Goods; (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; (7) Distribution Center Merchandise or goods in the Distribution Centers, in-transit or on order received at the Stores after the Receipt Deadline; or (8) fixtures that belong to or reference Under Armour.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Display Merchandise" means any item of Merchandise which is not new because it was used by the Merchant in the ordinary course of business for demonstration purposes or as a display or floor sample.

"Defective Merchandise" means any item of Merchandise which is not finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, or out of box (if normally sold as new in-the-box).

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, or (ii) goods that are missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items not ordinarily sold separately.  Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Distribution Center Merchandise" means any item of Merchandise located at Merchant's warehouse/distribution centers identified on Exhibit 1(b) (collectively, the "Distribution Centers") and reflected in the Merchandise File.

"In-Transit Merchandise" means items of inventory that were ordered by Merchant in the ordinary course of business as identified on Exhibit 5.2(b)(2) annexed hereto, which inventory was in-transit to the Stores or Distribution Center as of the Sale Commencement Date, but which may be received in the Stores or Distribution Center prior to the Receipt Deadline.

"Merchandise File" shall mean Merchant's [_____], files and any updated files received by the Agent between [•], 2016 and the Sale Commencement Date.

5.3    Valuation.

(a)    For purposes of this Agreement, "Cost Value" and "Retail Price" shall each mean, with respect to each item of Merchandise, the actual cost of such item as reflected in the Merchandise File.  For purposes of calculating Retail Price, if an item of Merchandise with the

same SKU has more than one ticketed, file, marked, or shelf price, or if multiple items of the same SKU have different ticketed, file, marked or shelf prices, the lowest ticketed, file, marked, or shelf price shall prevail for all such items of Merchandise in the same Store ("Per Store Lowest Price"), and shall be determined on a Store-by-Store basis only.

(b)    Anything in Section 5.3(a) to the contrary notwithstanding, Excluded Pricing Adjustments shall not be taken into account in determining the Retail Price of any item of Merchandise. For purposes of this Agreement, the term "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant: (i) point of sale discounts or similar adjustments regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (x) instant (in-store) or mail in rebates; or (ix) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

5.4    Excluded Goods. Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder (including for these purposes any Distribution Center Merchandise or In-Transit Merchandise) that does not arrive in the Stores or Distribution Centers on or prior to the Receipt Deadline. If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods"). The Agent shall retain [•]% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive [•]% of the receipts (net of Sales Taxes) in respect of such sales. Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation. If Merchant does not elect to have Agent sell Merchant Consignment Goods, then all such items will be removed by Merchant from the Stores at Merchant's expense as soon as practicable and shall not be shipped to the Stores from the Distribution Centers absent Agent's express written consent. Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6. Sale Term.

6.1    Term. Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court enters the Approval Order, but in no event later than _____ __, 2016 or as otherwise ordered by the Court (the "Sale Commencement Date"). Agent shall complete the Sale at each Store no later than _____ __, 2016 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"). Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than ten (10) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses and all accrued and unpaid Expenses that become due and payable after the Sale Term, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store; provided further, however, that, with respect to Occupancy Expenses, the Agent's obligations to pay all Occupancy Expenses for each Store shall continue until the last day of the calendar month in which the Vacate Date occurs.

6.2 <u>Vacating the Store</u>. At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below. Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant. Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7. <u>FF&E</u>.

7.1 <u>Owned FF&E</u>. Agent shall have the right to sell all FF&E owned by Merchant located at the Stores, the Corporate Offices and the Distribution Centers, whether or not reflected on Exhibit 7.1 but including (without limitation) all items set forth on Exhibit 7.1 (the "<u>Owned FF&E</u>"). Merchant shall have the option, which option shall be exercised no later than one (1) business day before the Sale Commencement Date, to have Agent sell the Owned FF&E on a commission or guaranteed basis. Merchant hereby represents, warrants, covenants, and agrees in favor of Agent that: (i) all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all liens, claims, and encumbrances; (ii) Merchant owns all Owned FF&E and has good and marketable title to all and right, power, and authority to sell the Owned FF&E, and (iii) all Owned FF&E is devoid of hazardous materials and substances.

