## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16- ( _____ )<br><br>(Joint Administration Requested) |

### DECLARATION OF DUANE A. HUESERS
### IN SUPPORT OF DEBTORS' FIRST DAY PLEADINGS

I, Duane A. Huesers, declare, as follows:

1.      I am Chief Financial Officer of Hastings Entertainment, Inc. ("Hastings"), one of the above-captioned debtors (the "Debtors").  I submit this Declaration in support of the Debtors' chapter 11 petitions and the first day pleadings described herein.  I am familiar with the Debtors' day-to-day operations, businesses and financial affairs.

2.      I have served as Hastings' Chief Financial Officer since joining the company in March 2016, and was appointed as acting Chief Executive Officer and Chief Financial Officer of MovieStop, LLC ("MovieStop") two weeks after the liquidation of MovieStop's inventory began and as MovieStop's former officers were terminated.  Prior to my employment by the Debtors, I served as the Chief Financial Officer of United Fashions of Texas, a discount retailer.  I also previously served as the Senior Vice President of Finance for National Stores, Inc., a discount apparel retailer, and as VP of Finance at both Coldwater Creek Inc. and Tuesday Morning Corporation.  In all, I have 40 years of accounting and finance experience at various retailers.  I received a Bachelor's of Business Administration degree from Washburn University and a

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).  The Debtors' executive headquarters are located at 3601 Plains Boulevard, Amarillo, TX 79102.

Masters of Business Administration degree from the University of Kansas. I am a Certified Public Accountant in the State of Texas.

3. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First Day Pleadings"). I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

4. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases. Among other things, the First Day Pleadings are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity and value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' businesses, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

5. In my capacity as Chief Financial Officer of Hastings, I am familiar with the Debtors' day-to-day operations, financial affairs, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (iv) my opinion based on my experience and knowledge of the Debtors' operations and financial

condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6.      This Declaration provides an overview of the Debtors' businesses, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases, and summarizes the relief requested in each of the First Day Pleadings.

**THE DEBTORS' BUSINESS**

7.      Founded in 1968, Hastings, a Texas corporation, is a leading multimedia entertainment and lifestyle retailer. From its corporate headquarters in Amarillo, Texas, Hastings operates entertainment superstores that buy, sell, trade and rent various home entertainment products, including books, music, software, periodicals, movies on DVD and Blu-ray, video games, video game consoles, hobby, sports and recreation, lifestyle and consumer electronics. Hastings also offers consumables and trends products such as apparel, t-shirts, action figures, posters, greeting cards and seasonal merchandise. With the assistance of over 3,500 employees, Hastings operates 123 superstores at locations it leases from third parties, averaging approximately 24,000 square feet, principally in medium-sized markets located in 19 states, primarily in the Northwestern, Midwestern, and Southeastern United States.

8.      Hastings also operates a multimedia entertainment e-commerce web site, goHastings.com, which offers a broad selection of books, software, video games, movies on DVD and Blu-ray, music, trends, comics, sports & recreation and electronics. Hastings fills orders for new and used product placed at the website and also through Amazon and eBay Marketplaces using its proprietary goShip program, which allows Hastings to ship directly from stores or its distribution center. Hastings has one wholly-owned subsidiary, Hastings Internet, Inc. In 2015, Hastings generated revenue totaling approximately $401.1 million.

9.      On July 15, 2014, Hastings was acquired by Draw Another Circle, LLC ("DAC"), a Delaware limited liability holding company.  Pursuant to the terms of that certain Agreement and Plan of Merger, dated as of March 17, 2014, by and among Hastings, DAC and Hendrix Acquisition Corp. (a Texas corporation and a wholly-owned subsidiary of DAC), Hendrix Acquisition Corp. was merged with and into Hastings, with Hastings continuing as the surviving corporation.  Through this transaction, Hastings transitioned from a public company to a private company.

10.      As of May 31, 2016, Hastings owned inventory valued at approximately $130.6 million at cost.  In addition, Hastings possessed merchandise valued at approximately $275,000 delivered by third parties pursuant to unperfected consignment agreements.