7.2 <u>FF&E Guaranteed Option</u>. If Merchant elects to have Agent sell the Owned FF&E on a guaranteed basis, subject to the consent of the Term Agent or further court approval on appropriate notice to the Term Agent, Merchant and Agent shall mutually agree upon the guaranteed amount (the "<u>Additional Guaranteed Amount</u>") on account of the sale of the Owned FF&E, which Additional Guaranteed Amount shall be paid by Agent on the Payment Date or within two (2) business days after mutual agreement with respect to such Additional Guaranteed Amount. In consideration for the payment of the Additional Guaranteed Amount, Agent shall be authorized to sell the Owned FF&E and retain all proceeds (net of Sales Taxes) from the sale of all Owned FF&E (the "<u>FF&E Proceeds</u>") for Agent's sole and exclusive benefit, which FF&E Proceeds shall not constitute Proceeds. Agent shall be responsible for the payment of all costs and expenses associated with the disposition of Owned FF&E, other than costs and expenses associated with the Corporate Offices and Distribution Center Expenses pursuant to Section 4.3 hereof.

7.3 <u>FF&E Fee Option</u>. If Merchant elects to have Agent sell the Owned FF&E on a fee basis, Agent shall be entitled to receive a commission equal to [•] percent ([•]%) of the gross proceeds from the sale of the Owned FF&E (net only of Sales Taxes), and Merchant shall reimburse Agent for Agent's documented costs and expenses associated with selling the Owned FF&E pursuant to a mutually agreed upon budget, subject to Lender's consent and approval of such budget.

7.4 <u>Abandonment of FF&E</u>. Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all FF&E, whether owned or not by Merchant, in place without any cost or liability to Agent. For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant.

Section 8.  <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent</u>.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order. Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)    Subject to the Approval Order and Sale Guidelines, to establish Sale prices and discounts and Store hours which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; <u>provided</u>, <u>however</u>, to the extent that Agent extends the hours of operation at one or more of the Closing Stores beyond the hours historically operated by Merchant, which results in additional utilities charges and increased Occupancy Expenses in excess of the average utilities charges and Occupancy Expenses for such Stores over the twelve (12) months preceding the Sale Commencement Date, Agent shall reimburse Merchant the amounts, if any, of such additional costs and such additional costs shall constitute Expenses;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Merchant located at the Stores or the Distribution Centers (whether owned, leased, or licensed);

(c)    (i) subject to Agent's payment in accordance with Section 4.1 in respect of Central Services, to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data); <u>provided</u>, <u>however</u>, that, in the event Agent requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Center and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such additional services incurred by Merchant as an Expense of the Sale hereunder;

(d)    to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar theme, including, without limitation, by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(e)    once the Inventory Taking is complete at the affected location, to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking; and

(f)    subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

8.2    Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  Except as provided in Section 8.6 below, all sales will be made only for cash or nationally recognized bank debit or credit cards.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.

8.3    Sales Taxes.

(a)    During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise and Additional Agent Goods (including any consigned goods sold as part of the Sale) as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Agent Goods (including any consigned goods sold as part of the Sale) and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  If Agent does not timely remit Sales Taxes to Merchant, Merchant and/or the DIP Agent shall be permitted to immediately draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week. Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Merchandise and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties"). Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Agent shall add Sales Tax to the sales price of all Additional Agent Goods sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Goods and deposit such amounts into existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant, the Lenders, and their respective officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to,

reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that any Merchant Indemnified Party sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (or if Merchant shall be unable to or otherwise for any reason fails to, and Lender has received such payment, the Lender) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    <u>Supplies</u>.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse the Merchant at Merchant's cost therefor.

8.5    <u>Returns of Merchandise</u>.  For the first thirty (30) days of the Sale Term, Agent shall accept returns of goods sold by Merchant in stores or online prior to the Sale Commencement Date ("<u>Returned Merchandise</u>"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date.  Agent shall maintain and deliver to Merchant a detailed Returned Merchandise log, including copies of all relevant merchandise receipts and credits, and shall mark the Returned Merchandise in such a fashion as to render such merchandise readily identifiable by Merchant and Agent.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value and Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5). If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Retail Price applicable to such Returned Merchandise for purposes of determining the Retail Price attributable thereto.  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7.  Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final Sale reconciliation provided for under Section 8.7(b)

hereof.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

        8.6    <u>Gift Certificates</u>.  For the first _____ days of the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "<u>Gift Certificates</u>"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates, notwithstanding the foregoing, the Agent shall not accept coupons or honor any employee or other discounts, and if Merchant maintains any customer membership or customer loyalty discount programs, Agent shall not honor such program during the Sale Term.

        8.7    <u>Sale Reconciliation</u>.

        (a)    On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amounts, sales of Additional Agent Goods, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Lenders may, in their discretion, participate in and audit any Weekly Reconciliation.