11.      MovieStop, a Delaware limited liability company, is a value retailer of new and used movies based in Atlanta, GA.  MovieStop currently operates 39 destination locations at leased premises in 10 states, primarily along the coast of the Eastern United States.  The chain was originally established in 2004 as an operating division of GameStop, and was subsequently spun out into a private entity and acquired by DAC in 2014.  As is further discussed below, MovieStop is conducting store closing sales at all of its locations, and anticipates completion of all store closings by the end of July 2016.

12.      SP Images, Inc. ("SPI"), a Massachusetts corporation, is a full-service licensed distributor of sports and entertainment products and apparel headquartered in Franklin Massachusetts.  SPI specializes in providing retail partners with an assortment of licensed merchandise, including over 20,000 individual items licensed by Major League Baseball, the National Football League, the National Hockey League, the National Basketball Association,

Marvel Comics, DC Comics and many more.  As of May 31, 2016, SPI owned inventory valued at approximately $3.3 million at cost.

13.     Hastings, MovieStop and SPI are each wholly-owned subsidiaries of DAC.  A chart reflecting the Debtors' corporate structure is annexed hereto as **Exhibit A**.

14.     As is further discussed below, the Debtors commenced these chapter 11 cases to (i) effectuate the sale of Hastings pursuant to a Court-approved bidding and auction process; (ii) complete the liquidation of the MovieStop business for the benefit of creditors; (iii) preserve SPI's business through a going concern sale process; and (iv) liquidate all of the Debtors' remaining assets and discontinue all business lines that cannot be sold for value.

## CAPITAL STRUCTURE[2]

**I.     Secured Debt**

15.     The Debtors are borrowers under that certain Amended and Restated Loan and Security Agreement with Bank of America, N.A. ("BofA"), as lender and agent (as subsequently amended, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement provides for a revolving credit facility of $115 million and has a maturity date of January 4, 2017.  The Debtors' obligations under the Prepetition Credit Agreement are secured by first priority security interests in and liens on substantially all of the Debtors' assets.

16.     As of the Petition Date, the Debtors' obligations under the Prepetition Credit Agreement totaled not less than approximately $70 million, exclusive of accrued interest, fees and expenses.

17.     The Debtors are also parties to that certain term loan credit agreement with Pathlight Capital, LLC ("Pathlight") as lender and agent (the "Term Loan").  The Term Loan

---

[2] The summary of the loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

provides for a term loan of $15 million and has a maturity date of July 15, 2017. As of the Petition Date, the Debtors' obligations under the Term Loan totaled not less than $10 million, exclusive of accrued interest, fees and expenses. The Debtors' obligations under the Prepetition Credit Agreement are secured by second priority security interests in and liens on substantially all of the Debtors' assets.

**II.      Unsecured Debt**

18.    *Trade Debt*. The Debtors owe their trade vendors, landlords, service providers and other general unsecured creditors approximately $59 million as of June 8, 2016.

19.    *Intercompany Transactions*. Pursuant to Business Services Agreements between Hastings and MovieStop and Hastings and SPI, dated as of May 1, 2015 and August 1, 2015 respectively (together the "Business Services Agreements") Hastings performs financial, accounting, IT, human resource management and operational services (including inventory purchasing in the case of MovieStop) for MovieStop and SPI. Under the Business Services Agreements, and in consideration for the services rendered by Hastings, MovieStop and SPI are obligated to pay fees as specified in the Business Services Agreements. As of May 31, 2016, MovieStop owes Hastings $9.6 million under the Business Services Agreements and on account of fixtures and POS systems that Hastings purchased on its behalf.

20.    In addition, Hastings purchased inventory from SPI and established a consignment agreement with SPI to sell the merchandise on behalf of Hastings under a revenue split agreement with extended payment terms. These consignment transactions are recorded as consignment sales on Hastings' income statement, and as revenue for SPI's commission portion of the revenue split on SPI's income statement. Consignment revenue due to Hastings from SPI is recorded in Hastings' accounts receivable balance and SPI's accounts payable balance, and

SPI is required to transfer 85% of the proceeds of the sale to Hastings. Hastings also advanced SPI $1.1 million in cash in April 2015 for operating expenses. As of May 31, 2016, the balance of inventory on consignment with SP Images was approximately $1.3 million, and SPI owes Hastings a total of $6.6 million, comprised of (i) $60,000 pursuant to the Business Service Agreements; (ii) $1.1 million on account of the April 2015 advance; and (iii) $5.5 million on account of unpaid consignment revenue.