        (b)    Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, but in no event later than 60 days after the Sale Termination Date, Agent and Merchant shall complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written results of which shall be certified by representatives of each of the Merchant, Lenders, and Agent as a final settlement of accounts between the Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Cost Value, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records.  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 8.7(c) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the Lenders), Lenders and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Expenses, and other Sale-related items to review and audit such records.

        (c)    In the event that there is any dispute with respect to either (x) the determination of the aggregate Retail Price of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend

the Letter of Credit in accordance with the provisions of Section 3.4 hereof.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or the DIP Agent shall have the right to make a draw under the Letter of Credit in an amount or amounts equal to the amounts Merchant asserts are then owing to Merchant.

(d)     Contemporaneously with the completion of the Final Reconciliation and Agent's receipt of all funds due to Agent from Merchant (or from Lenders, as the case may be), if any, pursuant to Section 3.3(d), Agent shall have no further rights or claims against Merchant or any Lender under Section 3.3(d) (and Agent shall, upon the reasonable request of Merchant or Lenders hereunder, acknowledge the same in writing) and Merchant and Lenders shall be fully discharged of any such further obligations pursuant to such Section 3.3(d).

8.8     <u>Force Majeure</u>.  If any casualty, act of war or terrorism, or act of God directly prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores for five (5) consecutive days, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or any Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9     <u>Right to Monitor</u>.  Merchant and Lenders shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores and Distribution Centers during the hours when the Stores and Distribution Centers are open for business; <u>provided that</u>, Merchant's or Lenders' presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores and Distribution Centers at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10     <u>Additional Agent Goods.</u>

(a)     Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("<u>Additional Agent Goods</u>").  Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Goods and shall pay for all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Goods. All such documented costs and expenses with respect to Additional Agent Goods shall constitute an Expense of the Sale.  Sales of Additional Agent Goods shall be run through Merchant's cash register systems, <u>provided</u> <u>however</u>, Agent shall, at Agent's sole cost and expense, mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as

non-Merchant goods. Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

(b) Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(c) Merchant shall, as an Expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible or self-insured retention under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount of any deductible or self-insured retention shall be deemed an Expense; provided, however, that for purposes of determining the amount of the loss, the Additional Agent Goods subject to the loss shall be valued at the selling price of such Additional Agent Goods at the time of such loss.

(d) Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds). The Additional Agent Goods shall be at all times subject to the control of Agent, and Merchant and Lender shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the Additional Agent Goods.

(e) Lenders hereby acknowledge receipt of notice that the Additional Agent Goods are not subject to the Lenders' liens and consent to the payments to Agent for the sale of the Additional Agent Goods pursuant to the terms of this Agreement notwithstanding any order of the Bankruptcy Court to the contrary.

8.11    <u>Delivery and Assembly Program.</u>  Agent shall be authorized to broker contracts for the delivery and assembly of Merchandise sold as part of the Sale. Any commissions the Agent receives in connection with such contracts are referred to herein as "Delivery Commissions."

Section 9.  <u>Employee Matters.</u>

9.1    <u>Merchant's Employees.</u>  Agent may use Merchant's employees and may employ temporary employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>"). For the avoidance of doubt, Retained Employees shall

include all of Merchant's Store-level employees and all of Merchant's district and regional managers as of the date hereof. Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant. Agent's activities with respect to Merchant's employees, including, without limitation, selection and scheduling, shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees and temporary employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, WARN Act claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

       9.2    Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause." Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant). From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or terminate Retained Employees except "for cause" without Agent's prior consent; provided, however, that Merchant shall have the right to terminate any Retained Employees that Agent stops using in accordance with this Section 9.2 without Agent's prior consent.

       9.3    Payroll Matters. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

       9.4    Employee Retention Bonuses. Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees and Distribution Center employees, to such Retained Employees and Distribution Center employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount

to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  Conditions Precedent and Subsequent.

(a)  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)  All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lenders have executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order.

(iii)  The Bankruptcy Court shall have entered the Approval Order by _____ __, 2016, or such later date as mutually agreed upon by the Merchant and the Agent (the "Approval Order Deadline").

(b)  The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)  All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lenders have executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order.

Section 11.  Representations, Warranties and Covenants.