21.    Hastings also owes $273,219.00 to the National Entertainment Collectibles Association, an indirect affiliate of the Debtors, on account of goods sold and delivered prior to the Petition Date.

III.    **Equity Holders**

22.    DAC's membership interests are 100% owned by Joel Weinshanker. Hastings, MovieStop and SPI are wholly-owned subsidiaries of DAC. Hastings Internet, Inc. is wholly-owned by Hastings.

**EVENTS LEADING TO THESE CHAPTER 11 CASES**

23.    Several factors have severely impacted the profitability of the Debtors' businesses, ultimately prompting the current liquidity pressures that precipitated the Debtors' decision to commence these chapter 11 cases and dispose of their assets pursuant to a Court-approved sale process.

24.    Over the last several years, the Debtors have suffered declines in sales and increasing losses in net income. Hastings' operations generated revenue totaling $420 million and a loss of $10.9 million in 2014, and revenue totaling $401.1 million and a loss of $16.6 million in 2015. During the same period, MovieStop's operations suffered losses of $4.3 million and $4.7 million on revenue of $34 million and $32 million. This decreased performance was caused by a decline in the market for physical media properties like music, movies, books, games

and media rentals, coupled with the tremendous growth of online retail and social media. The downward trend in the Debtors' revenue prompted the Debtors to take a critical look at their business, and in August 2015, Hastings retained FTI Consulting, Inc. ("FTI") to advise the company on matters related to a potential restructuring.

25.    In December 2015, Hastings' prior President and Chief Operating Officer and a prior Chief Financial Officer under a part-time contract both resigned, and the decision was made to implement a holistic, top-down operational restructuring. This was initiated by retaining Jim Litwak, an experienced leader with an extraordinary ability as a multimedia merchant, as President and Chief Operating Officer. I was hired as the Chief Financial Officer in March 2016. Jim Litwak, in consultation with outside restructuring advisors from FTI and Hastings' management team, developed a set of key initiatives to align the company more with a 21st century retail model. Management's restructuring plan focused on the following company-wide initiatives: (i) remerchandising and changing the layout of stores to find new product lines while deemphasizing and downsizing non-growth business lines; (ii) utilizing increased modeling to more accurately forecast Hastings' financial position; (iii) reducing expenses in all aspects of the Debtors' business; (iv) developing partnerships with third parties to expand and sell product lines; (v) improving customers' online shopping experience by utilizing the Hastings rewards card as a tool to communicate with customers; and (vi) continuing to keep employees upbeat and focused while introducing new initiatives. The overriding objective of these efforts was to create a core of profitable stores in select Northwest, Midwest and Southeast markets that was coupled with an improved e-commerce platform and supported by low cost social marketing driven by Hastings' customers.

26.     As a result of these initiatives Hastings began to shift its merchandising strategy to focus more on its trend, children's, comics, electronics, consumables, recreation and hobbies businesses, and experimented with store layout changes at a number of locations.  As of the Petition Date, 20 stores have been completely "refreshed" to show the new merchandise focus and make the stores easier to shop.  In addition, Hastings embarked on an aggressive reduction of expenses and successfully obtained $12 million in reductions, including $2 million in rent concessions from landlords, refocused the use of store payroll to save $7.8 million and reduced employee headcount in Hastings' warehouse and corporate headquarters by 15%. Simultaneously with these efforts, the Debtors' principal and their lenders began exploring alternatives for the restructuring of the Debtors' secured obligations and/or the recapitalization of the enterprise.

27.     Notwithstanding the initial positive results generated by Hastings' operational restructuring (particularly the improved performance of the re-merchandised stores utilizing new store layouts), Hastings' top line revenue continued to deteriorate in the first quarter of 2016, as Hastings suffered year-over-year sales decrease of 14%.  During this period, the decline of the MovieStop business also continued unabated.  This precipitous – and unanticipated – drop in revenue created a short term liquidity crisis in late April 2016.  In addition to the liquidity constraints resulting from the decline in revenue, at or around that time, BofA imposed certain reserves per the terms of the Prepetition Credit Agreement that further limited short term liquidity.  These constraints limited the Debtors' ability to (i) pay rent to many of their landlords for the months of May and June 2016; (ii) pay vendors in accordance with applicable terms; and (iii) purchase new inventory and normalize the inventory mix of their retail locations, all of which is especially essential with trends and new releases to maintain customer loyalty and drive

customer traffic into their stores.  This inventory shortfall negatively impacted sales even further, creating a vicious cycle that scuttled the Debtors' recapitalization efforts and threatened to destroy value for all of the Debtors' stakeholders.