11.1  Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)  Each entity comprising Merchant (i) is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)  Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement

contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)      Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are reasonably accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(d)      Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Other than in the ordinary course of business, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(e)      With the exception of merchandise and goods that may have been transferred to or from the Existign Closing Stores on or prior to [•], 2016, since [•], 2016, Merchant has not, and through the Sale Commencement Date Merchant shall not purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course.  From and after [•], 2016, neither Merchant nor any other person or entity has transferred, nor shall Merchant or any other person or entity transfer goods from the Existign Closing Stores to the Stores or the Distribution Centers or transfer goods from the Stores or the Distribution Centers to the Existign Closing Stores.

(f)      To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(g)      Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair

adequate cash registers, heating systems, air conditioning systems, elevators, escalators and other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(h)        Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs with respect to employees that are employed by Merchant.

(i)        Since _____ __, 2016, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course or to the extent necessary to replace employees that are voluntarily or involuntarily terminated from Merchant.

(j)        To the Merchant's knowledge after reasonable inquiry, prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(k)        To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(l)        For the avoidance of doubt, the Merchant's representations in this Section 11.1 are made with respect to only those Stores listed on Exhibit 1(a) and not to any of the Existign Closing Stores.

(m)        Merchant is not subject to any collective bargaining agreement pertaining to Merchant's employees.

(n)        Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Inventory Taking.

(o)        Merchant has not since _____ __, 2016 shipped any Excluded Defective Merchandise from the Existign Closing Stores or Distribution Centers to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(p)        Merchant (i) at the Sale Commencement Date will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the other Agency Documents, (ii) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (iii)

at the Sale Commencement Date, will not have incurred any obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

       11.2    <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

       (a)    Each entity comprising Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of its state of incorporation; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

       (b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

       (c)    No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

       (d)    The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

       (e)    Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

       (f)    To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All

Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  <u>Insurance</u>.

12.1  <u>Merchant's Liability Insurance</u>.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall use commercially reasonable efforts to cause Agent to be named as an additional insured (as its interest may appear) with respect to all such policies.  Merchant shall use commercially reasonable efforts to deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional insured, in form reasonably satisfactory to Agent.  Merchant shall use commercially reasonable efforts to ensure that all such policies require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2  <u>Merchant's Casualty Insurance</u>.  Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  Merchant shall use commercially reasonable efforts to ensure that, from and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall use commercially reasonable efforts to deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  Merchant shall use commercially reasonable efforts to ensure that all such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3  <u>Agent's Insurance</u>.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly

negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    <u>Workers' Compensation Insurance</u>.  Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  <u>Indemnification</u>.

13.1    <u>Merchant's Indemnification</u>.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) subject to Agent's compliance with its obligations under Section 9 hereof, any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees (subject to Agent's compliance with its obligations under Section 9 hereof), or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under worker's compensation or the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vii) Subject to Agent's compliance with its obligations hereunder, any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (viii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

13.2    <u>Agent Indemnification</u>.  Agent shall indemnify and hold the Merchant and Lender, and its respective officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any violation of Applicable General Laws that occurs in the Stores during the Sale Term, (iv) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (v) any claims brought against the Merchant by any Retained Employees that arise out of the Agent's actions or inactions with respect to such Retained Employees (vi) any consumer warranty or products liability claims relating to Additional Agent

Goods; (vii) as set forth in section 8.3 above; and (viii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)     Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) business days after receipt of written notice thereof;

(b)     Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) business days after written notice to the defaulting party; or

(c)     The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, (ii) any other material breach or action by Agent not authorized hereunder, or (iii) any Force Majeure (as provided in Section 8.8).

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15.  Agent's Security Interest.

(a)     In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Goods; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the Additional Guaranteed Amount; or, alternatively, the FF&E Commission; (vi) Agent's percentage share of the Sharing Amounts (if any), and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit, the security interests and liens granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Without any further act by or on behalf of the Agent or any other party (including (without limitation) any Lender or the Merchant), the Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests; provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, Merchant's percentage share of the Sharing Amounts (if any), Expenses, in the event Merchant elects the FF&E Guaranty Option, the Additional Guaranteed Amount or, alternatively, the

proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission), as applicable, and such other amounts due to Merchant hereunder, the security interests and liens granted to Agent hereunder shall be junior and subordinate in all respects to the security interests and liens of the Lenders in the Agent Collateral but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, Merchant's percentage share of the Sharing Amounts (if any), Expenses, in the event Merchant elects the FF&E Guaranty Option, the Additional Guaranteed Amount or, alternatively, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission), as applicable, and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, Merchant's percentage share of the Sharing Amounts (if any), Expenses, in the event Merchant elects the FF&E Guaranty Option, the Additional Guaranteed Amount or, alternatively, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission), as applicable, and such other amounts due to Merchant hereunder, any security interest or lien of the Lenders in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.  Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)     Merchant will not sell, grant, assign or transfer any security interest in, or lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lenders.