28.	In light of these results, in early May 2016 the Debtors took a number of steps to conserve liquidity and maximize value for the benefit of creditors.  First, the decision was made to immediately commence a chain-wide liquidation of the MovieStop business.  With the assistance of Gordon Brothers Retail Partners, MovieStop commenced store closing sales (the "Store Closing Sales") on May 14, 2016.  Second, management began to aggressively explore strategic alternatives for the Hastings business.  In consultation with FTI and in conjunction with the efforts of RCS Real Estate Advisors, Hastings' real estate disposition consultant and business broker, Hastings management began a targeted outreach to potential investors and strategic acquirers.

29.	Over the subsequent 5 weeks, Hastings management, FTI and RCS contacted approximately 22 strategic acquirers, including Hastings' key competitors, and solicited interest from approximately 10 investors and financial institutions that invest in or acquire distressed retailers.  A number of these parties expressed interest in a potential transaction, and several parties have signed non-disclosure agreements, held meetings with management and conducted due diligence with respect to a potential transaction.  Nonetheless, to date no indications of interest or letters of intent have been received.  Unfortunately, a transaction in the best interest of Hastings, its creditors and its shareholders was not available outside of chapter 11 and the Debtors have reached the end of their liquidity runway.

30.	As a result, the Debtors ultimately determined that the commencement of these cases would provide the only platform to recapitalize Hastings and SPI or maximize the value of

their assets as a going concern or otherwise. If the Debtors are successful in identifying a going concern buyer, these proceedings will allow the Debtors to improve their business through (i) the evaluation and elimination of liabilities associated with the MovieStop business that serve as a drain on the Debtors' profitability, and (ii) further operational improvements consistent with the restructuring already underway at Hastings with the leadership of existing management. While chapter 11 provides a framework to recapitalize the Debtors or sell substantially all of their assets, the Debtors' limited liquidity mandates an expedited sale process in these chapter 11 cases. The Debtors simply lack the access to capital to sustain operations beyond the middle of July 2016, absent the closing of a sale of substantially all of their assets to one or more purchasers or the receipt of a guaranteed payment from a national liquidator to conduct going out of business sales in the Hastings retail locations. BofA agreed to provide the Debtors with the additional financing necessary to support a 30-day sale process which essentially represents the culmination of the more extensive marketing and refinancing efforts conducted by the Debtors prior to the Petition Date.

31.    Through this chapter 11 proceeding, the Debtors intend to continue their marketing efforts and are hopeful that a buyer will emerge that is willing to operate Hastings as a going concern. In the alternative, the Debtors propose to liquidate substantially all of Hastings' assets to the highest bidders pursuant to a Court-supervised auction and sale process. While the Debtors' hope is that their assets will be purchased by a party that will continue its business as a going concern, management recognizes that such an outcome is far from certain. Accordingly, as of the date hereof, the Debtors have filed a motion for the approval of a sale process that would allow for an auction in approximately 30 days and would enable liquidation sales to commence shortly thereafter if a going concern purchaser is not located. The sale process is

structured such that it would not foreclose the possibility that a going concern bid could be made for the Debtors' assets, and the Debtors continue to believe that, if available, a going concern sale would provide the best result for all interested parties.

## SUMMARY OF FIRST DAY PLEADINGS

I.    **Motion of the Debtors for the Sale of Substantially All of Its Assets**

32.    In the weeks prior to the Petition Date, the Debtors conducted a targeted marketing process in an effort to identify a going concern partner and/or equity investment in Hastings. While doing so, the Debtors' financial condition continued to deteriorate to the point that they can no longer operate in the ordinary course without immediate access to additional financing. Unfortunately, the Debtors' assets cannot adequately collateralize additional financing, and in order to sustain further operations (including payment of payroll and inventory purchases), the Debtors are left with no choice but to immediately seek the Court's approval of the sale of substantially all of their assets through the consummation of one or more transactions.