(d)     In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(e)     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 16.  Intentionally Omitted.

Section 17.  Miscellaneous.

17.1     Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, or by Federal Express or other recognized overnight delivery service, as follows:

If to the Agent:          [•]

If to the Merchant:       _____
                          _____
                          _____

With a copy to:

                          _____

_____

_____

If to the Lenders:        Bank of America, N.A.
100 Federal Street, 9th Floor
Boston, Massachusetts 02110
Attn:Mr. Andrew Cerussi and Mr. Richard D. Hill, Jr.
Email: andrew.cerussi@baml.com
rick.hill@baml.com

with a copy to:

Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
Attn:  Marjorie S. Crider, Esq.
E-mail: MCrider@riemerlaw.com

Pathlight Capital, LLC
130 West 42nd Street
Suite 1001
New York NY 10036
Attn:  Daniel T. Platt
E-mail: dplatt@pathlightcapital.com

with a copy to:

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attn: Kevin J. Simard, Esq.
Email: ksimard@choate.com


17.2    Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

17.4     No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5     Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent, Lenders, and Merchant and their respective successors and assigns, including, but not limited to any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

17.7     Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8     Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9     Wiring of Funds.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10     Nature of Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as

a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

      17.11   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

[<em>Signature page follows</em>]

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**[Agent]**

By:_____

Print Name and Title:

**[Merchant]**

By:_____

Print Name and Title:

## List of Exhibits

Exhibit 1(a) – Store List
Exhibit 1(b) – Distribution Centers
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions
Exhibit 5.2(a) – Excluded Locations & Divisions
Exhibit 7.1 – FF&E
Exhibit 8.1 – Sale Guidelines

**<u>EXHIBIT F</u>**
**Notice of Motion**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16- ( _____ )<br><br>(Joint Administration Requested) |

## NOTICE OF BID PROCEDURES AND SALE MOTION AND HEARING THEREON

    PLEASE TAKE NOTICE that on June __, 2016, the above-captioned debtors and debtors in possession (the "Debtors") filed the **Debtors' Combined Motion for Entry of Orders (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief [Docket No. __]** (the "Motion").  A copy of the Motion is available at _____ and you may request that a copy be mailed to you by contacting the Debtors' claims and noticing agent, Rust Consulting/Omni Bankruptcy at [email] or [number]. The Motion seeks approval of proposed auction and bid procedures, the scheduling of an auction and a final sale hearing, procedures for the assumption and assignment or rejection of executory contracts and unexpired leases, and other related procedures (the "Bid Procedures Relief").

    PLEASE TAKE FURTHER NOTICE that hearing to consider the Bid Procedures Relief requested in the Motion is scheduled for _____, 2016 at __:__ _.m. **(ET)** before the Honorable _____, United States Bankruptcy Judge, 824 North Market Street, __th Floor, Courtroom No. __, Wilmington, Delaware 19801 (the "Bid Procedures Hearing").  The Bid Procedures Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Bid Procedures Hearing or on the agenda filed for such Bid Procedures Hearing.  Objections to the Bid Procedures Relief must be filed with the United States Bankruptcy Court for the District of Delaware and served so as to be received by the undersigned counsel no later than **4:00 p.m. (ET) on** _____, **2016.**

    PLEASE TAKE FURTHER NOTICE that if the Bid Procedures Relief is approved, the Motion seeks authority for the Debtors to sell all or substantially all of the Debtors' assets **free and clear of all liens, claims and encumbrances**, except for certain assumed liabilities, the assumption and assignment or rejection of certain executory contracts and unexpired leases in connection with the sale and certain other related relief.  Unless you specifically request notice of documents filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002, you may not receive any further notice of the sale.

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

Dated: June __, 2016
        Wilmington, Delaware

Respectfully submitted,

*/s/*
_____
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Chantelle D. McClamb (No. 5978)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 353-4144
Email:      csamis@wtplaw.com
            kgood@wtplaw.com
            cmcclamb@wtplaw.com

- and –

Cathy Hershcopf, Esq.
Michael Klein, Esq.
Robert Winning, Esq.
COOLEY LLP
1114 Avenue of the Americas
New York, New York 01136
Telephone:  (212) 479-6000
Email:      chershcopf@cooley.com
            mklein@cooley.com
            rwinning@cooley.com

*Proposed Counsel for the Debtors and*
*Debtors in Possession*