33.    Through *Debtors' Motion for Entry of (i) an Order (a) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets (b) Approving Procedures for Assumption and Assignment of Executory Contracts, (c) Approving the Form and Manner of Notice, and (d) Scheduling an Auction and a Sale Hearing, and (ii) an Order Authorizing and Approving the Sale of Certain Assets* (the "Sale Motion"), filed contemporaneously herewith, the Debtors are seeking to dispose of certain of their assets.

34.    The Sale Motion contemplates that the Debtors will continue to solicit "stalking horse" bids that will set the floor for subsequent bidding on the Debtors' assets. In the event remaining interest materializes into multiple bids, the Debtors expect to conduct an auction and to request the approval of that transaction or any higher or better bid received at the auction.

## II.    Emergency Motion to Continue Store Closing Sales

35.    As part of their chapter 11 preparation process, the Debtors conducted an analysis of the performance, sales and profitability of all of the retail stores across the Debtors' various platforms. The Debtors determined that commencing the Store Closing Sales was the best way under the circumstances to maximize the value of the Debtors' businesses and assets for their estates and creditors. Accordingly, in early April 2016, FTI contacted certain nationally recognized liquidators to solicit interest in supervising store closing inventory sales for MovieStop on a fee basis (the "Store Closing Sales"). Ultimately, the Debtors, with assistance from FTI, selected Gordon Brothers Retail Partners ("Gordon Brothers") to supervise the Store Closing Sales and determined to sell all of the assets of the MovieStop business, including merchandise and certain furnishings, trade fixtures, equipment, and improvements to real property in accordance with the terms of a consulting agreement (the "Agreement").

36.    Under the terms of the Agreement, Gordon Brothers would continue to supervise the Store Closing Sales using sale guidelines similar to other retail liquidations conducted in chapter 11 cases. Through the motion, the Debtors seek to assume the Agreement so that they may leverage the experience and resources of Gordon Brothers in conducting large-scale liquidations and not disrupt the liquidation of MovieStop's inventory while retaining control over the sale process, which the Debtors believe will provide the maximum value to their estates and creditors.

## III.    Motion of the Debtors for Financing/ Use of Cash Collateral and Granting Adequate Protection

37.    It is essential that the Debtors obtain immediate access to new financing and post-petition authority to use cash collateral (the "Cash Collateral"), as that term is defined by section 363 of the Bankruptcy Code. The Debtors are facing an immediate liquidity crisis. After

consulting with their professional advisors, the Debtors concluded that the best course to maximize value for their estates is to conduct a 30-day postpetition sale process. As set forth above and in the *Declaration of Mike Nowlan In Support of Debtors' (i) Financing Motion; (ii) Bidding Procedures and Sale Motion; and (iii) Emergency Store Closing Sales Motion,* the Debtors made a good faith effort to obtain additional secured or unsecured financing or an equity investment to address their liquidity concerns. Ultimately, the Debtors were unable to identify an investor or lender willing to provide them with new liquidity. Moreover, the Debtors' professionals advised me that the prepetition lenders declined to consent to the Debtors' granting of new liens on their assets or to the granting of a priming lien to a third party lender in connection with a DIP facility. Based on this experience, the Debtors determined that actively seeking DIP financing from a third party lender would be futile.

38.     Accordingly, and in order to allow the Debtors the opportunity to pursue a value maximizing sale, the Debtors negotiated with BofA and Pathlight on the terms of a DIP financing facility and received their consent to use Cash Collateral in accordance with a budget that the Debtors believe will be sufficient to pay their administrative expenses that become due and payable before such a sale can be consummated on the timeline assumed in such budget.

39.     Without the new financing and the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, pay employees, payroll taxes, inventory suppliers and other vendors, overhead, lease expenses, and other expenses necessary for the operation of the Debtors' business in the ordinary course and to maintain the value of their assets. Accordingly, without immediate access to the new financing or Cash Collateral, the Debtors could suffer substantial and irreparable harm.

40.     By contrast, once the new DIP financing facility is approved, the Debtors will be able to continue their business operations during the interim period between the Petition Date and the consummation of a going concern sale or liquidation of the Debtors' business in mid-July 2016, which would allow the Debtors to maximize the value of their assets for the benefit of all of their stakeholders.  The Debtors' need for access to additional liquidity therefore, is urgent. In addition, because the Debtors lack sufficient unencumbered funds to meet certain imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim approval of the use of the proceeds of the DIP financing facility or Cash Collateral.

## IV.     Motions to be Heard at First Day Hearing

41.     To minimize the adverse effects of the commencement of these chapter 11 cases, and to provide the Debtors' business with the much needed liquidity they lacked in the months leading up to the Petition Date, the Debtors have requested a variety of relief in "first day" motions and applications filed concurrently herewith. A list of the First Day Pleadings is attached hereto as **Exhibit B**.  I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

42.     In sum, the First Day Motions seek to implement goals that are intended to promptly restore the Debtors' operations to the ordinary course of business so that Hastings' business can emerge from chapter 11 poised for success and a return to profitability.  One purpose is to allow the Debtors to promptly begin normalizing and stabilizing their vendor relationships to secure the flow of goods and services required to continue to meet their customers' needs and to preserve and maximize the value of their assets and operations as a

going concern. A second purpose is to provide the Debtors' employees certainty that the Debtors can—and will—meet the obligations under the Debtors' various employee compensation and benefit programs. This is essential given that the Debtors are asking the employees, and indeed relying on them, to continue to support the business during and following these chapter 11 cases. A third purpose is to assure the Debtors' customers that the Debtors will stand by their customer commitments, and ensure the Debtors' position as a go-to business partner.  I believe that the relief included in the First Day Motions is necessary to accomplish these goals.

43.    The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Motions. In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors, employees and customers.

44.    Accordingly, I respectfully request that the Court grant all of relief requested in the First Day Motions and such other and further relief as may be just and appropriate.

*Remainder of page intentionally left blank*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 13, 2016

Draw Another Circle, LLC, *et al.*

By: _____

Duane Huesers
Chief Financial Officer, Hastings Entertainment, Inc. and Chief Executive Officer and Chief Financial Officer of MovieStop, LLC

## EXHIBIT A

**Organizational Chart**

## Corporate Structure



# EXHIBIT B

## List of First Day Motions

**LIST OF FIRST DAY MOTIONS**

1.      Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion").

2.      Debtors' Motion for Entry of Order (i) Authorizing Debtors to Prepare Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (ii) Granting Related Relief the (the "Consolidated Creditors' Matrix Motion").

3.      Debtors' Motion for Entry of an Order Extending the Debtors' Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules/SOFA Extension Motion").

4.      Debtors' Application for an Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent For the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f) (the "Claims Agent Application").

5.      Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuance of Certain Customer Programs (the "Customer Programs Motion").

6.      Debtors' Motion for Entry of Order (i) Authorizing Continued Use of Cash Management System, (ii) Authorizing Continued Use of Existing Business Forms (iii) Authorizing the Continuation of Intercompany Transactions, (iv) Granting Administrative Priority Status to Postpetition Intercompany Transactions, (v) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Certain Payment Methods, and (vi) Temporarily Suspending The Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion").

7.      Debtors' Motion for Entry Of Interim and Final Orders (i) Authorizing (a) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, and (b) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Premium Financing Programs; and (ii) Authorizing Banks To Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Insurance Motion").

8.      Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing  the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees and (ii) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Taxes Motion").

9.      Debtors' Motion for Entry of Interim and Final Orders (i) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (ii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (iii) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (iv) Granting Related Relief (the "Utilities Motion").

10.     Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Shipping, Delivery, and Warehousemen Charges (the "Shippers and Warehousemen Motion").

11.     Debtors' Motion For Interim and Final Orders Authorizing (i) Payment Of Wages, Compensation and Employee Benefits and (ii) Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Employee Benefits Motion").

12.     Debtors' Motion for Entry of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens And Super-Priority Claims, (iv) Granting Adequate Protection to Prepetition Secured Lenders, (v) Modifying The Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief (the "DIP Financing Motion").

13.     Debtors' Emergency Motion for Interim and Final Orders (i) Authorizing the Continuation of Store Closing Sales in Accordance with the Store Closing Agreement and Sale Guidelines, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (ii) Authorizing the Assumption Of the Disposition Agreement; and (iii) Granting Related Relief (the "Store Closing Sales Motion").